IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
**MIAMI**
CASE NO. **15-CR-20106-KMM**

---

**UNITED STATES OF AMERICA**,
Plaintiff

vs.                                    **July 6, 2015**

**PATRICK KILLEN**, **JR**,
Defendant.

---

**TRIAL DAY 1**

BEFORE THE HONORABLE **K. MICHAEL MOORE**,

UNITED STATES DISTRICT COURT JUDGE

---

**A P P E A R A N C E S**

FOR THE PLAINTIFF:     **ROBERT J. EMERY**, AUSA
UNITED STATES OF       **BENJAMIN J. WIDLANSKI**, AUSA
AMERICA                U.S. Attorney's Office
                       99 NE 4th Street
                       Miami, FL 33132
                       (305) 961-9421
                       Robert.emery@usdoj.gov


FOR THE DEFENDANT:     **FRED A. SCHWARTZ**, ESQ
PATRICK KILLEN, JR     Kopelowitz Ostrow Ferguson Weiselberg
                       Keechl
                       200 E. Palmetto Park Road, Suite 103
                       Boca Raton, FL 33432
                       (561) 910-3070
                       Schwartz@kolawyers.com


REPORTED BY:           **GIZELLA BAAN-PROULX**, RPR, FCRR
                       United States Court Reporter
                       400 North Miami Avenue, Suite 8S32
                       Miami  FL  33128
                       (305) 523-5294
                       gizella_baan-proulx@flsd.uscourts.gov

Also present:  Special Agent Laura Schwartzenberger

# I N D E X

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| SUSAN OSTROBINSKI | 81 | 137 | 151 | |
| JASON GINTHER | 153 | 181 | 194 | |
| RICARDO SOTO | 195 | | | |

# G O V E R N M E N T   E X H I B I T S

| Exhibit | Received | Admitted |
|---|---|---|
| 2A through 2F | 90 | 93 |
| 2G through 2L | 97 | 98 |
| 3 | | 100 |
| 4A through 4C | 104 | 105 |
| 4D and 4XX | 106 | 106 |
| 4E | 107 | 108 |
| 4F through 4WW | 118 | 118 |
| 5 | 88 | 88 |
| 6 | 154 | 155 |
| 7 | 165 | 165 |
| 8 | | 167 |
| 9 | 175 | 175 |
| 10 | 163 | 163 |

| | | |
|---|---|---|
| 11 | 178 | 179 |
| 12A | 209 | 209 |
| 12B | 211 | 211 |
| 12C | 212 | 213 |
| 13A | 214 | 215 |
| 13B | 216 | 217 |
| 13D | 218 | 219 |
| 13E | 231 | 231 |
| 13L | 233 | 234 |
| 13M through 13U | 222 | 223 |
| 23B through 23O | 133 | 134 |
| 48A | 215 | 216 |

**D E F E N S E   E X H I B I T S**

(None)

**P R O C E E D I N G S**

*(The following proceedings were held in open court.)*

THE COURT:  Okay.  This is the United States of America versus Killen.  Counsel, state your appearances.

MR. EMERY:  Good morning, Your Honor.  Ron Emery along with Ben Widlanski for the United States, and Special Agent Laura Schwartzenberger of the FBI.

THE COURT:  Good morning.

MR. SCHWARTZ:  Good morning, Fred Schwartz representing the defendant, Patrick Killen, who is present with me in the courtroom.  Also, just walking in is my paralegal Elizabeth Schwartz, who has the misfortune of being married to me also.

THE COURT:  Good morning.  Have a seat.  Is the jury ready?

THE COURTROOM DEPUTY:  I'm getting them right now Judge.

MR. SCHWARTZ:  Your Honor?

THE COURT:  Yes.

MR. SCHWARTZ:  I don't know what -- how you want to proceed in this instance?  I have a couple of applications that I wanted to make before -- either before jury selection or after jury selection regarding evidence.

We got to view some of the evidence with the Government on Thursday.  We got their exhibit list and their

witness list on Friday.  We have a motion that's being filed as we speak as to some of the evidence, but I thought I could discuss it with Your Honor either now or after the jury is selected.  It's obviously your decision.

THE COURT:  You haven't filed your motions --

MR. SCHWARTZ:  I'm sorry?

THE COURT:  Is your motion filed?

MR. SCHWARTZ:  My office is in the process of filing it as we speak.  We were writing it yesterday and this morning.

THE COURT:  And when do you expect to have it filed?

MR. SCHWARTZ:  It should be filed within the next ten minutes or so.

THE COURT:  Well, let me take a look at it.

MR. SCHWARTZ:  Thank you, Your Honor.  There are other matters that aren't referenced in that motion that I wanted to raise as to certain witnesses.

THE COURT:  Well, they're bringing the jury any moment now.  You're welcome to fill up the time between now and then.

MR. SCHWARTZ:  I can start now and until the jury comes in.

THE COURT:  Okay.

MR. SCHWARTZ:  Your Honor, we learned Friday

afternoon that the Government is intending -- there are three victims in this case with whom my client allegedly had chats and got pictures from.  Those are the ones charged in the indictment, Mr. Cook and Mr. Frost and Mr. Mason -- I'm sorry -- Freeman.  The Government isn't going to call those gentlemen.  They're in their mid-teens now or late teens.  But they are intending to call their parents as witnesses.  One of the parents they brought back from overseas.  He's a colonel in our armed forces.

My application is to exclude those parents, the two mothers and the father as witnesses.  The only thing I can think of that the Government would be calling them for is -- other than sympathy -- is to identify that the pictures of the young men are, in fact, their children.  We will stipulate to that.  We will stipulate that each of the pictures are the boys with whom my clients have alleged to have chats and have received the pictures.

With that stipulation, we would suggest to the Court that any other probative value of those three parents testifying is outweighed by the prejudice to my client.  Anything they talk about that their children told them is hearsay.  Anything else can only go to identifying who their children are.

So I ask that they be excluded as witnesses in the Court except our stipulation as to the identity of the young

men in the pictures.

THE COURT:  Any response from the Government?

MR. EMERY:  Your Honor, the parents are going to testify to a number of things.  The testimony will go to the following:  There were several chats that were found on the defendant's computer, and amongst those chats were chats with the three named victims, Mason Freeman, Gary Frost, and Jackson Cook.  And within those chats are pictures, sexually explicit pictures that the named victims sent to the defendant and so the purpose of the parents are, number one, to identify that they are, in fact, their children.

Number two, some of the pictures for each victim were actually taken within the house of where the child was living so we're going to use the parents to identify the location of where the picture was taken.  Also, Your Honor, we have to prove one of the charges that the defendant made interstate threats against these victims, at least two of them.

So the purpose of the testimony of at least two of the parents will go to show where the children were living at the time when the defendant made the threats.  And they're all going to testify that they were outside of Florida at that time.

MR. SCHWARTZ:  And I appreciate the thoroughness of my colleague's presentation.  He's done an excellent job.

But we'll stipulate to all that.  We'll stipulate to the state they lived in.  We'll stipulate to the birth certificate that the Government intends to produce for each of these children is, in fact, the birth certificate of the people with whom my client is alleged to have had chats.  We'll stipulate that the pictures are in the house.

We don't need these three nice people to have to come in to court and they're coming in to court and talking about their children, I suggest would be significantly prejudicial and the probative effect is eliminated by accepting these stipulations from the defendant.

MR. EMERY:  Your Honor, if I can respond really quickly.  For at least one of the parents, the Government believes, and right after he was threatened by the defendant he went and told his mom, and the Government's position is that it is not hearsay, that it's an exception under the presence sense impression, he immediately told his mom right after it happened what happened to him.

Also, Your Honor, based on Old Chief, the Government is not required to stipulate away its case.

THE COURT:  All right.  Anything further?

MR. SCHWARTZ:  A couple of interesting cases, Judge, the Crawford case and the Cameron, which are the U.S. Supreme Court case, and the Cameron, 699 F.3d 621, Third Circuit case from 2012, both of which distinguish between the

hearsay parameters and the confrontation clause, and we suggest that if we're going to have this boy say that I was threatened, I was scared, I went to my mother, we have a right to be confronted by the boy and have him testify. He is -- he's not a minor who is incapable of taking the oath. He's a, I think he's now 16 years old, so he's a competent witness and the circumstances under which he made the statement to his mother I suggest need to be further flushed out before we can say he's under an exception to the hearsay rule.

So we know they're not required to stipulate away their case, we're not suggesting they do that. However, we are suggesting that in light of our willingness to stipulate, Your Honor, should make a balancing test under the Federal Rules of Evidence 403 and say that with our willingness to stipulate, their probative value of their evidence is significantly outweighed by the prejudice.

THE COURT: Well, I haven't really heard any articulation of what the prejudice, the unfair or undue prejudice would be. I mean, from what I can understand, these are -- the testimony largely, with the exception of this last comment about the statements made to the parent, seemed to me to be jurisdictional testimony or elements of the offense. I don't know what the unfair prejudice will be from that. Sounds like the testimony should be relatively

brief.

MR. SCHWARTZ:  Well, Your Honor, my experience has been that when you get a parent of a victim on the stand, and it tends to engender sympathy in the jury for both the parent and the child.  And I believe we're supposed to try the case based solely on the fact without undue sympathy being put before the jury in that regard.  And I would suggest that that's the prejudice.

Further, I don't know if the Government intends to call Colonel Cook in his full uniform.  I've never had the honor of getting to the Colonel, but it's an exalted rank.  I don't know if they intend to bring out his overseas duty, his position in the military, his current assignment, et cetera, but I think all that would give undue weight to testimony that is not necessary anyway in light of our willingness to stipulate.

THE COURT:  Okay.  I'll take it under advisement.

MR. SCHWARTZ:  Thank you, Your Honor.  While we're waiting for the jury, the Government has filed a notice under 404(b) of intent to use other acts.  They filed a very limited notice regarding other act evidence, prior bad acts.  They filed their rather limited notice saying that they intend to introduce evidence that the defendant posed as a young girl and sent pictures of a young girl in the course of his attempts to get pictures, nude pictures from boys.  We

think that that's proper 404(b).

I can't validly object to that.  However, they have a number of other bad act situations that I suggest they're going to introduce.  Case was initiated by complaint in North Carolina by -- two FBI agents in North Carolina by a father who discovered that his son was sending photographs.  The FBI in North Carolina then filed an MLAT request with the Government -- through the Government of Canada for pictures and information on Kik, a file-sharing site.

My motion that you'll have shortly deals with the Kik request and the MLAT, but the Government also intends to produce FBI agents from North Carolina and to tell the story of how they got a complaint by a father of a boy and how -- what they did to act on it.

First of all, I suggest the father's complaint is hearsay and should not be admitted.  There should be no testimony about that.

Second, I would ask the Court to consider whether the whole North Carolina incident is a prior bad act of which we got no notice from the Government in their 404(b) notice.  The only other matter I wanted to raise to the Court, I think I know the Government's response --

MR. WIDLANSKI:  Perhaps we can respond to the first.

THE COURT:  I think we have a jury --

(Thereupon, the venire panel entered the courtroom.)

THE COURT:  Good morning, ladies and gentlemen. Please be seated.  Good morning, again.  My name is Michael Moore.  I'm the judge on the next case that we're going to begin.  I want to start by welcoming all of you to the United States District Court for the Southern District of Florida. We appreciate your being here.

We realize that jury service can pose an inconvenience to you and your family and your work lives. Nevertheless, we hope that you appreciate the very important civic duty that you performed by your willingness to perform jury service and we thank you for that.

We will try to make your jury service as comfortable and as prompt as possible so as not to inconvenience you any more than necessary.

We're about to begin a new case and one of the first things we need to do is to select a jury for the case. All of you have been randomly selected up until this point. We're going to ask you a series of questions and based on your responses to those questions, you may be more or less qualified for jury service in this particular case.  If you are selected, all well and good, I hope that you will find your jury service to be an interesting and educational experience.  If you are not selected or if you are excused, I would ask that you return to the jury assembly room where you

came from earlier this morning and you'll be given instructions as to when or whether you will be needed back for the two-week period for which you have been summoned for jury service.

This is your first week of jury service?  This is your second?

JUROR:  Second.

THE COURT:  So you still have a week to go, and based on what the lawyers have told me let me just ask them again, how long do the lawyers estimate this case to last?

MR. WIDLANSKI:  Your Honor, the United States believes that its case in chief will last approximately five or six days.

THE COURT:  And the defense?

MR. SCHWARTZ:  Approximately, two days, Your Honor.

THE COURT:  Okay.  So they're telling us total seven, eight or nine days.  Really, my experience is that trying a case is more an art than it is a science.  It depends on the questioning of witnesses and how long that questioning takes.  It could go a little bit longer or a little bit shorter than what they had estimated.  But we'll try to keep on the schedule so that we will move the case along, as I say, to minimize the inconvenience to you.

But for planning purposes you should expect that the case should last at least through this week.  We start at

9 o'clock in the morning and we go until 5 o'clock in the afternoon.  We'll take a lunch break around the noon hour depending on where we are with the examination of the witness and we will also have two ten-minute breaks, one midmorning and one midafternoon, but if you need to take a break for whatever reason, outside of those scheduled breaks or recesses, just let me know and we'll certainly accommodate you in that regard.

When you came into court today, you were brought in order and seated in order, with Ms. Ondarza who is, for our purposes, for jury selection purposes, juror number one, and I would ask that you respond in the order in which you came in to court starting with jury number one working our way down the first row of the jury box, and we'll start with the gentleman in the back row, work our way across and then we will start from the wall and go to the aisle in each row in the back of the courtroom starting with the young man who is seated in the first row in the back to my right, your left, and closest to the wall.  And we'll work our way across each row.  But I would ask that you respond in the order in which you have been seated.

The lawyers are keeping track of your responses and when it comes time to seat you or excuse you, it's helpful for them to be able to keep track of your responses based on the order in which you came into the courtroom.

If you do have a response, I would ask that you indicate that by raising your hand and we'll take up your response in turn. And when you give your response, I would ask you to please stand. This is a large courtroom and your voice carries better or projects better when you stand. We all want to hear what you have to say.

And when you have a response, I would ask that you start each time by giving us your name. There's a court reporter who is seated in front of me who is taking down the proceedings and the only way for the court reporter to identify who is speaking is if you identify yourself by name each time you begin your response.

And don't worry about these instructions. If you don't remember them, I'll remind you, whether I keep them in mind.

This case that we're about to begin today is a criminal case. We try both civil and criminal cases in this courthouse, but today we have a criminal case. We'll be able to tell you a little bit about criminal cases.

A criminal case is initiated by what is referred to as return of an indictment. An indictment is a written document in which the Government alleges that an individual has committed one or more violations of federal law. An indictment is not evidence and should not be considered by the jury as evidence. It is simply a written document which

alleges violations of federal criminal law.

When the Government files an indictment, it assumes the burden of proving what it has alleged.  A defendant in a criminal case has no burden to disprove the allegations and, in fact, the defendant is entitled to remain silent throughout the course of the criminal proceedings and to not have his silence held against him.  The jury cannot consider that in any way in determining whether the Government has proved the allegations that it has made.

In a criminal case, the burden is on the Government to prove what it has alleged beyond a reasonable doubt, so for those of you who may have sat as a juror in a civil case in the past, you may recall the judge gave you an instruction as to the burden of proof in a civil case.

In a civil case, the burden is on the plaintiff to prove what it that is alleged by a preponderance of the evidence.  It's a lower burden of proof than what's applicable to a criminal case, which this is, so if you have served as a juror before in a civil case, it's important for you to put that burden out of your mind and apply the correct burden, the higher burden of proof that's application in criminal cases, and that is proof beyond a reasonable doubt.

If the Government fails to prove what it has alleged beyond a reasonable doubt, then you must acquit the defendant of that allegation.  And as I said earlier, the

defendant has no burden to disprove the allegations.

So the style of this case is United States of America versus Killen, and in the indictment, I won't go into it in any detail, but just to summarize for you the nature of the allegations, it's a criminal case brought by the United States charging the defendant, Patrick Killen, with 16 counts of production of child pornography, distribution and receipt of child pornography, transmission of interstate threats, and possession of child pornography and destruction of records of a federal investigation.  So those are the allegations about which we will be receiving evidence over the course of the next week.

Next let me have the parties to the case introduce themselves and anyone seated with them at counsel table. We'll start first with Government counsel.

MR. WIDLANSKI:  Good morning.  My name is Ben Widlanski.  I'm a United States Attorney.  Together with me at counsel table is Assistant United States Attorney Robert Emery and FBI Special Agent Laura Schwartzenberger.

THE COURT:  Thank you.  For the defense?

MR. SCHWARTZ:  Good morning, ladies and gentlemen. My name is Fred Schwartz, I'm the attorney for Patrick Killen, Junior, who is standing up next to me.  The lady at my table, and I have to say the pretty lady because she's my wife, is my paralegal Elizabeth Schwartz.

THE COURT:  Thank you.  Where is our courtroom deputy?  We need to swear in the jurors next.

Okay.  Would you all stand and raise your right hand?  Please swear in the jury.

THE COURTROOM DEPUTY:  Yes, Judge.

(The venire panel is sworn)

THE VENIRE PANEL:  I do.

THE COURT:  Please be seated.

Ladies and gentlemen, I introduced the parties to you in this case and anyone who is seated with them at counsel table, the prosecutors, the FBI special agent, the defendant's counsel.

Does anyone in the panel know any of the parties introduced socially, by acquaintance, by reputation?  If you do, please raise your hand.  No hands raised.

Okay.  I mentioned to you briefly, I summarized to you briefly what this case is about, what the allegations are.  Does anybody know anything about this case or the allegations before coming to court today by any source?  I'm not suggesting that you would have, but anything on the TV or on the radio or in the newspaper or otherwise?  If you know anything about this case, please raise your hand.  No hands raised.

Okay.  Has any member of the panel had prior jury service in either the state or the federal court on the civil

or criminal case? If you have had prior jury service, would you please raise your hand. Okay. I see several hands go up. And we'll start, the first hand that I saw go up was Mr. Rocha.

JUROR: Yes, sir.

THE COURT: Introduce yourself by name, and for those of you who raised your hand, my following questions to you are, when was it that you served on the jury? Where was it that you served, in state or federal court? What kind of case was it? Was it a civil or a criminal case? And did you reach a verdict? We're not interested in knowing what your verdict was but just whether you did reach a verdict.

All right, Mr. Rocha.

JUROR: My name is Evanilton Rocha. I -- actually, I did not -- I was not selected for the case. This was done on September 2014.

THE COURT: You were called but you were not selected?

JUROR: Correct.

THE COURT: Okay. Thank you. And anybody else in the -- okay, in the back row there.

JUROR: Mary Helen Hayden. I served on two cases, one was federal about ten years ago, and it was a drug case, and there was a verdict reached.

THE COURT: Okay.

JUROR:  I served on a state case also.  It was a burglary and there was a verdict reached.

THE COURT:  And when was that?

JUROR:  About eight years ago.

THE COURT:  Were both of those here in Dade County?

JUROR:  Yes.

THE COURT:  Thank you.

How about in the back of the courtroom in the first row?

JUROR:  Good morning.  My name is Robert Knight.  I served on a Air Force Court Martial.  It was a criminal case and we did reach a verdict.

THE COURT:  Thank you.  And, you know, just to go over that again, so you had a different burden of proof so it's important for you to put that out of your mind and apply the correct -- do you recall what the burden of proof was there?

JUROR:  No, sir.  It was 20-something years ago.

THE COURT:  So it is important for you to apply the correct burden that is applicable to this case and that is proof beyond a reasonable doubt.  Thank you.

JUROR:  Yes, sir.

JUROR:  My name is Bernard Akerman.  I served on a jury about 30 years ago.  It was Dade County Criminal Court, and we did reach a verdict.

THE COURT:  Thank you.

JUROR:  My name is Richard McCroskey.  I served on a jury November 4th, 2014, 11th Judicial Circuit Court, and the matter was settled on the second day of the trial.

THE COURT:  So you didn't have to render a verdict?

JUROR:  No.

THE COURT:  And it was a civil case?

JUROR:  Yeah.

THE COURT:  Okay.  Thank you.

JUROR:  My name is Lucy Gutierrez.  It's been over 25 years, but I served on a case of insurance fraud and it was declared a mistrial.

THE COURT:  Thank you.  Anybody else in the next row?

JUROR:  Good morning.  My name is Gail Kirby and I've served on two cases.  I've served on a criminal case here in Dade County probably about 22 years ago.  We did reach a verdict.  And I served 14 months ago on a civil case and we did reach a verdict here in Dade County.

THE COURT:  Thank you.

JUROR:  Good morning, my name is Susana Ortega.  I served as a juror about a year ago in a case against Lennar Homes, it was only to assign an amount in damages.

THE COURT:  Civil case?

JUROR:  Civil case.

THE COURT: Okay. Thank you.

JUROR: My name is Suzanne Haller and I did serve. It was over 30 years ago and I almost had forgotten but it was a criminal case. It was a murder case and a verdict was reached.

THE COURT: Was that here in Dade County?

JUROR: Yes.

THE COURT: Thank you.

JUROR: I'm Robert Piersol. About 20 years ago it was a civil case, lawsuit.

THE COURT: And did you reach a verdict?

JUROR: Yes.

THE COURT: Was it here in Dade County?

JUROR: Yes.

THE COURT: Thank you. How about on this side of the courtroom, first row, all the way down? Anybody? Okay.

JUROR: Good morning. My name is Waldina Mejia. I served federal here in this court two years ago February. And we did reach a verdict and it was criminal.

THE COURT: Thank you.

JUROR: Hello, my name is Lori Freedline. About 15 years ago, it was a criminal case in Miami-Dade county and we did reach a verdict.

THE COURT: State court?

JUROR: Yes, sir.

THE COURT:  Thank you.

JUROR:  Good morning.  My name is Cathy Hamilton and I served February of 2014 on a criminal case.  Picked as a juror and a verdict was reached.

THE COURT:  Thank you.  No other hands raised.  Let's see.  Mr. Oliveros?

JUROR:  Yes, sir.

THE COURT:  Go ahead.  We'll get you the microphone.

JUROR:  My name is Gustavo Oliveros.  I'm here, but I can't understand because it's no my language.  I write and read, but my listening is no good to in here.

THE COURT:  Sorry.  We're going to get to that as we go through the questioning.

All right.  You may hear from witnesses in this case who are employed by law enforcement agencies.  Has any member of the panel or has any member of the panel had a family member or a close friend ever been employed by a law enforcement agency?  If you have had -- if you have worked for a law enforcement agency, had a close friend or family member, please raise your hand.  We'll start with the first row.

JUROR:  Robert Beans, my brother-in-law is the chief of police for Virginia Gardens.

THE COURT:  And my followup question to all of you

for those of who you raised your hand, would the fact that you have any family member or close friend serve or is serving in a law enforcement capacity, would that affect in any way your ability to be a fair and impartial juror in this case?

JUROR:  No.

THE COURT:  Thank you.  Okay.  Just pass it down to who is next in that row.

JUROR:  Good morning.  My name is Alina De Leon and my cousin's husband is a police officer.

THE COURT:  Would that you affect you at all in this case?

JUROR:  No, sir.

THE COURT:  Thank you.  Anybody else in the first row?  How about the back row?  Yes, sir.

JUROR:  My name is Marc Oberlies.  My brother and sister-in-law are both sheriffs in Tallahassee.

THE COURT:  And would those relationships affect you at all in this case?

JUROR:  No, sir.

THE COURT:  Thank you.  Let's start on this side of the courtroom.  See if we can keep in order.

JUROR:  My name is Bernard Akerman.  My wife works for the Dade County Juvenile Services Department, also known as the JAC.

THE COURT: Would that you affect you at all in this case?

JUROR: No.

THE COURT: Thank you. Anybody else in the first row? All the way down.

JUROR: My name is John Tellez. My brother is in the air force.

THE COURT: Is he in the military police or --

JUROR: No, he just went to the air force.

THE COURT: Okay. Thank you. Anybody in this row?

JUROR: My name is Yainira Perez. I have two friends are who are police officers.

THE COURT: Is that here in Dade County?

JUROR: Yes.

THE COURT: Would that you affect you at all in this case?

JUROR: No.

THE COURT: Thank you.

JUROR: My name is Robert Knight. Again, my brother-in-law was a policeman at the City of Miami Beach, he was a sergeant and I was also a security police officer in the air force when I was serving.

THE COURT: Would either of those two experiences affect you at all in this case?

JUROR: No, sir.

THE COURT:  Thank you.

JUROR:  Yes.  My name is Richard McCroskey.  I was a military policeman a long time ago and it would not affect my decision in this case.

THE COURT:  Thank you.

JUROR:  My name is Jorge Pulles.  Through my wife's side of the family there are several police officers and that would not affect my decision in this case.

JUROR:  My name is Jessica Ramirez.  My ex-brother-in-law is a police officer and it will not affect my decision in the case today.

THE COURT:  Thank you.

JUROR:  Robert Piersol.  My late father was in U.S. Customs for 30 years.  It will not affect my judgment here.

THE COURT:  Thank you.

JUROR:  My name is Gail Kirby and I have a brother-in-law that works in a criminal courtroom, and I have a brother-in-law with BSO, and it would not affect my decision.

JUROR:  My name is Tye Goodine and both of my uncles work for the City of Miami and the Fort Lauderdale Police Department and, no, it won't affect my decision.

THE COURT:  How about on this side of the courtroom?

JUROR:  Hi, good morning.  My name is Yudania

Dominguez.  My cousin is a law enforcement police officer and it would not affect my decision.

THE COURT:  Thank you.

JUROR:  Hello, my name is Lori Freedline.  I currently work for the Miami Beach Police Department.  I'm a former police officer with them and currently a civilian, and it will not affect me.

THE COURT:  Thank you.

JUROR:  My name is Kevin Camara.  My uncle is the chief of police for Biscayne Park and I also have a brother-in-law that is in military police.

And no, it will not affect my decision.

THE COURT:  Thank you.  No other hands.  Okay.  Thank you.

Has any member of the panel ever been involved in a criminal matter in any court that concerned yourself, any a member of your family or a close friend, either as a defendant, a witness or a victim?  Anybody been involved in the criminal justice system either as a defendant, a victim or a witness?  If you have, please raise your hand.

Okay, I see someone in the first row.

JUROR:  My name is Rocha.  (Inaud.) It was the neighbor.

THE COURT:  And when was that?

JUROR:  It was many months ago.

THE COURT: Okay. And you were a defendant, a victim or a witness in the case?

JUROR: Defendant.

THE COURT: And did you go through the criminal justice system?

JUROR: Yes, sir.

THE COURT: And do you think you were treated fairly or unfairly?

JUROR: Fairly.

THE COURT: Do you think there's anything about that case that would affect your ability to be a fair and impartial juror in this case?

JUROR: No.

THE COURT: Thank you. How about anybody else? I see another hand go up in the back.

JUROR: My name is Jose Galdamez and I have a son and he was involved in a criminal case back in 1996, and he was prosecuted.

THE COURT: Was that here in Dade County?

JUROR: Yes.

THE COURT: And do you think he was treated fairly or unfairly by the criminal justice system?

JUROR: I believe he was treated unfair because we didn't have money to put lawyer.

THE COURT: Okay. And do you think there's

anything about that experience that might affect your ability to be a fair and impartial juror in this case?

JUROR:  Not at all.

THE COURT:  Anybody else.

JUROR:  My name is Lucy Gutierrez.  I don't know if you consider this, I was in a deposition a year ago.

THE COURT:  And was that a civil or criminal case?

JUROR:  Civil.

THE COURT:  Okay.  So nothing to do with a criminal case or criminal proceedings?

JUROR:  No.

THE COURT:  You're just a witness in a civil case?

JUROR:  Correct.

THE COURT:  Okay.  Thank you.  No other hands raised.  Okay.

I mentioned to you earlier the nature of the allegations in this case and I underscored and emphasized that, and I'll say again now that the allegations are not evidence of any kind.  As any defendant sits before you at this stage of the proceedings they are, by law, presumed innocent.

Having said that, the nature of the allegations and the evidence the Government will be presenting involves the production of child pornography in violation of federal law, the distribution and receipt of child pornography in

violation of federal law, transmission of interstate threats in violation of federal law, possession of child pornography in violation of federal law, and destruction of records in ae federal investigation in violation of federal law.

So those are the allegation that is the Government is going to intend to introduce into evidence.  And as I said again, you haven't heard any of the evidence in this case.  As any defendant sits before you they are, by law, presumed innocent.

Is there anything about the nature of the allegations themselves, however, that would make it difficult or impossible for you to serve as member of the jury in this trial?  Just the nature of the allegations themselves or you don't think you could be a fair and impartial juror?  If there is, please raise your hand.

Ms. Ondarza, you raised your hand.

JUROR:  Yes.

THE COURT:  Ms. Ondarza, just the nature of the allegations, you don't think you could be a fair and impartial juror?

JUROR:  I think it would give me a lot of anguish to listen to the evidence and all that.

THE COURT:  All right.  Thank you.  Anybody else?  Let's see.  One hand raised over here.

JUROR:  My name is Lucy Gutierrez.

THE COURT:  Hold on, Ms. Gutierrez.  Let me see if I can -- okay.

Ms. Gutierrez, do you think just the nature of the allegations might make it difficult for you to serve as a fair and impartial juror in this case?

JUROR:  Yes, it bothers me.

THE COURT:  Okay, thank you, Ms. Gutierrez. Anybody else?  Give us your name?

JUROR:  Charles Julian.

THE COURT:  You think there's something just about the nature of the allegations without having heard any of the evidence that you think would make it difficult or impossible for you to serve as a fair and impartial juror in this case?

JUROR:  Yes, sir, I think it's very disturbing.

THE COURT:  Thank you.  Anyone else?

JUROR:  David Larson.

THE COURT:  You think just the nature of the allegations will make it difficult for you to serve as a fair and impartial juror in this case?

JUROR:  A little bit, yes.

THE COURT:  Thank you.  Anyone else on that side? How about on this side of the courtroom?  Give us your name.

JUROR:  My name is Nicole Valle.

THE COURT:  You said Nicole?

JUROR:  Nicole Valle.

THE COURT:  Okay, I see it.  And you think there's something just about the nature of the allegations?

JUROR:  Yes.

THE COURT:  Thank you, Ms. Valle.

JUROR:  Good morning.  My name is Maria Ramirez.

THE COURT:  Thank you, and you think just the nature of the allegations, you don't think you could be a fair juror?

JUROR:  As a mother of four kids, I don't think I could be fair.

THE COURT:  Anybody else?  Let's see, another hand there.

JUROR:  My name is Yudania Dominguez.

THE COURT:  Hold on.  All right.  Ms. Dominguez, you think there's something about the nature of the allegations that you think you couldn't be fair?

JUROR:  Yeah, I wouldn't be fair.

THE COURT:  All right.  Thank you.  Anybody else?  Okay.  All right.

Other than the responses you've already given me, can each of you assure me that if you are selected as a juror in this case, that you will render a verdict based solely on the evidence presented here at trial, that you will follow the Court's instructions to you as the law is in this case, and you will not substitute your own ideas about what you

think the law ought to be?  Can each you assure me of that?  If you cannot, raise your hand.

Some of you think that the laws applicable to a case may be too harsh, some of you may think it's some too lenient, but regardless of what your own personal views are that you will set aside your own views and follow the Court's instructions as to what the law is in this case and base your verdict solely on the evidence presented here in this courtroom.

If you can't do that, please raise your hand.  Okay.  No hands raised.

Let's start with the -- well, before I do that, I know Mr. Oliveros indicated that he had a problem understanding the English language.  Is there any member of the panel who has any special disability or problem, communications, language, otherwise, medical, that would make it difficult or impossible for you to serve as a member of this jury for the duration of the trial?  If there is, please raise your hand.

Okay, Mr. Oliveros expressed his difficulty in understanding the English language.  Who else?  We'll go in order with the juror in the first row.  Give us your name.

**JUROR**:  John Tellez.  I think that my English not so good for a court.

**THE COURT**:  And now, you may not speak English as

well as you would like to, but have you been able to understand my questions?

JUROR:  I don't understand some words.

THE COURT:  All right.  Thank you, Mr. Tellez.

JUROR:  My name is Lucy Gutierrez.  Your Honor, you said medical and I have an important doctor's appointment tomorrow.

THE COURT:  And you've already indicated another reason as well and so we'll just go ahead and reset Ms. Gutierrez for jury service at another time and go ahead and postpone it.

All right.  Anyone else?

JUROR:  Good morning, Sandra Mattos, and I don't understand, you know, most of the --

THE COURT:  Thank you, Ms. Mattos.

Anyone else?

JUROR:  My name is Teresa Alfaro.

THE COURT:  Can I hear your name again?

JUROR:  My name is Teresa Alfaro.  I can't speak English very well and I can't understand everything.

THE COURT:  All right.  Thank you, Ms. Alfaro.

JUROR:  Yudania Dominguez.  So you mentioned medical or anything that would allow me to be here this week. I'm a doctor of pharmacy, I graduated in May.  I have my board of pharmacy next week and I have the following week my

law exam as well.  So I'm studying for those two exams.  I would be really appreciated if I can come, like, two or three months.

THE COURT:  Can we go ahead and postpone Yudania Dominguez?  Okay.  Anyone else?

JUROR:  Kevin Camara.  Based on the type of evidence, I had an accident a few years ago that impaired me in one eye that I'm -- legally it's blind in that eye, so depending on what we will be looking at.

THE COURT:  Do you have good sight in the other eye?

JUROR:  The other eye is good but it fades in and out from time to time.  Sometimes I would have to just close them both for a while.

THE COURT:  Thank you.

JUROR:  Good morning.  My name is Mauricio Marin. I speak basic English.

THE COURT:  Okay, thank you.

JUROR:  Good morning, my name is Nicole Valle.  I have a two and four year old at home very sick, so I will be not be able to be here the duration of the time.

THE COURT:  Thank you.

JUROR:  My name is Marco Chacon.  Yes, my English is basic, so I only understand 30 percent, 70 percent I don't understand.

THE COURT:  Thank you, Mr. Chacon.

Okay.  Let's start with Ms. Ondarza, and if you can please stand one at a time, introduce yourself by name and just tell us if you are employed, unemployed, or retired, if you are working or are retired and what you are doing or have done for a living.  And also what your marital status is, if you are married what your spouse does.

JUROR:  Laura Ondarza.  I am a translator.  I work freelance.  And I am a widow.

THE COURT:  Okay, thank you.

JUROR:  Robert Beans.  I'm own a service plumbing company in Dade County, for 29 years I've been there, and single.

THE COURT:  Thank you.

JUROR:  My name is Alina De Leon.  I work for Maspons Funeral Homes and LER Investments Corporation.  I am single.

THE COURT:  Thank you.

JUROR:  Thank you.  My name is Monica Cruz.  I'm single.  I work for Avaya, it's a telecommunications company, in sales.

THE COURT:  Thank you.

JUROR:  Good morning.  My name is Wayne Rogers, I am married.  I work for a nonprofit agency in Florida City, for Florida, and my wife is a quality assurance manager for

Invo International (ph.).

THE COURT:  Thank you.

JUROR:  Good morning.  My name is Claudio Carrillo. I am married.  I work for a Chinese company, Hytera, and it's a telecommunications company, and I'm the director of sales for Latin America.  My husband has a freight forwarding.

THE COURT:  Thank you.

JUROR:  My name is Evanilton Rocha.  I'm employed, I'm a nurse, and I am single.

THE COURT:  Thank you.

MR. SCHWARTZ:  Your Honor, may we approach for one moment?

THE COURT:  Alright.

(Sidebar conference)

MR. SCHWARTZ:  Your Honor, as you go through the jurors will you ask if they have any children and what their ages are?

THE COURT:  I'm not going to do that.  Why do you want to do that?

MR. SCHWARTZ:  I think how they would react to child porn might somehow be dictated by whether they have children or what their children's ages are.

THE COURT:  What's your position?

MR. WIDLANSKI:  Your Honor, I believe you covered that adequately, the evidence in this case.  I believe you

covered this adequately when you asked them if they would have any problems hearing the evidence in this case.

THE COURT:  All right.  I'm satisfied.

(Sidebar concluded.)

THE COURT:  Okay.  I think we were to Mr. Oliveros.

JUROR:  My name is Gustavo Oliveros.  I am married and I work as an instructor and inspector.

THE COURT:  And what does your wife do?

JUROR:  I'm sorry?

THE COURT:  What does your wife do?

JUROR:  My what?

THE COURT:  Your wife.  *Esposo*.

JUROR:  Oh, my wife is Amparo, she is children, daycare children.

THE COURT:  Thank you.

JUROR:  You're welcome.

JUROR:  My name is Mark Oberlies.  I work for Miami-Dade County Public Schools, I'm a mail carrier and I'm single.

THE COURT:  Thank you.

JUROR:  My name is Nicole Hope.  I'm currently unemployed due to medical reasons.  My last place of employment and my husband's employment is Whole Foods Market, and I'm married.

THE COURT:  Thank you.

JUROR:  Good morning.  My name is George Bethea.  I work for Dade County Public Schools.  I'm a teacher and for Miami-Dade Community College I'm a teacher.  My wife is unemployed at the moment.

THE COURT:  Thank you.

JUROR:  Mary Helen Hayden.  I work for the school, social work at Florida International University.  My husband is the president and CEO of Banyan Health Systems which is Spectrum Programs, Miami Behavioral Health and FQHC.

THE COURT:  Thank you.

JUROR:  My name is John Tellez.  I'm a quality inspector and I'm married.  My wife works in an office for immigration services.

THE COURT:  What does your wife do?

JUROR:  She's an administrative assistant.

THE COURT:  Thank you.

JUROR:  Yanira Perez.  I'm married.  My husband and I both work for the same company.  It's an import-export company.

THE COURT:  Thank you.

JUROR:  My name is Robert Knight.  I'm retired after 47 years of working, 12 of which were in the air force. My wife and I have been married for 35 years, two kids, and she works with import export.

THE COURT:  Thank you.

JUROR:  My name is Jose Galdamez and I work for Transportation.  I've been working for SDS for the last 20 years.  My wife work for 7-Eleven stores, she's a cashier.

THE COURT:  Thank you.

JUROR:  Bernard Akerman, accountant for a local CPA firm.  My wife works for the Miami-Dade Juvenile Services Department.

THE COURT:  Thank you.

JUROR:  My name is Bermita Drummond.  I work with a cashier, dry cleaning.

THE COURT:  Are you married?

JUROR:  Single.

THE COURT:  Thank you.

JUROR:  My name is Mireille Koletsky.  I am retired, I was a bookkeeper.  My husband is retired as well and he was a systems analyst.

THE COURT:  Thank you.

JUROR:  My name is Susan Haller.  I'm a retired teacher from Miami-Dade Public Schools and my husband is a retired import exporter who now works as an adjunct professor with computers.

THE COURT:  Thank you.

JUROR:  Yes.  My name is Richard McCroskey and I'm chief financial officer with a private bank.  I'm married. My wife is currently retired and worked for Miami-Dade County

for 12 years prior.

THE COURT:  Thank you.

JUROR:  My name is Jorge Pulles.  I own a construction company and my wife is employed in the same company running human resources.

THE COURT:  Thank you.

JUROR:  My name is Lucy Gutierrez.  I'm a paralegal and my husband works for Miami-Dade County.

THE COURT:  You said paralegal?

JUROR:  Real estate paralegal.

THE COURT:  Thank you.

JUROR:  My name is Giovanni Sanchez and I work at Ford Motors.  I'm single.

THE COURT:  Thank you.

JUROR:  My name is Sandra Mattos.  I'm working as a clerk and I'm single.

THE COURT:  Thank you.

JUROR:  My name is Orlando Comas, I'm a landscape architect, self-employed; divorced.

JUROR:  Robert Piersol, worked for UPS for 30 years, wife, married 33 years.  She works for Miami-Dade Schools.

THE COURT:  Thank you.

JUROR:  My name is Charles Julian.  I work with Broward General Medical Center as a food service manager.  My

wife is an attorney.  I'm married.

THE COURT:  What kind of practice is she in?

JUROR:  She does real estate.

THE COURT:  Thank you.

JUROR:  My name is Josephine Bermudez Lejuez, I work for Carnival Cruise Lines as a trainer, and I'm single.

THE COURT:  Thank you.

JUROR:  My name is Arthur Horton, I'm a mental health technician.  Been there for 15 years and I'm fresh out of a divorce.

THE COURT:  Thank you.

JUROR:  David Larson, I recently retired from Dade County Public Schools as a school psychologist.  My wife still works for Dade County Public Schools as a secretary.

THE COURT:  Thank you.

JUROR:  My name is Leonie Newby, I'm a single mother of three, and I work with mentally disabled clients in their homes.

THE COURT:  Thank you.

JUROR:  My name is Tye Goodine and I work for the Ritz-Carlton.

THE COURT:  Single?

JUROR:  Yes.

THE COURT:  Thank you.

JUROR:  My name is Gail Kirby, I'm married, I have

two children.  I work for Mount Sinai Medical Center as an insurance verifier.

THE COURT:  Thank you.

JUROR:  My name is Everton Charles.  I'm employed with investments and mentoring company.  I'm married and my wife is an RN.

THE COURT:  Thank you.

JUROR:  My name is Susana Ortega.  I work as an accounting clerk and an interior design/furnishing company, and I am single.

THE COURT:  Thank you.

JUROR:  My name is Roberto Tamayo.  I work as an agronomist here in Homestead, Florida, and my wife is a chicken manager in the same company.

THE COURT:  Thank you.

JUROR:  My name is Isabel Monsibaez.  I am single. I work as an assistant at (inaud.) Technologies.

JUROR:  My name is Israel Fernandez.  I work at (inaud.) Florida Center and --

JUROR:  My name is Sandra Heros, recently retired, previously worked as a sales manager for a diagnosis company. And single.

THE COURT:  Thank you.

JUROR:  My name is Tancy Vickers, I work at Miami-Dade Transit, and I'm single.

THE COURT:  Thank you.

JUROR:  My name is Waldina Mejia, I work for Carnival Cruise Lines as a cruise travel coordinator, and I'm single.

THE COURT:  Thank you.

JUROR:  My name is Teresa Alfaro.  I am married. My husband working in shopping and maintaining.

THE COURT:  Thank you.

JUROR:  My name is Lenel Bien-Aime.  I'm working for Transportation America.  Married.  My wife, she's a student at dietician.

THE COURT:  Thank you.

JUROR:  Good morning.  I'm Ken Fairman and I have a pavement maintenance service business.  My wife was an IT person at Royal Caribbean Cruise Lines.  Now she's our office manager.

THE COURT:  Thank you.

JUROR:  Yudania Dominguez.  I'm a doctor of pharmacy.  I don't have a license yet so I'm working currently as an intern at CVS Pharmacy.  I'm married.  I have no kids.  My husband works at Miami International Airport.

THE COURT:  Thank you.

JUROR:  Lori Freedline, I'm divorced.  I currently work for Miami Beach Police Department.  My assignment is court liaison supervisor.

THE COURT:   Thank you.

JUROR:   My name is Kevin Camara.   I'm currently a salesman for CarMax.   I'm going to be sales manager at the end of this week, no idea of the store.   I also work as an audits director for FIU.   I'm married.   My wife works as the shipping operations manager at Krispy Kreme Donuts.

THE COURT:   Thank you.

JUROR:   Good morning.   My name is Diana Lopez.   I work for HSBC in private banking, and I'm single.

THE COURT:   Thank you.

JUROR:   My name is Jorge Velez, I'm an account manager for Avaya Telecommunications Company, and I'm single.

THE COURT:   Thank you.

JUROR:   My name is Manuel Apaza.   I work at the American Airlines Arena for restaurants and I'm single.

THE COURT:   Thank you.

JUROR:   My name is Maria Ramirez.   My husband is disabled and I have a small business as an architectural landscaping design and I'm the one that mainly supports my house, and's it's very important for me to be on the business because they cannot work without me being there.

THE COURT:   Thank you.

JUROR:   Good morning.   My name is Samaiyah Engram. I work as a pharmacist, now I'm self-employed.   My husband is an education teacher.

JUROR:  My name is Mauricio Marin.  I work in video game distributors.  I'm married.  My wife is a general manager of (inaud.)

THE COURT:  Thank you.

JUROR:  My name is Cathy Hamilton.  I'm part-time employee at Courtesy Express out of Pompano Beach, Florida, not by choice.  My is husband is self-employed.  He does interior design installing window treatment, motorized treatments and shutters and drapes.

THE COURT:  Thank you.

JUROR:  My name is Nicole Valle.  I'm a Miami-Dade County Public School teacher.  My husband works for Baptist, network engineer, and I have two children.

THE COURT:  Thank you.

JUROR:  My name is Marco Chacon.  I'm married and my wife is a housewife.  Actually, I'm working for Miami-Dade Public Works and I am truck driver.

THE COURT:  Thank you.

JUROR:  Hi.  My name is Lauren Arnold.  I work for IKEA as a kitchen planner and I'm single.

THE COURT:  Thank you.

So you've heard the questions that I've put to you.  You've heard the reasons why we ask those questions.  Is there any other reason that suggests itself to you as to why you could not sit on this jury and render a fair and

impartial verdict based on the evidence presented to you and following the Court's instructions to you on the law?

Anything else you think that if you were the prosecutor or the defense attorney that they should know in terms of affecting their ability to make an intelligent selection as to whether to seek or excuse you in this case that we haven't already discussed?  If there is, please raise your hand.  Nothing else.

Okay.  We'll start with the Government as to Juror Number 1.

MR. WIDLANSKI:  Yes, Your Honor.  The United States believes that Ms. Ondarza should be excused for cause and we thank her for coming.

THE COURT:  Any objection?

MR. SCHWARTZ:  No objection.

THE COURT:  Granted.  To the defense, Juror Number 2?

MR. SCHWARTZ:  Your Honor, may we have a moment to consult with my client?  Perhaps a short break to go over the list before we exercise.

THE COURT:  We're just going one at a time.  But if you need to talk to your client about it, go right ahead.

MR. SCHWARTZ:  We would exercise a peremptory challenge.

THE COURT:  To the Government, Juror Number 3?

MR. WIDLANSKI:  Your Honor, the United States accepts Ms. De Leon.

THE COURT:  To the defense, Juror Number 3?

MR. SCHWARTZ:  No objection.

THE COURT:  To the defense, Juror Number 4?

MR. SCHWARTZ:  No objection.

THE COURT:  Does the Government?

MR. WIDLANSKI:  The United States accepts Ms. Cruz and thanks her for her service.

THE COURT:  Did you --

MR. WIDLANSKI:  Accept.

THE COURT:  To the Government, Juror Number 5?

MR. WIDLANSKI:  United States accepts Mr. Rogers.

THE COURT:  To the defense?

MR. SCHWARTZ:  Your Honor, we would exercise a preemptory challenge as to Mr. Rogers, and thank him for coming down here today.

THE COURT:  To the defense, Juror Number 6?

MR. SCHWARTZ:  Your Honor, we would respectfully ask that Mr. Rocha be excused and thank him for coming today.

THE COURT:  To the Government?

MR. WIDLANSKI:  The United States would excuse Mr. Rocha and thank him for his time.

THE COURT:  To the defense, Juror Number 8?

MR. SCHWARTZ:  Your Honor, we would respectfully

suggest that this juror be excused for cause due to his problem with the English language.

THE COURT:  To the Government, Juror Number 9, do you grant it?

MR. WIDLANSKI:  Your Honor, the United States accepts Mr. Oberlies.

THE COURT:  To the defense?

MR. SCHWARTZ:  Your Honor, we would ask that Your Honor excuse Mr. Oberlies for cause based on the fact that both his brother and sister-in-law are sheriffs and as much as he tries to be fair, it might create a problem.

THE COURT:  Denied.

MR. SCHWARTZ:  We would, therefore, exercise a peremptory challenge and ask him to be excused, and thank you him for coming.

THE COURT:  To the defense, Juror Number 10?

MR. SCHWARTZ:  We would accept Juror Number 10.

THE COURT:  To the Government?

MR. WIDLANSKI:  The United States accepts Ms. Hope.

THE COURT:  To the Government, Juror Number 11.

MR. WIDLANSKI:  The United States accepts Mr. Bethea.

THE COURT:  Does the defense?

MR. SCHWARTZ:  We would respectfully exercise a preemptory challenge and thank the gentleman for coming here

today.

THE COURT:  To the defense, Juror Number 12?

MR. SCHWARTZ:  We would accept Juror Number 12.

THE COURT:  To the Government?

MR. WIDLANSKI:  Your Honor, the United States would excuse Ms. Hayden and thank her for her time.

THE COURT:  Okay.  As I call your name, thank you, you may be excused, and I would ask that you return to the jury assembly room where you will get instructions as to when and whether you will be needed back for future jury service.

Ms. Ondarza, Mr. Beans, Mr. Rogers, Ms. Carrillo, Evanilton Rocha, Gustavo Oliveros, Marc Oberlies, George Bethea and Mary Helen Hayden.

Yainira Perez, seat number one.  Robert Knight, seat number two.

MR. WIDLANSKI:  Your Honor, did we skip Yainira Perez?  Are we excusing John Tellez, Your Honor?

THE COURT:  Tellez, aren't we going to excuse him because of the language?

MR. SCHWARTZ:  No objection.

MR. WIDLANSKI:  No objection.

THE COURT:  Jose Galdamez, seat number five.  Bernard Akerman, seat number six.  Bermita Drummond, seat number seven.  Mireille Koletsky, seat number eight.  Suzanne Haller, seat number nine.  Richard McCroskey, seat number 11.

Jorge Pulles, seat number 12, and that is to the Government, Juror Number 1.

MR. WIDLANSKI:  United States would accept Ms. Perez.

THE COURT:  To the defense?

MR. SCHWARTZ:  Your Honor, the defense would accept Ms. Perez.

THE COURT:  To the defense, Juror Number 2?

MR. SCHWARTZ:  Your Honor, in light of Mr. Knight's service in the military security, we would suggest that he be challenged for cause.

THE COURT:  Denied.

MR. SCHWARTZ:  Your Honor, we would respectfully exercise a peremptory challenge, ask that Mr. Knight be excused and thank him for his service to our country.

THE COURT:  To the Government, Juror Number 5.

MR. WIDLANSKI:  Your Honor, the United States would ask that Mr. Galdamez be excused and thank him for his time.

THE COURT:  To the defense, Juror Number 6?

MR. SCHWARTZ:  Your Honor, we would respectfully excuse number 6, Mr. Akerman, and thank you him for coming down today.

THE COURT:  To the Government, Juror Number 7?

MR. WIDLANSKI:  Your Honor, the United States would accept Ms. Drummond.

THE COURT:  To the defense?

MR. SCHWARTZ:  Your Honor, the defense would accept Ms. Drummond.

THE COURT:  To the defense, Juror Number 8?

MR. SCHWARTZ:  Your Honor, the defendant would accept the juror, Juror Number 8.

THE COURT:  To the Government?

MR. WIDLANSKI:  The United States accepts Ms. Koletsky.

THE COURT:  To the Government, Juror Number 9?

MR. WIDLANSKI:  The United States accepts Ms. Haller.

THE COURT:  To the defense?

MR. SCHWARTZ:  Your Honor, the defense would accept Ms. Haller.

THE COURT:  To the Government, Juror Number 11?

MR. EMERY:  The United States accepts Mr. McCroskey.

THE COURT:  To the defense?

MR. SCHWARTZ:  Again, Your Honor, I would respectfully suggest that Mr. McCroskey's service as an MP to our country would make it more likely that he would favor the Government and we challenge him for cause.

THE COURT:  Denied.

MR. SCHWARTZ:  Your Honor, we would respectfully

exercise what I believe is our --

THE COURT:  Eighth.

MR. SCHWARTZ:  -- eighth peremptory challenge.

THE COURT:  To the defense, Juror Number 12?

MR. SCHWARTZ:  We would respectfully request our ninth peremptory challenge and ask that Mr. Pulles be excused and thank him for his service, and I forgot to thank Mr. McCroskey.

THE COURT:  Okay.  Mr. Knight, Mr. Galdamez, Mr. Akerman, Mr. McCroskey, and Mr. Pulles, thank you.  You may be excused.  Please return to the jury assembly room.

MR. WIDLANSKI:  Your Honor, I would note for the record that all of the jurors that the defense has exercised peremptory strikes on are males.

THE COURT:  Okay.  Do I have a challenge for cause to Lucy Gutierrez?

MR. WIDLANSKI:  You do, Your Honor.

THE COURT:  Any objection?

MR. SCHWARTZ:  No, Your Honor.

THE COURT:  Giovanni Sanchez, seat number two.  We have a challenge for cause to Sandra Mattos?

MR. WIDLANSKI:  Yes, Your Honor.

THE COURT:  Any objection?

MR. SCHWARTZ:  No, Your Honor.

THE COURT:  Orlando Comas, seat number five.

Robert Piersol, seat number six.  No challenge for cause to Charles Julian?

MR. WIDLANSKI:  Yes, Your Honor.

THE COURT:  No objection?

MR. SCHWARTZ:  No objection.

THE COURT:  Josephine Lejuez, that would be seat number 11.  How do you pronounce that name?

JUROR:  Lejuez.

THE COURT:  I apologize.  Pretty name.

Arthur Horton, seat number 12.

And we are now nine to the defense, Government three.

So this is Juror Number 2, that's to the defense, Mr. Giovanni Sanchez.

MR. SCHWARTZ:  Your Honor, I didn't get the name of Juror Number 12, though.

THE COURT:  Arthur Horton.

MR. SCHWARTZ:  Thank you.

We accept Juror Number 2, Your Honor.

THE COURT:  To the Government?

MR. WIDLANSKI:  United States accepts Mr. Sanchez, Your Honor.

THE COURT:  To the Government, Juror Number 5?

MR. WIDLANSKI:  The United States accepts Mr. Comas.

THE COURT: To the defense?

MR. SCHWARTZ: We would accept Mr. Comas.

THE COURT: And to the Government, let's see, this is Juror Number 6 to the defense.

MR. SCHWARTZ: We would respectfully exercise our tenth peremptory challenge and thank Mr. Piersol for joining us today.

THE COURT: To the Government, Juror Number 11?

MR. WIDLANSKI: The Government accepts Ms. Lejuez.

THE COURT: Any challenge for cause to Juror Number 11?

MR. SCHWARTZ: No, Your Honor.

THE COURT: Any challenge for cause to Juror Number 12?

MR. SCHWARTZ: No challenges to Mr. Horton, Your Honor.

THE COURT: To the Government, Juror Number 12?

MR. WIDLANSKI: The United States would accept Mr. Horton.

THE COURT: Okay. Mr. Piersol, thank you, you may be excused.

Do I have a challenge for cause for Mr. Larson?

MR. WIDLANSKI: Yes, Your Honor.

THE COURT: Any objection?

MR. SCHWARTZ: No, Your Honor.

THE COURT:  Newby, seat number six.

And that is to the defense first, any challenge for cause?

MR. SCHWARTZ:  No, Your Honor.

THE COURT:  To the Government?

MR. WIDLANSKI:  Your Honor, the United States would thank Ms. Newby for her service, but ask that she be excused.

THE COURT:  Ms. Newby, thank you, you may be excused.  No, no, it was short and sweet.  No, no.  Come on.  Thank you.  Please return to the jury assembly room.  Okay.

Tye Emmanuel Goodine.

That's to the defense for cause only.

MR. SCHWARTZ:  No challenges for cause, Your Honor.

THE COURT:  To the Government?

MR. WIDLANSKI:  The United States accepts Mr. Goodine.  My apologies.

MR. SCHWARTZ:  We would accept Tye, Your Honor.

THE COURT:  Okay.  Okay.  Gail Williams-Kirby, take the first seat in the back there.  Everton Charles.  Susana Ortega.  Roberto Tamayo.

Okay.  You have two challenges to those four.

MR. WIDLANSKI:  The United States accepts all four.

THE COURT:  To the defense?

MR. SCHWARTZ:  Your Honor, we would respectfully exercise our two peremptory challenges as to

Ms. Williams-Kirby and Mr. Tamayo, and thank them for their service.

THE COURT: Thank you, Ms. Kirby and Mr. Tamayo.

Mr. Everton, can you move down one seat? And Ms. Ortega, can you move down one seat?

Isabel Monsibaez and Garcia-Fernandez. That is to the Government as to Isabel Monsibaez and Garcia-Fernandez.

MR. WIDLANSKI: United States tenders the panel, Your Honor.

THE COURT: Any challenge for causes for those two?

MR. SCHWARTZ: No challenge for cause. We would tender the panel.

THE COURT: Folks in the jury pool, those of you whose name has not been called, I would ask that you return to the jury assembly room and you will be given instructions as to when and where you will be needed back.

Please swear in the jury.

(The jury was duly sworn.)

THE COURTROOM DEPUTY: Thank you. Please be seated.

THE COURT: Members of the jury, now that you have been sworn, I want to give you some preliminary instructions to guide you in your participation in the trial. It will be your duty to find through the evidence what the facts are. You and you alone are the judges of the facts. You will then

have to apply to those facts the law as the Court will give it to you and you must follow that law whether you agree with it or not. Nothing the Court may say or do during the course of the trial is intended to indicate nor should be taken by you as an indication of what your verdict should be.

The evidence from which you will find these facts will consist of the testimony of witnesses, documents and other things received into the record as exhibits and any facts the lawyers agree or stipulate to or the Court may instruct you to find. Certain things are not evidence, must not be considered by you. I'll list them for you now.

Statements, arguments and questions by lawyers are not evidence. Objections to questions are not evidence. Lawyers have an obligation to their client to make objections when they believe evidence that is being offered is improper under the rules of evidence and you should not be influenced by the objection or by the Court's ruling on it.

If the objection is sustained, ignore the question. If it is overruled, treat the answer like any other. And if you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.

Testimony that the Court has excluded or told you to disregard is not evidence and must not be considered. And anything you may have seen or heard outside the court is not evidence and must be disregarded. You are to decide the case

solely on the evidence presented here in the courtroom.

There are two kinds of evidence, direct and circumstance. Direct evidence is direct proof of a fact, such as testimony of an eyewitness. Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist, and I will give you further instructions on these as well as other matters at the end of the case, but have in mind that you may consider both kinds as evidence.

It will be up to you to decide which witnesses to believe and how much of any witness's testimony to accept or reject, and I'll give you some guidelines to determine the credibility of witnesses at the end of the case.

As you know, this is a criminal case. There are three basic rules about a criminal case that you must keep in mind.

First, any defendant is presumed innocent until proven guilty. An indictment against the defendant brought by the Government is only an accusation, nothing more, it is not proof of guilt or anything else. A defendant, therefore, starts out with a clean slate.

Second, the burden of proof is on the Government until the very end of the case. A defendant has no burden to prove his innocence or to present any evidence or to testify and since the defendant has the right to remain silent, the law prohibits you in arriving at your verdict from

considering that a defendant may not have testified.

Third, the Government must prove any defendant's guilt beyond a reasonable doubt, and I'll give you further instructions on this point later, but bear in mind that in this respect a criminal case is different from a civil case.

Now a few words about your conduct as jurors. First, I instruct you that during trial you are not to discuss the case with anyone or permit anyone to discuss it with you.  Until you retire to the jury room at the end of the case to deliberate on your verdict, you are simply not to talk about the case.

Second, do not read or listen to anything touching on this case in any way.  If anyone should try to talk to you about it, bring it to the Court's attention promptly, and that includes don't go on the internet to try to do any internet searching, don't go on any social media to try to discuss with people the fact that you're on the case or what you're doing on the case or what the evidence is in the case.

Third, don't do any research or make any investigation about the case on your own.  Finally, do not form any opinion until all the evidence is in, keep an open mind until you start your deliberations at the end of the case.

The trial will now begin.  First the Government will make a brief opening statement which is simply an

outline to help you understand the evidence as it comes in.

Next, the defendant's attorney may, but doesn't have to make an opening statement.  Opening statements are not evidence or argument.

The Government will then present its witnesses and counsel for the defendant may cross-examine them.  Following the Government's case the defendant may, if he wishes, present witnesses whom the Government may cross-examine.

After all the evidence is in, the attorneys will present their closing arguments to summarize and interpret the evidence for you, and the Court will instruct you on the law.  After that, you will retire to deliberate on your verdict.

So we're going to go ahead and take our midmorning recess for about ten minutes.  The Court Security Officer will escort you to the jury deliberation room and show you where you will sit when we have our recesses, show you where the restrooms are, but we'll take a brief recess and when you come back we'll hear the openings statement.

THE COURT SECURITY OFFICER:  All rise for the jury.

(Thereupon, the jury was escorted out of the courtroom.)

THE COURT:  We'll take a short recess.  I have a matter, I don't know if we can take it up now.  FDIC versus American Time Insurance Company.

(Recess taken from 10:48 a.m. to 11:09 a.m.)

THE COURT:  Bring in the jury, please.

MR. EMERY:  Can I ask a quick question?

THE COURT:  What's that?

MR. EMERY:  In the opening, the Government, I wanted to make a brief reference to the parents that are going to testify.  I just want to --

THE COURT:  Well, go ahead.

MR. EMERY:  Thank you.  And the Government will also invoke the rule, Your Honor.

THE COURT:  If there are any witnesses in the courtroom, they need to remain outside.

MR. SCHWARTZ:  Your Honor, the defendant's parents may be witnesses, we haven't decided yet.  They're in the courtroom now.  I'll instruct them to leave.

THE COURT:  All right.

MR. SCHWARTZ:  And, Your Honor, there were two other evidentiary issues I was raising.  Your Honor was nice enough to take them before jury selection.  I can raise them again after opening if Your Honor wishes.

THE COURT:  Okay.

(Thereupon, the jury was brought into the courtroom.)

THE COURT:  Please have a seat, everyone.  Folks, I know I was told that one or more of you wanted to take notes.

Let me just give you an instruction about notes and note taking.

If you want to take notes, you're entirely welcome to do so.  If you don't want to, you're under no obligation to do so, either.  But let me give this note of caution if you do take notes or if you don't.  If you do take notes, you should not give undue weight to your notes as opposed to your recollection of what the testimony was or the exhibits.  Sometimes you may take notes of what you think are important things, but there may be other things that are said and you don't take notes about.  So remember, it's what -- everything you heard, not just what's in your notes.

And also, if you -- if you don't take notes, you should not give undue weight to someone else's notes as opposed to your recollection of the testimony that you heard or the evidence that was presented.  So it's okay to take notes, just with the understanding that your notes may not be as comprehensive as all the testimony that you heard and the documents that were admitted.

So with that caution in mind, bear that in mind and we'll hear opening statements now from both parties.  First from the Government.

### *OPENING STATEMENT*

MR. EMERY:  Good morning, ladies and gentlemen of

the jury.

THE JURY: Good morning.

MR. EMERY: As you heard the Judge mention before, and when I introduced myself, my name is Rob Emery, and along with Ben Widlanski, Assistant United States Attorney, and with FBI Special Agent Lauren Schwartzenberger, we represent the people of the United States of America in this matter.

The defendant seated right there, Patrick Killen, Junior, a 22-year-old adult man, produced images of children engaged in sexually explicit conduct for his own personal sexual gratification and for the personal gratification of others.

However, his criminal conduct didn't stop there. When the children refused to send him photographs that he wanted, he threatened them. He threatened to post their pictures online for all their friends to see. And even more calculating and methodical, the defendant got all these photographs from these children while he pretended to be a 14-year-old teenager from Florida, a female. And when the FBI was on to him, the defendant destroyed evidence. He destroyed evidence of his crimes to cover his tracks. That's what this case is about.

You heard from the Judge that the defendant has been charged with 16 counts of various and multiple federal violations. He's been charged with three counts of

production of images of children engaged in sexually explicit conduct, six counts of distribution and receipt of images of children engaged in sexually explicit conduct, four counts of possession of those same type of images, and for some of those images there were children under the age of 12.

The defendant's also been charged with two counts of making interstate threats against children and, lastly, one count of destruction of evidence in a federal investigation.

Now, the evidence will show that the defendant, Patrick Killen, Junior, trolled the internet for young boys. He trolled social media sites like Facebook and Instagram looking for these boys. And when he found his mark, he started communicating with them. He started communicating with them on Facebook and Instagram, and the whole time he was communicating with them he was pretending to be a 14-year-old cheerleader from Florida.

He would start talking to them on Facebook and Instagram. He would start chatting with them. He would then say, "How about we talk on Kik, Kik messenger?"

What is Kik? I had no idea when I started this investigation. Kik is a mobile app, a mobile app that is popular with teens and preteens for its chat function.

You just download it to your phone and all you need is an internet connection, for example, Wi-Fi connection.

It's also popular because while you're chatting you can exchange videos and photographs.  You're going to hear a lot about Kik throughout this trial.

So the defendant would start talking to a boy on Kik.  The conversation would start fairly innocuous.  The defendant would ask the defendant or would ask the boys, for example, "Have you seen the most recent Miley Cyrus video, Wrecking Ball?"  They would talk about that.  But then the defendant would quickly escalate the conversation to a sexual one.  He would ask the boys, "Do you have a girlfriend?  Do you masturbate?"  And once he set his trap, the defendant would ask the boys, "Send me a photograph," and the boys would comply.

But the evidence will show at first some of the boys, for example, would send a photograph of just themselves in their boxer briefs.  Was that good enough for the defendant?  The evidence will show that it wasn't.  The defendant wanted more.  He wanted a picture of the boys' genitals.  And he would ask for that.

Was that good enough for the defendant?  It wasn't.  And the boy would send him that photograph.  But the defendant wanted more.  He wanted more for his own sexual gratification and he had a signature shot, a shot that he wanted for his trophy case.  And that was a picture of a boy with his genitals and also a picture of the boy's face in the

same picture.  Those are the kind of photographs that the defendant, an adult, obtained from young boys.

And with some of these boys, after sending them 10, 20 photographs of themselves, naked photographs, some of them had regrets.  Did they really know who they were talking to on the other side of that phone?  They would ask the defendant to please delete them.  And did the defendant?  No.  He threatened the boys.  He threatened to post the photographs that they had already sent if they didn't send exactly what they wanted, the picture of the genitals with the boy's face, and the boys would comply.  They would send him what he wanted.

Now, you're going to hear a lot about, like I said, Kik, and you're also going to hear that we found some of these chats, the Kik chats, that were found on the defendant's computer, and I just want to read a snippet of one that he had with a 14-year-old boy named Garrett Frost.  And Garrett had already sent the defendant a number of images of himself engaged in sexually explicit conduct and he had regrets.  Garrett didn't want to send the defendant anymore photographs and here is what he said to the defendant.

"Nothing.  It's just that I've sent so many and I believe it's you, but please, delete them right now."

The defendant responds, "Sure, if you send."

Garrett responds, "I know.  I'm sorry.  Please

don't put them on Insta," referring to Instagram."

MR. SCHWARTZ: Judge, I object.

THE COURT: Overruled.

MR. EMERY: "I'm begging you. I'll send one more but you have to delete them, please." That's what Garrett said.

The defendant would reply, all caps, "SEND."

What does Garrett do, he sends a sexually explicit photograph of himself, exactly how the defendant wanted it, but the defendant complains about the picture and Garrett says to him, "I'm not hard anymore. I'm scared you'll post them. I'm crying right now, please."

And the evidence will show that the defendant acted in blatant disregard of the welfare of these boys. For him, it was more important to blackmail these boys and get exactly what he wanted.

You're also going to hear that there was chats found on the defendant's computer where he's having conversations with fellow traders of child pornography. Fellow traders who had a similar interest like the defendant in young boys. And there was one trader in particular named Karucem that the defendant had a conversation with him, and I'll read a little snippet of that.

MR. SCHWARTZ: Same objection.

THE COURT: Overruled.

**MR. EMERY:** Karucem asked the defendant, "When you blackmailed the boy, did he tell you that if you post his pics, he will kill himself?"

The defendant responds, "Yes, but they don't."

Karucem says, "When they reply, 'I will kill myself,' what do you answer them?"

The defendant replied, "It depends on the situation. I say more like, 'I don't care, just send,' or just ignore them if they say it."

In addition to all of that, the evidence will show you'll hear about many more images that were found on the defendant's computers of children engaged in sexually explicit conduct.

And, ladies and gentlemen of the jury, you will also hear that the defendant confessed to the crime, that when the FBI showed up at his residence, the defendant admitted that he used Kik messenger, that he used Kik messenger to contact these young boys.

And that by his estimation, and the evidence will show that it was a very conservative estimation, he had contacted 100 to 200 boys, all the while pretending to be a female cheerleader teenager from Florida, and of those 100 to 200 boys, again, conservative estimate, he said he got nude photographs from about 50 of those boys.

You will also hear evidence that when the FBI

showed up at his house, the defendant deleted evidence from his phone to cover his tracks. You're also going to hear from two females, two women, who girls, from whom the defendant stole their likeness. He stole their pictures from the internet and he used their likenesses to perpetuate his crime. He sent the boys photographs of these girls so that when the boys were talking, chatting with the defendant, they thought they were talking to these girls, but they weren't.

You're also going to hear from some of the parents of the victims that the defendant -- of the boys that the defendant victimized and exploited.

And at the end of the trial, and based on all the Government's evidence, the overwhelming evidence, we're going to stand back before you and ask that you reach one and only one conclusion that's consistent with that evidence, and that the defendant is guilty as charged.

Thank you.

THE COURT: Thank you. The defense.

*OPENING STATEMENT*

MR. SCHWARTZ: Ladies and gentlemen of the jury, my name is Fred Schwartz. I've introduced myself to you before. And if you can't hear me, I'm going to try to speak up, but my family tells me I mumble a lot, so if I mumble and you can't understand me, just raise your hand and I'll try to

correct that.

This is not a happy case, not a case that anybody enjoys being in the courtroom and trying.

What will the evidence show from the defense point of view?  The evidence will show that Patrick Killen, Junior, starting at about the age of 15 or 16, became interested in seeing naked pictures of other boys on the internet.  The evidence will show that Patrick believes that he's not very well-endowed, that he likes to -- wanted to look at pictures of other boys to compare back to himself.  And that's a very private thing, and it's private to be saying in an open courtroom, but, unfortunately, it is necessary and you'll hear evidence about that.

The evidence will show that Patrick didn't stop when he turned 18 and magically became an adult.  And this type of conduct became a crime because he was an adult and these were the images of teenage boys that he was looking at.

The evidence will also show that during the time when Patrick was 19 and 20, he did have conversations, chats, you'll have to forgive me, I'm not very technologically-oriented.  When I had a VCR and I wanted to get it to stop flashing, I had to use a piece of black tape.  So I don't really understand the internet and chats that well.

But he wanted to use various internet applications to talk to boys and get them to send him naked pictures of

themselves.

Now, you might say, well, Mr. Schwartz is telling me his client is guilty, why do we need go further?  Because there's somewhat more to it than that and that's what you'll hear in the evidence of the case.

The defendant is charged with specific crimes that have been written by Congress.  The laws once they are passed by Congress have been signed by the president, and they're laws that we have to abide by.  But because they're laws describing criminal conduct, they're laws that have to be strictly construed by the jury.  You have to find that each of the elements, each of the little pieces of the law were violated, and you'll have to find at the end of the evidence that the Government has proven Patrick guilty of each of those elements of the crime beyond a reasonable doubt.

Now, let me start off with the easiest crime for the jury.  Patrick did extort some of these boys.  When I say extorting him, it wasn't blackmailing them and saying, "Give me $100,000 or I'll post the picture," he was saying, "Send more pictures."

When you consider that crime after you have heard the testimony, I suggest to you that you will say Patrick was guilty of that extortion of these boys, threatening them, telling them if you don't send me a picture I'm going to post it on the internet.  It's your decision.  I can't decide any

of this for you, but when you hear the testimony I think the testimony will likely establish that.

But now let's go to the other more serious crimes to which he's charged, and I say more serious from the point of view of society.  Patrick is charged with producing, distributing, possessing, sexually explicit photographs of children, people under 18 years of old or years old.  And young, people in their teens.

Notice I use the word sexually explicit?  I didn't use the word naked pictures because we have all seen great statues of Michelangelo's David, which is a picture of a naked man showing his genitals.  We have all seen pictures in Playboy or other popular sites of naked people.  But these were naked children.

In order for the Government to prove its crime, the evidence has to show that these pictures of these boys were sexually explicit and I believe the evidence, when presented of the pictures of the boys with whom Patrick had chats, will show that these are not what is defined by the law, what the Judge will tell you is the law at the end of the case, sexually explicit pictures.

There are certain categories of pictures that are sexually explicit.  The Judge will tell you, I think the relevant one, and this is up to the Judge, is a lascivious exhibit of the genitals or pubic areas of any person is

sexually explicit.

When I read that, that didn't help me very much because I didn't really understand the word lascivious, but the Judge is going to tell you that there are seven different items that you should consider in determining whether something is lascivious.  And one of those items, the evidence will show, is a man, whether a picture of a minor partially clothed or nude.

But there are six other items, and I would suggest when we hear the evidence as it comes in, that evidence will not be met.  The Government will not be able to prove beyond a reasonable doubt the other six items.  Maybe one of them, but certainly not all seven or the majority of them.

And the same way the Government says they'll come back and ask you for a verdict of guilty on all of the counts, I will come back at the end of the case and suggest to you that they haven't met their burden of establishing that this was a lascivious exhibition.

Yes, Patrick was injurious.  Yes, he was curious to see what the pictures of naked boys looked like, other boys, other genital areas.  In today's society, I guess there's nothing wrong with boys wanting to look at boys or girls wanting to look at girls, but you'll have a chance to look at those pictures and make a determination as to whether they meet the standards set out in the law.

The other crime that the Government suggests Patrick committed is destroying evidence involved in a government investigation, and I'm paraphrasing.

What the evidence will show is that at some point in time in the year 2014 -- I'm old so I forget dates sometimes, but I would suggest, I think the date was February 11th, 2014, Special Agent Schwartzenberger and her then partner Special Agent Ginther came to Patrick's house.  They knocked on his door.  There was a question of whether they knocked on the door at 6:30 in the morning or was it 7:00 or 7:15, but he was still asleep, he hadn't gotten up to go to school yet.  His parents were home and they let the FBI agents in.

People trust FBI agents and the FBI agents, and there will be some controversy about how this happened, but they wanted to see Patrick's electronics, his computer, his cell phone, his iPad.  They didn't have a search warrant, but they wanted to see his electronics, and the evidence will show that Patrick complied with what the FBI requested or demanded, it's not quite clear which, brought out from his bedroom his laptop and his iPad and his cell phone was not charged, it was dead, and he plugged it in to charge it and he eventually brought it out later.

There will be a controversy during the course of the testimony that you will have to decide.  One of the

agents will say when he eventually brought out his cell phone, the apps, the applications that are on the front of the cell phone with pretty little pictures on it were shaking, and that indicated to him that Patrick had been erasing something.  And he believes that Patrick at that point knowing that there was an FBI investigation going on, erased certain things from his cell phone.

The testimony that the defense will present is that the cell phone was locked, closed, and that Patrick had to give him his code to open it, and I've since learned, because I have an 18-year-old daughter who teaches me these things, that when you unlock a cell phone with a code, the apps can't be shaking.  You have to double click on a button to make the apps shake.

So that is going to be, I suggest to you, the evidence that Patrick, when he knew an FBI investigation was going on, destroyed evidence of that which was important to the FBI, which is took pictures off his phone and destroyed, therefore, destroyed it.

I suggest to you, again, at the end of the case, I will get up here in closing argument and argue to you that the Government hasn't proved that crime beyond a reasonable doubt.  But I will also tell you that the evidence will show that Patrick erased images that he downloaded from his either computer or cell phone, not when the FBI was at his house,

but on other occasions.

Patrick went to the internet and downloaded on a number of occasions, what they call blind folders, folders that aren't labeled as to what's in them from a website called GigaTribe.  I don't know how they got the name.  But when he downloaded those folders, he would then open the folders and there would be various clips which are short portions of videotapes that were in the folder.  When he looked at the videotape, the evidence will show, that these weren't things he wanted to see.  He didn't know what they were when he initially downloaded them on blind folder, he didn't want to see them.

As a matter of fact, on one occasion he chats with somebody who had sent him the folder or replaced the folder in GigaTribe in the app.  These are not things I want to see.  This is disgusting.  These people should go to jail.  Because they were pictures of people and children having sex.  And that's not what he was interested in.  He was interested in viewing the bodies of boys.  Not for sexual purposes.  They were sexually explicit in viewing the bodies of boys.

Now, what did he do with those clips that were downloaded?  He deleted them from his phone or his computer. His phone was backed up to his computer so what was on his phone, his iPhone, got onto his MacBook computer, but he deleted them.  He didn't want to have them.

The testimony will show that Patrick is a procrastinator.  He hadn't had a chance to delete.  But you'll see a pattern of when he gets this kind of stuff, it is sent to him or downloaded, he deletes it.

Now, why is he here if he deleted it?  Because some of those clips you are going to be shown in the courtroom.  And you can say to me, "Schwartz, you're not credible.  You told me he deleted it.  You told me he didn't want to see it.  And yet, here it is.  The Government is showing it to me."

The evidence will show that our Government is very sophisticated, particularly when it comes to dealing with computers.  They have the ability to go into a computer and extract -- I think that's a word you'll hear during the trial -- extract images, extract things, that we believe we have deleted.  If I get an e-mail or a letter from a friend, I'm not particularly interested, I don't want to have it, it's something that bothers me and I delete it.  Somehow it's still there for the FBI to come back and pull it out, almost bring back to life a ghost, and the evidence will show during the course of the trial, that the FBI has specialists whose job it is to go into your computer -- to go into a computer, and extract things that have been deleted.

That -- and I'd ask that you listen closely to the testimony of these FBI experts in recovering things that people don't want to have anymore and see if these clips that

I'm talking about, the ones that Patrick got around to deleting, not the ones that he procrastinated and didn't delete yet, were, in fact, deleted and extracted.

So I'd ask you to listen very closely to the evidence. There is a lot of nuance. I think many of you will be -- I don't want to use the word disgusted or repelled by images of naked boys in their teens. Imagine you when you were -- none of you when you were young played doctor or anything like that, but you will be repelled by the images of these boys, but I ask you to get past that when you're listening to the evidence.

Listen carefully. See what the testimony actually is from the Government for what will be four or five or maybe six days of Government testimony, because they have a burden of proving each and every element of the case beyond a reasonable doubt. We don't have to do, as the Judge told you, put on any witnesses at all. We will put on either one, two or three witnesses, if we believe it's necessary. But our case will be much shorter, much briefer, but that doesn't mean that the number of witnesses will count. It's the quality of the evidence.

Listen carefully, and then at the end of the case, listen to what our learned judge, Judge Moore, tells us the law is and at the end of the case, I'll come back and ask you to hold the Government to proving each and every element and

to the exclusion of any reasonable doubt.  Because the defendant, as he's here today, is cloaked in a presumption of innocence.  It's like he's wearing a veil of invisibility or something of that sort where he's innocent.  He is presumed -- he's presumed to be innocent, and it's only if the Government meets its burden beyond a reasonable doubt that you can remove that cloak of innocence.

So thank you for letting me mumble to you today and I hope you all understood me.  And I'd ask you to please listen carefully to all the evidence.

Thank you very much.

**THE COURT:**  Thank you.  Call your first witness.

**MR. EMERY:**  The United States calls FBI Special Agent Susan Ostrobinski.

Thereupon,

**SUSAN OSTROBINSKI,**

having been duly sworn by the courtroom deputy, testified as follows:

**THE WITNESS:**  I do.

**THE COURTROOM DEPUTY:**  Please be seated.  State your name for the record and then please spell it.

**THE WITNESS:**  Susan Ostrobinski, O-S-T-R-O-B-I-N-S-K-I.

*DIRECT EXAMINATION*

BY MR. EMERY:

Q.  Good morning.

A.  **Good morning.**

Q.  Where are you employed?

A.  **I'm the supervisor special agent for the FBI in Charlotte.**

Q.  And just generally, what do you do for the FBI?

A.  **I'm a supervisor for the Violent Crimes Against Children Squad and the Civil Rights Squad.**

Q.  And how long have you been a supervisor in that squad?

A.  **In Charlotte, I've been a supervisor for three years.**

Q.  And how long have you been with the FBI?

A.  **A little over 16 years.**

Q.  And what did you do before that?

A.  **Before that I was assistant legal attache overseas in several posts, in Yeomen, Ethiopia and Toronto.  Before that I was in the training division in the international training and assistance unit, and before that I was in New York.**

Q.  And then before you were an FBI special agent, what did you do?

A.  **I was an assistant district attorney in Massachusetts.**

Q.  Now, you just talked about the squad that you're a supervisor in.  Does that squad also investigate crimes against children over the internet?

A.  **Yes, we do.**

Q.   Now, on March 24th, 2013, did FBI Charlotte receive a complaint from Jeffery Eckert?

A.   **We did.**

Q.   And how was that complaint received by the FBI?

A.   **It came in through our Charlotte public folder which is -- it can be accessed through FBI.gov, and it's an e-mail address that goes to the Charlotte office, and once it goes to the Charlotte office it's farmed out to the appropriate squad.**

Q.   And did you get that complaint?

A.   **I did.**

Q.   And did you ask Mr. Eckert to come in and see you?

A.   **I did.**

Q.   Did he?

A.   **He did.**

Q.   When was that?

A.   **March 28th, 2013.**

Q.   And did he come into your office alone?

A.   **He did.**

Q.   And did he come in to talk to you about the complaint he had filed?

A.   **Yes.**

Q.   And based on the information that he told you, did you take subsequent investigative action?

A.   **I did.**

Q.   When Mr. Eckert came to your office, on March 28th, 2013, what did he tell you?

MR. SCHWARTZ:  Objection.  Hearsay.

THE COURT:  Overruled.

A.   He told me that he had --

MR. SCHWARTZ:  Objection.  Confrontation clause.

THE COURT:  Overruled.

A.   He told me that he had located some nude photographs of his son on his daughter's iPad because all the iPhones were linked in the house.  And he asked his son about it and learned that his son had been corresponding with a person he believed to be a 14 or 15-year-old girl named Rebecca Till who lived in Florida.

MR. SCHWARTZ:  Objection.  Double hearsay.

THE COURT:  Well, we'll overrule the objection. It's not being offered for the truth of the matter, just to explain why the agent did what she did in response to the complaint that she received.

BY MR. EMERY:

Q.   What was his son's name?

A.   Kyler.

Q.   What happened next?

A.   He indicated that he went on Kyler's account acting as Kyler and engaged Rebecca Till in conversation, that immediately went to Rebecca Till requesting more nude

photographs.

MR. SCHWARTZ:  May I have a continuing hearsay objection, Your Honor?

THE COURT:  All right.

BY MR. EMERY:

Q.  I'm sorry, could you repeat that last part, I didn't hear that.

A.  Rebecca Till immediately asked for more nude photographs from Jeffery Eckert who was using his son's Kik account.

Q.  And let's talk a little bit about that then.  What is Kik?

A.  Kik is a smartphone app that allows people to privately text each other and it can be used with your data plan or by connecting with the Wi-Fi.

Q.  And is there a particular -- in your training and experience, is there a particular age group amongst which Kik is popular with?

A.  I find it's popular with kids between the age of 10 and 17.

Q.  And why is that; do you know?

A.  Well, it doesn't use your data plan and it's private and it uses user names and not telephone numbers.

Q.  Are you able to connect using Wi-Fi?

A.  Yes.

Q.  And in this case, did you determine the user name of

Kyler?

A.    **Yes, it was KylerJ723.**

Q.    And you said that previously in your testimony that Mr. Eckert took over this account; is that correct?

A.    **Yes.**

Q.    And then what happened next when he took over the account?

A.    **He took over the account and had a conversation with RebeccaTill05, which was the other user name, and RebeccaTill05 requested more nude photographs, and when he attempted to put off sending anything, RebeccaTill05 threatened to post all the nude photographs that had been previously sent under that account of Kyler to all of his friends.**

Q.    And after that, did Mr. Eckert set up his own account?

A.    **He said he wanted to see if we could duplicate the same type of conversation with Rebecca Till.**

Q.    And as part of your investigation, were you able to determine what user name he used?

A.    **He's used Jeeter I Am.**

Q.    And did he chat with this person?

A.    **Yes.**

Q.    And what was the -- and the user name that he was chatting with?

A.    **Jeeter I Am was his user name and he was chatting with**

RebeccaTill05.  She accepted his friend request and they began to chat over Kik.

Q.   And what, if anything, happened over this chat?

A.   He said it pretty much immediately went to requesting nude photographs and he stopped conversation at that point.

Q.   And is the information that Mr. Eckert had told you, was that of investigative value to you?

A.   It was.

Q.   And based on the information that he had given you that day, what did you do next?

A.   Contacted Kik and requested that they preserve the Rebecca Till and KylerJ723 accounts.

Q.   Why did you do that?

A.   Because that basically freezes an account so nothing can be deleted off the Kik server and the account remains as it is when we requested it to be preserved.

Q.   And where is Kik located, where is the company located?

A.   It's in Canada.

Q.   And after you did this preservation request, what did you do next?

A.   Next we had to contact the Office of International Affairs to request that they assist us in getting Kik to provide records through a mutual legal assistance treaty.

Q.   Is also known as an MLAT?

A.   It is.

Q.   If you could briefly describe to the ladies and gentlemen of the jury, what is an MLAT?

A.   **An MLAT is basically an agreement between countries that they will -- the country will assist us in getting documents that are located, or evidence that is located in their country and provide it to us, basically on our behalf.**

Q.   Did you do an MLAT to Kik?

A.   **I did.**

Q.   And generally, what did you ask Kik for?

A.   **I asked Kik for all records relating to the RebeccaTill05 account, the KylerJ723 and the Jeeter I Am account to include account information, chats, photographs that were sent back and forth; basically anything that happened between those three accounts.**

Q.   Did Kik respond?

A.   **They did.**

Q.   And what did they respond with?

A.   **Well, they first told us that they don't save any of the content of the text messages, they can just provide us with the chat logs which will show basically User A is talking to User B at this certain time.  So they were able to provide that information to us.**

Q.   Is that, fair to say, basically like transactional information?

A.   **Correct.**

Q.   And in addition to this transactional information about the chats, what else did they -- what else did they provide to you?

A.   **They were able to provide photographs that were sent back and forth and logs when actually the person -- it's called bind logs, it's when a person actually connects to the app and it basically opens it in Kik.**

MR. EMERY:  May I approach, Your Honor?

THE COURT:  All right.

**BY MR. EMERY:**

Q.   I'm showing you what's been marked for identification as Government's Exhibit 5.

(Thereupon, the exhibit was marked for identification.)

MR. EMERY:  At this time we would move Exhibit 5 as self-authenticating.

MR. SCHWARTZ:  No objection, Your Honor.

THE COURT:  It will be admitted.

(Thereupon, the exhibit was admitted into evidence.)

MR. EMERY:  Move to publish, Your Honor.

THE COURT:  All right.

MR. EMERY:  Can we turn on the screen, please?

THE COURT:  Which screen do you want, your computer or the --

MR. EMERY:  Also to publish it to the jury.  Yes, up here and also to the witness.

THE COURT:  Right.  Is it on the juror's screen? They're on but what is your source?

MR. EMERY:  My source, Your Honor?

You're right.  I'll take it from the witness.

THE COURT:  You can have it from the witness if you want.  The witness has the --

MR. EMERY:  I'll go ahead and publish it.

THE COURT:  Look, look.

MR. EMERY:  I'll put it on the ELMO.

THE COURT:  Okay.

BY MR. EMERY:

Q.  I'm showing you what's been admitted as Government's Exhibit 5.  What is this?

A.  **That's a birth certificate for Kyler Eckert.**

MR. SCHWARTZ:  And I'm going to not object to the birth certificate, it's self-authenticating but any other testimony as a violation of 404(b) and 403.

THE COURT:  Overruled.

BY MR. EMERY:

Q.  And all right, so I see at the top there's a name.  You said that's Kyler Eckert?

A.  **Right.**

Q.  And what is that right there?

A.  **His date of birth, 7-23-2000.**

Q.  And down here there's a name of the father?

A.  **Jeffery Philip Eckert.**

Q.  Is that the name of the father you met with?

A.  **Yes, yes.**

Q.  After the father came in on March 28th, 2013, did you also meet with Kyler?

A.  **I met Kyler I think in October of that year as well.**

Q.  Is that his date of birth?

A.  **Yes, it is.**

MR. SCHWARTZ:  Your Honor, I'm going to object to the documents that the Government is about to produce pursuant to the motion in limine filed today.

THE COURT:  Overruled.

BY MR. EMERY:

Q.  Now you said that you had received a response, an MLAT response from Kik, correct?

A.  **Correct.**

MR. EMERY:  May I approach, Your Honor?

THE COURT:  All right.

MR. EMERY:  If we could turn off the jury screen, Your Honor.

BY MR. EMERY:

Q.  I'm showing you what's been marked as Government's 2A through 2F.  Could you please take a look at those?  Let me know.

(Thereupon, the exhibit was marked for identification.)

A.   Okay.

BY MR. EMERY:

Q.   Do you recognize Government's 2A through 2F?

A.   I do.

Q.   And are those business records you had received from Kik?

A.   They are.

        MR. EMERY:  Move to admit, Your Honor?

        THE COURT:  Defendant?

        MR. SCHWARTZ:  Your Honor, may I voir dire?

        THE COURT:  All right.


                    *VOIR DIRE EXAMINATION*

BY MR. SCHWARTZ:

Q.   Special Agent, you've testified that these are business records received from Kik; is that correct?

A.   Correct.

Q.   Were they received directly from Kik?

A.   They were received from the Royal Canadian Mounted Police.

Q.   A constable; is that correct?

A.   Correct.

Q.   And did the constable do any work in selecting which records were received?

A.   No.

Q.   Did he prepare any summary reports or select any

photographs that were received?

A.   **From Kik?**

Q.   That you got that he sent to you from what he received from Kik?

A.   **It's my understanding he sent everything he received from Kik to me.**

Q.   He just passed them along, he didn't participate in the preparation of any reports or any -- he didn't exercise any discretion in what you received; is that correct?

A.   **I don't know.  I don't think so.  I think that he just provided me with a summary of what he -- what they gave me and they encrypted the disk because it contained child pornography.**

Q.   I understand.  And that's an excellent precaution.  But my question is, he provided you with a summary you said.  So at some point he acted in a way so as to summarize and provide to our government agencies, you, that which he received from the Canadian company; is that correct?

A.   **He didn't provide a summary.  He provided like an index, like an inventory of what he provided.**

Q.   So he went through and inventoried it and provided you that inventory?

A.   **Correct.**

          MR. SCHWARTZ:   I would renew my objection on the motion I filed this morning.

THE COURT:  Overruled.

MR. EMERY:  So the Government would move to admit 2A through 2F.

THE COURT:  It will be admitted.

(Thereupon, the exhibit was admitted into evidence.)

MR. EMERY:  Permission to publish, Your Honor?

THE COURT:  All right.

MR. EMERY:  Is that on for the jury?  Yes.

BY MR. EMERY:

Q.   What is Government's 2A?

A.   **That is the encrypted disk that we received back from Kik with the records that we requested.**

Q.   And, again, this was between the transactional information and also photographs from Rebecca Till, and who else?

A.   **Rebecca Till and Kyler which would be KylerJ723 and Jeeter I Am.  The photographs were encrypted and the documents were not.**

Q.   And when I said Rebecca Till, I meant to say RebeccaTill05; is that correct?

A.   **Correct.**

Q.   What is Government's 2B?

A.   **That's an unencrypted version, a work copy of taking the photographs off to un-encrypt them so we could work on them.**

Q.   So Government's 2A and 2B, 2A was the encrypted files you

received?

A.   Correct.

Q.   And 2B are actually unencrypted so you could actually look --

A.   Could open them, yeah.

MR. SCHWARTZ:   Your Honor, I believe the disks have it opposite.  2A says unencrypted and 2B says encrypted.

A.   The photographs are encrypted on the 2A and the documents are unencrypted.

BY MR. EMERY:

Q.   All right.  What is Government's 2C?

A.   That would be the account information when the account was set up which provides the user name, the name of the person who sets it up, and the location where it's set up and some of the devices that are associated with the account.

Q.   So let's first start then at the top, next account info, and it says user name.  What user name is that?

A.   RebeccaTill05.

Q.   And then account info, it says first name?

A.   It's Rebecca.

Q.   And then account info, it says last name?  You want me to zoom in a little bit?

A.   Yeah.  A little bit, I'm sorry.

Till3K Kik Me.

Q.   And I see right below that, too, it says account info

right here; is that correct?

A.   Correct.

Q.   And next to it it provides an e-mail?

A.   Correct.

Q.   What e-mail does it provide?

A.   ZachGonzalez05@Yahoo.com.

Q.   And then moving down the document, for example, it says right here, registration client info, right next to it it says, model?

A.   Uh-huh.   (Nodding).

Q.   Can you see that?

A.   Yes.

Q.   And what is that?

A.   That would be the model, the device that was associated with that account that was used with that account.

Q.   And what are one of the devices here?  What does that say?  I'll zoom in.

A.   Phone, iPhone.

Q.   And then what about up at the top, that says time stamp, correct?

A.   Yes.

Q.   Is that what it says?

A.   Yes.

Q.   And then what is this column right here?  You're not aware of what that is?

A.   I'm not aware of what that is, no.

Q.   We'll move on.  And then over here where it says, user location?

A.   Correct.

Q.   What is that?

A.   It's where the person is located or where their iPhone or their device is located and it gives a latitude and longitude.

Q.   Does it give a city right there?

A.   Hialeah.

Q.   What is Government's Exhibit 2D?

A.   That's a bind log.

Q.   And again, what is this?

A.   A bind log, when someone opens the Kik app, it connects to the Kik server in Canada and this records the opening of the app, and the IP address that is basically using the app.

Q.   And is an IP address of investigative value to you?

A.   Yes.

Q.   And why is that?

A.   It can provide the location of where the person is located when they're using the app or when they're using that IP address.

Q.   And I see right there, is that a user name right there?

A.   Yes, it's RebeccaTill05.

Q.   And then, for example, right here, this first IP address,

what does that tell us?

A.  **It tells us the location that the person was using the internet service that they were using at the time.**

Q.  And what about Government's 2E?  I'll zoom in here.

A.  **Those are chat logs between RebeccaTill105 and the KylerJ723 account.**

Q.  Is that what we referred to before as transactional information?

A.  **Correct, not the actual chats themselves but that they were, in fact, chatting at that date and time.**

Q.  I'm sorry.  Do you know what the column on the right here says where it says CIP?  Do you know what they were saying?

A.  **They were using iPhones.**

Q.  Government's 2F, what is this?

A.  **This is the same transactional log, but it's between RebeccaTill105 and Jeeter I Am, which is the account that Jeffery set up, Jeffery Eckert set up.**

Q.  I'm showing you what's been marked for identification as Government's 2G through 2L.  Please take a look at those.

(Thereupon, the exhibit was marked for identification.)

A.  **(Complies).**

BY MR. EMERY:

Q.  Do you recognize those documents?

A.  **I do.**

Q.  Are those business records that you also received from

Kik as part of the MLAT?

A. **They are.**

MR. EMERY: Move to admit.

MR. SCHWARTZ: Other than the same objection, if I could have a continuing objection as to all of those.

THE COURT: All right. Will be admitted.

(Thereupon, the exhibit was admitted into evidence.)

MR. EMERY: If we could publish, Your Honor, please to the jury.

BY MR. EMERY:

Q. What is Government's 2G?

A. **That is a picture of Kyler that I received from MLAT that Kik provided.**

Q. And based on the business records that Kik had sent you, were you able to determine who had sent this photograph?

A. **Yes. I was able to determine that Kyler J's account sent it to the Rebecca Till account.**

Q. And that's RebeccaTill05?

A. **RebeccaTill05, sorry.**

Q. Government's 2K. What is this, or 2H, I'm sorry?

A. **Again, that would be a picture provided by Kik and their response to the MLAT. It's a screen shot of the Kik conversation info of the RebeccaTill05 account and the KylerJ723 account.**

MR. EMERY: Ladies and gentlemen of the jury, I

just want to mention at this point I'm going to be showing some photographs, some nude photographs of Kyler.

BY MR. EMERY:

Q.   I'm showing you Government's 2I.  What is this?

A.   **That's a picture of Kyler exposing his penis in the records that I received from Kik.**

Q.   And according to the records that Kik had sent, who sent this photographs?

A.   **KylerJ723 account sent it to the RebeccaTill05 account.**

Q.   Government's 2J, do you recognize this?

A.   **That's another picture of Kyler exposing his penis that was received from Kik in the response to the MLAT.**

Q.   And you said you met Kyler before?

A.   **I have.**

Q.   Is this the same person?

A.   **It is.**

Q.   Government's 2K, do you recognize this?

A.   **Yes.  That was the photograph that was also received by Kik in response to the MLAT that was sent from the RebeccaTill05 account to the KylerJ723 account.**

Q.   And then lastly, Government's 2L, what is that?

A.   **Again, that was a photograph that was received by Kik in response to the MLAT, and that was a photograph that was sent by the RebeccaTill05 account to the KylerJ723 account.**

Q.   And is this of a female spread apart?

A.  Yes.

Q.  Now, after you received this information from Kik, what did you do next?

A.  **Once we had the bind logs which showed the IP addresses that Rebecca Till was connecting to Kik on, we looked in the top three IP addresses and we did a subpoena for those to determine what account they came back to.**

Q.  And this is Government's 2D.  Is this what you're referring to?

A.  **Yes, it is.**

Q.  And you said that there was -- so for some of these IP addresses?

A.  **Yes, we looked at the most -- the ones that hit the most and we picked the top three and did an admin subpoena to determine who subscribed to those IP addresses.**

Q.  And who did you send the subpoena to?

A.  **BellSouth.**

Q.  And did BellSouth respond?

A.  **They did.**

MR. EMERY:  Your Honor, the government would move to admit Government's Exhibit 3 without objection.

THE COURT:  It will be admitted.

(Thereupon, the exhibit was admitted into evidence.)

BY MR. EMERY:

Q.  What is this?

A.   **That's the response we got back from BellSouth for the IP addresses.**

Q.   And I see at the top where it says IP assigned, was this -- did they give you responsive information for these IP addresses?

A.   **They did.**

Q.   And there's two there, correct?

A.   **There's two, yes.**

Q.   And I'm going to show you then Government's 2D, for example, the first IP address at the top.  Does that also appear on Government's Exhibit 3?

A.   **Yes.**

Q.   Is that right there?

A.   **It is.**

Q.   And what kind of information then does Government's 3 give you?

A.   **BellSouth will give us the account information involving -- with that IP address, so it will tell you who has the account, when it was created, the customer ID, the e-mail address associated with that account, a phone number associated with that account, and the address associated that account as well.**

Q.   So right here where it says contact information, what does that tell you?

A.   **It tells us the name was Patrick Killen that had that**

account with the IP address.

Q.   And then down below also there's an e-mail login?

A.   **Yes, PJKillen@bellsouth.net.**

Q.   And then it says address line.  What address did it give you?

A.   **6880 Pinehurst Drive in Miami, Florida.**

Q.   And based on your investigation, did Government's Exhibit 3 tell you who RebeccaTill05 was?

A.   **Didn't tell us who, but it definitely told us it was associated with that person.**

Q.   This information just tells you who --

A.   **Had that account.**

Q.   The name on the account?

A.   **Right.**

Q.   After you then received that subpoena response from BellSouth, what did you do next?

A.   **We sent a lead to the Miami Division because it appeared that the person of interest was located in their area of responsibility.**

Q.   Is it normal to send a lead to another FBI office?

A.   **Yes.**

Q.   And do you know which agent in FBI Miami received that lead request?

A.   **It was assigned to Laura Schwartzenberger.**

Q.   And what did you ask Special Agent Schwartzenberger to

do?

A.   **We asked for just logical investigative followup which we thought would probably just include what we call a knock and talk.**

Q.   What is a knock and talk?

A.   **A knock and talk is basically going to that address that was in the subpoena and speaking to the individuals who reside there, interviewing them to determine if they were involved in this case.**

Q.   And as far as you're aware, did Special Agent Schwartzenberger go to that residence?

A.   **Yes.**

Q.   And did she tell you her results?

A.   **She did.**

Q.   And without going into the specifics too much, generally what did she tell you?

          MR. SCHWARTZ:  Objection.

          THE COURT:  Overruled.

A.   **She told me that the person who was located at that address, Patrick Killen, Junior, admitted to using the RebeccaTill05 account on Kik.**

BY MR. EMERY:

Q.   Was that information of investigative value to you?

A.   **It was.**

Q.   And based on the information that Special Agent

Schwartzenberger told you, what did you do next?

A.  **I requested that Kik provide -- in a supplemental MLAT request, I requested that they provide the whole Rebecca Till account because Mr. Killen indicated that he spoke to several people on that account.**

Q.  And did you do a supplemental request to Kik?

A.  **I did.**

Q.  Was that, again, through the MLAT process?

A.  **It was.**

Q.  Did Kik respond?

A.  **They did.**

Q.  Did they provide you with business records?

A.  **They did.**

MR. SCHWARTZ:  Same Motion in Limine objection.

THE COURT:  Overruled.

MR. EMERY:  May I approach, Your Honor?

THE COURT:  All right.

BY MR. EMERY:

Q.  I'm showing you what's been marked for Government's identification as Government's 4A through 4C.  Do you recognize these documents?

(Thereupon, the exhibit was marked for identification.)

A.  **I do.**

BY MR. EMERY:

Q.  What is 4A?

A.  **4A is the thumb drive that I received from Kik with the supplemental information that I requested.**

Q.  Was it encrypted?

A.  **It was encrypted.**

Q.  And what is Government's 4B?

A.  **4B is the photographs that had been unencrypted.**

Q.  And then Government's 4C?

A.  **The documents that are also unencrypted.**

Q.  Are those the business records of Kik?

A.  **Yes.**

            MR. EMERY:  Move to admit, Your Honor.

            THE COURT:  Be admitted.

         (Thereupon, the exhibit was admitted into evidence.)

            MR. EMERY:  Permission to publish, Your Honor.

            THE COURT:  All right.

BY MR. EMERY:

Q.  So 4A you said was the thumb drive?

A.  **Yes.**

Q.  And then 4B contains what again?

A.  **Unencrypted photographs that were on that thumb drive.**

Q.  And then Government's 4C?

A.  **Those were the documents that were on the thumb drive.**

            MR. EMERY:  Permission to approach, Your Honor.

            THE COURT:  All right.

BY MR. EMERY:

Q.   I'm showing you what's been marked for identification as Government's 4D, as in David, and 4XX.  Do you recognize those documents?

(Thereupon, the exhibit was marked for identification.)

A.   **Yes.**

BY MR. EMERY:

Q.   What is Government's 4D?

A.   **4D would be the bind logs, some of the bind logs for the RebeccaTill105 account.**

Q.   And then what about 4XX?

A.   **That would be the account information for the RebeccaTill105 account similar to the first one that we received.**

Q.   Are these business records from Kik?

A.   **They are.**

MR. EMERY:  Move to admit, Your Honor.

MR. SCHWARTZ:  Same continuing objection.

THE COURT:  Admitted.

(Thereupon, the exhibit was admitted into evidence.)

BY MR. EMERY:

Q.   And you just testified that these are the bind logs?

A.   **Correct.**

Q.   And these are just certain pages?

A.   **Yes.**

Q.   Was there more than this?

A.   **There was a lot more than that.**

Q.   Government's 4XX, let me just zoom out a little bit.  It says this is metrics user inspector.  Is this similar to what we previously reviewed?

A.   **It is.  It's the account information.**

Q.   We won't go through it in so much detail.  But for the first name right there under account info over here, what does it say?

A.   **Rebecca and RebeccaTill05.  First name is Rebecca, the user name is RebeccaTill05?**

Q.   And that's at the top, correct?

A.   **Correct.**

Q.   And then the e-mail address, is that the same as before?

A.   **Yes.**

Q.   Is that ZachGonzalez05@Yahoo.com?

A.   **Correct.**

        MR. EMERY:  Permission to approach, Your Honor?

        THE COURT:  All right.

BY MR. EMERY:

Q.   I'm showing you what's been marked for identification as Government's 4E.

    (Thereupon, the exhibit was marked for identification.)

BY MR. EMERY:

Q.   Do you recognize that?

A.   **Yes.**

Q. What is Government's 4E?

A. **These are all the chat logs between the RebeccaTill105 account and any user that that person was chatting with.**

Q. And was Government's 4E provided by Kik as a business record?

A. **It was.**

MR. EMERY: Move to admit, Your Honor.

THE COURT: It will be admitted.

(Thereupon, the exhibit was admitted into evidence.)

BY MR. EMERY:

Q. For Government's 4E --

A. **I'm sorry.**

Q. For Government's 4E right here that's been admitted, you said this is the conversations, the chats between Rebecca Till and as far as the registries of every user name or person that RebeccaTill105 talked to?

A. **Yes.**

Q. And how many other user names are there other than RebeccaTill105?

A. **I would say thousands.**

MR. EMERY: Your Honor, the Government would respectfully suggest that now may be a good time for a lunch break.

THE COURT: Okay. Let's go ahead and take a break for lunch, ladies and gentlemen, and ask that you be back at

1:30.  There is a cafeteria on the 7th floor if you want to use that.  If you go outside the building, you're welcome to do that but give yourself a few extra minutes to get through security so we can start promptly at 1:30.

MR. SCHWARTZ:  Would you instruct the jury that we will be attempting --

THE COURT:  If you run into any of the parties in the cafeteria or around the area, they're under the same rules as you are not to have any contact with you about the case.  So it's not because they're being impolite or rude, they just don't want to have any issue arise about any communication with you.  Okay?

(Thereupon, the jury was escorted out of the courtroom.)

(Thereupon, a luncheon recess was taken.)

*        *        *

**A F T E R N O O N   S E S S I O N**

THE COURT:  We had a question or a note or a comment from -- what juror number was it?  What's the name?

THE COURTROOM DEPUTY:  I think his name was Ramirez.

THE COURT:  Ramirez?  Perez?

THE COURTROOM DEPUTY: Let me confirm that. It was a gentleman.

THE COURT: Okay. In any event, this juror indicated he wanted to be relieved because he had a problem looking at the pictures.

MR. EMERY: What number was this?

THE COURT: I don't know which one. He's confirming it.

THE COURTROOM DEPUTY: Juror Number 8, Giovanni Sanchez.

THE COURT: I have Giovanni Sanchez is Juror Number 2. Is that his name, though?

MR. WIDLANSKI: I have him as Number 2 as well.

THE COURT: So in any event, Mr. Sanchez has asked to be excused because he doesn't like looking at the pictures. What do you want to do?

MR. WIDLANSKI: Your Honor, the United States believes if he's having problems looking at it, it could be a late trial and we have no problem excusing him and moving in to alternate number one, who I believe we have as Everton Charles.

THE COURT: Let me, before we head down this trail, and I don't have a problem doing that, let me get the input from defense counsel.

Is it necessary for him to look at the pictures?

**MR. WIDLANSKI**:  Your Honor, the United States would posit that it is.  It forms part and parcel of the Government's case.  There is at least one element of the possession count that requires a determination be made of the age of the victims in the images.

**THE COURT**:  And is that in dispute?

**MR. SCHWARTZ**:  Not as to the counts charged in the indictment, Your Honor.

**MR. WIDLANSKI**:  Possession count, there is a possession count that has a minors under the age of 12 codicil.  Am I taking that you're stipulating --

**MR. SCHWARTZ**:  No.  As to the three defendants with whom he's alleged to have chatted with and exchanged pictures with, I don't argue as to the age.  There are some random clips that were extracted or found on the computer that age may be a question.

But also, Judge, just to be clear, I think they need to make a factual finding as to whether the pictures are lascivious or not, and in order to make that factual finding under the criteria that is set forth in the 11th Circuit pattern jury instructions, I think they have to see the pictures.

**THE COURT**:  Okay.  Well, so do you agree that we have to or should excuse this juror?

**MR. SCHWARTZ**:  Yes.

THE COURT: Well, let me say this. We're in the early stages of the trial. I selected four alternates in anticipation that something like this could happen. However, if we let this juror go for his stated reasons, I don't necessarily want to establish that as a praecipe for the next juror who says, you know, I don't want to look at these pictures either. I mean, at a certain point nobody likes looking at these pictures and -- but if it has to be done it has to be done and at a certain point just because they say this if we wind up with not enough jurors, you know, it's a little late in the trial to start having second thoughts about not wanting to look at pictures that are necessary for that determination.

MR. SCHWARTZ: Your Honor, might I make a suggestion? The reason I agree is because I feel that looking at the pictures might prejudice him against my client. Having said that, I understand that there's a possibility of other jurors who might not want to be here necessarily copying this method of getting off the panel and I would suggest that we excuse him in the sense that in our consideration he's no longer a juror, but not necessarily tell him he can leave or that he's off the panel so that it doesn't create in the other jurors' mind a stampede effect, so to speak.

THE COURT: What do you mean? Where is he going to

go?

MR. SCHWARTZ:  Let him sit here and stay as if he's a juror, but we agree that he's not going to be deliberating.

THE COURT:  And then what, he has to look at the pictures anyway?

MR. SCHWARTZ:  Unfortunately, yeah.  I guess I'm not a nice person because I'm not as concerned about his sensibilities as I am as to whether he can give my client a fair trial, and with him having said that, I doubt his ability to give my client a fair trial, but I also want this to be one trial and not a mistrial.

THE COURT:  Well, you do agree that he should be released as a juror?

MR. SCHWARTZ:  Correct.

MR. WIDLANSKI:  Your Honor, if I may, perhaps we can call Your Honor to colloquy him briefly and see to what extent his objections are to these images, whether it's sort of, oh, I'm not comfortable or whether it's actively making me, it's giving me a difficult time being rational and reasonable in the consideration of the evidence.

THE COURT:  I don't mind asking him questions, but I don't -- I'm not persuaded by the idea of letting him hang around after he's been discharged and, you know, I can envision a more downside to that as opposed to an upside.

MR. SCHWARTZ:  I'll withdraw the suggestion, Your

Honor.

THE COURT:  But let's bring him out, he's Juror Number 2.

MR. SCHWARTZ:  I don't know if it was clear, but I withdrew that suggestion.

(Thereupon, Giovanni Sanchez, entered the courtroom.)

THE COURT:  Mr. Giovanni, apparently you conveyed a message to the courtroom deputy.  Can you just tell us what your concern is?

JUROR:  I found it very disturbing.

THE COURT:  What was disturbing?

JUROR:  The pictures and everything about the case.

THE COURT:  And I understand that.  I think we all understand that.  But only jurors can make the determination that needs to be made in terms of the facts of this case.  And I guess I'm concerned about having selected you as a juror in this case whether you feel you can continue as a juror and be fair and impartial to both the Government and to the defendant in the case.

JUROR:  I told him I'm very uncomfortable so, I mean, I'm not going to be fair.

THE COURT:  Okay.  Anybody have any other questions of this juror?

MR. SCHWARTZ:  Not from the defense, Your Honor.

MR. WIDLANSKI:  Nor from the Government.

THE COURT:  Mr. Sanchez, did you express any of these thoughts to any of the other jurors?

JUROR:  No.  I spoke to him when everyone left.

THE COURT:  And that's the only one you spoke to?

JUROR:  Yeah, just to him.

THE COURT:  So they don't know why you're --

JUROR:  No.

THE COURT:  So you don't have anything that's in the jury room so you're free to go.  What I would ask is that you go down to the jury assembly room and tell them that you've been excused from this trial, but that you can be called for a jury service in other trials for the remainder of your time.

JUROR:  So I just stay there, stay in the room on the fifth floor?

THE COURT:  You can leave out the front door and just go down to the jury assembly room on the fifth floor and just explain to them that you've been excused off this case because it was a child pornography, you didn't feel comfortable sitting on the case but that you may be called for a jury service.

JUROR:  For the rest of the week.  All right. Thank you.

THE COURT:  Thank you, Mr. Sanchez.

JUROR:  Bye.

THE COURT:  Bye-bye.

(Thereupon, Giovanni Sanchez exited the courtroom.)

THE COURT:  Okay.  So with that, that beautiful last name that I couldn't pronounce, she apparently didn't care for the juror sitting next to her or his cologne is a little too strong for her taste, so she asked to be moved to another location.  And so we set up this extra seat on the end here.  But if nobody objects -- let's see.  What do we do?  I can move her into Mr. Sanchez's place and just leave everybody else where they are.

MR. WIDLANSKI:  What was her number, Your Honor?

THE COURT:  I think she was Number 11.  She is Number 11.  So I would take, just for practical purposes, I mean, we're just going to put Juror 11 in the now vacant seat Number 2 and just leave that seat vacant and Mr. Everton Chandler -- is that his name, whoever is the first alternate now becomes the 12th juror.

MR. WIDLANSKI:  Everton Charles, yes, Your Honor.

THE COURT:  Is that okay?

MR. WIDLANSKI:  Yes.

THE COURT:  Can we move that seat out of there?

MR. SCHWARTZ:  And, Judge, I anticipate that the Government -- I actually know it was the Government who showed me.  In his next exhibit he's going to use what's

called his bubble demonstration on the chats.  He has extracted from the documents he's received or from the computer various chats and he's going to be introducing them.

Again, I don't want to keep interrupting while the witness is testifying.  I have -- I'd like to make a hearsay objection.

MR. EMERY:  If I may, this is actually still from the Kik so it's not the bubble chats that were pulled from the MacBook.

MR. SCHWARTZ:  I would still like to object to the responses of the boys to my client's chats in the chat rooms that they have.  I believe they are out of court statements by those boys being offered to prove the truth of what's contained there in the same way in his opening the prosecutor talked about what the boy from North Carolina had said in response to my client.

I believe I have a right to cross-examine those witnesses as to what they said and why they said it, et cetera, and I'm losing my right of confrontation of crucial witnesses in the case, so I object.

THE COURT:  Okay.  I'll note the objection.  All right.  Can you bring the jury out, please?

(Thereupon, the jury was brought into the courtroom.)

THE COURT:  Okay.  We have got everybody here.

Have a seat, everyone.  Good afternoon.  All right.  Please continue.

MR. EMERY:  Thank you, Your Honor.

May I approach the witness?

THE COURT:  All right.

BY MR. EMERY:

Q.  I'm showing you what's been marked as Government's 4F through 4WW for identification.

(Thereupon, the exhibit was marked for identification.).

BY MR. EMERY:

Q.  Do you recognize these documents?

A.  **Yes, I recognize them**.

Q.  And where did these Government exhibits come from?

A.  **These came from the supplemental MLAT request from Kik**.

Q.  And are these what Kik provided as their business records?

A.  **Correct**.

MR. EMERY:  Move to admit.

THE COURT:  Admitted.

(Thereupon, the exhibit was admitted into evidence.)

MR. EMERY:  Permission to publish, Your Honor?

THE COURT:  All right.

BY MR. EMERY:

Q.  I'm showing you Government's 4F, and generally, what is this?

A.   That is a picture that Kik provided which would be a profile picture of RebeccaTill05, Kik user.

Q.   And I'm showing you next Government's 4G.  What is this?

A.   That was also provided by Kik.  It's a screen shot of the RebeccaTill05 account on Kik.

Q.   And I see here it says -- what does this say here?

A.   The official Rebecca Till, Florida.

Q.   I'm sorry?

A.   Florida.  Sorry.  Lacrosse.  Cheer.  Beach.  3K Goal. Kick Me.  Pics of me with a little camera entitled RebeccaTill05.

Q.   And do you know what Kik Me means?

A.   Kik Me is a phrase that you use when you want to talk to someone on Kik.  So someone would say Kik Me at, and then give their user name.

Q.   I see at the top, and do you know what this is up here?

A.   That RebeccaTill05 has 68 photos, 2,658 followers and is following 7,501 people --

Q.   And that's --

A.   -- on Kik.

Q.   And that's for RebeccaTill05?

A.   Correct.

Q.   But is this from Kik or is it from Instagram, do you know?

A.   I don't know.  It was from a Kik response.

Q.   Correct.  This was provided to you by Kik?

A.   **Yes.**

Q.   I'm showing you Government's 4H.

A.   **That's also a screen shot that was provided by Kik.**

Q.   And at the bottom, what does it say there?

A.   **It looks like a conversation between RebeccaTill05 and Matt Federer -- several people.**

Q.   But it says right after RebeccaTill05, what does it say right here?

A.   **Kik Me, RebeccaTill05.**

Q.   Government's 4I?

A.   **Again, that was provided by Kik as their business records and it's a screen shot.**

Q.   4J?

A.   **That would be a screen shot of Kik and it says Rebecca Till.**

Q.   And what is this right there?

A.   **That's a profile picture associated with the Rebecca Till account.**

Q.   Is it also known as an avatar?

A.   **Yes.**

Q.   Government's 4K, is this -- what is this?

A.   **Again, it's a screen, that's a Kik screen shot, RebeccaTill3K.**

Q.   Government's 4L?

A.   Another screen shot of Kik showing several users.

Q.   And what does it say right here?

A.   Screen shot UR Kik Combos List.

Q.   Showing you Government's 4M.  What is this?

A.   That would be a record provided by Kik in response to the MLAT that shows the conversation between Rebecca Till and someone else.

Q.   And read at the top, what does it say there?

A.   "I can't talk right now, but thanks."

Q.   Who is responding?

A.   This is the Rebecca Till account responding, "Why not?  "Because I have chores to do.  Talk to you in a sec."

Q.   And Rebecca responds?

A.   Responds "K," the letter K.

Q.   And what happens next?

A.   And then Rebecca, it says 20 minutes ago, so it's 20 minutes later, Rebecca Till responds, "Hey, you done?  Hey can we sext?"

Q.   Government's 4N, again, what is this?

A.   This was a screen shot provided by Kik in their business records between Rebecca Till, a screen shot of a conversation between Rebecca Till and someone else.

Q.   So let's start from the top.  What does it say here?

A.   "Hello, you're on Kik."

Q.   Who's talking?

A.   **That's Rebecca Till 3.5.  Okay.  Now.**

Q.   And then right here what does it say?

A.   **Again, Rebecca Till says, "I'll show boobs."**

Q.   Now, I notice that it's circled right there.  Now, did you circle that or did someone circle it?

A.   **That's the response we got.  I don't know who circled it.**

Q.   This it how it was provided by Kik?

A.   **Correct.**

Q.   And it says right here?

A.   **Someone responds, "What?"  And then Rebecca Till responds, "Hey," and then someone else responds, "Uhm, hey."**

**And then Rebecca Till responds, "Uhm, you talked to me yesterday, dumb cunt.  What's the uhm about you?"**

Q.   Government's 40, what is this?

A.   **This is, again, a conversation between RebeccaTill3K and someone else that Kik provided in the supplemental MLAT response.**

Q.   And what does Rebecca Till start by saying here?

A.   **"Hey," and then someone responds, "Hi," and then Rebecca Till responds, "What's up?  Why are you reading and not saying anything," and the other person responds, "IDK."**

Q.   What does that mean?

A.   **I don't know.**

**And Rebecca Till responds, "Okay."  And then**

responds, "Wanna see my boobs?"

Q. And then Government's 4P, what's going on here?

A. This is another screen shot that Kik provided in their business records that shows Rebecca is typing. There's no other person in the conversation, you are just seeing the Rebecca Till side of the conversation.

Q. Let's start from the top. Is that Rebecca Till talking?

A. Yes.

Q. And what does Rebecca Till say?

A. "You are stupid. Stop sending me pics of your fucking hat covering your face and I won't call you stupid. You do stupid shit, then you wonder why I call you stupid. You have 10 seconds to respond and be nice or then I share your Kik."

Q. And this is all RebeccaTill05 talking?

A. Correct.

Q. What's going on here?

A. That's a conversation between a person -- this is the response we got from Kik from the MLAT and it's a person appears to be Tristen Danyluk having a conversation with Rebecca Till.

Q. Who is talking here?

A. Rebecca Till.

Q. What does it say?

A. "You know what I saif," SAIF. It's now confusing said. So it's corrected, the spelling error is corrected.

And then the person Tristen replies, "Oh, oops, face wasn't in," and then Rebecca Till says, "Redo it," and then the boy replies, "Did you get it," and then Rebecca Till, "Fuck off, this isn't text."

Q.   Government's 4Q, where did this come from again?

A.   This is, again, part of the supplemental response we got from the Kik business records and it's a conversation between Rebecca Till and another individual.

Q.   And what does it say, starting from the top?

A.   The other individual is saying, "Send me a pic with the camera of you, not nude."

Q.   And does Rebecca Till respond?

A.   Rebecca Till responds, "Or I can just block you and post your nudes SLL over Instagram and Facebook."

Q.   And the first response?

A.   "I probably Googled one."  And then Rebecca Till responds, "It has YR face in it," and then the person responds, "I've never sent a nude."

Q.   Government's 4R, what is this?

A.   That's a record that was received by Kik as part of the MLAT, supplemental MLAT request, and it's a screen shot of Snapchat users.

Q.   Continue, I'm sorry?

A.   It's Snapchat users.

Q.   And just briefly, what's the top one?  There's a -- what

is this listed right here?

A.   BeverlyHills05.

Q.   Government's 4T?

A.   This is a screen shot of a chat between Rebecca Till and someone else that was provided by Kik in the supplemental request.

Q.   And when you say -- this profile right here you said that's Rebecca Till, why do you say that?

A.   That was a photo that was provided by Kik in their supplemental response that I've seen several times sent by the Rebecca Till account to various boys.

Q.   And then what does it say at the top?

A.   Rebecca Till responds, "Finger.  Yes."

         And then the person she's talking to says, "Can you send me a pic?  I'd do anything for one."

         Then the Rebecca Till photo account says, "I can't do that.  I like Colin.  Sorry."  And then the other person responds, "Can you send me any sexy pics, please," and the Rebecca Till account says, "No."

Q.   Government's 4U, what is this?

A.   This is a screen shot that I received from Kik.  It's part of the supplemental MLAT request.  It's a conversation between RebeccaTill2.3K and someone else.

Q.   And what does it say here?

A.   Rebecca Till says, "Hey."  And someone responds, "What's

up?"  Rebecca Till responds, "N M bored."

Q.  Do you know what NM stands for?

A.  Not much.  And then Rebecca Till says, "Who are you? Sorry."  And then the person responds, "Oh, sorry, I'm Josh. Ha-ha.  I just saw you Instagram and saw you saying to Kik you so I am, ha-ha.  You are super hot."

Q.  Government's 4V.  What is this?

A.  That was a picture that was received from Kik in response to the supplemental MLAT request.  And that was a picture that was sent from the Rebecca Till account numerous times to various boys.

Q.  What's 4W?

A.  That was another photograph received in response to the supplement and that photo was sent to numerous boys from the RebeccaTill05 account.

Q.  Government's 4X, what is that?

A.  That's the same, it's another photograph sent by the RebeccaTill05 account that was received by Kik in the supplemental MLAT request.

Q.  And was it sent by Rebecca Till to anyone else?

A.  To numerous boys.

MR. EMERY:  So again, at this time I just want to warn the jury that I'm going to show some graphic pictures.

BY MR. EMERY:

Q.  Showing you what's been marked as Government's 4Y.  What

is that?

A.   That's a picture that was received from Kik in the supplemental response of a boy showing his penis.

Q.   And this was sent by whom to whom?

A.   It was sent by -- I don't know the user name but it was sent by a boy to the RebeccaTill105 account.

MR. SCHWARTZ:  Objection, Your Honor.  We don't know if that's child porn or not.

THE COURT:  Is there an objection?

MR. SCHWARTZ:  Yes, I don't -- we don't know the age of the boy.

THE COURT:  Well, isn't that --

MR. EMERY:  I have more pictures that I'm about to show, Your Honor.

THE COURT:  Okay.

BY MR. EMERY:

Q.   What is Government's 4Z?

A.   That's the same boy, a picture of the same boy exposing his penis, now his face is in the picture.  That was received by Kik in response to the MLAT supplemental.

Q.   And who did he sent it to?

A.   Sent it to the RebeccaTill105 account.

Q.   Government's 4A?

A.   That's the same boy, again with his face exposing his penis and that was sent from his account to the RebeccaTill105

account.

Q. Government's 4BB?

A. **Again, received from Kik of a boy exposing his penis sent from his account to the RebeccaTill05 account.**

Q. And lastly, Government's 4CC?

A. **This is taken in the mirror with the flash, again, from this boy's account to the Rebecca Till account exposing his penis.**

Q. And you just mentioned the word mirror. And within the MLAT response, are there other similar photos?

A. **Yeah, there's a lot of mirror shots. They're just taken to show you the reflection in the mirror.**

Q. Government's 4D, as in David. What is this?

A. **That's a photograph that was sent from the RebeccaTill05 account to that boy.**

Q. The one we just viewed?

A. **Correct.**

Q. And does this particular picture show up in other parts of the MLAT response from Kik?

A. **Yes, I've seen this picture several times.**

Q. And who is it sent by?

A. **RebeccaTill05 to various boys.**

Q. Government's 4EE, just briefly, what is this?

A. **It's a picture, a close-up of a vagina that was sent from the RebeccaTill05 account to that first boy's account.**

Q.   And again, that was Government's 4F.  What is this -- FF, I'm sorry.

A.   **This is a screen shot showing an account, Chanel Izzabel.**

Q.   And to the left, is there a picture?

A.   **That's the picture that RebeccaTil105 had sent to many of the boys.**

Q.   That's the picture you testified about?

A.   **Correct.**

Q.   Government's 4GG, what is this?  Let me zoom back out.

A.   **It's a photograph of a boy that was received from Kik in the supplemental MLAT request.**

Q.   And to whom did this boy send this photograph to?

A.   **RebeccaTil105.**

Q.   Government's 4H, what is this?

A.   **This same boy sending that picture of his penis to RebeccaTil105.**

Q.   And that was the same boy based on the Kik records we just saw?

A.   **Correct.**

Q.   In 4GG?

A.   **Yes.**

Q.   Government's 4II, what is going on here?

A.   **This is a screen shot of a conversation.  It says Rebecca is typing and she's speaking to an individual who is responding.**

Q.  What does it say at the top?

A.  Rebecca Till's account starts with, "No," and then the person responds, "How," and then Rebecca Till responds, "The message bubble top right, click it and screen shot it.  Don't act dumb."  Then the person responds, "What message bubble?"

Q.  4JJ?

A.  Again, it's a screen shot received from Kik of the RebeccaTill3K account.

Q.  What's being said there?

A.  "No, I'm not, I've been trying to go to bed."

Q.  Government's 4KK, what is this?

A.  Again, this is a conversation now with a person identified as Marcus Riley from the Kik account, the screen shot of the conversation between that person and Rebecca Till.

Q.  And who is speaking here?

A.  Rebecca Till.

Q.  And what does Rebecca Till say?

A.  "And just send.  Wow.  Gay."  And the person, the boy responds, "Didn't you get the pic," and Rebecca Till responds, "Funny, I'll send if you actually send," and then the boy says, "I've sent it like three times," and then Rebecca Till responds, "No, you didn't, STFU."

Q.  And what does -- I apologize for having to asking, but what does, in common parlance, do you know what STFU means?

A.   **Shut the fuck up.**

Q.   Government's 4K, what's going on here?

A.   **That's a picture that was sent by this user to RebeccaTill05 that was received from the Kik supplemental request.**

Q.   And is this what you referred to before as a mirror shot, is it fair to say?  Can you tell?

A.   **I can't really tell.  Could be.**

MR. SCHWARTZ:  4LL, not 4KK.

BY MR. EMERY:

Q.   I'm sorry, we're looking at 4LL?

A.   **Yes.**

MR. EMERY:  Thanks.

BY MR. EMERY:

Q.   I'm showing you 4MM.

A.   **It's the same boy taking a picture with his penis exposed sent to the RebeccaTill05 account.**

Q.   4NN?

A.   **That's the same boy, looks like it's in a different room now taking a picture with his penis exposed that was received from Kik.  That was sent to the RebeccaTill05 account.**

Q.   4OO?

A.   **Same boy now laying on his bed.  Appears to be a mirror there exposing his penis that was sent to the RebeccaTill05 account.**

Q.   Government's 4PP.   What is that?

A.   **That was a picture that was sent from the RebeccaTill05 account to that boy that you just previously showed.**

Q.   Briefly, 4QQ?

A.   **It's, again, a picture that was taken from behind of a woman exposing herself that was sent from the RebeccaTill05 account to that boy.**

Q.   That we just saw?

A.   **Correct.**

Q.   4RR?

A.   **Another picture of a girl holding a dog that was sent from the RebeccaTill05 account to the boy that we previously mentioned.**

Q.   Government's 4SS?

A.   **Another picture received from the Kik response of a boy showing a peace sign.**

Q.   4TT?

A.   **Same boy in the bedroom exposing his penis taking a picture that was sent from his account to the RebeccaTill05 account.**

Q.   Government's 4UU, what is that?

A.   **A picture that was sent from the RebeccaTill05 account to that boy.**

Q.   And have we seen this picture before?

A.   **Yes, we have seen it many times.**

Q.   4VV, as in Victor?

A.   **That is a picture of a girl holding the dog that was sent from the RebeccaTil105 account to the previous -- to the boys that we just saw, his account.**

Q.   And 4WW?

A.   **A picture of a girl on the beach that was sent from the RebeccaTil105 account to that boy's account.**

Q.   And have we seen this picture before?

A.   **Yes.**

MR. EMERY:   May I approach, Your Honor?

THE COURT:   All right.

BY MR. EMERY:

Q.   I'm showing you Government's 23B through 230 for identification.   Please take a look at those.

(Thereupon, the exhibit was marked for identification.)

A.   **(Complies).**

BY MR. EMERY:

Q.   Do you recognize these exhibits?

A.   **I do.**

Q.   And where do they come from?

A.   **This also comes from the supplemental MLAT request of -- these are photos that were sent by the RebeccaTil105 account to various boys.**

MR. EMERY:   Move to admit, Your Honor.

THE COURT:   Admitted.

MR. SCHWARTZ: Your Honor, the same objection based on the Motion in Limine and one further objection on some of these pictures, someone has handwritten comments. I believe the witness who handwrote them may be called on later to testify by the Government. I don't object to that subject to them being connected.

MR. EMERY: We will do that, Your Honor.

THE COURT: All right.

(Thereupon, the exhibit was admitted into evidence.)

MR. EMERY: Permission to publish.

THE COURT: All right.

BY MR. EMERY:

Q. We'll go through these quickly. Government's 23B, as in boy?

A. **A picture of a girl that was sent from the RebeccaTil105 account to various boys.**

Q. On the left it looks like there's handwriting?

A. **Yes.**

Q. Was that on the record that was sent by Kik?

A. **No.**

Q. So the record received by Kik was --

A. **Just the picture.**

Q. -- just the picture. 23C we have already seen before; is that correct?

A. **Correct.**

Q.   23D, as in David?

A.   **Another picture that was sent from the RebeccaTill05 account to various boys.**

Q.   Government's 23E?

A.   **Another picture of the girl from the RebeccaTill05 account to various boys.**

Q.   Again, this handwriting, was that on the record?

A.   **It was not, just the photographs.  No writing.**

Q.   23F?

A.   **A picture of that was sent from the RebeccaTill05 account to various boys without the writing.**

Q.   23G?

A.   **Again, another picture sent by the RebeccaTill05 account to various boys.**

Q.   23H?

A.   **Same.  Another photograph sent by the RebeccaTill05 account to various boys on Kik.**

Q.   23J?

A.   **Another photograph sent from the RebeccaTill05 account to various boys.**

Q.   23I?

A.   **Picture of a girl on a beach in a bikini from the RebeccaTill05 account to various boys.**

Q.   And then we have already seen this before; is that correct?

A.   That's correct.  That was another picture that was sent from the RebeccaTill05 account and that was the profile pic, her avatar that was on the Kik account.

Q.   Government's 23L?

A.   That's a screen shot of several pictures full of -- that were on the RebeccaTill05 account.

Q.   And there's some handwriting there and a circle.  Was that from Kik?

A.   No.

Q.   Government's 23M, as in Mary?

A.   Another screen shot of a girl, I think we've previously seen the pictures, but this is a screen shot from the RebeccaTill05 account.

Q.   And what does it say at the top of the picture?

A.   "RebeccaTill05."

Q.   Again, 23N?

A.   Another screen shot with a picture we have seen before with the RebeccaTill05 account.

Q.   And 23O?

A.   Another picture with the RebeccaTill05 account.

Q.   Again, I want to go back briefly to Government's 4Z that we just talked about and, for example, with respect to this picture and the pictures that we looked at in court today, are those the only pictures of boys in the raw state that was provided by Kik?

A.   **No, it was not.**

Q.   And how many additional photographs of young boys in are there that were provided by Kik?

A.   **I would say close to 5,000.**

Q.   Is that a conservative number?

A.   **Probably.**

Q.   Did FBI Charlotte continue to investigate this case?

A.   **No.**

Q.   Why not?

A.   **The subject, Patrick Killen, Junior, was located in Florida so we transferred our evidence to the Miami Division.**

Q.   And who did you transfer the evidence to?

A.   **Laura Schwartzenberger.**

Q.   Is she in the courtroom today?

A.   **She is.**

Q.   And have you ever physically met the defendant, Patrick Killen, Junior, before?

A.   **No.**

          MR. EMERY:   The Government tenders the witness.

          THE COURT:   Cross?

          MR. SCHWARTZ:   Thank you, Your Honor.


                    *CROSS EXAMINATION*

BY MR. SCHWARTZ:

Q.   Now, you said Kik is a picture exchange chat room; is

that correct?

A.   **It's a private chat application.  It's an interactive smartphone app that kids use to chat with each other.**

Q.   So at various times there might be three or four or five people in that chat room; is that correct?

A.   **I think that it's just a private chat between two people.**

Q.   Could you be incorrect as to that?

A.   **I don't know.**

Q.   And you mentioned that Kik is mostly used by 10 to 17 year olds; is that correct?

A.   **That's been my experience, that mostly the kids that are middle school to junior high are using it.**

Q.   And are you aware what Kik's rules are as to the age of users?

A.   **I think that you have to be -- I know it's older, maybe 17 or 18, to use it.**

Q.   So to get on Kik you have to be 17 or 18?

A.   **You're supposed to be.**

Q.   So are children lying?

A.   **I don't know, they don't have to put real ages when they set up their account.**

Q.   And the father who came to see you whose conversations you recounted to the Court, what was his name?

A.   **Jeffrey Eckert.**

Q.   And are you aware that Mr. Eckert is trying to gather up

people for a class action?

MR. EMERY:  Objection.

THE COURT:  Overruled.

BY MR. SCHWARTZ:

Q.  To do a class action against Kik?

A.  **I'm not aware of that**.

Q.  Are you aware that he's trying to use this case as an illustration as to why he should be able to sue Kik for a lot of money?

MR. EMERY:  Objection, Your Honor.  The witness already said that she's not aware of a lawsuit.

THE COURT:  Sustained.

BY MR. SCHWARTZ:

Q.  Have you seen Mr. Eckert?  Is he in Miami, to your knowledge?

A.  **I don't know**.

Q.  Do you know if the Government is going to bring him here as a witness?

A.  **I don't know**.

Q.  Do you know if the jury will have an opportunity to see him or have him questioned about this lawsuit?

A.  **I don't know**.

Q.  Now, you said that Mr. Eckert developed a screen name and communicated with RebeccaTill05?

A.  **That's what he told he me, yes**.

Q.   You don't know that as a fact, do you?

A.   **That's what he told me.**

Q.   But you were relying on what he said?

A.   **Right.**

Q.   Do you know if he sent child pornography pictures to RebeccaTill05?

A.   **No, he told me that he didn't send any pictures.**

Q.   But you don't know that as a fact either, do you?

A.   **Well, I do know because we requested the entire account from RebeccaTill05 and Jeeter I Am, and there were no pictures sent from that account.**

Q.   Are there other services similar to Kik?

A.   **I'm not sure what you mean like, chat services?**

Q.   Yes.

A.   **I'm sure there are.**

Q.   And photo exchange services?

A.   **Like Snapchat and things like that?**

Q.   Or others?

A.   **Uh-huh.   (Nodding).**

Q.   Do you know if he used any of those to send child pornography or nude pictures of children?

A.   **No, I don't.**

Q.   To RebeccaTill05?

A.   **I don't.**

Q.   Did you subpoena or attempt to obtain photographs from

Q.   any other services regarding that father's screen name?

A.   **No.**

Q.   Now, when we saw the profile or the -- I forgot the right word.  You'll have to forgive me.  The information about the person who registered the name RebeccaTill05, did it say that the instrument to be used was an iPhone?

A.   **The account information?**

Q.   Yes.

A.   **An iPhone was listed as being associated with the account.**

Q.   Do you know when Patrick Killen, Junior, obtained his iPhone?

A.   **I don't.**

Q.   Are you aware that he never had an iPhone until July of 2013, that he actually had a Samsung Galaxy?

A.   **A Samsung was also listed as a phone on that, but I don't know when he got his phones.**

Q.   You don't know when he got an iPhone?

A.   **Correct.**

Q.   And Samsung is a different operating system than an iPhone, isn't it?

A.   **I think so, yes.**

Q.   One is an Android type phone and the other is an Apple or an IOS system; is that right?

A.   **Correct.**

MR. SCHWARTZ:  Might I have Exhibit 4H?

MR. WIDLANSKI:  (Complies).

BY MR. SCHWARTZ:

Q.  While we're looking for that, do you know if the father had an account on any of these sites under a different name?

A.  **Not that -- I don't know.**

Q.  Did you ever ask him?

A.  **I did.**

Q.  I'm projecting 4H on the screen.  Are those chats on the bottom?

A.  **I believe so.**

Q.  Could they be comments rather than chats?

A.  **I don't know.**

Q.  Do you know the difference between a chat and a comment?

A.  **I don't really have the context to see what I'm looking at other than a screen shot, so I know what the comments are, but I'm not sure if this is Kik or Instagram.**

Q.  And if you look on the top, does it tell you what type of service provider is being used?

A.  **Verizon.**

Q.  Now some of these on top have said Verizon and some of them say AT&T, don't they?

A.  **I didn't notice.**

Q.  Do you know if Patrick's account was Verizon or AT&T?

A.  **His cell phone account, I don't know.  His internet**

**account would be BellSouth which is AT&T.**

Q.   But this is Verizon, right?

A.   **That's what the phone says, yes.**

Q.   And some of these on top have symbols that indicate they are from Android phones and others have symbols that indicate they're from iPhones; is that correct?

A.   **As far as the pictures that were just shown?**

Q.   Of all the pictures dressed and nude that the Government just showed?

A.   **It could be, but I don't know.**

Q.   You're not sure?

A.   **I'm not sure.**

Q.   One of -- another thing I wanted to get into.  We saw some pictures of girls who appear to be in their mid-teens, dressed, and one with a dog, others on the beach, one a photo of her in what my generation would call Daisy Dukes.  Are you familiar with those pictures?

A.   **I am.**

Q.   We also saw a number of nude pictures of girls; is that correct?

A.   **Correct.**

Q.   I think there were three or four different variations?

A.   **Correct.**

Q.   Is that fair?

A.   **Uh-huh.  (Nodding).**

Q.   Are these nude pictures, to your knowledge, pictures of the girls who we see dressed?

A.   **I don't know.**

Q.   So you have no knowledge that they are?

A.   **I don't.**

Q.   You know the girls who were dressed were interviewed by the Government?

A.   **I actually did not know that, no.**

Q.   Do you have any way of knowing the ages of the girls who are nude, the pictures of the naked girls?

A.   **No.**

Q.   And are you suggesting that those pictures are child pornography?

A.   **They could be.**

Q.   Could be and are beyond a reasonable doubt is different. Do you have any proof that the naked pictures that somehow Rebecca Till obtained are pictures of children under the age of 18?

A.   **The female pictures?**

Q.   Yes.

A.   **No, I don't know if they're under the age of 18.**

Q.   And to your knowledge, are they charged in this indictment as being child pornography?

A.   **I don't know.**

Q.   Now, earlier in your testimony you stated that Kik

doesn't keep the chats, they only keep pictures; is that right?

A.   **They do not keep the messages themselves, correct.**

Q.   The messages sent back and forth?

A.   **Correct.**

Q.   I'm sure there's an explanation.  Could you explain to me why we in the courtroom, the jury and myself and the other people here, were able to see what is alleged to be a couple of chats?

A.   **Those would have been screen shots that were taken, like a picture that was taken and sent to someone.**

Q.   Okay.  So somebody -- and we don't know who -- took a picture of a chat while it was on a screen of a phone and sent it to somebody via Kik; is that what you're suggesting?

A.   **Yeah.  I could tell who it was if I could see the picture, but it tells who -- the first person who sends it, the second person who sends it.**

Q.   And it could have been Rebecca Till or it could have been one of the other participants in the chat depending upon looking at the particular chat, the screen chat; is that right?

A.   **Correct.**

          MR. SCHWARTZ:  May I have a moment, Your Honor?

          THE COURT:  All right.

BY MR. SCHWARTZ:

Q.   Just, for example, this photo is supposedly a chat; is that correct?

A.   **I'm sorry?**

Q.   This photo is a chat?

A.   **Yes.**

Q.   People talking to each other?

A.   **Yes.**

Q.   And the one with the picture of the girl in the dungaree jeans is supposed to have been sent by RebeccaTill05; is that right?

A.   **It's supposed to have been sent --**

Q.   It's supposed to be the chat, the conversation of whoever is RebeccaTill05?

A.   **That is a chat that she was having, that RebeccaTill05 was having with someone else, correct.**

Q.   And just to be clear, the Government is suggesting that RebeccaTill05 is Patrick Killen?

A.   **Correct.**

Q.   But this says Verizon on the top, doesn't it?

A.   **It does.**

Q.   So that's sent by somebody who was using a Verizon account, not a BellSouth/AT&T account; is that right?

A.   **I don't -- I can't answer that.  I'm not sure.  I mean, that's what I'm seeing, the Verizon account, but I'm not sure who sent what.**

Q.   It's your exhibit, right?

A.   **I'm sorry?**

Q.   You obtained this exhibit --

A.   **I did.**

Q.   -- from Canada; is that right?  You obtained this exhibit from a constable in Canada, correct?

A.   **Correct.  Correct.**

Q.   And you're the one most familiar with this exhibit?

A.   **I'm familiar with it.**

Q.   You're offering it into evidence before this jury?

A.   **Correct.  Correct.**

Q.   Do you know if Patrick Killen or RebeccaTill05 took this screen shot or somebody else did?

A.   **I don't know.  I could look at the photograph itself and tell you.  I mean, I'd have to look at the photograph on the disk to tell you.**

Q.   But it comes from Verizon?

A.   **That's what this screen shot says, yes.**

Q.   And this is another screen shot of a chat?  Is this an Android or an iPhone screen shot?

A.   **I don't know.**

Q.   Do we know what operating system it is?

A.   **I don't know.**

Q.   Do we know who the IS internet service provider is?

A.   **Don't know.**

Q. Same with this picture. Do we know who sent or took this screen shot? This is a snap -- I'm sorry -- screen shot?

A. **It was sent, that picture was sent from a Rebecca Till account to various boys.**

Q. This particular one or the generic picture?

A. **The generic picture.**

Q. But we don't know about this particular one?

A. **I could tell if I could look at the actual photo that was on the disk.**

Q. Now, this picture or this screen shot, is that when this is?

A. **Yes.**

Q. On the top, my left-hand corner, says iPod. Do you know if Patrick had an iPod?

A. **I do not.**

Q. Do you know if the Government recovered an iPod from Patrick?

A. **I do not.**

Q. This picture, 4H, this is also from Verizon; is that right?

A. **That's the screen shot on top, yes.**

Q. After you turned over this investigation to the Miami field office of the FBI, did you have any further input into the investigation?

A. **No. I mean, I'm not sure what you mean by input, but no.**

Q.   You didn't do anything else in the investigation?

A.   **No.**

Q.   That was then taken over by Special Agent Schwartzenberger; is that right?

A.   **Correct.**

Q.   Now, before you turned it over, Special Agent Schwartzenberger did what's called a knock and talk; is that right?

A.   **Yes.**

Q.   Now, do you know if she had a search warrant when she went to the Killen house?

A.   **I don't believe so.**

Q.   Do you know if she tried to get a search warrant and was told by attorneys for the Government that she couldn't?

A.   **I don't know.**

Q.   You never discussed that with her?

A.   **No.**

Q.   Were you aware of her plan to go to the Killen house and attempt to get information or evidence without a search warrant?

A.   **Yes.  I knew that.**

Q.   And did you have to approve it as a supervisory agent in charge of the investigation at that time?

A.   **No.**

Q.   Weren't you the supervisory agent in charge of the

investigation at that time?

A.   **I guess I was but it was a lead that we sent to Miami to follow up on who RebeccaTill105 was, so at that point I didn't have any say in what they did with the lead.**

Q.   I haven't worked for the Government in a long time, but my understanding is that the special agent in charge of the investigation remains in charge of the investigation and has the ultimate say even if other officers are, quote, doing favors for them or following up leads for them; is that true?

A.   **No.   I mean, if they told me that there was nothing they were going to do with it, then that would have been the end of it.**

Q.   You mean if you, as the supervisory special agent of a co-equal field office asked the Miami office, please, send an agent out to gather evidence from these people, and they told you no, that there was nothing you could do?

A.   **I wouldn't say there's nothing I could do.   I could call the supervisor to ask him to follow up on it.   But once you send a lead to the field, they can have the discretion to follow up the best that they think.**

Q.   Without your supervision?

A.   **Without my supervision, correct.**

Q.   But doesn't what they do affect your case?

A.   **It would have affected my case.**

Q.   So are you saying that you have absolutely no control

over what another FBI agent does that might affect your case?

A.   **It's hard to say what I would have done if they said no, but they told me they were going to do a knock and talk so I felt that that was the appropriate thing to do.**

Q.   And did they say they were going to do a knock and talk without a search warrant?

A.   **I don't know if I knew that they didn't have a search warrant.  I assume if it was a knock and talk, they didn't have a search warrant because if we had a search warrant we would -- that typically we just -- we don't do a knock and talk with a search warrant.**

Q.   And do you usually do a knock and talk with a search warrant when you don't have enough to get a search warrant?

A.   **It's possible.**

MR. SCHWARTZ:   I have no further questions of this witness, Your Honor.

THE COURT:   Redirect?

MR. EMERY:   Yes, Your Honor.

*REDIRECT EXAMINATION*

BY MR. EMERY:

Q.   Special Agent, are you aware if the defense has the subpoena power to subpoena Mr. Eckert?

A.   **I would assume they do, yes.**

Q.   And remember when defense counsel was asking you about a

screen shot?

A. **Yes.**

Q. Is that a type of image?

A. **Yes.**

Q. And images are what Kik retains?

A. **Correct.**

Q. And in your supplemental MLAT request, did you only ask for the RebeccaTill05 account or did you ask for other accounts?

A. **I only asked for the RebeccaTill05 account and just the entire account.**

Q. Showing you Government's 4II, and, again, what does it say at the top?

A. **"Rebecca is typing."**

Q. And does this mean that the screen shot is of Rebecca Till's account or is it possible that it's of a boy's?

A. **I think it's of her account because we're seeing the picture of her.**

Q. And are you able to -- if Rebecca Till sent a screen shot to a boy, based on your knowledge of Kik, could that boy send the same screen shot back to Rebecca Till?

A. **Yes.**

            MR. EMERY:  That's all, Your Honor.

            THE COURT:  Thank you.  You may step down.

            Call your next witness.

MR. EMERY:  Your Honor, does somebody need to take a break?

The United States calls Special Agent Jason Ginther.

(Juror steps outside momentarily)

THE COURT:  Please stand and raise your right hand.

Thereupon,

**JASON GINTHER,**

having been duly sworn by the courtroom deputy, testified as follows:

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Please be seated.  State your name and spell it, please.

THE WITNESS:  Good afternoon.  My name is Jason Ginther, G-I-N-T-H-E-R.

*DIRECT EXAMINATION*

BY MR. EMERY:

Q.  Good afternoon.

A.  **Good afternoon.**

Q.  Where do you work?

A.  **I am a special agent with the Federal Bureau of Investigation.**

Q.  And how long have you worked as a special agent for the FBI?

A.   For five years.

Q.   Currently, what unit do you work for in the FBI?

A.   Currently, I investigate public corruption and tax fraud.

Q.   And what about in February 2014, what unit of the FBI did you work for?

A.   I worked for the crimes against children unit which investigates the online sexual exploitation of children.

Q.   And on February 11th, 2014, did you go to a residence at 6880 Pinehurst Drive in Hialeah, Florida?

A.   Yes, I did.

Q.   Why did you go to that residence?

A.   To assist Special Agent Schwartzenberger with an investigation led out of the North Carolina office.

         MR. EMERY:  May I approach, Your Honor?

         THE COURT:  All right.

BY MR. EMERY:

Q.   I'm showing you Government's 6.  Do you recognize that?

    (Thereupon, the exhibit was marked for identification.)

A.   Yes, I do.

BY MR. EMERY:

Q.   What is that?

A.   That's the residence we went to that day.

         MR. EMERY:  Move to admit?

         MR. SCHWARTZ:  No objection.

         THE COURT:  Be admitted.

(Thereupon, the exhibit was admitted into evidence.)

MR. EMERY:  May I publish?

THE COURT:  All right.

BY MR. EMERY:

Q.   Is that the address at 6880 Pinehurst Drive in Hialeah?

A.   **Yes, sir.**

Q.   That's where you went on February 11, 2014?

A.   **Yes.**

Q.   Now you said you were there because of a lead out of the FBI North Carolina.  Do you know what they were asking you to do as part of that lead?

A.   **Investigate -- there was a victim in North Carolina who was exploited online and their investigation in North Carolina led to the address in question and that's why we were there.**

Q.   And so that day you were going with Special Agent Schwartzenberger to that residence?

A.   **Yes, I was.**

Q.   What was your role for the interview?

A.   **I was there to assist her, maybe ask a few questions, if permitted, look over computer/electronic media to see if we could see evidence of any crimes or anything to that effect.**

Q.   And is this type of interview also known as a knock and talk?

A.   **Yes, it is.**

Q.   And in FBI parlance, what is a knock and talk?

A.   **Where you go to the residence and you literally knock on the door and ask the residence if you could speak to them.**

Q.   And what if the resident says no?

A.   **Then you are done.  You leave.**

Q.   Do you go inside the house?

A.   **No.**

Q.   And, approximately, what time did you go to the residence that day?

A.   **Sometime between 7:00 and 8:00 a.m. in the morning.**

Q.   Was it a weekend or a workday?

A.   **A workday.**

Q.   How were you dressed?

A.   **Business casual, polo, polo and slacks.**

Q.   And what about Special Agent Schwartzenberger, how was she dressed?

A.   **Same thing, slacks and shirt.**

Q.   And when you arrived, do you arrive in a marked vehicle or an unmarked vehicle?

A.   **Unmarked vehicle.**

Q.   What happened when you got to the residence?  When you first arrived the residence, outside, what did you do?

A.   **Parked the car and we walked up to the residence.**

Q.   And did she knock on the door?

A.   **Yes, she did.**

Q.   What happened after she knocked on the door?

A.   **A resident came to the door.  It was Patrick Killen, Senior.**

Q.   And what happened after Patrick Killen, Senior, came to the door?

A.   **Special Agent Schwartzenberger introduced us, explained we're FBI agents.  We both displayed our credentials to show that we were, in fact, FBI agents and at that point Special Agent Schwartzenberger informed the resident that we were there doing a computer crime investigation that led to that house and we wanted to inquire further about it.**

Q.   Did you indicate to Patrick Killen, Senior, who you wanted to talk to?

A.   **Well, we asked who was at home inside the residence and they explained that the mother, daughter, and Patrick Killen, Junior, were inside the house.  And then we asked, Special Agent Schwartzenberger asked if we could speak to Junior.**

Q.   And why did you want to speak with Patrick Killen, Junior, as compared to others in the house?

A.   **Well, Special Agent Schwartzenberger from the lead that we received, it was a crime that was committed on the computer and using an app called Kik, which is very prevalent, well-known and used among younger documents, teenagers and young adults.**

Q.   And at that time, what information did Special Agent

Schwartzenberger have about Patrick Killen, Junior?

A.   **That he resided in the house and that he was in that age range.**

Q.   And after you indicated that you wanted to speak with Patrick Killen, Junior, what happened next?

A.   **We were let inside the house.**

Q.   After you were let inside the house, where did you go?

A.   **When you walk into the house, there is a dining room table as you go in and myself and Special Agent Schwartzenberger were led to that dining room table and the father, Patrick Killen, Senior, went to go get his son.**

Q.   And did the son come out of his room?

A.   **Yes, sir.**

Q.   And do you see that person in the courtroom today?

A.   **Yes, I do.**

Q.   Would you identify that person?

A.   **The young man sitting over there with the white shirt that just stood up.**

        MR. EMERY:   Would the record reflect that he has identified the witness?

        THE COURT:   The record so reflects.

BY MR. EMERY:

Q.   So you and Agent Schwartzenberger are sitting at the dining room table?

A.   **Yes.**

Q.   The defendant comes out?

A.   **Yes.**

Q.   What does he do?

A.   **We, again, explain that we're with the FBI and displayed our credentials for him again so he knows that we're also with the FBI.  And telling him, again, we're doing a computer crime investigation, we would like to speak to him.**

Q.   And did he sit down?

A.   **Yes.**

Q.   And at the beginning of the interview, did you notice anything about the defendant, anything about his physical appearance?

A.   **Well, it was apparent to me he just woke up or something and he looked like he was either very nervous or cold or both.  And he asked at that time, at one point if he could get a robe of some sort because he was cold.**

Q.   And did he?

A.   **Yes.**

Q.   After he got the robe, did he come back to the table?

A.   **Yes.**

Q.   What happened once he came back with his robe?

A.   **He agreed to speak with us so Special Agent Schwartzenberger began asking him background questions, what do you do for a living, what's your education level, to get a grasp of who he is.**

Q.   And why does an FBI agent ask those questions?

A.   **Well, it lets you know what he education level that person has, are they competent to speak with you, are they on any type of -- are they coherent at the time to talk to you.**

Q.   And at any time, during the interview of the defendant, did you have any problem understanding him?

A.   **No.**

Q.   Did he indicate where he worked?

A.   **Yes, he said he worked at Publix.**

Q.   And then what about -- so you said Special Agent Schwartzenberger started asking him some additional questions.  Did she ask him any additional questions at this point?

A.   **With school.  He said he went to Miami-Dade Community College taking computer classes.**

Q.   And what, if any, questions were asked about the internet layout of the house?

A.   **Special Agent Schwartzenberger asked about what kind of internet service the residence has and Patrick Killen, Junior he informed us it was AT&T.**

Q.   What about with respect to the internet service, what, if any questions were asked about whether it was secure or not?

A.   **Special Agent Schwartzenberger again asked if the internet service was secure because you can have wireless internet service that's not secure and that's a logical**

question to determine if it truly came from the house.  And Patrick Killen, Junior, explained that it was secured.

Q.   And so then what if the network was unsecured, what does that tell you as an FBI agent?

A.   Well, it tells us that the crime could possibly have been done by somebody else stealing the internet.

Q.   But in this case, he told you their internet was secure?

A.   Yes.

Q.   And by meaning secure, does that mean it needs a password?

A.   Yes.

Q.   And did he indicate what the network was?

A.   PJKillen.

Q.   And while this was all going on, who else was in the house?

A.   The father, Patrick Killen, Senior, was in the house.  A young girl probably 12, 13, I believe it was their daughter, and the mother, and Patrick Killen, Junior, and myself and Special Agent Schwartzenberger.

Q.   Now before you said part of the investigation was to ask about what type of computers there are at the residence; is that correct?

A.   Yes.  We asked that, Special Agent Schwartzenberger did.

Q.   And what did Special Agent Schwartzenberger ask the defendant?

A.  Just what kind of computers were in the house and Patrick Killen, Junior informed us that he had an Apple MacBook Pro and an Apple iPad and an Apple iPhone.

Q.  Did he indicate who has access to those devices?

A.  He informed us that all three items were his, all three were password secured individually, and no one else uses them and that the other family members had their own computers that they use within the house.

Q.  Now, then after asking those basic questions, did Special Agent Schwartzenberger ask anything else of the defendant?

A.  She did ask if he knew or had any knowledge of Rebecca Till, RebeccaTill05.

Q.  And what was his response?

A.  No.

Q.  After that response, what, if any, questions did Special Agent Schwartzenberger ask about the electronic items that you just mentioned?

A.  Well, she then asked if they could have permission to search those items.

Q.  What was the defendant's response?

A.  He gave us a verbal consent to do so.

Q.  And then after he gave you verbal consent to search those items, what happened next?

A.  He then Special Agent Schwartzenberger prepared a consent to search computers form and she presented it to Patrick

Killen, Junior.  He reviewed it and signed it.

MR. EMERY:  May I approach, Your Honor?

THE COURT:  All right.

BY MR. EMERY:

Q.  I'm showing you Government's 10?

(Thereupon, the exhibit was marked for identification.)

BY MR. EMERY:

Q.  What is that?

A.  That is the consent to search computers form.

Q.  And is this the one that the defendant signed?

A.  Yes, it is.

MR. EMERY:  Move to admit.

THE COURT:  Admitted.

(Thereupon, the exhibit was admitted into evidence.)

MR. EMERY:  Permission to publish, Your Honor?

THE COURT:  All right.

BY MR. EMERY:

Q.  I just want to walk through -- just one second.  At the top it says -- and what is the purpose of this form?

A.  It's just to document that the subject gave us permission to search his computers.

Q.  And why does the FBI want someone to sign this before they search their electronic items?

A.  Simply to be informed of their rights.

Q.  And there's a signature at the bottom.  Whose signature

is that?

A.   Patrick Killen, Junior.

Q.   And that signature right there?

A.   Special Agent Laura Schwartzenberger.

Q.   And it gives a date right there?

A.   Correct.

Q.   And it says right there, what does that paragraph say?

A.   "I have been advised of my right to refuse to consent to the search and I give permission for this search freely and voluntarily and not as a result of threats or promises of any kind."

Q.   And then I see at the top there are electronic items that are listed.  And I just want to talk about the first three, so what are those?

A.   Apple MacBook, the iPhone 5 and iPad 2.

Q.   So then after the defendant gave you consent to search these electronic items, what happened next?

A.   Then we asked to see those items to search them.

Q.   And what did the -- and did the defendant agree?

A.   Yes.

Q.   And what did he -- did he bring you those items?

A.   He brought out the MacBook and the iPad.  And we're still at the dining room table at that point.

          MR. EMERY:  May I approach, Your Honor?

          THE COURT:  All right.

BY MR. EMERY:

Q. I'm showing you Government's Exhibit 7 for identification. What is that?

(Thereupon, the exhibit was marked for identification.)

A. **This is the Apple MacBook that Patrick Killen, Junior, gave Special Agent Schwartzenberger.**

BY MR. EMERY:

Q. What is else is inside the bag?

A. **The charger for it.**

Q. Can you just bring it out?

A. **(Complies).**

MR. EMERY: Move to admit, Your Honor?

MR. SCHWARTZ: No objection.

THE COURT: Be admitted.

(Thereupon, the exhibit was admitted into evidence.)

MR. SCHWARTZ: No objection without waiving the motion that I previously made.

THE COURT: All right.

MR. SCHWARTZ: Before Magistrate McAliley.

THE COURT: All right.

BY MR. EMERY:

Q. Now, after he gave his consent to you and Special Agent Schwartzenberger to search his MacBook, what happened next?

A. **He proceeded to -- I proceeded to go into the computer to search it for any evidence of any crime.**

Q. And why were you doing that?

A. **Because Special Agent Schwartzenberger was the interviewer and I was there to assist, like I said earlier, with forensics and looking over the computer stuff.**

Q. Now, you mentioned when you were on the consent to search form that there was also an iPhone; is that right?

A. **Yes.**

Q. And when he brought out the MacBook Pro to you, did he bring out his iPhone to you?

A. **No.**

Q. Why not?

A. **He explained to us that it was in his room and the battery had died or he didn't charge it the night before, it needed to be charged.**

Q. And then why -- so then -- let me ask you a question then. While you were there with the MacBook, you just said his iPhone was in his room?

A. **Yes.**

Q. Did he ever go back to his room?

A. **Several times.**

Q. And for how long?

A. **A couple minutes each time.**

Q. And did you ask him anything when he came back from going into his room?

A. **Yes. After a couple of times I asked him if he was**

deleting anything off his phone.

Q.   And why did you ask him that?

A.   Because he went back several times and for several minutes at each time and it's just a concern we had that maybe he was doing that.

Q.   And what was his response?

A.   No, he wasn't.

Q.   Did he eventually bring out his iPhone?

A.   Yes, he did.

MR. EMERY:  Your Honor, I would move to admit Government's 8 without objection.

MR. SCHWARTZ:  No objection except for the previous motion.

THE COURT:  Admitted.

(Thereupon, the exhibit was admitted into evidence.)

BY MR. EMERY:

Q.   Now, showing you what's been marked as Government's Exhibit 8, what is that?

A.   That's the Apple IPhone that Patrick Killen, Junior, produced with the charger.

Q.   And after -- so when he went back into his room for the last time and he brought you this, what, if anything, did you notice about his phone?

A.   When he walked back out to us he had the phone in his hands and the phone was open as in it was on, it wasn't

locked or anything, and I noticed that the apps, the icons were shaking.  I'm an Apple IPhone user and I know that when you hit the home button on the phone it makes the apps that you install on the phone shake.  And at that point you can either rearrange your apps in different folders or you can delete them from your phone so the person looking at it won't see that app.

Q.   And did you ask him after seeing that the icons on his iPhone from shaking, did you ask him anything?

A.   I asked him, again, if he was deleting anything off his phone and he said no.

Q.   Now, let's go back and talk about the MacBook.  Were you able to search the MacBook while you were there?

A.   I was able to search it -- yes.

Q.   But when you showed up at the house that day, did you have any particular type of thumb drive or tool with you that would possibly help you to search this?

A.   Yes.

Q.   And what was that?

A.   The thumb drive had a program called OS Triage and it's a program developed to help us examine computers for any known child pornography files or what not.

Q.   And then how does that work as far as that program?  How is it contained.  What's it contained in?

A.   It's a thumb drive.  You insert it into the computer.

You start the program. It doesn't put anything on the computer, it just searches for known files of child pornography.

Q. And were you able to use that OS Triage on this machine?

A. No. Unfortunately, this program worked for Windows-based computers and, obviously, that's an Apple product so it wasn't put on. So I manually searched through like anyone would look at a normal computer.

Q. So then -- and then let's go back then and talk about -- so after he brought out his cell phone and you noticed that the icons were shaking, what did you do with respect to the iPhone?

A. Well, at that point, I wanted to make a copy of the phone for us to review.

Q. And how do you do that?

A. We have a machine called a Cellebrite machine and what that does is you connect the phone to the machine and a thumb drive to the machine, and you can make a complete copy of someone's phone onto that thumb drive and that way when you're at someone's house you don't have to take their phone with you, you can just take a copy of it and they can keep their phone.

Q. Now, when you first went into the house did you have the Cellebrite machine with you?

A. No, I didn't.

Q.   What did you do?

A.   **I left that machine in my car outside.**

Q.   And so then when you got the phone handed to you, what did you do next?

A.   **I then went outside to my car and obtained this Cellebrite machine and re-entered the home?**

Q.   And did someone open the door?

A.   **I think they were in the front area, they just said, "Come on in."**

Q.   All right.  Now, so then you went outside, you come back in with the Cellebrite machine, right, and while this is all going on, where was the defendant and Special Agent Schwartzenberger?

A.   **They were still in the dining room table in the living room area of the residence.**

Q.   And when you came back in with the Cellebrite machine, what happened next?

A.   **Special Agent Schwartzenberger got my attention and she explained to me that Patrick Killen, Junior had admitted to her to being RebeccaTill05, something about he was bisexual and he wanted to speak to her in private outside away from his parents so they wouldn't overhear what they were talking about.**

Q.   And after she told you what the defendant had just said, what happened next?

A.   **They went outside, to the backyard of the residence and sat at some chairs outside.**

Q.   And all right.  So Special Agent Schwartzenberger and the defendant go outside.  Is that like a patio area?

A.   **Yes.  Uncovered area.**

Q.   Uncovered area.  And while that was going on, what were you doing?

A.   **I was still trying to go through the computer and make a copy of the cell phone.**

Q.   Were you able to make a copy of the cell phone?

A.   **No.  The Cellebrite machine kept giving me error messages.  I tried multiple times and it just wouldn't make a copy of it.**

Q.   Now, did there come a point in time when you finished your review of the MacBook and the iPhone 5?

A.   **Yes.  And I was reviewing the iPad at the same time.**

Q.   Now, and this was the iPad that the defendant said was his?

A.   **Yes.**

Q.   Did you find anything of interest on the iPad?

A.   **No.  Not on the iPad.**

Q.   After you finished your review of those three electronic items, what did you do next?

A.   **I then packaged all of it, the Cellebrite machine and then I rejoined Special Agent Schwartzenberger out on the**

back patio.

Q.   And what happened on the back patio?

A.   As I approached, she was wrapping up her interview with Patrick Killen, Junior, that they were sitting down, she had a notepad in her front of her, and Patrick Killen, Junior, was sitting across from her.

Q.   And then so -- and then when you saw that, what happened next?  What, if anything, did Special Agent Schwartzenberger say to you?

A.   At that point she said, "I want to go over what we talked about."  She was talking to me in front of Patrick Killen, Junior.

Q.   And when you say go over, you know, her notes, and without going into details, what did that mean?

A.   That she just wanted to recap what he had said to her in his presence in front of me.

Q.   And after she recapped it, what, if anything, did the defendant say?

A.   He agreed that that was accurate and correct.

Q.   All right.  So now I then want to talk about that recap.

A.   Okay.

Q.   So it's Special Agent Schwartzenberger who is doing the recap from her notes and the defendant is right there listening to it all, correct?

A.   That's correct.

Q.   Then what did Special Agent Schwartzenberger say?

A.   **She informed me that Patrick Killen, Junior had admitted to her that he used Instagram and was, in fact, RebeccaTil105 on the Kik app.  What he did was going on Instagram search for pictures of young boys and then he would message them on Instagram and ask them if they did Kik.  Then he would talk to them on Kik.**

**He estimated he had talked to 200 or so young boys and when he talked to them he would ask for pics, nude pics, and that he would receive their pics.  He said he used his cell phone for this primarily because Kik is used on cell phones.  And that before he had the iPhone he had a Samsung phone with a cracked screen that he used this for.  Said he had been doing this for two years and when he was communicating with the boys, he would use a picture of his friend from high school, a girl named Alexandra Reyes to get the boys to talk to him, and then he would use other pictures of girls to send to the boys.**

Q.   And when you say, what about any particular type of picture of a girl?

A.   **Nude.  And he also admitted to being -- using the e-mail ZachGonzalez05@Yahoo.com.**

Q.   And what about in this discussion, was there any discussion or any statement about what type -- did he send photographs and videos, or was it just photographs?

A.   He said he that he only did photographs and he never posted any of the kids' photos on the internet.  And the last time that he tried -- did this, was probably about two months earlier.

Q.   So then after Special Agent Schwartzenberger said all this, so she was reading back her notes?

A.   Yes, she was looking at her notes, she would look down, look at her notes, look up at me, making eye contact.

Q.   And then after she finished she said something to the defendant, right?

A.   She said, "Is that accurate," and he agreed and said, "Yes."

Q.   Now, after the defendant had made that statement, what happened next?  Did you go inside?

A.   Yeah.  At that point the interview was over so we went back inside the residence.

Q.   And what happened when you went inside?

A.   Special Agent Schwartzenberger asked Patrick Killen, Junior if he had any other storage, computer storage devices or anything of that nature.

Q.   And why does an FBI agent -- why did you want to know that?

A.   Well, it's a computer crime.  Evidence is stored on computer storage.  He just admitted to his computer crime so we obviously want to make sure we get all the items we can.

Q.   And so then after he -- he was asked that question by Special Agent Schwartzenberger, what did he respond?

A.   **He said, "Yes, he had two thumb drives."**

Q.   I'm showing you Government's 9.

(Thereupon, the exhibit was marked for identification.)

BY MR. EMERY:

Q.   Do you recognize this?

A.   **Yes.   That's one of the thumb drives.**

Q.   And what is that?

A.   **It's a Sandisk thumb drive.**

Q.   And is this the thumb drive that he produced?

A.   **One of them, yes.**

Q.   And how many did he produce?

A.   **Two.**

         MR. EMERY:  Move to admit, Your Honor?

         THE COURT:  Be admitted.

         MR. SCHWARTZ:  No objection, subject to the motion.

      (Thereupon, the exhibit was admitted into evidence.)

         MR. EMERY:  Permission to publish, Your Honor?

         THE COURT:  All right.

BY MR. EMERY:

Q.   And Sandisk I see that that's written here, is that the maker?

A.   **Yes.**

Q.   And then at the top what does that say right there as far

as where it's made?

A.   **"Made in China."**

Q.   Now I know you talked before about Government's 10 and we just were focused on the first three items.  He said there was two thumb drives that he produced?

A.   **Yes.**

Q.   And do they appear on this consent to search?

A.   **Yes.**

Q.   And I see right there's the word thumb drive; is that right?

A.   **Yes.**

Q.   And then there's also, looks like right there, the word thumb drive?

A.   **Yes.**

Q.   Now, after he gave you consent to search the thumb drives, what happened next?

A.   **Then we asked about the Samsung phone he mentioned to Special Agent Schwartzenberger.**

Q.   And, again, why did you care about the Samsung Galaxy, especially because you just said it had a cracked screen, too, right?

A.   **Correct.**

Q.   Why were you concerned about that?

A.   **Because it was his previous phone.  He said he had been doing this for over two years and there likely would be**

evidence of a crime on that phone.

Q.   And so then what happened then with respect to -- what, if anything, did you do with the Samsung phone?

A.   **We asked him where it was.  He said he thought it might be in his room still, he wasn't a hundred percent sure, and he went to his room to search for it on his own.**

Q.   And how long was he gone for?

A.   **Several minutes, five minutes maybe at the most.**

Q.   Did he come back out with it?

A.   **No.**

Q.   And after he came back out, what happened next?

A.   **I asked him if I could assist him in looking for the phone in his room and he said I could so --**

Q.   And, I mean, why were you so concerned about the Samsung? Why did you want to go back into his room and search?

A.   **Because, again, it might contain evidence of a crime that he just admitted to.**

Q.   And when you asked him if you could go back with him, what was his response?

A.   **He said, "Sure."**

Q.   Did you go back into his room?

A.   **Yes, I did.**

Q.   And how long were you back in his room for?

A.   **Probably about five minutes.**

Q.   And what happened when you were back in his room?

A.   **Just looking through his drawers and trying -- the closet just looking for where this phone might be.**

Q.   Did you find it?

A.   **No.**

Q.   And when you came out of the room, where was Special Agent Schwartzenberger?

A.   **She was in the dining room area with the parents.**

          MR. EMERY:  May I approach, Your Honor?

          THE COURT:  All right.

BY MR. EMERY:

Q.   Showing you what's been marked for identification as Government's 11?

     (Thereupon, the exhibit was marked for identification.)

BY MR. EMERY:

Q.   Do you recognize that?

A.   **Yes, I do.**

Q.   What is that?

A.   **That's a property receipt that the FBI uses.**

Q.   And who signed this document.

A.   **Patrick Killen, Junior.**

Q.   And what was it a property receipt for?

A.   **It was a receipt showing that we were taking the Apple MacBook, the iPhone 5, the chargers for both products, the two thumb drives.**

          MR. EMERY:  Move to admit, Your Honor.

MR. SCHWARTZ:  No objection.

THE COURT:  Admitted.

(Thereupon, the exhibit was admitted into evidence.)

BY MR. EMERY:

Q.  And could you please hand it to me?

A.  (Complies).

MR. EMERY:  Permission to publish.

THE COURT:  All right.

BY MR. EMERY:

Q.  So then I see there's a 1 through a 6.  Are these the items that the defendant gave you?

A.  Yes, sir.

Q.  And why do you have somebody sign the property receipt?

A.  That way they acknowledge we are taking these items from them and sometimes people come back wanting their stuff and they show that receipt and --

Q.  And there's a signature at the bottom.  Whose signature is that?

A.  Patrick Killen, Junior.

Q.  And that signature right there?

A.  Special Agent Schwartzenberger.

Q.  And did he sign Government's 11 in your presence?

A.  Yes.

Q.  I just want to show you on the screen Government's 11 which is the back of the MacBook.  Let me actually hand it to

you.  That might be a little easier.

Is there some handwriting on the back?

A.  **There's writing on it, yes**.

Q.  And what does that say?

A.  **It says, "Designed by Apple in California, assembled in China."**

Q.  Did you arrest the defendant that day?

A.  **No.**

Q.  And what happened then after the property receipt was signed?

A.  **Myself and Special Agent Schwartzenberger left.**

Q.  Why didn't you arrest the defendant that day?

A.  **We had no evidence of a crime at that point.**

Q.  He gave you a statement, though, correct?

A.  **Yes.**

Q.  But did you want to search his computers and other items?

A.  **Yes.**

Q.  What about the -- you talked before about an iPad.  What happened to the iPad?

A.  **I reviewed it as best I could and Patrick Killen, Junior requested if he could keep that because he wanted to use it for school.  So I felt it was satisfactorily done and so did Special Agent Schwartzenberger so he retained the iPad.**

MR. EMERY:  Government tenders the witness, Your Honor.

THE COURT:  Why don't we go ahead and take our afternoon break for about 10 minutes.

THE COURT SECURITY OFFICER:  All rise for the jury.

(Thereupon, the jury was escorted out of the courtroom.)

(Thereupon, a brief recess was taken.)

(Thereupon, the jury was brought into the courtroom.)

THE COURT:  All right, please be seated.  We were about to begin cross.

*CROSS EXAMINATION*

BY MR. SCHWARTZ:

Q.  Good afternoon, Special Agent Ginther.

A.  **Good afternoon, sir.**

Q.  Am I pronouncing your name correctly?

A.  **Yes.**

Q.  How long have you been with the FBI?

A.  **Five years.**

Q.  Prior to that, what did you do?

A.  **I was a deputy sheriff with the Orange County Sheriff's Office within Orlando, Florida, for about eleven and a half years.**

Q.  Did you root for the Magic?

A.  **Yes, sir.**

Q.  We won't hold that against you.  Now, Special Agent, did

you have a search warrant when you went to the Killens' house?

A.  **No, we didn't.**

Q.  Had you and/or Special Agent Schwartzenberger consulted with the U.S. Attorney's Office about getting a search warrant?

A.  **I didn't.**

Q.  Do you know if she did?

A.  **I'm not a hundred percent sure, no.**

Q.  And when you went to the house, you brought with you in your vehicle equipment to search electronics; is that correct?

A.  **That's correct.**

Q.  You brought equipment to search a phone and equipment to search a computer; is that right?

A.  **That's correct.**

Q.  So you anticipated at least the possibility that you might be able to talk this 20-year-old boy into letting you search his electronics; is that right?

A.  **If he were to give us consent, yes.**

Q.  And you did eventually search some of his electronics; is that right?

A.  **That's correct.**

Q.  And you said that you didn't arrest Patrick that day because you didn't have any evidence that he committed a

crime, correct?

A.   **Other than his statements, correct.**

Q.   Other than his statements.  So that means in your search of the phone and in your search of what was apparent in the computer, you didn't find any child pornography; is that right?

A.   **That's correct, in the search I conducted.**

Q.   Later, are you aware that the FBI extracted certain pictures and other things from the computer?

A.   **Apparently so.  I'm not privy to all that.**

Q.   Now, do you have any expertise in computers?

A.   **No, sir.**

Q.   But you have the ability to search them; is that right?

A.   **Yes.**

Q.   You know how to use the search tools that you brought which are fundamental tools; is that correct?

A.   **Yes.**

Q.   Extracting items from the computer is more advanced; is that fair to say?

A.   **There was no extracting of anything from any computer.**

Q.   On that day?

A.   **I didn't do extraction of anything from a computer.**

Q.   I agree.  I'm not challenging that.  I'm saying that the ability to extract things that have been deleted, for instance, from a computer is a more advanced type of --

requires more advanced computer knowledge; is that right?

A.  **That would be correct, yes, sir.**

Q.  That has to be done by an FBI computer technician and you're not a computer technician?

A.  **That's correct.**

Q.  What time did you arrive at the house?

A.  **Sometime between 7:00 and 8:00 a.m.**

Q.  And when you and Special Agent Schwartzenberger knocked on the door, the door was opened for you by a gentleman; is that correct?

A.  **Correct.**

Q.  I'm going to have a gentleman come into the courtroom in a moment and I'm going to ask if you recognize him.

A.  **Okay.**

Q.  Would you stand right there, sir?

Do you recognize this gentleman?

A.  **Yes, I do.**

MR. SCHWARTZ:  Thank you very much.

BY MR. SCHWARTZ:

Q.  Who do you recognize him as?

A.  **Patrick Killen, Senior.**

Q.  And is that Patrick's father?

A.  **That's what was represented to us, yes.**

Q.  And did you ask him if you could talk to his son?

A.  **Special Agent Schwartzenberger did.**

Q.   And his son was an adult, right?

A.   **Correct.**

Q.   Did you need his permission to talk to Patrick, Junior?

A.   **Well, it is his house so we felt necessary to ask the homeowners if we could speak to someone within there.**

Q.   And was there a point in time where Special Agent Schwartzenberger mentioned that she could have come in with a SWAT team and knocked down his door, or anything of that sort?

          MR. EMERY:  Objection, Your Honor.  Hearsay.

          THE COURT:  Sustained.

BY MR. SCHWARTZ:

Q.   Well, you've told us other things that Special Agent Schwartzenberger said in your presence; is that correct?

A.   **Yes.**

Q.   Do you know if she said anything about SWAT in your presence?

          MR. EMERY:  Objection.

          THE COURT:  Overruled.

A.   **When the -- during the point where Patrick Killen, Junior explained to us that he didn't know anything about Rebecca Till or RebeccaTill05 when we were initially doing an interview, the mother was offset in the living room and she interjected and wanted to know more about what we were doing and Special Agent Schwartzenberger addressed her at that time**

about that and explained to her that we were doing an investigation in reference to a computer crime.

During that conversation, Special Agent Schwartzenberger made a comparison as to how the FBI does investigations.  Sometimes we approach as we did today, that day, with a knock and talk.  Sometimes we had to utilize the SWAT team.  But that wasn't the case that day, that we were doing the knock and talk way.  That was the only reference to SWAT that was made in my presence during that day.

Q.   Did you mention SWAT at all in your testimony on direct examination by the prosecutor?

A.   I wasn't asked, sir.

Q.   You were asked what happened and what people said to each other.  Did you mention Special Agent Schwartzenberger's reference to SWAT?

A.   It had no bearing on what I was answering, sir.

Q.   Isn't it a fact that Special Agent Schwartzenberger told the Killens and that if they didn't cooperate, she would come back with a SWAT team and knock the door down and search the house?

A.   Absolutely not.

Q.   You talked about a consent form, consent to seize and search the computers; is that correct?

A.   Yes.

Q.   And you were shown that signed form?

A.  Correct.

Q.  Is it a fact that Patrick Killen, Junior, the defendant, signed that form after you had already searched the computers?

A.  No.  We didn't do the search until the form was signed.

Q.  You were having problems with the device you were using to try to copy the iPhone; is that correct?

A.  Correct.

Q.  Is that because the battery was low on the iPhone?

A.  I believe the battery was low, but I don't know if that had any bearing on that device at that time.

Q.  And the battery was very low because Patrick had to charge it and/or at least Patrick said he was charging it for a while trying to get it charged up; is that right?

A.  Correct.

Q.  You say that at the table Patrick said that he was Rebecca Till and that he was bisexual; is that correct?

A.  I said that Special Agent Schwartzenberger informed me of that as I reentered the residence to grab the Cellebrite machine I used.

Q.  Were you aware or did he tell Special Agent Schwartzenberger that he was a virgin and had no sexual experience with men or women?

A.  I don't recall that being brought up in my presence.

Q.  This consent form that you said you wanted Patrick to

understand, did you read it to him?

A.   **Special Agent Schwartzenberger gave it to him to read.  I did not give anything to him.**

Q.   Did Special Agent Schwartzenberger read it to him?

A.   **Not that I recall, no.**

Q.   Did anybody ask him to read it out loud?

A.   **No.**

Q.   Do you know of your own knowledge whether he read it before he signed it?

A.   **He said he understood it and agreed to it and signed it.**

Q.   Who did he say he understood it to?

A.   **Special Agent Schwartzenberger.**

Q.   He said that or the form said, "I understand it"?

A.   **Well, he gave us verbal consent and then the form was provided him and then he reviewed the form and signed it.**

Q.   And when you say he reviewed the form, did he read it in your presence?

A.   **He appeared to be reading it.**

Q.   You said that Patrick looked for the Samsung and then you went back in the room with him to look for it; is that right?

A.   **Yes.**

Q.   How many times had you been in the room before?

A.   **Zero.**

Q.   So why did you say you went back?

A.   **Went back as into the back of the house with him.**

Q.   You didn't say you went to the back of the house.  You said you went back in the room with him.  That was your testimony on direct.  Are you now backing off that?

A.   **No.  I've been in his room once and that was at the end of the day.**

Q.   And then why did you say earlier today the testimony with the prosecutor that you went back in his room with him?

A.   **Because I went back into his room with him.  That's how I worded it.**

Q.   Isn't it a fact that you had been in his room earlier, searched his room without his consent and seized his electronics?

A.   **Absolutely not.**

Q.   Who directed that you and Special Agent Schwartzenberger do the interview of Patrick?

A.   **Special Agent Schwartzenberger received a lead from our Charlotte division, that lead goes to our supervisors who then assigned it on to an agent and he assigned it to Special Agent Schwartzenberger.**

Q.   And when you get a lead from another field office, particularly from a supervisory special agent in another field office, is it the FBI's practice to then follow that lead and follow up and do what they're asked?

A.   **We try to resolve the lead, yeah, and investigate it, yes.**

Q. But at that point, you don't take control of the -- your office doesn't take control of the case. It's still a case of the Charlotte field office; is that correct?

A. **Yes, it's essentially them asking us to assist them to locate this person that victimized somebody in their area.**

Q. So it's their case, they basically direct what you do, your office tries to do its best to follow that direction and assist your sister field office, correct?

A. **They don't necessarily direct exactly what we do. They ask us for assistance and then we take logical investigative steps that we feel we need to successfully help them out.**

Q. But it remains their case unless, as in this case, it's eventually turned over to your office?

A. **Correct.**

MR. SCHWARTZ: Can I have a moment?

THE COURT: Yes.

BY MR. SCHWARTZ:

Q. Now, you didn't find any child pornography on the iPhone; is that correct?

A. **I never searched the iPhone. I tried to do an extraction to copy it, but I never physically searched it.**

Q. So you didn't, in whatever you were doing with the phone, find any child pornography, correct?

A. **Correct.**

Q. Did you find anything related to the investigation on the

iPad?

A.   **No, that's why we returned it to them.**

Q.   And you searched the iPad; is that correct?

A.   **Yes.**

Q.   You searched the MacBook; is that correct?

A.   **Tried to, yes.**

Q.   Why didn't you search the iPhone.

A.   **Tried to do an extraction of it and didn't work.  And there was no apps on there.  I recognized that it would require probably a more thorough examination as you explained earlier with our more advanced computer people.**

Q.   Well, there was some apps on there, weren't there?

A.   **Of course.**

Q.   When you say there were no apps on there, what do you mean?

A.   **The Kik app was not on there that I could see visually.**

Q.   The Kik app wasn't on there.  Was there a GigaTribe app?

A.   **I don't believe there's a GigaTribe app.**

Q.   But you found some sort of GigaTribe app on the computer?

A.   **Yes.**

Q.   You didn't find anything to do with GigaTribe on the phone?

A.   **No, I don't believe they have an app for a phone, no.**

Q.   So is that why you took the phone with you?

A.   **We took the phone with us because Patrick Killen, Junior**

admitted to using a phone to exploit young men.

Q.  Did he admit to using the iPhone or Samsung phone?

A.  **He said that he's been doing it for two years and as recently as two months ago stopped, which he presented the iPhone as his.**

Q.  Now, this was in February of 2014; is that right?

A.  **Yes.**

Q.  February 11th, 2014?

A.  **Yes.**

Q.  So that's why you took the iPhone, to try and search it?

A.  **For further examination by our computer people, yes.**

Q.  Do you know if anything was found on the iPhone?

A.  **No.  I'm not aware.**

Q.  What is your evidence to this jury that Patrick Killen, Junior, when the FBI was in his house, erased evidence that was crucial to this investigation from his iPhone?

A.  **Can you repeat the question?**

Q.  Yes.  There's a charge in the indictment suggesting that Patrick, when the FBI was investigating and you were at his house, deleted crucial evidence from his iPhone?  What do you have to prove that?

A.  **From my testimony that I provided earlier, his mannerisms from the apps were shaking and I asked him if he deleted anything and he said no, but that would have to be proven forensically later.**

Q.   So your only evidence as a witness before this jury that he violated this federal crime of destroying documents that were part of a federal investigation was you remember the apps as being shaking?

A.   **That's what I testified to**, correct.

Q.   Isn't it a fact that the phone was locked and you had to ask his code to open it?

A.   **No.**

Q.   If the phone was locked and it was reopened would the app still be shaking?

A.   **It was open in the palm of his hand and the apps were shaking.**

Q.   If an iPhone were locked based on your experience and it was opened with a code, would apps be shaking?

A.   **If it was locked, you wouldn't be able to see the apps, sir.**

Q.   And then you have a code and you open it, correct?

A.   **Correct.**

Q.   And then you see apps on the screen; is that correct?

A.   **Correct.**

Q.   And when you first open it, are the apps shaking?

A.   **No.**

          MR. SCHWARTZ:  I have no further questions.

          THE COURT:  Redirect?

          MR. EMERY:  Yes, Your Honor.

*REDIRECT EXAMINATION*

BY MR. EMERY:

Q.   Special Agent Ginther, now that morning when you and Special Agent Schwartzenberger went up to the door and knocked on it and asked to speak with the defendant, Patrick Killen, Junior, what would have happened if the father would have said no?

MR. SCHWARTZ:  Objection.  Speculation.

THE COURT:  Overruled.

A.   **If he would have said no, then we would have had to have left because we can't force our way into a house and we didn't have permission to be in his house, so we would have to leave.**

BY MR. EMERY:

Q.   And what would have happened if the defendant had refused to give you consent to search his electronic items?

A.   **Then we wouldn't have searched his electronic items.**

Q.   Now, when you were there at the house, how was the tone of voice that you had with the defendant?

A.   **Ordinary, conversational tone.  Nothing more than I'm talking right now.**

Q.   And what about Special Agent Schwartzenberger, how was her tone of voice with the defendant?

A.   **Exactly the same.  More pleasant.**

Q.   And how was Special Agent Schwartzenberger's tone of

voice with the defendant's mother?

A.   **Absolutely the same.**

Q.   And the father?

A.   **The same.**

MR. EMERY:  No further questions, Your Honor.

THE COURT:  Thank you, you may step down.  Call your next witness.

MR. WIDLANSKI:  We call forensic examiner Ricardo Soto of the FBI.

Thereupon,

**RICARDO SOTO,**

having been duly sworn by the courtroom deputy, testified as follows:

THE WITNESS:  Yes, I do.

THE COURTROOM DEPUTY:  Please be stated and state your name and spell it for the record.

THE WITNESS:  Ricardo Soto, R-I-C-A-R-D-O, S-O-T-O.

*DIRECT EXAMINATION*

BY MR. WIDLANSKI:

Q.   Good afternoon, sir.

A.   **Good afternoon.**

Q.   What's your current job?

A.   **I'm a computer forensic examiner for the FBI.**

Q.   And how long have you been a computer forensic examiner?

A.  About 15 years now.

Q.  With who, the FBI the whole time?

A.  Yes.

Q.  What do you forensically examine?

A.  We examine digital evidence.

Q.  And what is digital evidence?

A.  Any medium that can be used to store digital data.

Q.  Computers?

A.  Computers, laptops, desktops, phones.

Q.  Phones as well?

A.  Yes.

Q.  Thumb drives?

A.  Yes.

Q.  Did you receive an undergraduate degree?

A.  Yes, I do.

Q.  In what?

A.  Information technology and computer systems.

Q.  Have you received any advanced schooling?

A.  I currently working on my master's degree, yes.

Q.  In what?

A.  Cyber forensics.

Q.  What is cyber forensics?

A.  The program deals with the collection, acquisition and reporting on digital evidence, forensic examinations to include network penetration testing and systems like that.

Q.   Other than your undergraduate advanced degree programs, have you taken any other courses or classes in computer forensics?

A.   **Yes, I have.**

Q.   What are some of those classes?

A.   **I have taken various FBI sponsored classes that include Windows certification, Mac, Unix/Linux, cell phone, PDA and I've also taken commercial courses that deal with Windows forensic analysis, incident response, and penetration testing as well.**

Q.   So you used a lot of big words that I don't understand. Let's start with incidence response, what is that?

A.   **It depends on a certain case.  Some may have had a computer they feel it's a little sluggish, they may have gotten hacked, something is not working right so we can look in the program, on the training we could actually look into that trying to analyze what's going on with the system, if it's been compromised, if something has happened to it.**

Q.   And you've taken all these classes as part of your work with the FBI?

A.   **Yes.**

Q.   Are you required to get updates and certifications and do you have qualifications from the FBI and from these courses?

A.   **Yes, we are required to take an annual proficiency test and we're also required to take annual training.  In addition**

to that, as I mentioned earlier, I have been certified by the FBI to process UNIX systems, cell phones, PDAs and I've also received the FBI senior forensic examiner certification as well.

Q.   You have to take tests to get those?

A.   Yes.

Q.   And do you go to conferences and professional education as sort of a refresher every so often?

A.   Yes, I do.

Q.   Do you read professional literature and maintain an awareness of the sort of the most up-to-date skills and technology available to people who are forensic examiners?

A.   Yes.

Q.   Approximately, how many data devices in your career have you look at, generally?

A.   Generally, maybe over 300 pieces of evidence.

        MR. WIDLANSKI:  At this time, the United States would offer Mr. Soto as an expert in the field of forensic analysis.

        MR. SCHWARTZ:  May I have a moment, Judge?

        THE COURT:  All right.

        MR. SCHWARTZ:  Your Honor, I acknowledge that he's a trained expert in computers.

        THE COURT:  Okay.

BY MR. WIDLANSKI:

Q.   So, Mr. Soto, let's talk about what you do as a forensic examiner.  What sort of cases do you work on?

A.   **I work on cases, various cases, depending on the violation that the FBI investigates and what the case agent needs at the moment we recover; child pornography, Medicare fraud, public corruption.  Depends on the squad that's requesting the forensic assistance.**

Q.   So you're not specifically a child pornography computer expert?

A.   **No.**

Q.   Are you an investigator?

A.   **No.**

Q.   Are you a case agent?

A.   **No.**

Q.   Do you develop leads and investigate potential criminal conduct out in the field?

A.   **No.**

Q.   So basically, what is your role?

A.   **As a forensic examiner we provide support to the case agents.  If they have a request to process digital evidence we can process it and analyze and extract data that they may need for the investigation.**

Q.   I'm going to ask you generally to slow down for the benefit of our court reporter, something I had to learn very early on as well, so she just takes a little bit.

So basically a case agent, such as Laura Schwartzenberger, will bring you something and you'll look at it; is that right?

A. **She'll submit a request for analysis and we'll take a look at it, yes.**

Q. And you'll look at the particular piece of evidence that she gives you, that whatever she brings you on the computer, you will turn it on and start looking at it?

A. **No.**

Q. So what exactly will you look at?

A. **On a computer, for example, we would not turn it on, we would make a forensic copy of the device, and we would work off the forensic copy.**

Q. Let's talk about that for a little bit. How do you make a copy? What does that entail?

A. **Well, on a computer you can take the hard drive out and put it behind a write blocker so we don't accidentally write to it, and you can use a forensic program to create an image of the actual device to some other media, be it a hard drive or a storage area network.**

Q. You said a write blocker. What is a write blocker, what does that mean?

A. **What a write blocker does is if you put it on a hard drive that avoids accidentally writing to the device so that it can ensure the integrity of the device, that you don't**

change anything, you don't delete anything, you don't add anything to the device.

Q.   So it's like a one-way valve, it only goes out and nothing goes in?

A.   Yes.

Q.   So you've plugged the write blocker in and you've made this copy.  How can you be sure that the copy you made is the same as the evidence that you got?

A.   Once the copy is created, we do a hash verification of the file to verify it's the same.

Q.   Hash verification?

A.   Yes.

Q.   What's a hash verification?

A.   Hash verification is something like a digital fingerprint.  It's a mathematical algorithm that's run against the data set and then it gives it a unique number so when we copy evidence out, the number from the original evidence from the copy should match and that's how we know it's an exact copy.

Q.   So it's a program, an algorithm that essentially tells you a fingerprint, an original fingerprint for a piece of data?

A.   Yes.

Q.   And if the same algorithm is run against the same data, is the hash value going to be the same every time?

A.   **If it's the same data, yes.**

Q.   If you have a hard drive with data, and you change some very small piece of that hard drive, some small piece of the data, will the hash value be different?

A.   **Yes.**

Q.   Can you get hash values for anything?

A.   **For data sets and files, yes.**

Q.   So any type of digital data you can get a hash value?

A.   **Yes.**

Q.   So you could get a hash value for a hard drive or you can get a hash value for, like, a Word document?

A.   **Yes.**

Q.   Now, let's talk about Word documents for a second.  If I've got a Word document and I open it up, double click it, can I get a hash value for that blank document?

A.   **Yes.**

Q.   And if I make changes to that, is the hash value going to be different?

A.   **If you make changes to it, yes, it would be different.**

Q.   How much change?  If I have to type 30 pages will it be different or is it any changes whatsoever?

A.   **If you were to put hit the space bar once, it would significantly change the hash value for that file.**

Q.   So the space bar, hitting it one time, it will change the hash value?

A.   Yes.

Q.   So even though it looks the same, the hash values are going to be different?

A.   That's correct.

Q.   Why do you make a copy of the evidence and analyze it with these hash verifications we're talking about instead of analyzing the original evidence, instead of working from the computer or the thumb drive or whatever the agent brought in? Why did you make that copy?

A.   The idea behind it is to protect the original digital evidence.  Once you get the data out of there, you do not want to manipulate the original drive.  The drives can go bad.  You can lose data on there, which would change your hash values.  It's just general practice within the forensic community to work off a verified working copy.

Q.   So you've gotten this working copy in your lab and you basically just work on it in your lab and that's how you do your analysis?

A.   I use forensic tools to process the image files that are created when we copy the hard drive or the digital evidence.

Q.   Let's come back to the forensic tools in a little bit. Let me ask you, other than working in your lab with your forensic tools, do you do anything else for the FBI?

A.   Yes.  In addition to providing forensic reporting to the lab, we also assist with the search and seizure of warrants

as far as preserving evidence, imaging onsite or preparing --

collecting evidence and preparing to return back to the

office for processing.

Q.   And then when you get back to your office, the same stuff

that we talked about earlier, the copy and the hash

verification and all that stuff?

A.   Yes.

Q.   And if the hash values are the same, again, what does

that mean?

A.   We have an identical copy.

Q.   Now, when you say identical copy, I mean physically it's

not identical, right?  It's different physical thing; is that

correct?

A.   As far as where we store the image files?

Q.   Yes.

A.   Yes.

Q.   So when you say exact or identical copy, what does that

mean?  What does an exact copy mean?

A.   We would call it a bit by bit stream copy.  What that is

is the hard drive in divided into small pieces of sectors,

for example, and they run on tracks.  So we would copy from

the first sector to the hard copy all the way to the end.

        With the forensic image, you would have everything

from the original hard drive, including the active files to

space, unallocated space.

Q.   And you said bit by bit.  What are bits?

A.   **Bits are your ones and zeros.**

Q.   So all of the data, all the ones and zeros from the original evidence is exactly copied and then that copy is verified through this hash analysis that you were talking about?

A.   **Yes.**

Q.   And then you analyze the copy instead of the original data?

A.   **Yes.**

Q.   So after you got that copy, what do you do with it?

A.   **We use, depending on what the request --- what they're requesting we would use certain forensic tools to process the digital evidence and pull out whatever hard drives they're looking for.**

Q.   Let's talk about those forensic tools.

A.   **Sure.**

Q.   What are forensic tools?  Is that like a hammer and a scalpel, is that the sort of tools you're talking about?

A.   **No.  It's computer programs that are designed to process digital evidence.**

Q.   It's just like you enter a program and you spit the data in, that sort of thing?

A.   **You could run an application and point it toward the image and burn processes on it, yes.**

Q.   And what are you looking for, in general?  What are you looking for?

A.   **That depends on the request.  It could be anywhere from image files, videos, spreadsheets, e-mails.**

Q.   And those requests come from the case agent who submitted the evidence?

A.   **Yes.**

Q.   And does it -- whatever forensic tool you use, does that depend on what request came in?

A.   **Yes.**

Q.   So what are some of the tools you'll be using?  What are the names of some of these tools?

A.   **We use AccessData, AD Lab Forensic Suite, Guidance Software has an application called EnCase that can process files as well and depending on what we're looking there are other tools like SkypeLogView, GigaTribe Chat Parser, Internet Evidence Finder.**

Q.   And are these programs generally available commercially for forensic analysts?

A.   **Yes.**

Q.   And after you use these programs, is there a product?  Is there something that is the result of your forensic analysis?

A.   **Normally after processing the evidence we'll place it up for review for the case agent to review the results of the examination.**

Q.   Do you ever take screen shots?

A.   **Upon request, yes.**

Q.   Do you ever make disks, CDs that contain some of the result of your analysis?

A.   **Yes, I have.**

Q.   And all the stuff that we just talked about, all of your general procedures, the way you normally review data, the copy, the hash verification, all of that stuff, were you asked to do that in this case involving Patrick Killen, Junior?

A.   **Yes, I was.**

Q.   And who initiated that request?

A.   **Special Agent Schwartzenberger.**

Q.   And what were you asked to analyze?

A.   **The request was to analyze an Apple MacBook Pro.**

Q.   Just an Apple MacBook Pro?

A.   **Yes.**

Q.   Any other devices that you were asked to look at?

A.   **Not in that request, no.**

Q.   So just an Apple MacBook Pro?

A.   **Yes.**

Q.   And did you do that?

A.   **Yes.**

Q.   What were you asked to do?

A.   **I was asked to analyze the system for possible child**

**pornography, chat messages and software.**

Q.   In general?  Generally?

A.   **General.**

Q.   We'll get into the details later.  But, generally, on the Apple MacBook Pro, what did you find?

A.   **I found images, videos, chat messages, videos, I already said that, basically.**

Q.   Did those images and videos appear to you to involve minors involved in sexually explicit conduct?

A.   **Some of them, yes.**

Q.   You mentioned earlier that when you examined these digital media, the digital devices, you take hash values of the evidence and hash values of the copy to make sure that it's the same.  Was that done in this case?

A.   **Yes.**

Q.   Was it done by you?

A.   **The original acquisition, no.**

Q.   So who made the original acquisition?

A.   **Forensic examiner David Mingarelli.**

Q.   And he's also in your lab?

A.   **Yes.**

Q.   Also in the FBI?

A.   **Yes.**

          MR. WIDLANSKI:  May I approach, Your Honor?

          THE COURT:  All right.

BY MR. WIDLANSKI:

Q. I'm showing you Government's Exhibit 12A for identification.

(Thereupon, the exhibit was marked for identification.)

BY MR. WIDLANSKI:

Q. What is Government's Exhibit 12A?

A. **These are screen shots from an application called FTK Imager and an acquisition log for the Apple MacBook.**

Q. And again, you did not create these yourself; is that correct?

A. **Yes, that's correct.**

MR. WIDLANSKI: Your Honor, by stipulation with the defense I move to admit Government's Exhibit 12A for identification.

MR. SCHWARTZ: Admitted.

THE COURT: Admitted.

(Thereupon, the exhibit was admitted into evidence.)

BY MR. WIDLANSKI:

Q. All right. So what are we looking at here?

A. **That's a screen shot from the software program, FTK Imager.**

Q. And at page 2, what is page 2 of?

A. **Verified results from FTK Imager.**

Q. Now I'm looking at two different lists here. One says MD5 hash and one says SHA1 hash. What are the differences

between those two?

A.   **They're both mathematical algorithms.  MD5 is 128 bit and SHA1 is 256 bit, but they're both, in essence, a hash value for a digital data set.**

Q.   What does this mean when you are looking at it?

A.   **It shows us the original hash value for the Apple MacBook hard drive and the results that we got when it was imaged.**

Q.   Where was it imaged to?

A.   **A storage area network.**

Q.   What's a storage area network?

A.   **That's a room full of servers with a lot of data storage capacity.**

Q.   Like a really big hard drive?

A.   **Yes.**

Q.   What is page 4 of Government's Exhibit 12A?  What is this page?

A.   **That's the acquisition log from the acquisition of the Apple MacBook Pro.**

Q.   And what are these numbers here about halfway down next to MD5, check sum and SHA1, check sum?

A.   **Those are the hash values.**

Q.   So should these numbers match the numbers on page 2?

A.   **Yes.**

Q.   And do they?

A.   **Yes.**

Q.   Showing you Government's Exhibit 7, and I'm handing you back 12A.  Looking at Government's Exhibit 7 and Government's Exhibit 12A, was that the computer that was imaged and the image hash verified on Government's Exhibit 12A?

A.   **Yes.**

Q.   How can you say that?

A.   **I'm looking at the model number here that's referenced in the log as well where it says Western Digital hard drive, and that states the serial number and the model which is an A-1278 which is this model right here, A-1278.**

Q.   Showing you Government's Exhibit 12B for identification.

(Thereupon, the exhibit was marked for identification.)

**BY MR. WIDLANSKI:**

Q.   What is Government's 12B for identification?

A.   **12B is an Apple MacBook Pro.**

Q.   Do you personally copy the images from the storage area network to that hard drive?

A.   **Yes.**

        MR. WIDLANSKI:  We would offer to admit Government's Exhibit 12B, Your Honor.

        THE COURT:  Admitted.

(Thereupon, the exhibit was admitted into evidence.)

**BY MR. WIDLANSKI:**

Q.   After you copied the images to the hard drive, did you verify the hash value on that hard drive as well?

A.   **Yes.**

Q.   How did you verify the hash value?

A.   **I used the FTK Imager again to verify the image files.**

Q.   And did you, in fact, verify it?

A.   **I did, and I received the same MD5 hash.**

Q.   So now we have got a hard drive copy, we have got the copy on the storage area network, and we have got the original evidence, that laptop.  Were the hash values the same for all three?

A.   **Yes.**

Q.   At the end of your examination, after you did all the work in this case that was requested by Special Agent Schwartzenberger, after you did additional work that was requested by annoying Assistant U.S. Attorneys who want to make your life difficult, do you do another hash verification?

A.   **Yes.**

Q.   Why?

A.   **To verify at the end of the examination that the original image file hasn't changed.**

Q.   Showing you Government's 12C for identification.

     (Thereupon, the exhibit was marked for identification.)

**BY MR. WIDLANSKI:**

Q.   And retrieving 12B, 12A, and 7.  What is Government's Exhibit 12-C?

A.   **It's a screen shot of FTK Imager showing the verified results.**

Q.   Did you create that screen shot yourself?

A.   **Yes.**

Q.   Does it fairly and accurately represent the results of your hash verification?

A.   **Yes.**

          MR. WIDLANSKI:  Move to admit, Your Honor.

          MR. SCHWARTZ:  No objection.

          THE COURT:  It will be admitted.

     (Thereupon, the exhibit was admitted into evidence.)

          MR. WIDLANSKI:  Retrieving the exhibit from the witness.

**BY MR. WIDLANSKI:**

Q.   Showing you 12C, you got these numbers here.  Are they the same numbers on Government's Exhibit 12C as they were on page 2 of Government's 12A?

A.   **Yes.**

Q.   Both of those are the same as what you saw when you created 12B, the hard drive?

A.   **Yes.**

Q.   What does that mean?

A.   **That verifies that the image was not changed from the beginning examination to the post examination.**

Q.   So even though you never turned on Government's Exhibit

7, that computer, you never physically pressed the power button, you never ran your analysis on that particular physical thing, can you say to a degree of scientific certainty that you analyzed the data on that computer?

A.   Yes.

Q.   If you had examined that physical thing, Government's Exhibit 7, with all the same tests, all the same forensic tools, would your analysis have changed?

A.   No.

Q.   Showing you Government's Exhibit 13A for identification.

     (Thereupon, the exhibit was marked for identification.)

BY MR. WIDLANSKI:

Q.   What is Government's Exhibit 13A for identification?

A.   It's an examination report for an Apple MacBook Pro.

Q.   What is an examination report?

A.   Those are the results from the examination of the MacBook Pro, the files that the special agent had reviewed and requested for further review.

Q.   Did you create that Blu-Ray disk?

A.   Yes.

Q.   And does it contain the results of your analysis, your forensic analysis of Government's Exhibit 7, the computer?

A.   Yes.

          MR. WIDLANSKI:   I would move it admit, Your Honor.

          THE COURT:   Admitted.

(Thereupon, the exhibit was admitted into evidence.)

**BY MR. WIDLANSKI:**

Q.   Now, after you create this examination report, 13A, in this case, what do you do with it?

A.   **I turned that over to our Miami evidence control room and then notify the case agent so they can pick up the report and review it.**

Q.   Why do you do that?

A.   **To maintain chain of custody.**

Q.   And what do the case agents do with it?

A.   **That'll look at it and review the artefacts to see how that correlates with their investigation.**

Q.   Do they ever come back to you after you've given it to them and say, "I need X, Y or Z"?

A.   **On occasion, yes.**

Q.   And in this particular case, did Special Agent Schwartzenberger ask you to create any other disks as a result of this analysis?

A.   **Yes.**

Q.   Showing you 48A for identification.

(Thereupon, the exhibit was marked for identification.)

**BY MR. WIDLANSKI:**

Q.   What is 48A for identification?

A.   **48A contains video files that were requested for further review.**

Q.   These were video files that were in your original examination report and were identified by Special Agent Schwartzenberger as she wanted you to pull them out and create a new disk?

A.   **Yes.**

Q.   But these were all on Government's Exhibit 7, the computer itself?

A.   **Yes.**

Q.   And you put them on this disk?

A.   **Yes.**

          MR. WIDLANSKI:  I would move to admit 48A.

          THE COURT:  Admitted.

     (Thereupon, the exhibit was admitted into evidence.)

BY MR. WIDLANSKI:

Q.   What is a MobileSync backup?

A.   **A MobileSync backup is an application by Apple that is used to back up IOS devices like an iPhone or an iPad.**

Q.   I'm showing you Government's Exhibit 13B for identification.

     (Thereupon, the exhibit was marked for identification.)

BY MR. WIDLANSKI:

Q.   **What is Government's Exhibit 13B for identification?**

A.   **It's a Lantern examination report for a MobileSync backup folder from the Apple MacBook Pro.**

Q.   **Now, what is a Lantern examination report?**

A.   Lantern is another forensic tool that we use to process IOS device information like Apples and iPads.

Q.   Now, you mentioned what a MobileSync backup is, we'll get into that in a moment but I want to ask you, did you create this report?

A.   Yes.

Q.   And is this report the result of your examination of that computer, the evidence, the digital evidence of that computer?

A.   Yes.

        MR. WIDLANSKI:  I would move to admit Government's Exhibit 13B for identification.

        THE COURT:  Admitted.

     (Thereupon, the exhibit was admitted into evidence.)

BY MR. WIDLANSKI:

Q.   So let's talk about what a MobileSync backup is.  Is it created automatically or by a user?

A.   The user initiates the backup.

Q.   And how does the user initiate the backup?

A.   Simply by connecting an IOS device to a computer.

Q.   An IOS device being an iPhone?

A.   An iPhone or an iPad, yes.

Q.   So you physically can plug it in or is there any other way that you would connect it?

A.   Initially, you would plug it in.  Then it would prompt

you to create the backup and further iterations would let you sync afterwards wirelessly, but initially you would sync it connecting with a wire, USB cable.

Q.   And what does the MobileSync backup store?

A.   It will store information from the device, applications and data, application data as well.

Q.   From the iPhone or iPad, whatever was plugged in and then uploaded to the cloud?

A.   It would save that, and if the laptop is set up to save in the cloud, it would do that as well, yes.

Q.   So basically, if someone's got an iPhone or an iPad and they have got all their stuff in it and they want to save it, they can create this MobileSync backup on their computer; is that right?

A.   It's done through a program called iTunes and they would connect their device to a computer and then iTunes would prompt you if you want to make a backup or you can initiate the backup yourself.

Q.   I'm showing you Government's Exhibit 13D for identification.

(Thereupon, the exhibit was marked for identification.)

BY MR. WIDLANSKI:

Q.   What is Government's Exhibit 13D for identification?

A.   Screen shots regarding the MobileSync backup folder from the Apple MacBook Pro.

Q.   Did you create that document?

A.   **Yes.**

Q.   Did you create it as a result of your forensic examination of the digital evidence in this case?

A.   **Yes.**

          MR. WIDLANSKI:  Your Honor, I would move 13D into evidence.

          THE COURT:  It will be admitted.

     (Thereupon, the exhibit was admitted into evidence.)

**BY MR. WIDLANSKI:**

Q.   So tell me what we're looking at here.

A.   **The first screen shot is the MobileSync backup folder as the user would see it on a computer if they were looking at it through Windows Explorer.**

Q.   So that doesn't look like it's readily accessible to the user?

A.   **That's correct, it's not.**

Q.   But it's there?

A.   **Yes.**

Q.   And if a user plugs an iPhone in, will it connect to this MobileSync backup folder?

A.   **If the laptop is configured to do that or the phone, excuse me.**

Q.   And I'm looking at right here, the value type, value block.  Does this tell us when the last time that the phone

Q. was backed up?

A. **Could you lower that a little bit, please?**

Q. Lower it?

A. **Yes, please. Look to the right side. Yes. That Status.P list maintains the information regarding the last time the device was backed up.**

Q. And when was the last time that an iPhone was backed up on that computer?

A. **September 13th, 2013.**

Q. And where do you see that?

A. **Where it says the key date.**

Q. You can actually touch that screen and underline it. It's new technology.

So that's the date that the phone was last backed up to that computer?

A. **Yes.**

Q. Do you know, does this document tell you the name of the phone?

A. **Yes, it does.**

Q. And what is the name of the phone?

A. **Patrick Killen iPhone.**

Q. So an iPhone named Patrick Killen iPhone was backed up on that laptop last on September 13th of 2013?

A. **Yes.**

Q. What is an IMEI?

A.   **The IMEI number is a unique number that phones that are on the GSM network have that allows the phone to connect to the telephone network.**

Q.   Is this is a unique number for the phone?

A.   **Yes.**

Q.   I should ask, since this was last backed up on September 13th of 2013, if there had been activity on the phone on, say, October 1st of 2013, would it have been captured by this MobileSync backup?

A.   **No.**

Q.   Why not?

A.   **Because it wasn't backed up.  The last backup activity shows September 13.  After that whatever happened on the phone would not be contained within that backup.**

Q.   So this MobileSync backup sort of gives you a snapshot of what that phone -- I'm sorry, Patrick Killen iPhone looked like on September 13th of 2013?

A.   **His backup application and the data, yes.**

Q.   So it doesn't tell you what happened to that phone?

A.   **No.**

Q.   Doesn't tell you what that phone did or did not do five months later in February of 2014?

A.   **That's correct.**

Q.   I'd like to direct your attention here on page 2 of 13D. Three-quarters of the way down here, what is that application

right there?

A.   **That's a Kik chat application.**

Q.   And what is that application right here?

A.   **That's also part of a Kik chat, it's a video function.**

Q.   So there were -- on September 13th of 2013, there were Kik applications on this phone; is that correct?

A.   **There was the Kik application, yes.**

Q.   Mr. Soto, I'm handing you, what are these documents 13M through 13U.

(Thereupon, the exhibit was marked for identification.)

A.   **These are partial screen shots from a Lantern examination report.**

BY MR. WIDLANSKI:

Q.   This is the Lantern examination report that you created?

A.   **That's part of it, yes.**

Q.   And this is not a complete encapsulation of the Lantern report; is that correct?

A.   **That's correct.**

Q.   But these are still shots, screen shots from the Lantern report?

A.   **Yes.**

Q.   And I know your initials are down in the corner.  Did you review these documents yourself?

A.   **Yes.**

Q.   And do they fairly and accurately represent what the

contents of the Lantern forensic report, review of the MobileSync backup?

A.   Yes.

MR. WIDLANSKI:  I would offer 13M through 13U into evidence, Your Honor.

THE COURT:  Admitted.

(Thereupon, the exhibit was admitted into evidence.)

BY MR. WIDLANSKI:

Q.   Let's start at the beginning, shall we?

Showing you 13M.  What does 13M show us?

A.   **Shows us the case information, the case number, the date, and then on the left-hand side we show you the fields that the software application could parse.**

Q.   So these are -- what are these things on the left?  What are those?

A.   **Those are the categories that the software application is capable of pulling out from the digital evidence.**

Q.   And this right here we're clicked on overview, correct?

A.   **Yes.**

Q.   And overview basically identifies within the FBI?

A.   **Yes.**

Q.   Showing you 13N, which the left side appears to be the same, the right side we have now clicked on evidence summary. What's going on here?

A.   **That just shows a basic summary of the artefacts that**

were found on the device.

Q.   So it shows how many contacts?

A.   58.

Q.   How many voicemails?

A.   34.

Q.   Scrolling down, how many images?

A.   3,557.

Q.   And next to Kik messenger, what is that number?

A.   32,519.

Q.   32,519 entries in Kik messenger?

A.   Yes.

Q.   Showing you 13P.  What is this page?  What is this page?

A.   This page shows information about the iPhone, to include e-mail accounts associated with the device and the device information.

Q.   So this is a people page.  And under the top block here, what is this account there?

A.   That's one of the e-mail addresses associated with the iPhone.

Q.   So the e-mail address that sends e-mails, that little bottom icon where you can click on what looks like an envelope?

A.   One of the e-mails that could be used for that.

Q.   Are there other e-mails that are used for that?

A.   There are other e-mails on the device that potentially

could be used for that, yes.

Q.   Are they listed here?

A.   Yes.

Q.   Where are they listed?

A.   Under the e-mails tab.

Q.   If you wouldn't mind highlighting on your screen?

A.   (Complies).

Q.   So you circled ChanelIzzabel@Outlook.com, PatrickJKillen@Gmail.com, ChanelIzzabel_27M@Talk.Kik.com and PatrickJKillen13@Gmail.com; is that correct?

A.   Yes.

Q.   And all of those e-mails were associated with this iPhone.

A.   Yes.

Q.   Scrolling down, what is the name of this iPhone?

A.   Patrick Killen iPhone.

Q.   Is that the same as the name we saw on that MobileSync information page you showed earlier?

A.   Yes.

Q.   And this IMEI, is that the same as what we saw earlier?

A.   Yes.

Q.   Moving on to 13Q.  What is this page?

A.   It's a bit blurry.

Q.   Is that better?

A.   A little bit.  It's part of the examination report

showing the Wi-Fi connections.

Q.   So that means that this phone connected to wireless internet?

A.   **Yes.**

Q.   Showing you here it says SSID, what does that mean?

A.   **That's the identifier for the wireless access point.**

Q.   And what is the first SSID there, the top one?

A.   **PJ Killen.**

Q.   What's the third one?

A.   **PJ Killen.**

Q.   And what's the fourth one?

A.   **PJ Killen-guest.**

Q.   I'm showing you 13R.  What is this page?

A.   **This is a partial page from the video section from the Lantern examination report for the Apple MacBook Pro.**

Q.   Now you said it was a partial page?

A.   **Yes.**

Q.   There are more than just these three entries on the whole Lantern report?

A.   **Yes.**

Q.   And how do you know that from looking at this page?

A.   **Right here it says 10 of 10.**

Q.   So is this just a screen shot and not just the entire entry of the videos format?

A.   **Yes.**

Q.   Showing you 13S.  What is 13S here?

A.   **Part of the Lantern examination report showing page 1 of 72 for image files.**

Q.   Now, there are three entries here and they're all blacked out.  Were they blacked out on all the rest of them?

A.   **No.**

Q.   Why were they blacked out on these three?

A.   **I'm not sure.  It could have been stored that way.  The information, I'm not sure at this point.**

Q.   But there were other pictures that were not blacked out?

A.   **Yes.**

Q.   And how many total images were there in the MobileSync backup?

A.   **3,557.**

Q.   And this is just the first three?

A.   **Yes.**

Q.   And you had mentioned earlier that when you did this analysis you saw images that appeared to you to be sexually explicit and involving children; is that right?

A.   **Yes.**

Q.   And were some of those images in this particular file folder?

A.   **Yes.**

Q.   I'm showing you page 1 of 13U.  What is this page here?

A.   **This is a page from the Lantern examination report**

showing part of the Kik messenger results.

Q. And how many total Kik messenger results were there in the Lantern report?

A. 32,519.

Q. Spread over how many pages?

A. 131 pages.

Q. And is this all of page 1 that we're looking at here or is this just a screen shot?

A. I'm sorry?

Q. Is this all of the first page of 131 or is this just a screen shot?

A. This is just a screen shot of page 1.

Q. So there's -- page 1 continues down?

A. I believe it does, yes.

Q. Now, what are we looking at here? If you wouldn't mind explaining to us, what's going on here? What is under the name column?

A. The name column would be the name of the user that is either sending or receiving the message depending on what the column indicates.

Q. Can you tell from this exhibit whether someone is sending or receiving a text message?

A. Green would indicate outgoing and red incoming.

Q. So the arrows on the first column, can you circle them?

A. (Complies).

Q.   So the green arrow means what?

A.   **Green would be outgoing and red incoming.**

Q.   So this phone Kik messengered with Jake Doran and sent a message to Jake Doran?

A.   **Yes.**

Q.   And what was the content of that message?

A.   **The message?**

Q.   Yeah, if you wouldn't mind reading it.

A.   **Sure.  "I have to actually see, smart ass."**

Q.   So from the Lantern MobileSync backup we're actually able to see with that iPhone that was connected to that computer the content of the Kik messages; is that correct?

A.   **Yes.**

Q.   And the number was 32,519?

A.   **Yes.**

Q.   Now we're not going to go through all of these.  But I'd like you to just read the second and the third from the bottom.  Are those outgoing or incoming?

A.   **These right here are outgoing.**

Q.   And what are the first, what are those two?  What are the content of those text messages?

A.   **The first one is, "From me fully naked," and the second one, "I'm saying close-up of dick."**

Q.   And that was sent from this phone to who?

A.   **To Jack Doran.**

Q.   Jake?

A.   **I'm sorry, Jake Doran.**

Q.   And page 2 of 13U, is this just more of the same sort of breakdown here?

A.   **Yes.**

Q.   And did you provide this entire data, this entire report to Special Agent Schwartzenberger?

A.   **Yes.**

Q.   And, again, how many total Kik messages did you pull?

A.   **32,519.**

Q.   Showing you now 13T.  What is page 1 of 13T?

A.   **From the Lantern examination report a listing of the applications that were --**

Q.   How many applications were on this phone?

A.   **Fifty.**

Q.   And is this pages 1 and 2, a complete listing of all the applications on this phone?

A.   **Can I see the top of that?  First sheet.**

Q.   I can actually hand this to you, how about that?

A.   **Yeah.**

Q.   So is this a complete listing of all 50 apps?

A.   **Yes.**

Q.   On page 2 of 13T, what's the top one there on page 2 that we have got?

A.   **That's the Kik chat application.**

Q.   And that was on this phone; is that correct?

A.   **Yes.  Excuse me, it was in the backup folder.**

Q.   In the MobileSync backup folder?

A.   **Yes.**

Q.   Which transmitted all the data that was on the phone to that computer on September 13th of 2013?

A.   **Yes.**

Q.   Showing you Government's Exhibit 13E?

(Thereupon, the exhibit was marked for identification.)

**BY MR. WIDLANSKI:**

Q.   What is Government's Exhibit 13E for identification?

A.   **It's information in regards to the Kit chat application.**

Q.   Did you create that docket yourself?

A.   **Yes.**

Q.   Did you pull it from the MobileSync backup examination that you conducted?

A.   **Yes.**

        **MR. WIDLANSKI**:  I would move 13E into evidence, Your Honor.

        **THE COURT**:  Admitted.

(Thereupon, the exhibit was admitted into evidence.)

**BY MR. WIDLANSKI:**

Q.   What does 13E tell us?

A.   **The first file is the property list information from Kik chat that shows a user name of Chanel Izzabel_27M.**

Q.   Do you want to identify that on the screen?

A.   **Sure.  (Complies).**

Q.   And is there an e-mail account associated with that?

A.   **Yes, there is.  ChanelIzzabel@Outlook.com.**

Q.   Is that the same e-mail account we saw identified on the iPhone MobileSync backup stuff?

A.   **Yes.**

Q.   This bottom chart where it says TCC database, what are we looking at there?

A.   **This database is used to identify the application and devices by permission that they have on certain services in the device.**

Q.   What is that?

A.   **Basically, you know how when you grab your phone and it will ask you if you want to allow an application to have access to your contact list and you can either allow it or deny it, if you allow it, this database keeps track of that. If you allow it, it would enter information in there to know that the application has access to your contact list.**

Q.   So some of the applications that were in the phone that was MobileSync backup to the computer, did allow access to the contents to the contacts?

A.   **Well, the address book.**

Q.   Yes.  Yes.

A.   **You can see here where it says, "Allowed."**

Q.   So scrolling down to lines 12 and 13 there, what are lines 12 and 13 telling us?

A.   **Line 12 shows that the Kik chat application has access to the photos but not to the address book.**

Q.   So a Kik chat application had access to the photos that were also contained on the iPhone?

A.   **Yes.**

Q.   But not to the book?

A.   **Correct.**

Q.   I'm showing you now 13E and 13P, simultaneously.  13E has these Chanel Izzabel names.  Do you see similar names on 13B?

A.   **Yes.**

Q.   You want me to zoom in a little bit there?

A.   **Yes.**

Q.   And this account right here, ChanelIzzabel_27M@talk. Kik.com, do you see that here as well?

A.   **Yes.**

Q.   What does that mean?

A.   **That's the user identifier you create.**

Q.   So Kik chat was installed on this phone when it was MobileSync backed up?

A.   **Yes.**

Q.   I'm now showing you 13L for identification.

(Thereupon, the exhibit was marked for identification.)

**BY MR. WIDLANSKI:**

Q.   What is 13L?

A.   **Contacts from Kik chat.**

Q.   Did you create this document yourself?

A.   **Yes.**

Q.   Did you pull it from the computer, the MobileSync backup as well?

A.   **Yes.**

          MR. WIDLANSKI:  I would move 13L into evidence, Your Honor.

          THE COURT:  Admitted.

      (Thereupon, the exhibit was admitted into evidence.)

**BY MR. WIDLANSKI:**

Q.   What are we looking at here?

A.   **We're looking at contacts from the Kik program which will display right here as the display name of the user received. This is the Kik chat ID over here and the user for the account.**

Q.   And what account was this user name, what account were these contacts for?

A.   **For Chanel Izzabel.**

Q.   So this is a fairly lengthy document?

          THE COURT:  It might be a good place to stop then.

          MR. WIDLANSKI:  Sounds good, Your Honor.

          THE COURT:  All right.  Folks, let's go over a couple of ground rules.

Please remember -- let me remind you again not to talk about the case with anyone. Don't let anyone talk to you about it. If anybody should try to talk to you about it, bring it to my attention promptly.

Don't do any research about the investigation on your own. Keep an open mind until you hear all the evidence in the case.

We'll get started at 9:00 promptly tomorrow morning. If you're unfamiliar with coming into the downtown area that time of the day, try to give yourself a few extra minutes. I ask that you be here between 8:45 and 10 minutes to 9:00 and that way you can gather yourself, you can use the restroom, get a cup of coffee, and we will all be ready to go sharp at 9 o'clock. So give yourself a few extra minutes so we can get started on time and keep the case moving along promptly.

Have a pleasant evening.

**THE COURTROOM DEPUTY:** All rise for the jury.

(Thereupon, the jury was escorted out of the courtroom.)

**THE COURT:** Anything we need to take up before we recess?

**MR. WIDLANSKI:** Nothing from the Government.

**MR. SCHWARTZ:** I assume the Court has denied my Motion in Limine.

THE COURT:  Well, I think I have.  I want to give the Government an opportunity to respond.  You filed your motion, I was concerned about the time, although I appreciate getting the Motion in Limine.  But I -- I'm satisfied that these are admissible as either non-testimonial in nature or business records, but I'll give the Government an opportunity to respond on that.  You know, worst-case scenario for them is that they're admissible and there's a mistrial, right?

MR. SCHWARTZ:  Correct, Your Honor.  And just to be clear, I'm talking about the records from the MLAT from Canada.

THE COURT:  Right.

MR. SCHWARTZ:  I thought I was clear.

THE COURT:  And, you know, I was just looking at a case out of the Ninth Circuit by Judge Rozinsky talking about some of these similar type records, satellite records that are purely descriptive in nature and that are not testimonial in character.  But -- and that was United States versus Paciano Lizzaraga Tirado.

MR. SCHWARTZ:  Normal spelling, Judge?

THE COURT:  Paciano, Lizzaraga or Tirado?

How about I give you the district court case number?  13-CR-00213, out of the Ninth Circuit Court of Appeals, the appellate 13-10530.  And that was filed June 18th, 2015.  Okay.  So we'll let the Government get a

response in there.  Give them something to do tonight.

We'll see you tomorrow morning at 9 o'clock.

(Thereupon, the above portion of the trial was concluded.)

*          *          *

**C E R T I F I C A T E**

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

01/26/2016

_____          _____

DATE COMPLETED          GIZELLA BAAN-PROULX, RPR, FCRR