IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
**MIAMI**
CASE NO. **15-CR-20106-KMM**

---

**UNITED STATES OF AMERICA**,
Plaintiff

vs.                                    **July 9, 2015**

**PATRICK KILLEN**, **JR**,
Defendant.

---

**TRIAL DAY 4**

**BEFORE THE HONORABLE K. MICHAEL MOORE**,

UNITED STATES DISTRICT COURT JUDGE

---

**A P P E A R A N C E S**

FOR THE PLAINTIFF:        **ROBERT J. EMERY**, AUSA
UNITED STATES OF          **BENJAMIN J. WIDLANSKI**, AUSA
AMERICA                   U.S. Attorney's Office
                          99 NE 4th Street
                          Miami, FL 33132
                          (305) 961-9421
                          Robert.emery@usdoj.gov


FOR THE DEFENDANT:        **FRED A. SCHWARTZ**, ESQ
PATRICK KILLEN, JR        Kopelowitz Ostrow Ferguson Weiselberg
                          Keechl
                          200 E. Palmetto Park Road, Suite 103
                          Boca Raton, FL 33432
                          (561) 910-3070
                          Schwartz@kolawyers.com


REPORTED BY:              **GIZELLA BAAN-PROULX**, RPR, FCRR
                          United States Court Reporter
                          400 North Miami Avenue, Suite 8S32
                          Miami  FL  33128
                          (305) 523-5294
                          gizella_baan-proulx@flsd.uscourts.gov

Also present:  Special Agent Laura Schwartzenberger

**I N D E X**

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| EXAMINER YOHEL DIAZ | 5 | 60 | 93 | |
| CARLY MANNING | 95 | 110 | | |
| COLONEL TERRY COOK | 114 | 118 | | |
| SPECIAL AGENT LAURA SCHWARTZENBERGER | 120 | | | |

**G O V E R N M E N T   E X H I B I T S**

| Exhibit | Received | Admitted |
|---|---|---|
| 32A | | 117 |
| 32B | 115 | 116 |
| 37A | 20 | 20 |
| 37B | 21 | 21 |
| 37C | 21 | 21 |
| 37D | 21 | 21 |
| 37E | 21 | 21 |
| 37F | 205 | 205 |

| 37G | 21 | 21 |
| 37H | 21 | 21 |
| 38F and 38G | 5 | 6 |
| 39A and 39B | 40 | 40 |
| 40A and 40B | 47 | 48 |
| 43A | 102 | |
| 43A and 43B | | 102 |
| 43B | 102 | |
| 43C | 102 | |
| 43E and 43F | 102 | |
| 45A | 107 | 108 |
| 45B | 108 | 108 |
| 45C | 108 | 108 |
| 45D | 108 | 108 |
| 45E and 45F | 108 | 108 |
| 46K and 46L | | 109 |
| 46L and 46K | 108 | |
| 48B through 48I | 179 | 180 |
| 49A through 49I | 181 | 182 |
| 50A | | 44 |
| 50A and 50B | 43 | |
| 50B | | 44 |
| 50C and 50D | 43 | 44 |
| 51A through 51E | 195 | 196 |
| 52A | 198 | |

| | | | |
|---|---|---|---|
| 52A through 52D | | | 198 |
| 52B and 52C | | 198 | |
| 52D | | 198 | |
| 54F | | 170 | 171 |
| 54G and 54H | | 170 | 171 |
| 55A and 55B | | 176 | 176 |
| 56A and 56B | | 174 | 174 |
| 59 | | 174 | 174 |
| 60A through 60V | | 48 | 48 |

**D E F E N S E   E X H I B I T S**

(None)

P R O C E E D I N G S

*(The following proceedings were held in open court.)*

THE COURT:  Have a seat, everyone.  Good morning.

THE JURY:  Good morning.

THE COURT:  Where is your neighbor, Ms. Koletsky?

JUROR:  I really don't know.  I don't have a phone number.

(Thereupon, a juror entered the courtroom.)

Thereupon,

EXAMINER YOHEL DIAZ,

having been previously sworn by the courtroom deputy,

testified further as follows:

*DIRECT EXAMINATION*

BY MR. EMERY:  (Continued)

Q.  Good morning.

A.  **Good morning.**

MR. EMERY:  May I approach, Your Honor?

THE COURT:  All right.

BY MR. EMERY:

Q.  I'm showing you what's been marked for identification as Government's 38F and 38G.

(Thereupon, the exhibit was marked for identification.)

BY MR. EMERY:

Q.  Do you recognize those documents?

A.   Yes, I do.

Q.   Generally, what are those?

A.   This is the NT user dot DAT.  It's part of the user registry of the Patrick J. Killen Windows user.

Q.   Is that from the Dell laptop?

A.   Yes, it is.

Q.   And then what about the second exhibit?

A.   38G is a sampling of some linked files associated with Patrick J. Killen Windows user from the Dell laptop.

Q.   And did you prepare both documents?

A.   Yes, I did.

MR. EMERY:  Move to admit.

THE COURT:  Admitted.

(Thereupon, the exhibit was admitted into evidence.)

BY MR. EMERY:

Q.   I'm showing you Government's 38F.  What is this?

A.   So the NT user dot DAT file is a file that Windows uses to keep track of certain activity for each of the Windows users.  This one in particular it belongs to the Patrick J. Killen Windows user.

Q.   And was this screen shot of the report that was previously contained on another one of the admitted exhibits?

A.   Yes.

Q.   And what report does this come from?

A.   This comes from the AD Lab report that I created.

Q.   And then right here, so what happens is there a link right there?

A.   **There is a link there, yes.**

Q.   And you click on that, where does that take you?

A.   **That link will then take you to some other artifacts that I highlighted in the -- as part of the contents of that NT user dot DAT.**

Q.   Is that what we're looking at right here?

A.   **Yes, it is.**

Q.   And what is this right here?

A.   **So this particular artifact is the recent docs artifact. Windows keeps track of approximately the last 150 documents that the user opens.  These could be artifacts like data files.  So pictures, documents, those type of artifacts.  It usually lists them from the most current to the oldest.**

Q.   So, for example, at the top the second column, what do we have here?

A.   **Correct.  So this registry key gives each artifact a numerical name or a number, and then also lists the target name of the file.  In this case, Article 30 belongs to the Patrick resume underscore Apple dot DOC document.**

**Also, it lists a LiNK file associated to that document.  The interesting thing about these LiNK files is that every time a user opens a document, Windows creates a dot LNK file.  The interesting thing about these LiNK files**

is that it tells us the very first time a document was opened and the very last time that the document was opened.

Q.   So then the user of this computer, Government's 34, would have had to actively access that file?

A.   Yes.

Q.   And what about the top where it says, "Last written time," what does that mean?

A.   So this is the time that this registry key was updated. So the very last time that it was updated was on December 22nd of 2014.

Q.   Let's go ahead then and talk about some of these other files here.  What about, which is named 82, what is this right here?

A.   So entry 82 belongs to a file that was opened and that file was titled 13 YO long slender cums on bed sound dot MP4.

Q.   And I also noticed that right below it there is a file that you talked about that has this at the end LNK?

A.   Correct, the associated LiNK file is also listed there.

Q.   And based on then what you just testified about, the presence of that file means what?

A.   Correct.  So the LiNK file will give us the very first time that Windows user opened that document and the very last time.  And that is done by the creation date of the LiNK file and the modified date of that LiNK file.

Q.   And based on your training and experience right here with

the file where it first starts off 13 YO, what does that mean to you?

A.   **So in my experience, when there's a number and a YO, we're talking about age, so 13 YO would be 13-year-old.**

Q.   Moving down the document, what about where it says name, four, what is that?

A.   **So the entry Number 4 is targeting the GigaTribe downloads and this particular artifact is a folder.  And we see there the GigaTribe downloads, that LiNK file which is associated with the user double clicking on the folder.**

Q.   Let's go ahead and moving to the second page.  What about where it says 55?

A.   **Entry 55 belongs to a file titled, "2014 Skype webcam cousins fuck play dot MP4" and the associated LiNK file.**

Q.   That's right below, correct?

A.   **Correct.**

Q.   Where it says 71 right there?

A.   **Entry 71 belongs to a file titled, "Omegle 2012.05.19-13 YO, Florida boy shows dick, open parentheses, SV cam, close parentheses, dot MP4," and right below it is the associated LiNK file.**

Q.   And then I see 58.

A.   **58 is an entry for Patrick J. Killen and the associated LiNK file.**

Q.   Okay.  Page 3, these are generally files that the user

accessed on that Government's 34?

A.   **Correct.**

Q.   And 34, I see another entry for Patrick resume; is that correct?

A.   **Entry 34 is Patrick resume underscore Microsoft dot DOC and the associated LiNK file.**

Q.   What about where it says 12?

A.   **Twelve is an -- entry 12 is for others, spy cams and the associated LiNK file.**

Q.   All right, turning to the next page.  What is this where it says -- begins with software?

A.   **Again, this was part of the NT user dot DAT.  It's part of the Windows registry and we can see here that GigaTribe was installed and this particular user, the Patrick J. Killen Windows user, had GigaTribe and the default user was BeverlyHills05.**

Q.   And when you say default user, what do you mean by that?

A.   **When the GigaTribe software is launched, a log-in window appears and the user name that's going to be pre-populated in that dialogue window is BeverlyHills05.**

Q.   What about then the next category where it says software backslash SHAL soft, what is that?

A.   **So this is another sub key within the NT user dot DAT for the Patrick J. Killen Windows user.  The artifact here is the traffic download path.  This shows the default download**

folder for the GigaTribe account and the BeverlyHills05 user, and you can see there under the traffic downloads path, the default download is C colon backslash users Patrick J. Killen backslash documents backslash GigaTribe downloads.

Q.   What does that then?  Tell us with respect to the GigaTribe user name BeverlyHills05 when that user then downloads a document or an image or a video where does it go?

A.   Right.  So when the user is using the GigaTribe software and they choose to download a file from another GigaTribe user, it will automatically go into that GigaTribe downloads folder.

Q.   And at the bottom where it says software backslash Skype?

A.   Yes.  This is an artifact that I included to show that Skype was installed on the Dell laptop and that is one of the registry keys within the NT user dot DAT file or the Patrick J. Killen user.

Q.   And turning to the last page where it says software backslash Skype backslash phone?

A.   Correct.  So this is the last known version for Skype that was installed and as you can see, the data accounting of that column is 6.14.0.14.

Q.   And then moving on to the last category, what do we have here?

A.   So here we see when the Patrick J. Killen user logs in, the applications that are automatically run when that user

logs in.  And of interest here, what I wanted to point out to, is that AVG, which is an antivirus program, was set to automatically run and search for updates.

Q.   And when you say automatically run, what do you mean by that with respect to this antivirus software?

A.   It means that it requires no user interaction.  The system will automatically launch that program and run it.

Q.   With respect to Government's 34, did you find any malware viruses?

A.   Yes, I do.

Q.   And is it common or uncommon to find malware virus on a computer that is running Windows?

A.   In my experience it is very common to find some sort of malicious software on a Windows computer.

Q.   Did you do research with respect to the malware viruses that you found on Government's 34?

A.   Yes.  So what I did is I ran antivirus on the specimen, mounted in a virtual environment so I couldn't change the image.  I identified several pieces of malware.

I also went ahead and did a search using the MD5 hash of the malware that I found and I noticed that there was one particular trojan installed that had been active for about a year from 2010 through 2011.

I also went further and I ran a tool that looks at not only the programs that automatically run by the user, but

all the programs that are launched by the entire system.  I compared the list of viruses of malware that I found and I did not find any of those pieces of malware being run automatically.

In addition, there was also a hyper file, that SYS file which is a hibernation file in Windows.  The special interest in this file is that it basically contains a dump from memory, what's up in RAM from the computer.  I ran some tools to look at what processes, what executables meaning programs that were running at the system.  That hyperfile dot SYS was a few weeks before the last shutdown time.  I compared the executables that were running in memory at the time with the list of the malware that I found.  I did not find any matches.

Q.   So then at the time then that this Dell laptop was seized, were there any malware viruses actively running on that laptop?

A.   According to my analysis, I could not find a match for the malware that was on the disk versus what programs were scheduled to run on that computer.

Q.   And in your -- on the cases that you worked on, are you aware of any type of malware viruses that have been known to put images of children engaged in sexually explicit conduct on a computer?

A.   During my years of experience I have not come across a

piece of malware that will download pieces of photographs of that nature.

Q.   Showing you Government's 38G, what is this?

A.   **So this is a list containing some of the file attributes from the recent DOCS report.**

Q.   Is that just what we went over in Government's 38F?

A.   **Yes.**

Q.   Continue, please.

A.   **So remember how I said that Windows keeps track of approximately the last 150 data files that the user opens? And I mentioned that there were some LiNK files associated with those files.**

**Well, this is just a sampling from that list.  And as you can see, on the left column, I have the path which includes the LiNK file and where it came from on the Dell computer.  The next column is the category which is Windows shortcut, that's what Windows categorizes -- excuse me, that's what AD Lab categorizes the LiNK files as.**

**I then had the physical size and the logical size and then the last two columns are the created date and the modified date.  So the way LiNK files work, again, the created date is the very first time that the document was opened.  And the modified date was the last time that a document was opened.**

Q.   All right.  Well, let's talk then about that in a second.

But there's something that you mentioned that is of interest to me.  When you said logical space, what is that?

A.  **So logical space is a space where the active files on the computer reside.  So when I call a file a logical file, that means it is an active file on the system.**

Q.  And what does it mean then if an item or file or artifact and -- correct me if I'm wrong -- is in carved space?

A.  **All right.  So, in other words, to explain carved I need to talk to you a little about a file, how it's deleted on a Windows machine.  So when a user deletes a file, the normal behavior is for the file to go into a recycle bin.  This is the equivalent of putting a piece of paper into a wastebasket.**

**The document is not deleted.  It has just been put into a special folder for it to be deleted later.  When the user empties the recycle bin, then the document is deleted.  However, the document at this point is still recoverable with some forensic software.**

**The document itself, the data still resides on the hard drive.  The directory entry, which is where Windows can tell where to go find that file on the hard drive, has been marked to be used again.  If nothing overwrites that directory entry, the file can be recovered.  And we call that a recovered deleted file.**

**However, if the directory entry, meaning the index**

part of the hard drive, is overwritten by another file, it is possible using forensic software to go out into the hard drive and scan for what is called a file signature.  Most files have a unique signature at the beginning which lets us identify or lets the forensic tool identify what type of file it is.

Using this process, the forensic tool can go out into the hard drive and carve, in other words, look for these file signatures to look for specific files.

We use this technique primarily to carve or to look for graphic files, JPG files, PNG, bit maps, GIFs that are out on the hard drive, meaning these are files that used to be on the computer.  They have been deleted.  And the directory entry has been overwritten but the data itself still resides on the hard drive.

Q.   Then -- with respect then to the -- on this particular then computer, Government's 34, how many files did you find, approximately, in the logical space?

A.   So Access Data Lab identified approximately 85,000 active logical files on the hard drive.

Q.   And then what about in carved space?

A.   Well, when I ran the carving tool within AD Lab, I carved for graphic images only.  That carved an additional 44,000 images from the hard drive.

Q.   Now, we talked a little bit earlier about what is

bookmarking, correct?

A. **Yes.**

Q. And we saw on the left side of that screen where Special Agent Schwartzenberger had marked files of interest to her as far as images being consistent with child pornography or children engaged in sexually explicit conduct, and did she then -- so then she bookmarked those files, correct, that are of interest to her, correct?

A. **Correct.**

Q. So then the 85,000 or so files in logical space and then we had how many in carved space?

A. **An additional 44,000, approximately.**

Q. And then all of those files, right, how many of those files that she indicated that were of interest to her, that is children engaged in sexually explicit conduct, were in carved space?

A. **They were less than 10 images contained within all of her bookmarks.**

Q. And so then what percentage of that is of the -- either the total number of files found on the computer or the ones that were in carved space?

A. **It is less than one percent of the logical files plus the carved items number.**

Q. So all the files together?

A. **All the files together.**

Q.   All right.  So let's go back then to the LiNK file sampling, let's just talk about a few of those.

So let's talk about the second one from the top. Where was this file found?

A.   **So that is the LiNK file associated with the 13 YO polo no hair slender dick cums twice sound that MP4.  That file -- that LiNK file resides within the recents folder within Windows.**

Q.   Okay, but I see as far as the user it's Patrick J. Killen; is that right?

A.   **Correct.  The LiNK filed is associated with the Patrick J. Killen Windows user.**

Q.   And so then let's move over then to the created and modified.  If you would please explain to the jury just so we can see how it works with respect to that file.

A.   **Again, based on the creation date of 12-17-2014, with the time stamp of 7:54 in UTC, that stands for coordinated universal time, and also a modified date that is identical that leads me to believe that that file was opened once on 12-17-2014.**

Q.   And UTC time is again?

A.   **Coordinated universal time is Greenwich Mean Time.  We try to standardize all the times in the world and then from that time, for example, in South Florida we are UTC minus four during daylight savings time and UTC minus five hours**

during standard time.

Q.   Then just moving down then as far as the one right here, that's for the GigaTribe downloads dot DOC LNK?

A.   **Correct, so that LiNK file belongs to the GigaTribe downloads folder within the Patrick J. Killen account and we see a creation date of 9-24-2014 for the LiNK file and we see a modified date of November 18th, 2014.  That means the first time it was opened on September 24th, 2014.  The last time the user double clicked on that artifact was on November 18th, 2014.**

Q.   And then just briefly at the bottom, the one that ends with Patrick resume underscore Apple dot DOC dot LNK, what was then the last date that that was as far as accessed?

A.   **So the modified date of that LiNK file is December 22nd of 2014 at 3:03:16, and that indicates that the last time that file was opened was on that date.**

Q.   All right.  Examiner Diaz, just to kind of make sure that it's clear for everybody, so we have the logical space and then we have the carved space, correct?

A.   **Yes.  Carved items comes from the hard drive.  This is the area of the drive that is available for Windows and the user to save files in.**

Q.   And then with respect to then the files that Special Agent Schwartzenberger marked as far as images that were consistent with children engaged in sexually explicit conduct

so she marked those that were of interest to her, correct?

A.   **Correct.**

Q.   And some of those were in carved space?

A.   **Yes.**

Q.   And so then of those that she bookmarked from carved space, what was the -- as far as the percentage of the total number of files that remained on the computer?

A.   **Less than one percent.**

Q.   Examiner Diaz, I'm showing you what's been marked for identification as Government's 37A.  Do you recognize this?

     (Thereupon, the exhibit was marked for identification.)

A.   **Yes, I do.**

BY MR. EMERY:

Q.   And what is that?

A.   **This is a DVD containing the report from the tool Internet Evidence Finder, SkypeAlyzer, and GigaTribe Chat Parser.**

Q.   And are these additional reports that you prepared with respect to your analysis of Government's 34, the Dell laptop?

A.   **Yes.**

          MR. EMERY:  Move to admit.

          THE COURT:  Admitted.

     (Thereupon, the exhibit was admitted into evidence.)

BY MR. EMERY:

Q.   Now, I'm also going to show you a series of

identification Government's 37B, 37E, 37C, 37D, 37G, and 37H?

(Thereupon, the exhibit was marked for identification.)

BY MR. EMERY:

Q.   Please take a look at those and let me know if you recognize them.

A.   **Yes, I do.**

Q.   And, generally, what are those?

A.   **37B is a report from GigaTribe Chat Parser.  37C is a report from Internet Evidence Finder pertaining to Chrome bookmarks.  37E is an Internet Evidence Finder report on Skype accounts identified on the computer.  37D is a report of SkypeAlyzer about the Skype users on the computer, on the Dell computer.**

Q.   And then is that the same for G -- and what about G and 37H?

A.   **Correct.  37G and 37H are also SkypeAlyzer reports for Skype users on the Dell computer.**

Q.   And these are reports that you prepared?

A.   **Yes.**

MR. EMERY:  Move to admit, Your Honor.

THE COURT:  Admitted.

(Thereupon, the exhibit was admitted into evidence.)

BY MR. EMERY:

Q.   I'm showing you Government's 37B.  I will definitely blow this up.  So what is this document?

A.   **This document is GigaTribe Chat Parser, the report for the chats that are contained within the GigaTribe software for the Patrick J. Killen Windows user.**

Q.   And then at the top so that's where it says end file name?

A.   **Yes, so the file name is based on the GigaTribe user ID. If you see up on the top in the file name section SHAL soft backslash GigaTribe backslash 1569635 backslash chat backslash chat history underscore 1569635 underscore 1501374 dot DAT.**

**So GigaTribe keeps track of the chats between two users and as the users have different sessions of chats it continues to include the chats into these DAT files.**

Q.   And the default user on Government's 34 was BeverlyHills05?

A.   **BeverlyHills05, correct.**

Q.   So let's just talk then a little bit at the top where it says message date right there.

A.   **So the first column is the message date.  This is the date stamp that the message was transmitted.  The next column is the number of recipients.  This will tell us if the message had obviously one or more recipients.  The next column is the GigaTribe sender ID and right next to it is the GigaTribe sender user name.  The following column is the recipient GigaTribe ID and directly to its right is the**

GigaTribe recipient user name.

The next column is private message.  If the box is checked off it means that the chat message was sent specifically to this one GigaTribe user.  If it is unchecked it is a GigaTribe message sent to all the GigaTribe contacts within the software.  The off line message column if it's checked means that the message was sent when the user was not connected online.  And the plain ASCII message column is the content of the chat message.

Q.  All right.  Let's then go ahead and --

A.  There's one more column to the right if you could move it, please.

Q.  (Complies).

A.  Image path.  If during the course of a chat an image is sent within the chat we will have a path for an image in that column.

Q.  So then let's -- this is only a one page document.  Then let's talk about this chat.  Let's start at the top where it says, so the date of that first chat is September 9th, 2014?

A.  Correct.

Q.  And then going across the top the sender is Karucem?

A.  The sender user name is Karucem.  The recipient is BeverlyHills05.

Q.  And then the message starts off then with Karucem saying --

A.   Karucem says, "Hey."  And he sends another message, "Are you there," with a question mark.

Q.   Continue.

A.   BeverlyHills05 replies, "Hey."  Karucem sends, "Did you cam Cameron Hales?"

Karucem sends what appears to be a correction for the word "did."  BeverlyHills05 responds, "Nope, I sent you all the pics."

Q.   And let me just go back there where you said there was a correction.  Well, let's go ahead and go ahead and keep talking.  So we'll address that later.  So Karucem says, "Did," and Beverly Hills responds?

A.   "Nope, I sent you all his pics."  He continues to say, "I got like seven pics."  BeverlyHills05 continues to say, "That's a lot," with an exclamation mark.  Karucem replies, "He told me he cammed with a Rebecca Till some hours ago."  Karucem continues to say, "And Rebecca Till was your old fake name."

BeverlyHills05 responds, "Mmh, I swear I never cammed with him."  BeverlyHills05 continues to say, "I haven't even used Rebecca Till in like months.  I know he asked to cam Carly using Facetime."

Q.   And that's Beverly Hills said that?

A.   That is Beverly Hills continuing the conversation.  BeverlyHills05 continues to say, "But I said no."

BeverlyHills05 also chatted saying, "You have asked Karucem to recommend you to his users. Please wait for his answer."

Karucem then sends a message saying, "Mmh, okay. When did you talk to him last time?" Karucem sends another message with a question mark. BeverlyHills05 responds, "Today." BeverlyHills05 also says, "Earlier today." BeverlyHills05 also says, "With Carly and Kendall."

Karucem responds -- can you scroll over to the left please?

Q. (Complies).

A. All the way.

Q. (Complies).

A. Okay, we're still in the same date.

Q. So this is all occurring on September 9, 2014?

A. Correct.

Q. So then --

A. So Karucem states, "Okay, so he told me a bullshit or he cammed with someone else." Karucem also says, "Try to check, please," with what appears to be a smily face. BeverlyHills05 responds, "He told you bullshit probably, LOL. BeverlyHills05 says, "But I will check for you." BeverlyHills05 states, "Also."

BeverlyHills05 says, "I give you many boys' Kiks and Skypes. Do you talk to them," with four question marks. BeverlyHills05 says, "Also make sure you save any boys' pics

even if you don't know their Kik or name."

Karucem responds, "Okay, I will."  Karucem sends the BeverlyHills05 user a link and you can see the slash L designates that it's a link.  GigaTribe colon forward slash forward slash is the protocol, GigaTribe protocol.  You can see it's a link from the Karucem user, the My Caps 2 folder and a Shawn Weaver 13M U.S. folder within that.

Q.   So let me stop you right there.  What does this file path name mean to you?

A.   This means that within GigaTribe chat a user can send another user a link to a folder on their computer and the recipient of this link can click on it and go to that folder and view the contents if given permission by the other user.

Q.   And that's what Karucem is doing here?

A.   Giving BeverlyHills05 a link to files on Karucem's computer.

Q.   And this is, again, on the same date, correct?

A.   Correct.  So Karucem tells BeverlyHills05, "It's him." Karucem then puts on some sort some special character that would be some sort of a face.  Karucem states BeverlyHills05 what appears to be a happy face with some special characters.

The next entry appears to be a blank chat from Karucem to BeverlyHills05.  Following chat is Karucem asking BeverlyHills05, "Do you like," question mark and special characters that appear like a happy face.  BeverlyHills05

responds to Karucem saying, "OMG, yes," in capital letters. BeverlyHills05 tells Karucem on the next chat, "Anything cock," question mark.  The next chat BeverlyHills05 tells Karucem, "Nice."

Q.   Let me stop you right there.  When you see that there is this correction from what was said and then the later chat Beverly Hills corrects himself and says, "Nice," as a forensic examiner and talking about in the world of malware viruses did that have any meaning to you?

A.   Yes.  In my experience it's been that I have not seen any malware that has artificial intelligence to, number one, chat in GigaTribe and, number two, make a misspelling and then correct a misspelled word.

Q.   All right.  And then I see then the date changes, correct?

A.   Yes, the last chat transaction between those two users is November 16th, 2014 from BeverlyHills05 to Karucem, "Hey, where are youuuu," with the word "you" spelled with four Us.

Q.   I see then the next conversation he has with a user by the name of Baby Balls?

A.   Yes.  So this is a different DAT file found within the GigaTribe folder on the Dell computer.  And these are the chats between the BeverlyHills05 user and a user using the user name Baby Balls.

Q.   And do you know anything about Baby Balls?  Do you know

who Baby Balls is?

A. **No, I do not.**

Q. So let's just move down into the next conversation.

A. **So the following DAT file identified by GigaTribe chat parser a chat conversation between the BeverlyHills05 GigaTribe user and the GigaTribe user I Like Girls 8-14.**

Q. And then that occurs on October 1st, 2014?

A. **The first two messages take place on October 1st, 2014.**

Q. Okay. And then what what's going on there?

A. **BeverlyHills05 sends a message to I Like Girls 8-14 with the content saying, "Trade" with three questions marks, and he follows up with another chat message with the word, "Password."**

Q. And then?

A. **There's other chats from BeverlyHills05 to I Like Girls 8-14 from October 2nd 2014, October 15, 2014, and November 16, 2014.**

Q. And what does he say then on those respective dates?

A. **"Hello," hello with multiple Os at the end and, "Hey, pass" with two question marks.**

Q. Now 37B, is this the only -- are these the only chats that your forensic tools were able to recover?

A. **No. Those are only the GigaTribe chats from the Dell computer.**

Q. The only ones that your forensic software was able to

recover with respect to GigaTribe chats?

A.  **Yes.**

Q.  Does that mean that these are the only GigaTribe chats that the user had?

A.  **No.  Those are the only ones that are saved on the Dell computer.**

Q.  Let's then talk about Government's 37.  What is this?

A.  **So this report came from the tool Internet Evidence Finder.  It is the bookmarks from the Chrome web browser found on the Dell laptop.**

Q.  Okay.  And so let's then talk about what are these indicators at the top starting from the left?

A.  **So Internet Evidence Finder will search out for various artifacts.  Again, these are bookmarks.  The web sites that a user creates a bookmark so they can quickly go to them on the internet, GigaTribe parses the bookmarks filed from Chrome. It assigns it a record number.  This report gives us the URL, the uniform research locator.  Again, that is the easy human identifiable way that we surf the internet without having a to know a lot of complex numbers that we can't remember.**

**The date that was added and the time and UTC is the next column followed by the title of the web page at that time.  The parent means it was found -- the bookmarks are on the bookmark bar.  The type, URL, uniform resource locator.**

Q.  So yesterday we talked about the internet browser Safari,

right?

A.   **Correct.**

Q.   And is Chrome just another type of browser that the user can access in order to surf the internet?

A.   **Yes.  So it's common for a computer to have multiple browsers.**

Q.   And when you say -- and then bookmarks bar.  So you open up the Chrome browser and then how do you get to the bookmarks?

A.   **So different browsers have different ways of keeping the bookmarks, some have them from a drop-down menu, some of them have it where you can have a windowpane open, either the left or the right, and you click on the bookmarks, and then some browsers have a bar across the top so you can have some bookmarks where you can easily click on them.**

Q.   So let's just talk about the record one.  What is that all about?

A.   **So record one is a bookmark to some sort of artifact on the YouTube.com website.**

Q.   And that was accessed on August 5th, 2013?

A.   **Correct.**

Q.   That was when it was first added?

A.   **The bookmark was added on August 5th, 2013.**

Q.   And the name of that then website?

A.   **So the title across the top of the browser that appears**

when that website was visited and the bookmark was created is hacking dash hacking user names forward slash passwords.

Q. And what, as a forensic examiner, what does the word hacking mean to you?

A. Hacking traditionally has been to kind of take a part of --

MR. SCHWARTZ: I would object to this as irrelevant. There's no hacking charges here.

MR. EMERY: Your Honor, it goes to the defendant's extensive knowledge of how to use computers.

MR. SCHWARTZ: Sure, he knows how to use computers but how is it relevant to the trial, Your Honor?

MR. EMERY: Your Honor, because he destroyed evidence.

THE COURT: Overruled.

BY MR. EMERY:

Q. Please continue.

A. So hacking is also a popular term for figuring out how to do things and how to bypass, for example, security measures on a computer.

Q. All right. So then let's just go down to number nine then, I'll go ahead and zoom in on that, and let's just look at the name of that website then. What is that?

A. The title of the website at the time the bookmark was created is, "Amateur couple night vision sex dash amateur sex

video dash tube 8 dot com."

Q. And so the total number of bookmarks here is how many?

A. Can I refer back to the top of page 1, please?

Q. Yes, sir. (Complies).

A. Internet Evidence Finder reports 14 book marks.

Q. All right. So then let's -- what about number 13 right there? What is the name of that one?

A. Number 13A bookmark from -- you want the title or the URL?

Q. I want the name, the title.

A. The title, "teen self vids dash horny teens having fun on webcams for our pleasure."

Q. And where were these --

MR. SCHWARTZ: Again, may I object to him highlighting legal adult web sites? It's irrelevant.

THE COURT: Overruled.

A. I'm sorry, could you repeat the question?

BY MR. EMERY:

Q. Sure. Sure. So the name on that one is what again, "Teen self vids?

A. "Teen self vids dash horny teens having fun on webcams for our pleasure."

Q. And where were these bookmarks found?

A. These were from the Chrome internet browser within the Patrick J. Killen Windows user.

Q. Moving on to Government's 37E. Zoom out here a little bit. What is this?

A. **This is the report from Internet Evidence Finder and these reports specifically are the Skype accounts that were found in the computer, specifically the Patrick J. Killen Windows user.**

Q. And that was on the Dell laptop, correct?

A. **Correct.**

Q. Government's 34. So then let's talk about then at the top if you can explain the columns at the top.

A. **Correct. So when you register for the Skype service, the user registers. The thing, the one item that Skype and the user have to agree upon is the Skype name which is the user name in order for it to be unique within the Skype system. So here, you see the Skype name, there's three. BeverlyHills05, Chanel Izzabel, and P Killen 01. Everything else with the exception of the dates as to when the profile was created is entered by the user into the Skype profile when they register their account.**

Q. And then I see -- then let's move on so then -- let's talk about Beverly Hills, the first one that's labeled BeverlyHills05?

A. **Correct. So as you can see, the display name column is not being populated. The full name column is populated when the user types in a first name and last name at time of**

registration.  And for this particular user Rebecca Till was entered.  The next column was an e-mail BeverlyHills05 at live.com was entered.  The profile was created on September 11, 2009 at 2:59 in UTC.  The zero value under the birthday means they did not enter a birthday.  The zero value under the gender means they did not enter a gender when they registered the account.

Q.  All right.  And then I'm going to show you page 2 then.  Is this -- do the pages basically go like that?

A.  Yes, pages 1, 2 and 3 continue horizontally.

Q.  Like landscaped out?

A.  Correct.

Q.  So then let's show the right half of --

A.  So there's no entries for city or state or country.  And the profile was last modified on March 30th, 2014 at 17:13.

Q.  And then the second one?

A.  The second Skype user is Chanel.Izzabel.  We can see that a full name of Carly Izzabel was entered.  The e-mail address BeverlyHills05 at live.com was entered.  The profile was created on January 14th, 2012.  There was a birth date of 1994-09-13 that was entered.  A female gender was entered.

Q.  Okay.  And then page 2?

A.  Boca Raton was entered for the city.  Florida was entered for the state.  And the profile was last modified on April 18th, 2014.

Q.   And then lastly?

A.   The third Skype user P Killen 01, no full name was entered.  Patrick J. Killen at Gmail.com was the e-mail that was entered.  The profile -- can you scroll down just a little bit?  The profile was created on August 9th, 2011.  There was a birthday entered of 1993-05-31.  A zero under the gender column means no gender was entered.

Q.   And then?

A.   Miami was entered as the city.  Florida was entered as a state.  A mobile number of plus 1-786-493-0930 was entered under mobile phone.  The about info is a snippet saying entered by the user, "Hey, exclamation mark, Patrick Killen, Miami, Florida, lyricist forward slash songwriter."  There is a URL, the protocol of HTTP colon forward slash forward slash www dot REF 60S studio.com.  And the profile was last modified on September 5th, 2012.

There was also an entry under the mood text that could be seen by other Skype users and that has a link to www dot REF 60S studio.com.

Q.   So I just briefly wanted to go back to Government's 41D.  Is there a phone number on there?

A.   There is a phone number there, yes.

Q.   And what is the phone number that's associated with the Patrick Killen iPhone?

A.   786-493-0930.

Q.   And then what about then here from the Skype accounts, do they match?

A.   **Yes, they do.**

Q.   And that's for Government's 37E.  And that was for the user Skype named P Killen 01?

A.   **Correct.**

Q.   Now, on -- did you recover any Skype chats from Government's 34, this Dell laptop?

A.   **Yes, I did.**

Q.   And what software did you use to recover that for?

A.   **I used SkypeAlyzer and Internet Evidence Finder.**

Q.   And, approximately, how many chat transactions were you able to recover?

A.   **So there was approximately a little bit over 33,000 chat transactions.**

Q.   And then would that be for then these three accounts?

A.   **Yes.**

Q.   On Government's 37E?

A.   **Yes.  All three accounts combined.**

Q.   And are those chats that you just referenced contained on Government's 37A?

A.   **Yes, they are.**

Q.   And did you prepare a report?

A.   **Yes, I did.**

Q.   And one of those is the IEF report, correct?

A.  Correct.  And the SkypeAlyzer report.

Q.  And the SkypeAlyzer.  All right.  So then let's talk about those Skype account users.  Showing you Government's 37D.  What is this?

A.  So this is the SkypeAlyzer report for the -- I'm sorry, can you make that sharper?

Q.  Yeah, it's auto focusing here.

A.  This is the Skype report for BeverlyHills05 user.  You can see the SkypeAlyzer, it extracts the information that was entered so we see the Skype name of BeverlyHills05.  We see the full name of Rebecca Till.  And we see the avatar or the graphical picture that the user decided to use for that Skype account.

Q.  And then what does that appear to you to be?

A.  It appears to be a picture of a female in a bikini.

Q.  In a bikini.  And then is this first page Government's 37B, is this -- and then I see after that then there's some contacts, right?

A.  Correct.  This is just page 1 of a multipage report.

Q.  And how many pages?

A.  Sixty pages.

Q.  Moving on to Government's 37G.  What do we have here?

A.  This is the SkypeAlyzer report for the Chanel Izzabel Skype user.  You can see the full name of Carly Izzabel.  The language is set to English.  The country is U.S.  The

birthday entered is 1994-09-13. The time zone is the offset from UTC so UTC minus 240 minutes. The avatar time stamp, which is the picture to the right, was -- I'm sorry, can you scroll back?

Q. Sure.

A. June 19th, 2014.

Q. And do you know what that means by the avatar time stamp?

A. The time that the picture was set in the profile.

Q. And then province and city?

A. The province is State of Florida and the city is Boca Raton.

Q. And, again, then after that comes all the contacts for Chanel Izzabel?

A. Correct.

Q. And is this just the first page of all those contacts?

A. This is the first page of the entire SkypeAlyzer report for the Chanel Izzabel Skype user.

Q. And how many then pages is this one?

A. 1,701 pages.

Q. This is page 1?

A. Correct.

Q. Of 1,701?

A. Correct.

Q. Now, we talked about before sometimes these reports print out multiple pages. Is that the case here?

A.   Correct.  So the SkypeAlyzer report provides one very long web-based report and when you print it, depending on your settings, that denotes the number of pages.  In this case it was going to be printed on 1,701 pages, the entire report.

Q.   And on those pages, was there a series of contacts for Chanel Izzabel?

A.   It contains contacts, it contained chat messages, it contained file transactions as far as files being shared across the Skype user Chanel Izzabel and other Skype users.

Q.   Government's 37H, what is this?

A.   So this is the SkypeAlyzer report.

Q.   Let's zoom in here just a second.

A.   For the P Killen 05 Skype user.  So we can see the language is set to English.  The country is set to U.S.  There is a mood link inserted as www dot REF 60S studio dot com.

Q.   And this is all information you saw before, Government's 37E, and then there's an avatar?

A.   Correct, there's an avatar of a picture of a male.

Q.   And then, again, contacts and then I see this is page 1 of --

A.   One of four.

Q.   Thank you.  This is what I'm showing you for identification Government's 39A and 39B.

(Thereupon, the exhibit was marked for identification.)

BY MR. EMERY:

Q.   What are those?

A.   **These are lists that I created from the AD Lab tool.  It is a listing of the bookmark titled CP videos for 39A created by Special Agent Schwartzenberger.**

     **39B is a file listing of the bookmark titled CP videos-enhancements also created by Special Agent Schwartzenberger.**

Q.   And is this printouts of what is contained on the AD Lab that has previously been admitted into evidence?

A.   **Yes, that is a list from the bookmarks contained within that report.**

          MR. EMERY:  Move to admit, Your Honor.

          MR. SCHWARTZ:  What number was that?

          MR. EMERY:  39A and 39B.

          MR. SCHWARTZ:  Thank you.

     (Thereupon, the exhibit was admitted into evidence.)

BY MR. EMERY:

Q.   I'm showing you Government's 39A.  So, again, what is 39A?

A.   **So this is a list of the items that Special Agent Schwartzenberger bookmarked entitled CP videos using the AD Lab tool.**

Q.   So this is when she went and clicked and identified the

files that were of interest to her with respect to children engaged in sexually explicit conduct, those were listed here?

A.   **Yes.   There's a list of the files of the bookmarks she created.**

Q.   For the videos?

A.   **For the CP videos, correct.**

Q.   Or some of them?

A.   **Right.   This is the contents of the CP videos bookmark.**

Q.   All right.   So then let's talk about one of these then on here.   What is this one right here, that's the item 30558?

A.   **All right.   So that particular is an AVI, a movie file titled, "Four boys show."   It is contained within the GigaTribe downloads folder which is within the Patrick J. Killen Windows user.   It has a creation date of September 9, 2014, with a modified date of November.**

Q.   So then based on what you said before, that indicates the user looked at this file one time?

A.   **No.   This is the file listings for the actual file. Those dates there are the creation time and date and the modified date and time of the file itself.   These are not LiNK files.**

Q.   Understood.   But the created and the modified date are all on the same day, correct?

A.   **Correct.**

Q.   And I'll just show you page 2.   These are additional file

names, correct?

A.  **Correct.**

Q.  Showing you Government's 39B.  What is this?

A.  **This is a file list of the files that were bookmarked by Special Agent Schwartzenberger under the bookmark titled CP videos-enhancements.**

Q.  And these are -- that's what she had called the bookmarks, correct?

A.  **Correct.**

Q.  So let's then talk about item number 33741.  What is that?

A.  **That is a video file that is titled, "10 YO boy and girl playing fuck dot 3 GP."  It is found within the Patrick J. Killen Windows user.  It is inside the GigaTribe downloads folder.  It has a creation date of September 24th, 2014 at 12:57:09 in UTC and the modified date and time are the same.**

Q.  So with respect to this particular file, the 10-year-old boy and girl, what does that tell us as far as a created date?

A.  **It tells us that on September 24th, 2014, that file was saved on that computer.**

Q.  Does that mean that's when it was put on the computer?

A.  **Yes.**

Q.  And again, that was in the GigaTribe downloads folder?

A.  **Correct.**

Q.   And what does the word then download mean to you?

A.   **The word download?**

Q.   Yes.

A.   **It means it is a transfer from another remote computer into the system that receives the file.**

Q.   Is this then just the second page, does it go like that, are you aware?

A.   **I'd have to look at it.**

Q.   I'll show it to you and you can tell me.  (Complies).

A.   **Same document two copies.**

Q.   All right.  So I'm approaching you with Government's 50A and 50B.

   (Thereupon, the exhibit was marked for identification.)

**BY MR. EMERY:**

Q.   Do you recognize these documents?  And also 50C and 50D.

   (Thereupon, the exhibit was marked for identification.)

**BY MR. EMERY:**

Q.   Do you recognize those?

A.   **Yes, I do.**

Q.   And what are those generally?

A.   **50B is a printout from the AD Lab report for the CP videos dash enhancement bookmark.  50A is a series of screen shots of one of the videos.**

Q.   And does 50A, that file, relate to 50B?

A.   **It does.**

Q.   Please continue.   And was 50A a series of screen shots was that found on Government's 34?

A.   **Yes.**

Q.   Please continue.

A.   **50C is a printout from the AD Lab report for the CP videos bookmark and 50D is a screen shot of the videos referenced in this report.**

Q.   And was the screen shot of the video found on 50D, was that found on Government's 34?

A.   **Yes.**

        MR. EMERY:  Move to admit, Your Honor.

        THE COURT:  Be admitted.

   (Thereupon, the exhibit was admitted into evidence.)

BY MR. EMERY:

Q.   So let's first then talk about Government's 50B.  And I want to turn to the second page right here where it says exported as, and then there's a file name.

A.   **Yes.**

Q.   Is that the file we just finished talking about?

A.   **Yes.**

Q.   And that was the file that you said that it's a 10-year-old boy and girl playing fuck, and then it tells you what kind of file it is.  That was a video file?

A.   **Correct.**

Q.   And then the created date and the modified date, the

created date meaning the date that it was put on the computer was 9- 24-2014?

A.   **Correct**.

Q.   And I'm going to show you then this series of screen shots which are graphic in nature.  And so that file is a video and these are four screen shots of that video?

A.   **Yes**.

Q.   And I see, is that your initials at the bottom?

A.   **Yes, they are**.

Q.   And to the left that's the name of the file?

A.   **Yes, it is**.

Q.   And just generally are you able to describe what's going on in this video?

A.   **It appears that two children are engaging in sexual behavior**.

Q.   Government's 50C.  What is this?

A.   **This is the printout from the AD Lab report from the bookmarks done by Special Agent Schwartzenberger.  I believe the title on the top of the page, CP videos bookmark**.

Q.   Right at the top there, CP videos?

A.   **Correct**.

Q.   Then turning to the last page, which is 6 of 6, I want to talk to you then about this file right here, the last one.

A.   **Yes**.

Q.   What is that file name?

A.   **The name of the file is Skype-2014.09.06 dash Cameron Hales 14M US dot AVI**.

Q.   And the date that it was put on the computer?

A.   **The creation date reported by AD Lab was September 9, 2014**.

Q.   And let's go up to the top.  Are there other videos with the name -- files of Cameron Hales?

A.   **There are two other files on that page that reference the name Cameron Hales**, yes.

Q.   And then let me just go back to page 5.  Are there other video files here that are with the name Cameron Hales?

A.   **Yes, there are**.

Q.   And how many are there?

A.   **I can see two from what's visible**.

Q.   What about that?

A.   **Now I see three**.

Q.   And have we heard the name Cameron Hales before?

A.   **I believe there was a reference to it on a GigaTribe chat**.

Q.   So Government's 37B.  And from the third row from the top of the chat, that was -- you see the name?

A.   **Yes**.

Q.   And what name is that?

A.   **Cameron Hales**.

Q.   I'm showing you another graphic file image which is

Government's 50D.  And what is this?

A.  **That is a screen shot of the video of one of the stills in the video and the Skype dash 2014 dot 09 dot 06 dash Cameron Hales dot US AVI file.**

Q.  And this is just a screen shot of the video, correct?

A.  **Correct.**

Q.  And what is this boy doing on this file?

A.  **The video appears to be the young boy masturbating.**

Q.  I'm showing you Government's 40A and 40B.

(Thereupon, the exhibit was marked for identification.)

**BY MR. EMERY:**

Q.  Do you recognize these?

A.  **Yes, I do.**

Q.  And what is 40A?

A.  **40A are screen shots from the tool Access Data FTK Imager.  They are a listing of the contents of the GigaTribe download folder within the Patrick J. Killen Windows user.**

Q.  Please continue.

A.  **40B is a thumbnail view set of screen shots also from the Access Data FTK Imager tool and the thumbnail view here is also from the GigaTribe folders on the Patrick J. Killen Windows user.**

Q.  And did you prepare those both?

A.  **Yes.**

         **MR. EMERY:**  Move to admit.

THE COURT:   Admitted.

(Thereupon, the exhibit was admitted into evidence.)

BY MR. EMERY:

Q.   I'm showing you Government's 60A through 60V as in Victor.

(Thereupon, the exhibit was marked for identification.)

BY MR. EMERY:

Q.   Do you recognize these?

A.   **Yes, I do.**

Q.   What are these?

A.   **These are screen shots that I created from the virtualization of the Dell laptop.**

Q.   Government's 34, correct?

A.   **Correct.**

MR. EMERY:   So the Government would move to admit.

THE COURT:   Admitted.

(Thereupon, the exhibit was admitted into evidence.)

BY MR. EMERY:

Q.   Now, when you said you did a virtualization of the defendant's computer, what did you mean by that?

A.   **So we use a series of tools and the forensic image that I did from the Dell computer to create a virtual machine.  Now a virtual machine uses software to run Windows and the computer within another computer within another physical computer.**

So this process takes the forensic image, we create on overlay for the changes so nothing affects the original image, and then we are able to turn on the virtual machine and use it as the user would use the original evidence.

Q.   All right.  So let's go ahead then and take a look at the Dell laptop.  60A, what is that?

A.   60A is a screen shot of Windows 7 at the log-in prompt where the users are selected.

Q.   So if we were to right now, which we won't because of what you said about preserving evidence, but if we were to turn on this computer, plug it in, is that the first screen we would see?

A.   It would eventually go through the boot process and arrive at this screen where you would choose a user to log in.

Q.   And I see the users there?

A.   Yes.  There's a Patrick J. Killen user and a guest user.

Q.   So then you would click on Patrick J. Killen and assuming you had the password, because we knew it was password protected, right?

A.   Right.

Q.   That would then get you to another screen, correct?

A.   Correct.  So clicking on the user name and entering the password recovered previously I was able to log into Windows as to Patrick J. Killen user.

Q.   Showing you Government's 60B, as in boy.  Is this the screen you see when -- once you get past the -- by plugging in the password at the initial stage?

A.   **Yes, so I started the GigaTribe application and as you can see, the user name is pre-populated with the BeverlyHills05 GigaTribe user name.**

Q.   And so when you turned on this computer on the virtual machine, the GigaTribe app was the program that was the first -- that popped up right away?

A.   **No, Counselor.  During the session of the virtualization session that I did, that was just a screen shot of when I started GigaTribe on the laptop -- sorry, on the virtualized system.**

Q.   Thank you for that clarification.  So then let's talk about that then.  So where it says user name --

A.   **Correct.  As we saw on one of the previous reports from the NT user, the default user name for the GigaTribe program is BeverlyHills05 and we can see it here pre-populated in the log-in dialogue for GigaTribe.**

Q.   And then it asks for a password?

A.   **Correct.**

Q.   And then in order to get into BeverlyHills05 you've got to put a password?

A.   **You would enter a password and click okay.  With an internet connection, it would connect to the GigaTribe server**

and it would establish a connection to GigaTribe.

Q. But you didn't have a password, correct?

A. No, I did not.

Q. Let me just ask you this: What is -- I see there's some icons over here. What is CCleaner?

A. CCleaner is a tool that allows a Windows user to clean out logs or artifacts on a Windows system. Depending on what you choose you can delete or clean out LiNK files, internet history, certain registry settings, pre-fetched files which let us know when programs are run on a Window machine, and a vast majority of artifacts from a Windows computer.

Q. And then Government's 60C, is this, again, just how the desktop looked?

A. 60C is a screen shot of the virtualized Dell desktop as it appeared to be when starting the virtualized system.

Q. What is 60D, as in David?

A. 60D is a screen shot when navigating through Windows Explorer. This is the view that the user would see within the My Documents folder within the Patrick J. Killen Windows user.

Q. And then I see at the top the first folder there is --

A. GigaTribe downloads.

Q. And then after that?

A. My Music.

Q. And then in a section, a folder for Patrick, Junior

documents?

A.   **Correct.**

Q.   And then down below there is a series of Microsoft Word documents?

A.   **There's a series of Microsoft Word documents.  I see an Excel document.**

Q.   And then I see, and I know we talked about that one right there.

A.   **Yes.  The Patrick resume underscore Apple dot DOC.**

Q.   All right.  So then 60E?

MR. SCHWARTZ:  Your Honor, at this time I'm going to object.  60E through V are screen shots from various videos found on the computer that are clearly -- some of them clearly are child pornography, and we would concede that Patrick downloaded from this fellow Karucem on GigaTribe from a blind folder child pornography.  We haven't questioned it. It's not necessary to exhibit all of these photos.

MR. EMERY:  Your Honor, if I recall correctly, one of the things that the defense is saying is Patrick would just give these files to the defendant and delete them.

What this examiner is going to testify about is how he had it set so when you went into GigaTribe downloads he had it set to the download view, thumbnail view so the first thing you saw was images of children engaged in sexually explicit conduct.

MR. SCHWARTZ:  And, Your Honor, if I can correct counsel, I don't want to be arguing with him, speaking objection, but we said he was able to delete some of them, some of them were in recycling, and some of them he didn't get to delete yet.  So they're there.  We can we concede they're there.  It's not an issue in the trial.

MR. EMERY:  Your Honor, it also goes to how he organized his files.  It goes to his knowledge.

THE COURT:  Go ahead.

BY MR. EMERY:

Q.  Okay.  So let's talk about Government's 60E.  What's going on here?

A.  **So 60E is when I opened the GigaTribe downloads folder that is within the My Documents folder or within the Patrick J. Killen Windows user, this is the view of that folder as the user would have seen it on his laptop.**

**As you can see, the center pane is a thumbnail view and you can see that the videos which Windows can see a thumbnail for, you will see one of the frames from the video. If it happens to be a picture, it will show a small representation of the graphic as a thumbnail, and then if you notice to the right side of the screen it says, "Select the file to preview."  If you were to click on one of these images, it would show a larger presentation of the file.**

Q.  So I see here there is one folder entitled -- what is

that folder?

A.   **One of the folders found there is titled, "Spy folder."**

Q.   And then there is one right there.  What is that folder?

A.   **That one -- the name of that folder is "Photos" with the word "clean" in parentheses.**

Q.   And then right next to it?

A.   **That folder name is, "S 12, 2014, cams."**

Q.   Now let's talk a little bit more about the fact that the user had this set to thumbnail view.  Are there other options other than thumbnail view that a user can select for his files?

A.   **Yes.  There are several options.  Just to name a few, you can put a list view which just lists the names of the files without any thumb nails.**

Q.   So then let's just talk then about this one right here and I don't know how it's going to show up.  So I'm going to go ahead and hand this to you and you can just tell me as far as what is going on here.  But so this is an AVI file?

A.   **That is a video file and Windows is showing one of the frames within the video.**

Q.   So let me just show that to you.  Are you able to see what that person is doing in that file?

A.   **It appears like there is a male torso and a penis exposed.**

Q.   And again, that's the thumbnail view, correct?

A.   **That is correct.**

Q.   All right.  So let's talk about 60F.

A.   **So I continued to scroll down and get screen shots of every thumbnail that Windows Explorer showed me for the entire contents of the GigaTribe downloads folder.**

Q.   And when you say scroll down, is that what you're talking to right there?

A.   **Correct.**

Q.   And you scrolled down and then you took another screen shot?

A.   **Correct.**

Q.   And then so what about right there, what is that?

A.   **That is a JPG file.  It is a logical live file in the system and it appears to depict a young male who is naked.**

Q.   All right.  So then we'll just go through these quickly, I'll just show them to you.  60G.  These are just additional files set to thumbnail view?

A.   **Correct.  I continued to scroll down within the folder and continued to take screen shots.**

Q.   So that was 60G.  60H, and this is you just scrolling down taking additional screen shots?

A.   **Correct.**

Q.   60I?

A.   **Yes.**

Q.   Same thing here?

A. More screen shots of scrolling down on the GigaTribe downloads folder.

Q. This is all within the GigaTribe downloads folder?

A. It is.

Q. 60J?

A. More screen shots of the GigaTribe download folder.

Q. And let's just -- what's going on here with that file?

A. So as a file gets downloaded with GigaTribe, it starts putting the content of the file in a dot downloading extension file and then it also creates a name of the file dot downloading dot state. It lets -- GigaTribe keeps track of where the file is coming from in case connection is broken or the user where the file was being downloaded from goes off line and when both the recipient and the transmitter are online, it will continue to download that file.

Q. Okay. So these are -- so this file is downloading from GigaTribe?

A. That file -- that specific artifact there was the state file of a file that was being download inside GigaTribe.

Q. Into the GigaTribe downloads folder?

A. Into the GigaTribe downloads folder within the Patrick J. Killen Windows user.

Q. Understood. 60K, again, is this another screen shot scrolling down?

A. Yes, it is.

Q.   And then we have another downloading file right there?

A.   Yes.

Q.   And what's the name of that file?

A.   "Cameron jerks off dot AVI dot downloading dot state."

Q.   And that was 60K.  60L?

A.   Another screen shot of scrolling down of the contents of the GigaTribe downloads folder.

Q.   60M?

A.   Again, another screen shot of scrolling down of the content of the GigaTribe downloads folder.

Q.   And some of these are video files; is that correct?

A.   Correct.

Q.   60N, as in Nancy?

A.   Again, another screen shot scrolling down of the contents of the GigaTribe downloads folder.

Q.   All right.  60-O, as in Oscar?

A.   Another screen shot continuing to scroll down on the content of the GigaTribe downloads folder.

Q.   60P?

A.   Again, another screen shot of the contents of the GigaTribe downloads folder.

Q.   And 60Q?

A.   Continuing to scroll down in the GigaTribe downloads folder.

Q.   And then I see we talked about some of these videos as

far as with the name Cameron Hales; is that right?

A.   **That is correct.**

Q.   And there is six; is that right?

A.   **That's the number that I can count, correct, six.**

Q.   So I'm not going to go through then the rest of those but there is one I do want to talk to you about briefly.  Going back to Government's 60E.  There's a folder right there. What is that folder?

A.   **That folder is titled, Peirce."**

Q.   Showing you Government's 60U.  What is this?

A.   **So during the virtualization session, I took screen shots of the contents of the Peirce folder within the GigaTribe downloads folder within the Patrick J. Killen and that folder was set to thumbnail view and that is a screen shot of the contents of the Peirce folder.**

Q.   And then talking about the first file there top left, I see that there is actually no file name associated with that as far as one that is readable to a human.  But is that -- what type of file is that?

A.   **Well, there is a file name.  The file name happens to be letters, numbers and dashes, but it's a JPG photo and it is a logical file folder.**

Q.   And on this picture are you able to see what's going on in that picture?

A.   **It appears to be a male that appears to be naked and the**

strobe of the flash of the camera.

Q.   Is his penis exposed?

A.   I can't tell from here.

Q.   Let me briefly show this to you.

A.   Yes.

Q.   And then lastly, 60V, as in Victor, is this also from the Peirce folder?

A.   It is.

Q.   And was this just you scrolling down to the bottom of the folder?

A.   Yes.

Q.   Now, when you concluded your examination of the Dell, did you run a check to see if you had changed any of the evidence?

A.   I did.  I did another MD5 hash of the forensic image.

Q.   What was that result?

A.   It matched the original images hashed which matches also the original evidence at acquisition.

Q.   Would you expect if you looked at this, if you did -- went back to your lab and looked at the Dell laptop again, would you expect to find GigaTribe and Skype again on the Dell laptop?

A.   Yes.

Q.   What about the same user names?

A.   Yes.

Q.   Would you expect that the computer would still be password protected?

A.   **Yes.**

Q.   Would you expect to find the same images and videos on Government's 34, some of which we have talked about today?

A.   **Yes.**

Q.   If you did the examination again from start to finish and came back here and testified again, do you believe that your testimony would change at all?

A.   **No.**

     **MR. EMERY:**  Government tenders the witness again.

     **THE COURT:**  Let's go ahead and take our morning break for about ten minutes.

     (Thereupon, the jury was escorted out of the courtroom.)

     **THE COURT**:  Please be seated.  Cross-examination?

     **MR. SCHWARTZ:**  Thank you, Your Honor.

### *CROSS EXAMINATION*

**BY MR. SCHWARTZ:**

Q.   Good morning, Mr. Diaz.  How are you?

A.   **Good, sir.  Thank you, good morning.**

Q.   As I mentioned before, I don't know how you can wear a vest outside in this weather.  Let me skip ahead because your testimony really was in two parts.

The first part regarding your examination of Patrick's iPhone and the second part the examination of the Dell computer; is that correct?

A. **Correct.**

Q. So let me jump ahead for a second.  Were you the first FBI tech to examine the Dell computer?

A. **I was not.**

Q. And just so I get the chain of custody correct, Special Agent Schwartzenberger or another special agent who was involved in the search of Patrick's house took the Dell computer, I believe, placed it in a paper bag, initialed that bag, and deposited it in the evidence room, whatever the FBI calls it, at FBI headquarters in Miami; is that correct?

A. **I cannot testify to the events that I was not present to witness, sir.  I can testify after I reviewed the chain of custody what date and time I checked it out of the evidence control room of the field office of the Miami division and when I checked it back in.**

Q. Now, between the agent who seized the Dell checking it into the evidence room and you checking it out, was it checked out by another analyst?

A. **By another forensic examiner, yes, it was.**

Q. Forensic examiner.  And did that forensic examiner do things -- and that's my technical term -- to the computer?

A. **I don't know.  I do not know what your definition of "do**

things" is, if you can clarify that.

Q.  "Do things" is a term of art.  No.  Do things, when I say "do things," did he image it, did he examine the computer, did he do anything that in any way accessed what's on the computer?

A.  I know that he forensically imaged it in a forensically sound manner and I know that he took that image that he produced and he did the pre-processing in AD Lab, and that is all the knowledge I have as to what he did forensically with that specimen.

Q.  You can't say definitely whether he deleted anything from the computer, can you?

          MR. EMERY:  Objection, Your Honor.

          THE COURT:  Repeat the question again.

BY MR. SCHWARTZ:

Q.  Can you say whether or not the forensic, the first tech, deleted anything from the computer -- examiner deleted anything from the computer?

A.  My examination did not look for --

          MR. EMERY:  Your Honor, I object to that question.

          THE COURT:  Overruled.

A.  I would have to go back and review.  As of my current exam, I do not know of any dates that are of 2015.  I did not see any changed dates or modified dates of 2015 with my recollection of my examination.

BY MR. SCHWARTZ:

Q.   But for some reason we didn't go into the reason you were asked to then take over and start again; is that right?

A.   Correct.

Q.   And you took over and you've testified as to what you did regarding the Dell computer?

A.   Yes, I have.

Q.   Let's go back -- I may revisit that later but let's go back to the iPhone.  When you got the iPhone, was there a Kik app on the iPhone?

A.   There was not.

Q.   Do you know of your own knowledge whether there ever was a Kik app on the iPhone?

A.   No, I do not.

Q.   But you can assume or project that there probably was a Kik app on the iPhone because there was another app related to Kik on the iPhone; is that correct?

A.   That is correct.

Q.   What is that app?

A.   It is the video app made by Nixpa.

Q.   Let's assume for the purpose of your testimony that at some time there was a Kik app on that iPhone.  Can you tell from your examination of the iPhone when the Kik app was deleted from the iPhone?

A.   No, I cannot.

Q.   You know it was there at least in September of 2000 --
well, let me withdraw that.  Do you know whether it was there
at least in September of 2013?

A.   **No, I do not.**

Q.   Is there anything that indicates that the Kik app may
have been there up until September of 2013?

A.   **The only indication that the Kik app was there was the
third party helper app that its sole purpose is to provide
the taking of videos and be transmitted with Kik.  So that
would be the only indication that Kik was ever on that phone
by the presence of a third party app whose sole purpose is to
be used by Kik.**

Q.   Now, you spent a good ten minutes with the prosecutor at
the beginning of your testimony going through what are very
enviable credentials regarding your training and what you
needed to become a senior forensic examiner for the FBI; is
that correct?

A.   **Yes.**

Q.   And you are an expert in this area; is that correct?

A.   **Yes.**

Q.   But as an expert, the only thing you can tell us from
examining the phone is that you -- there's reason to believe
that Kik was once there and I can stipulate that Kik was once
there, and that it's not there now?

A.   **Correct.**

Q.   You can't tell us when it was deleted?

A.   **No, I cannot.**

Q.   And I profess not to be an expert in anything technological, I think I've told that to the jury so many times they're now getting sick of hearing it, but when you have an iPhone and the iPhone is off -- let me for a moment say the iPhone is on, you've gone past the code, and you get the initial screen with all of the applications on it, and you double click -- I'm sorry, forgive me, and you press one of the apps, what happens?

A.   **If you press one of the apps?**

Q.   And hold it in?

A.   **And hold it in, after a few seconds all the icons on the screen will begin to shake or wiggle.**

Q.   I guess that's a technical term also, shake and wiggle?

A.   **That is the best way I can explain it.**

Q.   And I agree with you.  And then on many of them, those that weren't initially on the phone when you bought it, an X appears; is that right?

A.   **That is correct.**

Q.   And if you press the X, what happens?

A.   **The iPhone will prompt you if you want to delete the app and it also, within the warning message, it will tell you that if you delete the app, it will delete the app and all the associated data with the app.**

Q.   And does that really happen on all of the iPhone operating systems or does that happen on an Android phone where it gives you the option of not deleting it or does it just delete?

A.   **I am not a hundred percent sure how the Android does it, however, on the iPhone that is the functionality for the iPhone and all of the versions of IOS.**

Q.   So do you have to be a hacker, somebody who knows how to hack a computer to delete an icon from your phone?

A.   **To delete an app?**

Q.   An app.

A.   **No, you don't have to be a hacker to delete an app.  That is regular user behavior on a phone.**

Q.   And even unskilled users like me can do that?

A.   **Yes.**

Q.   I'm glad you acknowledged my lack of skill.  Let's now go back to an iPhone that is locked.  Do you know what I mean when I say locked?

A.   **Do you mean where it is PIN detected or password protected to be able to open the phone?**

Q.   Correct.

A.   **Yes.**

Q.   And let's assume you had been erasing or deleting applications from the iPhone and you close it, you press the button on top, do you now need a password to get back in?

A.   If the phone is protected by a 4 digit PIN or pass phrase, yes, you need that to be able to log back in to unlock the phone.

Q.   When the phone is unlocked when the PIN or password is put in, would the icons still be shaking from the deletion?

A.   No, I do not believe they would still be shaking from the deletion.

Q.   So let me give you a hypothetical in your capacity as an expert as you've been qualified and ask, assuming that Patrick Killen went to his room and got his iPhone and handed it to Special Agent Schwartzenberger and she asked him for the PIN, he gave her the PIN, she put in the PIN, and opened the phone, from a technological point of view could the icons be shaking?

A.   I would have to conduct further testing on the different versions of IOS to see what the behavior of each IOS behavior would be.

Q.   Come on.

A.   It's possible that they could be shaking, it's possible that they could not.

Q.   Have you ever in your years as a senior forensic examiner for the FBI opened a phone by putting in the four digit PIN and seeing the icons shaking?

A.   No.   In my years I have not.

Q.   Now, when you examined the phone, you found a number of

Q. Assuming there were videos or pictures, et cetera, on the phone, could you still send them with that app that you mentioned that's associated with Kik without the Kik application being there, app being there?

A. **You're referring to the video --**

Q. Yes.

A. **-- app?**

Q. Yes.

A. **No.  The video app prompts for the Kik program in order to transmit the video that it records.**

Q. And just to refresh our recollection from yesterday, you gave a list of sites that had been visited, I believe, on the iPhone; is that correct?

A. **Which reports specifically are you referring to, sir?**

Q. There were so many of them.  But do you remember, for instance, the site Motherless?

A. **Are you referring to the history?**

Q. Yes.

A. **Yes.**

Q. And in the history you gave us a number of sites that the iPhone had visited; is that correct?

A. **My report included the sites that were found from the iPhone, yes.**

Q.   And did we establish yesterday that any of those sites who had names that were somewhat troubling were adult porn sites, not child pornography?

A.   **I didn't visit any of those sites.  The name is just a name.  I did not go through those sites so I do not know what they contained.  All I do is report the contents of the specimen forensically.**

Q.   Are you telling us as a witness for the Government that any of those sites were child pornography sites?

A.   **No, I am saying that I run my forensic tool on the phone and I extract the history of the phone, the contents that is there.  It is what it is.**

Q.   Let's talk about the Dell for a moment.  Dell is more troubling.  On the Dell, there are video files; is that correct?

A.   **Yes.**

Q.   Again, in your capacity as an expert let me ask you a hypothetical.  If a German national were to send a file labeled BIB or some other name on it, via GigaTribe to Patrick and he opened it, would the contents of that file then be on his GigaTribe download folder in his Dell laptop computer?

A.   **In this case, yes, because the GigaTribe's downloads folder was the default folder for all the files that were received via GigaTribe.**

Q.   So if this fellow, and I'm going to use a name, Karucem, also Vanyher, were to upload onto into GigaTribe a folder that had a couple hundred video clips in it -- is that the right term, video clips?

A.   **Video files.**

Q.   Video files.  And Patrick clicked on the yellow folder that looks like a manila folder, those would download into the GigaTribe downloads section of his computer; is that right?

A.   **Well, in my testing of GigaTribe, the third party user would share a folder.  Then in this hypothetical, the user of the Dell or their computer would have to choose to download and take an action to download that folder.**

Q.   From the shared area on the GigaTribe site; is that correct?

A.   **Not from the GigaTribe site.  From the other GigaTribe user's computer.**

Q.   And forgive me, so I'm a GigaTribe user sitting in Italy. I have my computer.  I mark a file that's on my computer which has a whole lot of child porn in it, to be shared on GigaTribe.  Patrick can then go and download or take this shared folder and it goes into his GigaTribe downloads; is that fair?

A.   **That is fair to say, but it depends on GigaTribe whether that is password protected or not by the other user, but yes,**

it is possible to download.

Q.   Let assume the other user is making it available, wants Patrick to look at it for either reasons of being a trader or reasons of working with law enforcement in Italy, for whatever his reasons, he wants to give it to Patrick. Patrick clicks on the yellow folder and everything in it is downloaded into his GigaTribe downloads section?

A.   **As far as the technical aspect of that transaction, the folder that will be selected to be downloaded would be saved with its content in the GigaTribe downloads folder.**

Q.   So now it's all there, whatever is in there.  And then when you go through that folder, you will see all of those videos as you examine it and you did, in GigaTribe downloads unless Patrick has deleted some of them; is that correct?

A.   **If you were to navigate that folder, yes, if those files are actively live on system you would see those files there.**

Q.   And if he clicks on a file, it downloads; is that right?

A.   **If the file is already downloaded onto his computer the file is already on his computer.**

Q.   So he doesn't even have to click on it, once that folder is there, the files download and they're there; is that right?

A.   **Yes.  If the user chooses to download the folder within a GigaTribe share it will download the folder with all of its contents.  All of that will be in the default GigaTribe**

downloads folder.

Q.   And let's say there are hundreds of, I'm calling them clips.  I guess you're calling them videos.  But let's say there are hundreds of those videos in that folder, in order to get rid of them he has to affirmatively start deleting them; is that right?  Am I using the right word?

A.   **Correct.  You have to actively delete them.**

Q.   And on a Windows-based computer, to delete them, they first go into a recycle bin; is that correct?

A.   **Correct.**

Q.   And I guess in the Apple computer they call it a trash bin.  Is that the same thing?

A.   **Different operating systems have similar or dissimilar names for it, correct.**

Q.   So the trash bin or the recycle bin are the same?

A.   **The trash bin on a Windows computer works similar to the trash on a Macintosh OSX computer.**

Q.   The recycle bin on a Windows computer?

A.   **The recycle bin on a Windows computer.**

Q.   So now if I want to get them permanently off the computer I need to take a second step, don't I, on a Windows-based computer?

A.   **Using the regular inherent feature you should have to empty your recycle bin in Windows, yes.**

Q.   Which means I have to either click on each of them and

press delete or somehow click on all of them using my shift key or a different key to delete them all at the same time; is that right?

A.   Yes, or you can simply right click on the recycle bin and say empty the recycle bin and empty all of its contents.

Q.   I didn't know that.  Thank you.

So once Patrick clicked on that folder that this guy Karucem sent to him, he had to -- they were automatically there.  He had no option at that point but to either leave them there or start affirmatively deleting them from his computer; is that right?

A.   Are you speaking of the folder that he clicked on and chose to download the folder with all of its contents?

Q.   Thank you.  I know you're a government witness but, yes, the computer that he chose to download and he got all of its contents from.

A.   Yes, they would be on his hard drive, correct.

Q.   And what about the thing you told us because even though you got the computer, the FBI seized the computer and it was off for a while and then it was copied and then copied again, but when you finally got to it, it still said downloading or download.  What does that mean?  Why are they still downloading?

A.   Well, some of the files were still downloading because at some point in time, the two GigaTribe users that were in that

transaction, somebody out of those two users went off line and the connection was severed. The files are downloaded directly from one user's computer to the other. So when the internet connection is severed, the transfer stops.

Q. So if the files are still downloading, it's because one or both of them just stopped the transaction?

A. The connection was severed.

Q. That doesn't mean that Patrick was intentionally continuing to try to download it. It's just that somebody stopped it, right?

A. No. In my testing it means that the connection was severed. In GigaTribe there is a transfers tab and it lists -- it gives you a listing of all the different items that are being downloaded. I have not done extensive testing to see what happens if you can cancel or stop a transaction in mid transfer.

Q. And I didn't mean that. I think we're on the same page here but we're using a little different language.

In my simple English, it stops if you turn the computer off; is that right? The downloading stops if you turn the computer off, but the symbol will still say download or downloading?

A. Yes.

Q. And did you also do any examination of what files were permanently deleted from the Dell?

A.   Well, what I did was I carved for permanently deleted graphic files.  Find only graphic files.

Q.   And did you find any?

A.   Yes, I found approximately 44,000.

Q.   Okay.  And what does that mean?

A.   Well, the carving feature not only carves the permanently deleted files, it also looks inside of other files within the hard drive.  So, for example, if you have a Word document and you have ten pictures inside of the Word document, the carving feature can potentially go through and carve those pictures out.

So the forensic tool will go and look on many places on the computer and carve items out for graphics, in this instance.  So it just means that it was able to recognize file signatures on approximately 44,000 files and provide them for review.

Q.   But I guess I don't know if it's clear to the jury, it's not a hundred percent clear to me yet.  How many files did Patrick -- how many videos did Patrick delete from this computer?

A.   I don't know.

Q.   Didn't you examine for that?

A.   Didn't search for how many videos were deleted.  All I did was I carved for graphic images, not videos.  Photographs, JPG files, BMPs, PNGs, those type of artifacts.

Q.   And did you carve for how many were deleted or just how many had ever been there?

A.   **I carved -- the tool will carve for everything you can find.  So if it finds a file signature it will attempt to carve it out of the hard drive.**

Q.   So in this case -- well, let me back up because maybe I didn't lay the right groundwork.  I have a video or an image on my computer that was taken by my kids when I'm wearing a funny looking hat at a party and sort of making a fool of myself, they take it and they send it to me via some sort of transfer, whether it be text or Skype or e-mail, and it's on my computer, and I don't want anybody to ever see me wearing that funny hat.  I delete it and it goes into my recycle bin, and then I say somebody can look and find it into my recycle bin, I want it to go away forever and never have to touch or see or smell it ever again and I permanently delete it.  Is it still on my computer?

A.   **It depends if it has been overwritten.**

Q.   Can you tell me what that means?

A.   **That means that when Windows deletes a file, as I explained earlier, there is an index pointing to that file in the master file table and then there is the data which is the file itself somewhere on the hard drive.**

     **If the entry in the master file table has not been overwritten by a new file that's been created on the**

computer, it is easily recoverable with forensic software. If that index entry in the master file table is overwritten by a new file, then we have to use some sort of a carving tool to go out and search the hard drive for file signatures which is likely the beginning part of the file in question and then the forensic tool can recover it and it will assign it as a carved file.

If the data on the hard drive is overwritten by a new file that takes its place, then it is not able to carve it out and it is truly permanently deleted at that point.

Q.   So were you able to determine in your extensive examination as a senior FBI forensic examiner how many videos Patrick deleted from the Dell?

A.   No.   The tool provided anything that was recoverable but I was not asked to search for deleted videos, so the answer would be no.

Q.   Well, let me divide that question in half or in a different way.

Had these fine folks at the government table asked you to search that computer and see how many videos Patrick had deleted, you could have done that; is that correct, unless they were overwritten?

A.   If it was recoverable, yes.   If it was overwritten there's no way to tell what is overwritten.

Q.   But you didn't do that and you don't have that evidence

for the jury because the Government didn't ask you to do that; is that right?

A.   **Specifically looking for that?**

Q.   Yes.

A.   **No, I do not have it.**

Q.   And you do not have it because the Government didn't ask you to look for it?

A.   **For deleted files, yes.  I did examine the recycle bin.**

Q.   I understand that.  But -- and you found four deleted videos on the recycle bin; is that correct?

A.   **No, in the Dell computer there were approximately 40 remnants of deleted files, most of them were pictures, and I say partially because when a file gets placed in the recycle bin there are two files that get created, the names get changed, there is one file that contained the actual data of the deleted file and there's an index file.**

**The index files were all gone and the files that contained the data were there, however, the peculiar thing was that all those files in the recycle bin were what we call padded with zeros, meaning they had a size to them but they were all zeros.**

**So in the instance of the JPG files or the photo files, it would be the equivalent of putting a 4 by 6 photograph into the recycle bin, but then when you look in the recycle bin the paper is blank, there is no content**

there.

Q.   So Patrick was able to -- at least the files that were in the recycle bin Patrick was able to delete and somewhat successfully, but you don't know if he deleted anything else because you weren't asked to look for that; is that fair?

A.   **Yes.**

Q.   Only because the court reporter can't take down when you nod.  Now, in Exhibit -- and I guess I told the Government I would ask for what exhibits I needed in advance so they didn't have to scurry around getting them.  But let me ask also for 37D, as in David.

It was another 37, but let me ask you this:  Do you remember testifying that one of the accounts, Rebecca Till account, was opened 9-11-2009?

A.   **To which specific service?**

Q.   That's a good question.  I need 37D, I guess.  Let me show you what has been marked as Government's Exhibit 37B. And those are Skype accounts; is that correct?

A.   **That is correct.**

Q.   And when was the Rebecca Till Skype account opened?

A.   **In our Evidence Finder reports from the Skype database, that is the value that is there, September 11, 2009.**

Q.   Assuming arguendo that Patrick just turned 22 this last month, how old would he -- I'm sorry in May, how old would he have been in September of 2009?

A.   Counselor, are you asking me to do math on the stand?

Q.   You're the forensic expert, I'm -- I told the jury I went to law school because I can't do math.  But it seems to me that that's about --

A.   Approximately 16.

Q.   I'm sorry?

A.   Approximately 16 years old.

Q.   And would he have been an adult then when he opened the Rebecca Till account, Skype account?

A.   No.

Q.   Now, in Exhibit 50, I think it was C, a printout from pages that Special Agent Schwartzenberger had bookmarked, which means she selected certain pages from what you found, there was a cam of a fellow by the name of Cameron Hales; is that correct?

A.   I would have to review the exhibit again to accurately answer the question.

Q.   I guess I have to avail upon you again to ask you for 50C.  And just for the record, this is from 50C page 6.  Can you tell us what that is?

A.   Can you scroll to the top of the page, please?

Q.   (Complies).

A.   So this is the bookmark report of videos which was created by Special Agent Schwartzenberger.

Q.   The videos weren't created by Special Agent

Schwartzenberger?

A.   **No, the bookmark was created by Special Agent Schwartzenberger.**

Q.   And these were videos that were in the GigaTribe download section of Patrick's computer; is that correct?

A.   **Under the Patrick J. Killen Windows user, yes.**

Q.   So just so it's clear, he was the Windows user of the computer and the reason you're saying Windows user is it's a Windows operating system, right?

A.   **Correct.**

Q.   But on the computer was a -- I don't know if it's called an app or application on Windows, but a section for downloads from GigaTribe; is that right?

A.   **There was a GigaTribe downloads folder which was configured to be the default download folder for the application GigaTribe.**

Q.   You say that so much better than I do.  And in that folder was something that was downloaded from GigaTribe, correct, or a lot of things downloaded from GigaTribe?

A.   **Well, that's the default folder so anything that will be downloaded would reside by default into that folder.**

Q.   So the camming or a camera or a video of this fellow Cameron Hales was downloaded from GigaTribe onto Patrick's computer; is that correct?

A.   **Correct.**

Q.   Now, the prosecutor earlier in your testimony on a chat on Exhibit 37B that occurred on September 9th, 2014, had you read Patrick saying to Karucem in response to a question from Karucem, "I never cammed with him.  I haven't.  I won't cam." Do you remember that?

A.   **I don't remember the specific content of the conversation.  I would have to review it again to see it.**

MR. SCHWARTZ:  Could I trouble you for 37B again?

MR. WIDLANSKI:  (Complies).

BY MR. SCHWARTZ:

Q.   And we're looking at Government's Exhibit 37B, and just so it's clear, can you tell me the date of these chats that are on 37B?

A.   **Those are September 9th, 2014, and they range from 4:48 in UTC time down past the screen, I can't see.  So those have to be adjusted for the current time zone.**

**So subtract approximately -- in September you would subtract five hours from that time so it would actually be the day before.**

Q.   And that's because we're in daylight savings time in September?

A.   **September is -- I believe in September we're still in standard time.**

Q.   Whatever.  It's either four or five hours difference?

A.   **Correct.**

Q.   And when it says, "Send a name," that's the person who is sending the chat, correct?

A.   **Yes.**

Q.   And he's the person who is typing it up?

A.   **Correct.**

Q.   It's easier when we talk to each other.  And the recipient name or user name is the person who is receiving it?

A.   **Correct.**

Q.   And we have established or the -- in some of these conversations the sender or the receiver is a fellow named Karucem; is that right?

A.   **That is the user name that is used in GigaTribe.**

Q.   And the user name that my client Patrick is using is BeverlyHills05; is that right?

A.   **BeverlyHills05 user is the user configured on the Dell laptop, yes.**

Q.   And we have established through all of the documents that that user is Patrick Killen, Junior?

A.   **It is the Patrick J. Killen Windows user on that laptop.**

Q.   So let me make this a little bigger.  Does everybody start chats by saying "hey" on GigaTribe or Kik?

A.   **I don't know.**

Q.   They start by saying, "Hey."  Karucem says that and about four seconds later since no one responds to his hey, he says,

"Are you there?"  And about 16 seconds after that from whatever time zone it is, Patrick comes back and says, "Hey"; is that right?

A.   **BeverlyHills05 user responds to hey.**

Q.   And then Karucem says, "Did" and then he corrects it to, "Did you cam Cameron Hales"; is that correct?

A.   **That's correct.**

Q.   Then BeverlyHills05 or Patrick says, "Nope, I sent you all his pics," meaning pictures as opposed to videos which would be the result of a camera; is that right?

A.   **I can tell you that literally what his chat says is, "Nope, I sent you all his pics."**

Q.   And he said, "That's a lie."  Patrick said -- I'm sorry, BeverlyHills05 says, "That's a lie," correct?

A.   **Yes, there is a chat message saying, "That's a lie."**

Q.   And then they get into a discussion where Karucem says, "He told me he cammed with a Rebecca Till some hours ago and Rebecca Till was your old fake name," correct?

A.   **Is that what the chat states, yes.**

Q.   And BeverlyHills05 or Patrick says "Mmh, I swear I never cammed him."  BeverlyHills05 says, "I haven't even used Rebecca Till in like months."  And then he says, "I know he asked to cam Carly using Facetime, but I said no."

Did you remember all of that?

A.   **Yes, that is the contents of that GigaTribe chat.**

Q.   So although there's a cam or a video of this fellow Cameron Hales on Patrick's computer, Patrick didn't, quote, produce that video.  That was a video he downloaded from the computer of Karucem when he downloaded a file from Karucem; is that correct?

A.   **I don't know, I don't know if he produced that video.  Is that the question you're asking me?**

Q.   Well, I asked you before and you agreed that he downloaded that video.

A.   **The video that is in the GigaTribe downloads folder, the Cameron Hales video is on that folder.  That is the default folder for the GigaTribe downloads, yes.**

Q.   Okay.  So would that be consistent with Patrick saying, "No, I never cammed him.  He asked me to, but I didn't"?

A.   **I can't testify what someone says on a chat and what their actions are using a program.  I can only tell you the artifact that I found on the specimen, on the Dell laptop.**

Q.   Let me show you what's been placed into evidence or accepted into evidence as Government's Exhibit 36G.

Can you tell me what this is?

A.   **That is a sampling of the LiNK files that were the recently opened documents for the Patrick J. Killen Windows user.**

Q.   So these were documents that Patrick, or items that Patrick opened on his computer; is that correct?

A.   Those are items that were open and these artifacts are the LiNK files when the Patrick J. Killen Windows user opened them on the Dell laptop.

Q.   And can you tell what program they were opened in?

A.   These LiNK files are created when a user double clicks on a data program, on a data file directly from the Windows Explorer.  So you navigate to the folder containing them and you double click on the item, and these LiNK files are created.

Q.   So if I navigate to GigaTribe and I've downloaded from someone else's computer a blind folder and it had contents which then automatically download on my computer and I click on one of those videos, a record of it will appear here in the LiNK file; is that correct?

A.   It depends on the application.  No.  Some applications have built-in viewers where they do not generate a LiNK file.  Other applications use the inherent Windows system to open the files and, therefore, a LiNK file will be created.

Q.   And here, when he clicked on some of those videos, LiNK files were created; is that right?

A.   Correct.  This report and the LiNK files are telling us that those files were opened and they were viewed on that computer under the Patrick J. Killen Windows user.

Q.   And one of those files downloaded automatically from that blind file that he took from Karucem was the top one --

forgive me -- "horny 12-year-old preteen boy JO and squirts"; is that right?

A.  **No, I cannot state that they downloaded automatically.  I would have to look at the contents of the GigaTribe folder on the exhibit that that is.  If that file is directly inside of the GigaTribe downloads folder, it is not part of a collection from a folder.**

**Would you like me to explain further how the folder download works?**

Q.  No, I think we have heard that type of thing.  But let's go look at this exhibit here.

A.  **Okay.**

Q.  And the one on top.  How many times did Patrick open that file?

A.  **By the creation date and the modified date, which they both match, it would appear by this artifact that was opened once.**

Q.  And let's look at the next one.  What file is that?

A.  **That is the, "13 YO polo with no hair slender dick cums twice," and the LiNK file.**

Q.  And how many times did Patrick open that file?

A.  **By the creation and modified date it would appear it was opened once.**

Q.  Let's look at the next file.  That's one about 15-year-old boys, et cetera.

A.   **That's correct.**

Q.   How many times did Patrick open that file?

A.   **Once.**

Q.   And how about the next file?  That's the one about the boy in the bathroom, et cetera.  How many times did he open that?

A.   **Once.**

Q.   What's the next file, what kind of file is that?

A.   **That is the GigaTribe download folder.**

Q.   That's the whole folder, not just an individual file, right?

A.   **Correct.**

Q.   So the folder was opened a number of times; is that correct?

A.   **Correct.**

Q.   It was opened in September and then the folder itself, not the downloads from the folder, was opened again in November; is that right?

A.   **Yes.  According to this LiNK file.**

Q.   And then we have another of the files within the folder and how many times was that opened?

A.   **Which one are you referring to, sir?  The one that starts with the word Justin?**

Q.   Justin Barry.

A.   **According to the LiNK file, it was opened once.**

Q. And the next one?

A. **The one that start with the word Omegle?**

Q. Yes.

A. **That one was opened once.**

Q. And what is the next file?

A. **The next file is a LiNK file to Patrick's resume underscore Apple dot DOC.**

Q. And that was a resume that he was creating or dealing with for himself on the computer; is that right?

A. **That is a Word document, that is correct.**

Q. And did he open that more than once?

A. **Yes.**

Q. And we know that because it was opened in May and then it was opened at least the last time in December; is that right?

A. **Correct.**

Q. Just so I don't leave anything out. The last two files on this report, can you tell us what the top one is on page 2?

A. **Yes. The Patrick resume underscore one click dot DOC dot LNK.**

Q. How does that differ from the other resume file, if you know?

A. **I do not know the contents of the file. I know the file name differs. The Apple is replaced by one click in this file. I do not know the contents.**

Q.   And this one he only opened one once, right?

A.   **No, this one he opened twice.  It was created at 14:42 and it was modified at 15:31, both in the same day.**

Q.   I was looking at the date, I didn't look closely enough at the time.  So he opened it that day and then he opened it again to make some changes?

A.   **He opened it twice.**

Q.   Or the second time he might have (inaud.).

     And then the last one on there, that's another child porn video, I guess?

A.   **Well, the one that begins with the word Skype?**

Q.   Yes, "14-year-old Chris Show"?

A.   **Yes, that was opened once.**

Q.   Only opened once.  Now, you mentioned when the prosecutor questioned you on Exhibits 60F through V, that the exhibits came up as thumbnails.  Can you tell me what that means?

A.   **I believe those exhibits are the ones from the screen shots of the virtualized session that I did.**

Q.   Correct.

A.   **That means that the thumb nails give a graphical representation of the contents of the file so if the file is a picture or a video, Windows will provide a thumbnail, a small graphical representation of the picture or it will be a frame from the video, a still, and provide that.  As long as Windows can read the file, it will provide a thumbnail.**

Q.   And are there other options as to how the file comes up?

A.   **Yes.  It's user selectable.  The user can select the different various views for the contents of a folder.**

Q.   And are some of them just the name of the folder?

A.   **Yes.**

Q.   What other choices are there?

A.   **Some of them is a simple list.  Some of it will give you the icon, which is a small graphical picture that represents what type of file that might be.**

**There's an extended details list which provides you the name of a file or the size of a file, the last modified date and the icon.  Those are just a few.**

Q.   Do you know what the default method of opening these folders were on this computer?

A.   **I do not know.  What I can tell you is when I virtualized the system, that's how the user would see the contents of that folder.**

Q.   I understand.  But was that the default setting?

A.   **I do not know what the default setting was.**

Q.   And if the default setting was to show it as an icon in this manner, then it would automatically show it as an icon in this manner, right?

A.   **Well, an icon will only show the icon for the program that opens the file, not the contents of the file.**

Q.   What do you call the little pictures, the thumbnails?

A.  **Thumbnails.**

Q.  So if the default was to show thumbnails when you opened it, it would show thumbnails, right?

A.  **If that was set as the default, then yes.**

Q.  By the way, did your studying the history of this computer determine whether Patrick was the first owner or not?

A.  **I did not.**

Q.  Would you know of your own knowledge whether this computer was a gift from Patrick to his father after his father got a new computer?

A.  **I do not know.  All I can tell you is the artifacts from the computer.**

Q.  And do you know who set the default settings on the computer?

A.  **No, I do not.**

Q.  Are default settings, settings that are automatically set by the factory or are they settings that a user can set?

A.  **The default settings is what Windows automatically sets them as they see fit.  They are configureable by the user to be changed.**

Q.  You can change it but this is how Windows sets it?

A.  **I don't know in this particular case if that was how Windows set the view for the GigaTribe downloads folder, but Windows will have a predetermined setting for certain**

folders.

Q.   Or a user can change it?

A.   **Or the user can change it.**

Q.   I think I know the answer but let me ask it anyway.  When we were talking about 37C, we talked about -- and I may have asked this already, if I did I apologize -- web sites called Amateur Couple Sex and Teen Self Videos, and these are legal adult porn sites; is that correct?

A.   **I don't know the legality of any website.  All I can report is that the browser -- if it's the history file the browser navigated to that website.  I have not seen the website nor can I testify to the legality of the website.**

          **MR. SCHWARTZ:**  May I have a moment?

          **THE COURT:**  All right.

          **MR. SCHWARTZ:**  At this point, I would tender this witness for redirect examination.

          **THE COURT:**  Thank you.  Redirect?

          **MR. EMERY:**  Briefly, Your Honor.


                    *REDIRECT EXAMINATION*

BY MR. EMERY:

Q.   Do you remember the line of questions from defense counsel when he's asking you if you download a folder from GigaTribe and what he called the blind folder, do you recall that and put it onto your computer?

A.   **Yes.**

Q.   Do you remember that line of questioning?  So right here showing you 60D.  So this is screen shot you prepared, right, and at the top you have GigaTribe downloads, right?

A.   **Yes.**

Q.   And then I'm showing you 60E, right?  And that's actually how GigaTribe downloads appears, correct?

A.   **Correct.**

Q.   And I see actually there are a couple of folders, four folders actually at the top right?

A.   **Correct.**

Q.   And then I'm going to show you then scrolling down what you did on the next page, 60F, and I believe we actually talked about that picture right there.  Is that a folder?

A.   **No.**

Q.   That's actually -- so when you go and click on GigaTribe downloads folder, scroll down, that picture is right there for the user to see; is that right?

A.   **Correct.**

          **MR. EMERY:**  No further questions, Your Honor.

          **THE COURT:**  Thank you, you may step down.

          How long is your next witness?

          **MR. WIDLANSKI:**  She should be fairly quick.  It depends on cross-examination.

          **THE COURT:**  How long on direct?

MR. WIDLANSKI:  Probably no more than 20 minutes, Your Honor.

THE COURT:  Are you all ready to keep going?  Let's call her.

MR. WIDLANSKI:  Yes.  The United States calls Carly Manning.

Thereupon,

CARLY MANNING,

having been duly sworn by the courtroom deputy, testified as follows:

THE WITNESS:  I swear.

THE COURTROOM DEPUTY:  Thank you.  Please be seated and would you please state your full name and spell it for the record?

THE WITNESS:  Carly Michelle Manning, C-A-R-L-Y, M-I-C-H-E-L-L-E, M-A-N-N-I-N-G.

THE COURTROOM DEPUTY:  Thank you.

*DIRECT EXAMINATION*

BY MR. WIDLANSKI:

Q.  Good afternoon, ma'am.

A.  **Hi.**

Q.  How old are you?

A.  **I'm 17 years old.**

Q.  A little nervous right now?

A.   **A little bit.**

Q.   There's a pitcher of water right there if you need some.
Feel free to calm yourself down at any point.

Where do you live?

A.   **Mabank, Texas.**

Q.   Are you still in high school or have you graduated?

A.   **I just graduated this year in May.**

Q.   Where are you going next year?

A.   **Oklahoma State University.**

Q.   Congratulations.

A.   **Thank you.**

Q.   Ms. Manning, do you know this guy right here, the
defendant, Patrick Killen?

A.   **No, sir.**

Q.   Have you ever seen him before in your life?

A.   **No, sir.**

Q.   Are you Facebook friends with him, to your knowledge?

A.   **No, sir.**

Q.   Have you ever been to his house?

A.   **No, sir.**

Q.   Have you ever used his computer?

A.   **No, sir.**

Q.   Have you ever sent him a picture of yourself?

A.   **No.**

Q.   Have you ever given him permission to use pictures of

you?

A.   **No.**

Q.   Have you ever spoken to him?

A.   **No.**

Q.   Ms. Manning, do you own a computer?

A.   **Yes, sir.**

Q.   Do you have a smart phone or a tablet or anything like that?

A.   **Yes, iPhone.**

Q.   And do you use Facebook?

A.   **Yes.**

Q.   What is your Facebook user profile account name?

A.   **Carly Manning.**

Q.   Have you ever had a profile Chanel Izzabel?

A.   **No.**

Q.   How about Carly Izzabel?

A.   **No.**

Q.   Anything with Izzabel in it?

A.   **No, sir.**

Q.   What about Car and Izza?

A.   **No.**

Q.   Do you know anybody by those names?

A.   **No.**

Q.   What about Rebecca Till?

A.   **No.**

Q.   Do you know anybody by that name?

A.   **No, sir.**

Q.   Have you ever gone by the name Beverly Hills?

A.   **No.**

Q.   Do you use Instagram?

A.   **Yes.**

Q.   What's your user name?

A.   **Carly Manning and then the number 10 on the end.**

Q.   So all those questions I asked you earlier about those names, Rebecca Till, Chanel Izzabel, any familiarity with Instagram accounts in those names?

A.   **No, sir.**

Q.   Do you use Snapchat?

A.   **Yes.**

Q.   And is the same stuff generally true that we talked about for Instagram and Facebook?

A.   **Yes.**

Q.   Have you ever used Skype?

A.   **I have.**

Q.   What's your Skype name?

A.   **Carly Is Cool 10.**

Q.   Not Chanel Izzabel?

A.   **No.**

Q.   Not BeverlyHills05?

A.   **No, sir.**

Q.  Do you know what Kik is?

A.  **Yes.**

Q.  Have you ever used it?

A.  **I made a Kik two years ago to contact my parents when I went to Sweden so I didn't have to charge the text messages, but I couldn't tell you the name of the account anymore.  It was too long ago.**

Q.  Have you used it in the last couple of years?

A.  **No.**

Q.  How many followers do you have on Instagram?

A.  **530,000.**

Q.  That sounds like a lot.

A.  **Yes.**

Q.  Is that a lot?

A.  **Yes.**

Q.  Why do you have such a significant social media presence?

A.  **I cheer in Dallas, Texas at Cheer Athletics which is the biggest cheerleading gym in the nation, and in the world, too, but I'm on the team called the Wildcats and we are -- we're the reigning world champions for the past three years and I made up this basket toss that -- which is a move in cheerleading, and a bunch of people found out my name with that and then they wanted pictures at the big competitions and stuff, and other people started catching on, so it led to a bigger following with fashion and branding industries where**

it led to more like money-making opportunities and stuff.

Q. So it's almost a job for you?

A. Yes.

Q. You make money on it?

A. Yes.

Q. And I presume since it's a job and it's a branding issue, that your social media accounts are open to the public?

A. Yes, sir.

Q. So if someone goes on the internet and searches for Carly Manning, your name, your picture is going to pop up?

A. Yes.

Q. And then if someone was computer savvy, they could just save those pictures or screen shot those pictures?

A. Yes, sir.

Q. Before coming Miami to testify for this trial, have you ever been here?

A. No, sir.

Q. And Ms. Manning, I apologize for the next couple of questions I'm going to have to ask you. But have you ever used Kik or Skype in an attempt to get young boys to send you naked pictures of themselves?

A. No.

Q. Have you ever asked anyone under the age of 18 to send you a naked picture of himself?

A. No.

Q.   Have you ever received naked pictures from boys over the internet?

A.   **No.**

Q.   Have you ever sent sexually explicit photographs of yourself over the internet?

A.   **No.**

Q.   Have you ever sent that guy, the defendant, naked pictures of yourself?

A.   **No, sir.**

Q.   Have you ever given permission to anybody to use your social media accounts or your passwords?

A.   **My mom only.**

Q.   Why does your mom have your passwords?

A.   **She monitors all my social media to make sure everything is clean and positive and she just kind of protects me in that field.**

Q.   She protects you?

A.   **Yes.**

Q.   Is that because you're still fairly young?

A.   **Yes.**

Q.   Have you ever allowed anyone to use your computer or your phone or your tablet other than your friends and your family?

A.   **No.**

Q.   I'm showing you Government's 43A and 43B, C, E, and F for identification.  I believe actually 43A and 43B are for

identification.

(Thereupon, the exhibit was marked for identification.)

BY MR. WIDLANSKI:

Q.   Do you recognize those?

A.   **Yes.**

Q.   What are those?

A.   **These are pictures from my Instagram account.**

MR. WIDLANSKI:   I would offer 43A and 43B, Your Honor.

THE COURT:   Admitted.

(Thereupon, the exhibit was admitted into evidence.)

BY MR. WIDLANSKI:

Q.   So I see some writing down here.  Whose handwriting is that?

A.   **That's mine.**

Q.   And what is the account name on this Instagram?

A.   **Carly Manning 10.**

Q.   Is that your account?

A.   **Yes.**

Q.   Is this a picture of you?

A.   **Yes.**

Q.   Who else is sitting in the background?

A.   **That's my best friend, Deylon Kirschling.**

Q.   Showing you 43B, same account here?

A.   **Yes, sir.**

Q.   And the handwriting is --

A.   **My handwriting and the same girl in the picture.**

Q.   Showing you 43C now, this has been previously entered into evidence.

A.   **That is me in the picture, I took that picture, but that is not my account and I do not have any access to that account.**

Q.   This is not your account?

A.   **No.**

Q.   And this is your handwriting?

A.   **Yes, sir.**

Q.   And, again, this is the same account we just saw?

A.   **Yes.**

Q.   Is this 43D, and this is your handwriting?

A.   **Yes, my handwriting and my picture.**

Q.   You took that picture?

A.   **Yes, sir.**

Q.   Showing you 43E now.  Do you recognize this picture, 43E?

A.   **The profile picture is me.  But the name Chanel Izzabel and this whole account is not me.**

Q.   But you do like to cheer; is that right?

A.   **I do.**

Q.   And is that how you spell freshman?

A.   **No.**

Q.   You said you don't know your Kik name.  Is your Kik name

Chanel Izzabel?

A.  **No.**

Q.  And 43F, is this the same?

A.  **Yes, that's my profile picture but that is not my Instagram account.**

Q.  43G has also been into evidence.  Your handwriting over here?

A.  **My handwriting, but not my account.**

Q.  Now these pictures down at the bottom, I think we have some larger versions that we are going to show you later, but do you recognize these pictures here?

A.  **The right four are my pictures, the ones of me.  But the two accounts on the left, I've never seen before.**

Q.  These are also -- these have also been admitted.  This is 4W.  Do you recognize this picture?

A.  **That is my picture, yes.**

Q.  And do you recognize this picture?

A.  **Yes.**

Q.  4V?

A.  **That's me.**

Q.  I'm showing 4X, do you recognize 4X?

A.  **Yes, that's me.**

Q.  Showing you 44E.  This is a Facebook account I think; is that right?

A.  **Yes.**

Q. Is that your handwriting down there at the bottom?

A. **That is my handwriting, yes.**

Q. Do you recognize the name here?

A. **No.**

Q. Not your account?

A. **Not my account, no.**

Q. Do you recognize this picture?

A. **That is me on the beach in Destin, Florida, yes.  And I have posted that picture.**

Q. All of these pictures that we have been showing, have you posted them to social media previously?

A. **Yes.**

Q. And anyone --

A. **Anyone can take them, yes.**

Q. Anyone can take them?

A. **Uh-huh.  (Nodding).**

Q. Do you live in Boca Raton, Florida?

A. **No, sir.**

Q. Have you ever studied at the University of Miami?

A. **No, sir.**

Q. And where were you born?

A. **Mabank, Texas.**

Q. Not Biloxi, Mississippi?

A. **No, sir.**

Q. Showing you 44C, here we have a whole bunch of pictures

on the same account.  Handwriting also.

A.  **Yes.  Those are my pictures.  The one with the design on the bottom right and the Kik messenger, those are not mine and the one next to the Kik messenger to the right, those are not my photos.**

Q.  So this is not yours?

A.  **No.**

Q.  This is not yours?

A.  **No.**

Q.  And this is not yours?

A.  **No.**

Q.  All the other ones are yours?

A.  **Yes.**

Q.  Who is this a picture of?

A.  **One of my friend's cousins.**

Q.  And all the rest of these are you and people you know?

A.  **Yes.  Yes.**

Q.  Showing you 29A here.  Same account.  I see there's some friends up here.  Do you know any of those people?

A.  **No.**

Q.  I'm showing you 29C.  Is that your mom's name?

A.  **No.**

Q.  What's your mother's name?

A.  **Cynthia Manning.**

Q.  And what's your father's name?

A.   **Robert Manning.**

Q.   Not Daniel Manning?

A.   **No.**

Q.   Have you ever sent pictures of yourself to a boy named Sam Katzman?

A.   **No, sir.**

Q.   Do you know anyone by the name of Sam Katzman?

A.   **No, sir.**

Q.   Showing you what has been previously produced as Government's 28.  Any of those names ring a bell, Chanel Izzabel, ChanelIzzabel@outlook.com?

A.   **No, sir.**

Q.   Showing you the second page.  Is this that picture that we saw earlier of you, I think you said on the beach in Destin, Florida?

A.   **Yes, sir.**

Q.   I'm showing you what has been agreed by defense for admission as 45A.

    (Thereupon, the exhibit was marked for identification.)

**BY MR. WIDLANSKI:**

Q.   That appears to be a different Facebook account in the name of Car M Izza; is that right?

A.   **That's not my Facebook.**

        MR. WIDLANSKI:  I would offer 45A, Your Honor.

        THE COURT:  Admitted.

(Thereupon, the exhibit was admitted into evidence.)

BY MR. WIDLANSKI:

Q.   Is that your handwriting?

A.   **Yes.**

Q.   And showing you 45B, C, D, E, and F.

(Thereupon, the exhibit was marked for identification.)

BY MR. WIDLANSKI:

Q.   Are those all of the same Facebook account that we just looked at in 45A?

A.   **Yes.**

MR. WIDLANSKI:  I would offer these as well.

THE COURT:  Be admitted.

(Thereupon, the exhibit was admitted into evidence.)

MR. SCHWARTZ:  No objection.

BY MR. WIDLANSKI:

Q.   And none of these pictures were posted by you to the Facebook account Car M Izza?

A.   **No, sir.**

Q.   But they were posted on various social media accounts?

A.   **Yes.**

Q.   I'm just going to show you a couple more.

This is 46L and 46K for identification.

(Thereupon, the exhibit was marked for identification.)

BY MR. WIDLANSKI:

Q.   Do you recognize these pictures?

A. Yes.

Q. What are these pictures of?

A. Those are both pictures of me that were posted on Twitter and Instagram.

MR. WIDLANSKI: 46K and 46L, Your Honor.

THE COURT: They will be admitted.

(Thereupon, the exhibit was admitted into evidence.)

BY MR. WIDLANSKI:

Q. When, approximately, if you recall, did you post this picture?

A. Seventh grade.

Q. And how old were you in seventh grade?

A. Twelve.

Q. So you posted this picture when you were 12 years old?

A. Uh-huh. (Nodding).

Q. And this is 46 -- that's 46K for the record. This is 46L. When did you post that picture, if you recall?

A. I think I was a freshman, probably 14 years old.

Q. So Ms. Manning, as we discussed, all these pictures that you posted on Facebook, on Instagram various other social media accounts --

A. Yes.

Q. -- they were open to the public?

A. Yes.

Q. Did you ever send any of them to this man, Patrick

Killen?

A.  **No.**

Q.  Did you ever give Patrick Killen permission to use any of your pictures?

A.  **No.**

Q.  Ms. Manning, have you ever requested that boys send you naked pictures over any form of internet or social media?

A.  **No.**

MR. WIDLANSKI:  No further questions, Your Honor.

THE COURT:  Cross?

MR. SCHWARTZ:  Very briefly.

### *CROSS EXAMINATION*

BY MR. SCHWARTZ:

Q.  Welcome to South Florida.

A.  **Thank you.**

Q.  We have established you don't know Patrick?

A.  **No.**

Q.  We have established that you have never sent him any pictures and we have certainly established that there are no improper pictures of you on the internet; is that right?

A.  **Yes, sir.**

Q.  All of these pictures that you've seen of you are pictures that you posted on various of your sites, they're fully clothed, properly attired, right?

A. There's sports bra and Spandex attire, which is my cheerleading attire that I wear for practices and my uniform which is a half top that I wear to compete in. And there's also swimsuit photos from the beach and vacations in the pool and things like that.

Q. But nothing improper?

A. Nothing inappropriate, no.

Q. Correct. And to your knowledge, you've never communicated with my client at all?

A. No, sir.

Q. And if he used your picture to communicate with boys, it would have been a picture of you in appropriate clothing because there are no such pictures of you not in appropriate clothing that are available?

A. Correct.

Q. And my daughter tells me you're famous.

A. I mean, I -- people say that to me a lot. There's this word called cheerlebrity, I guess you could call it, because cheerleading has kind of taken its own world.

But people do say famous sometimes because you could see, like, people take pictures of me calling themselves fans. I don't consider my myself famous because I come from a small town and I don't ever let it get to me, but you can say that, I guess.

Q. Now, the reason I ask that and I want you to have your

fame and enjoy it, but there were a couple of pictures that were shown to you by the prosecutor from a site called Carly Manning, I think, or fan dot fan?

A.   **Uh-huh.  (Nodding).**

Q.   Are you familiar with that site?

A.   **I have never seen it before they showed me the picture.**

Q.   But are there, to your knowledge, sites that people make up of you because they're your fans?

A.   **Yes.**

Q.   That's different from Chanel Izzabel, the Chanel Izzabel sites which have absolutely nothing to do with you, right?

A.   **Yes.**

Q.   So if there's a site -- may I have those pictures?

This site, Carly Manning underslash, or whatever it is, fan, that's a picture somebody who took of you or you took and posted?

A.   **I posted that picture on my account and someone took the picture and posted it on their Carly Manning fans account.**

Q.   And are there -- because you are a famous person, are there, to your knowledge, web sites or accounts of people who are your fans?

A.   **Yes.**

MR. SCHWARTZ:  No further questions.

THE COURT:  Redirect?

MR. WIDLANSKI:  No redirect, Your Honor.

THE COURT: Thank you. You may step down.

And your next witness.

MR. WIDLANSKI: Yes, Your Honor. The United States calls Colonel Terry Cook.

MR. SCHWARTZ: Your Honor, may I renew the objection that I made previously?

THE COURT: All right. How long do you expect this witness to last?

MR. WIDLANSKI: Fairly quickly, 10 minutes, maybe 15.

THE COURT: The reason I wanted to see if we can take this witness that's going to be brief is because I have a 2:00 calendar call and it shouldn't take long, but I'm trying to minimize interruption to the jury.

MR. WIDLANSKI: Yes, Your Honor. We should have no problem getting him in before 1 o'clock. My apologies to the Court, Your Honor.

Thereupon,

COLONEL TERRY COOK,

having been duly sworn by the courtroom deputy, testified as follows:

THE WITNESS: I do.

THE COURTROOM DEPUTY: Thank you. Please be seated. And would you please state your full name for the record and spell it?

THE WITNESS:  Terry Cook, T-E-R-R-Y, last name C-O-O-K.

THE COURTROOM DEPUTY:  Thank you.

### *DIRECT EXAMINATION*

BY MR. WIDLANSKI:

Q.  Good afternoon, sir.

A.  **Good afternoon.**

Q.  Sir, where do you currently live?

A.  **My family currently lives at Shaw Air Force Base, South Carolina, 7533 Carnation Circle, and I'm currently living in Bagdad, Iraq.**

Q.  And how long have you lived in South Carolina -- has your family lived in South Carolina?

A.  **Yeah, we moved there this summer so just at a year.**

Q.  Where did you and your family live on September 10th and September 11th of 2013?

A.  **We lived at Fort Bliss, Texas, which is in El Paso.**

Q.  And you're married?

A.  **Yes, my wife and my three children.**

Q.  What's your wife's name?

A.  **Joanna.**

Q.  And you said you have three children?

A.  **Yeah.  I have an oldest daughter.  Her first name is Lauren, we call her Haley, her middle name.  She's at the**

University of Alabama.  My second child is Hannah, and my son is Jackson.

Q.   Colonel, I'm showing you Government's Exhibit 32C which has been previously admitted.  Do you recognize these people?

A.   I do.

Q.   Who are these people?

A.   That's my -- on the left as I'm looking at the picture is my daughter Haley and my son Jackson.

Q.   And when was this picture taken?

A.   This picture was taken when my daughter graduated from high school.  It would have been 2013, so May of 2013.

Q.   And this account name, is that associated with your son?

A.   Yes.

Q.   I'm showing you Government's Exhibit 32B for identification, sir.

     (Thereupon, the exhibit was marked for identification.)

BY MR. WIDLANSKI:

Q.   Do you recognize that?

A.   I do.

Q.   What is this?

A.   That's my son's birth certificate when he was born in Germany in the year 2000.

          MR. WIDLANSKI:  By agreement of the parties, Your Honor, I would move 32B into evidence.

          THE COURT:  Admitted.

(Thereupon, the exhibit was admitted into evidence.)

BY MR. WIDLANSKI:

Q. Showing the jury 32B, is this your son's name?

A. **Yes.**

Q. Is that -- if you would wouldn't mind reading it?

A. **Jackson Derek Cook.**

Q. And your name?

A. **Terry Paul Cook.**

Q. And your wife's name?

A. **Joanna Lynn Cook, yes.**

Q. And his birth date was what?

A. **February 17th, year 2000.**

Q. In September of 2013, did your son have any devices that connected to the internet?

A. **Yes. I mean, the family had a desktop computer, my son had his own personal computer. He has an iPhone. And we also have, you know, numerous iPads within our home.**

Q. And in that same time, September of 2013, you said you and your family lived in Fort Bliss Texas; is that correct, sir?

A. **Yes.**

Q. And your son was there as well?

A. **Yes.**

MR. WIDLANSKI: Your Honor, I have 32A which is a certified business record, I would move for admission of 32A.

THE COURT:  Admitted.

(Thereupon, the exhibit was admitted into evidence.)

BY MR. WIDLANSKI:

Q.   Sir, I'm showing you 32A.  Do you know what Kik is?

A.   **No.**

Q.   Do you recognize those names?

A.   **I do.  I recognize my son's first and last name and I recognize his Yahoo account.**

Q.   I'm showing you the third page of 32A.  Do you recognize this picture, sir?

A.   **I do recognize that.  That picture it's -- that's my -- his grandfather's Toyota pickup truck.  It's from a place called Buena Vista, Georgia, which is outside Fort Benning where we hunt when we visit Thanksgiving and Christmas, and that's my vehicle right behind the truck, the white Sequoia.**

Q.   Sir, I'm going to show you some pictures now.  And I've covered them up with Post-It notes.  But I would just ask if you can recognize the individual in these pictures.

And this is from Government's Exhibit 19C.  This is page 43 of 19C.  Do you recognize the individual in that picture, sir?

A.   **Yeah, that's my son Jackson.**

Q.   Do you recognize that room?

A.   **I do.  That's my oldest daughter Haley's room.  I can tell by the white furniture.**

Q.   And where was this picture, in what city and state?

A.   **That's Fort Bliss, Texas.**

Q.   Now you said your daughter graduated in May of that year?

A.   **Yes.  So she would have been at the University of Alabama during this time period.  We turned her room into a den where I moved a 42-inch TV in there with his Playstation and made it easier for us to have a place to go watch TV while we're upstairs.**

Q.   Showing you page 44 of the same exhibit.  Do you recognize the individual on that picture?

A.   **Yeah, that's my son Jackson in his sister's bedroom.**

Q.   I'm going to show you one more picture, sir.  And this is from Government's 19H.  Do you recognize that picture, sir?

A.   **I do.  That's also a picture of my son, Jackson.**

Q.   And, sir, if these pictures were taken in September of 2013, how old would your son have been?

A.   **Thirteen.**

Q.   Sir, have you ever met Patrick Killen, Junior, before?

A.   **I have not.**

          MR. WIDLANSKI:  I have no further questions, Your Honor.

          THE COURT:  Cross?


                    *CROSS EXAMINATION*

BY MR. SCHWARTZ:

Q.  Good afternoon, Colonel.

A.  **Sir, good afternoon.**

Q.  By your uniform it's apparent but the record can't see your uniform, what branch of the service are you with?

A.  **I'm a Colonel in the United States Army.**

Q.  And your wife is currently residing with the rest of your family in South Carolina, right?

A.  **Yes, sir.**

Q.  Is she able to travel?

A.  **She's not.  She's a cancer survivor and just last week had surgery to remove an -- anyway, she had surgery.**

Q.  I'm sorry to hear that.  And prior to being contacted by the FBI, were you aware at all of Jackson posting some photographs on the internet?

A.  **No, sir.**

Q.  Was sending some photographs through the internet, forgive me for misstating?

A.  **Same, no, sir.**

Q.  You're not aware?

A.  **No, sir.**

Q.  And has there been any public outcry or does anybody at your community know about what Jackson did?

A.  **No, sir.**

        MR. SCHWARTZ:  I have no further questions.

        THE COURT:  Redirect?

MR. WIDLANSKI:  No, Your Honor.

THE COURT:  Thank you.  You may step down.

Who do you have next.

MR. WIDLANSKI:  Special Agent Schwartzenberger.

THE COURT:  Are you good for another 20 minutes?

THE JURY:  (Nodding).

THE COURT:  Okay, let's get 20 minutes in.

Thereupon,

**SPECIAL AGENT LAURA SCHWARTZENBERGER,**

having been duly sworn by the courtroom deputy, testified as follows:

THE WITNESS:  Yes, I do.

THE COURTROOM DEPUTY:  Thank you.  Please be seated.  State your full name and spell it for the record.

THE WITNESS:  Laura A. Schwartzenberger.  First name is spelled L-A-U-R-A, middle initial A, last name S-C-H-W-A-R-T-Z-E-N-B-E-R-G-E-R.

THE COURTROOM DEPUTY:  Thank you.

### *DIRECT EXAMINATION*

BY MR. EMERY:

Q.  Good afternoon.

A.  **Good afternoon, sir.**

Q.  Where are you employed?

A.  **With the Federal Bureau of Investigation.**

Q.   What do you do for the FBI?

A.   **I work on the Crimes Against Children squad.**

Q.   And is that as a special agent?

A.   **Yes, it is.**

Q.   How long have you been special agent with the FBI?

A.   **Approximately, nine and a half years.**

Q.   And how long have you been in the squad of Crimes Against Children?

A.   **It will be two years in November, this November.**

Q.   And what squad were you in before that?

A.   **I was on the Violent Crimes squad.**

Q.   And have you served on any sort of specialty units or teams within the FBI?

A.   **Yes, I have.  I'm currently a member of the Evidence Response Team which we call our ERT team.  It's kind of like a CSI.  We conduct crime scene searches and I'm a photographer for the ERT team.  I'm also on the underwater search and evidence response team, which is the dive team. We search for evidence underwater.**

         **Previous to that I have been on the SWAT team when I was in the Albuquerque division for one year.**

Q.   Are you currently on the SWAT team?

A.   **No, I am not.**

Q.   And aside from what you just told the jury, do you give any presentations about the internet?

A.   Yes, I do.  We give internet safety presentations to kids and to parents.

Q.   And when you say "internet safety," generally what you do you mean by that?

A.   We tailor the presentations to who we're presenting to, of course.  For the kids, we try to explain to them the dangers of having social media online, the dangers of being online, in general, posting photographs, posting videos and that sort of thing and who might be seeing what's on the internet.

And then to parents we also present those same dangers but how they can monitor the activity to try to help their kids not be a victim of these types of crimes.

Q.   All right.  Well, we have heard a lot about February 11, 2014 and the knock and talk.  So let's just go ahead and talk about that right now.

A.   Yes.

Q.   So let me take you back to that day.  What -- did you go to the defendant's residence, that is Patrick J. Killen?

A.   Yes, I did.

Q.   And that was the morning -- was that the morning of February 11th?

A.   Yes, it was.

Q.   And what is the address of that residence again?

A.   I believe it was 6880 Pinehurst Drive, Hialeah, Florida.

Q.   Why were you going to the defendant's residence that morning?

A.   **I was forwarded a lead from the Charlotte division of the FBI.  They had received a complaint that an individual in the Charlotte division was threatened into sending nude photographs to a person posing as a, or representing themselves as a teenage girl named Rebecca Till using the Kik user name RebeccaTill05.  So the Charlotte division of the FBI forwarded the lead to us, the Miami division.**

**They provided us with information that the IP address utilized by RebeccaTill05 came back to the residence in Hialeah, 6880 Pinehurst Drive.**

Q.   And who in Charlotte sent you that lead?

A.   **I believe the lead was from John Letterhos and approved by Susan Ostrobinski.**

Q.   Is that the same senior special agent who testified on the first day of the trial?

A.   **Yes.  She's supervisor special agent, yes.**

Q.   Now, when another FBI office sends a lead, what -- how does that work?  What is the process as far as -- you testified that you received a lead.  So once you get the lead, what then do you, as an FBI agent, do you have any discretion with respect to that lead?

A.   **Yes, we do.  First the lead comes into our supervisor and our supervisor assigns the lead to someone on the squad.  In**

this case it was assigned to me. And then we have discretion on how to handle the lead and I believe that lead was for us to conduct any investigation we deemed appropriate.

Sometimes the work they want done by a particular division will be specified and sometimes it will be of that nature conducting an investigation appropriate. So follow up on the information which was that IP address coming back to that house.

So it is our decision on how to handle that. And it's my decision in consultation with the supervisor or special agent of our squad in the Miami division on how to handle that.

Q. All right. Now, but since this was just a lead for you, was the case still technically being handled by FBI in Charlotte?

A. Yes, it was. They had an open investigation. We did not.

Q. And then you were just tasked to provide them assistance; is that fair to say?

A. Yes, that's correct.

Q. All right. So the lead comes in, gets assigned to you. What do you decide to do with respect to that lead?

A. First of all, I did a couple of surveillances on the residence to determine if the wireless network was secured or not secured and I determine that it was secured. In

consultation with my supervisor and the U.S. Attorney's Office, we determined that the best course of action at that time would be to conduct a knock and talk at the residence.

Q.   Now, and we have heard some testimony about this before, about what a knock and talk is, and then is there any sort of discretion as far as in a particular case doing a knock and talk versus getting a search warrant?

A.   Yes, there is.

Q.   And in this case, the decision was made to do a knock and talk?

A.   Yes, it was.

Q.   And is that also known as a consensual interview?

A.   Yes.

Q.   And then why was the decision made in this case as far as exercising that discretion to do a knock and talk versus getting a search warrant?

A.   Well, although we did have information from a minor that he was threatened and that he sent naked photographs of himself to another individual that came back to that address, the information could have been stale because it took so long for the Kik MLAT process to occur.

        By its very nature a lot of the times the MLAT process takes months which causes a possible staleness issue with the information which could make it more difficult for us to get a search warrant, so we decided to do a knock and

talk.

Q.   But it doesn't necessarily preclude it, correct?

A.   **No, it doesn't necessarily preclude it, no, or say that we did not have probable cause.  It doesn't say anything like that.**

Q.   And then after you -- would another option be was after you do a knock and talk, could you still possibly get a search warrant?

A.   **Yes.  And since we go to the U.S. Attorney's Office, that was the plan, to start out with a knock and talk and to contact them following the knock and talk to determine where to go from there, depending on the outcome of the knock and talk.**

Q.   So is it fair to say, so you have a lead from Charlotte saying that someone from 6880 Pinehurst Drive using the Kik user name RebeccaTill05 had threatened a boy in Charlotte using Kik; is that fair to say?

A.   **Yes, that's correct.**

Q.   But so did you know at that point who RebeccaTill05 was?

A.   **No, we did not.**

Q.   Did another agent go with you that morning?

A.   **Yes.  Special Agent Ginther, Jason Ginther.**

Q.   And who -- then with respect to the consensual interview, who was the -- what were the roles that morning with respect to the interview?

A. Special Agent Ginther's role was to conduct any forensic analysis of any electronic devices, if permitted. My role was the lead interviewer.

Q. Now, about what time did you arrive?

A. Approximately, 7:30 in the morning.

Q. Was that a workday?

A. Yes, it was.

Q. And how long were you there for, approximately?

A. Approximately, three hours.

Q. And I'm showing you what's been admitted as Government's 6. Do you recognize that?

A. Yes. That is the residence at 6880 Pinehurst drive.

Q. And how were you -- when you arrive at the house that morning, how were you dressed?

A. Both of us wore business casual.

Q. And I know you are a special agent so I'm assuming that you had your weapon with you?

A. Yes, we both did.

Q. And was your weapon -- and I want to talk about you. Was your weapon displayed or did you have it somewhere else?

A. No, I had it on -- I wear an ankle holster usually and that's where I had it on that day, so it's on my ankle covered by my pant leg.

Q. And as a special agent, when you're on the job are you required to have your service weapon with you?

A.   Yes.

Q.   What about Special Agent Ginther, did he have his weapon with him?

A.   Yes.  In a holster on the side of his pants and inside the belt or inside the waist seam.

Q.   Were you able to see his weapon or was it covered up?

A.   No, it was covered up.  His shirt was pulled over the weapon.

Q.   All right.  So you get there at approximately 7:30 in the morning on February 11th.  What happens?

A.   We pull up to the residence in an unmarked vehicle and we proceed to the front door and I knock on the front door of the residence.  Either Patrick Killen, Senior or Karen Killen, which is the defendant's mother, and father came to the front door of the residence.  I don't remember if it was -- which one it was or if it was both of them.

     We introduced ourselves and showed them our FBI credentials.  And we -- and I asked to speak to Patrick J. Killen.

Q.   Why did you ask to speak to Patrick J. Killen?

A.   Prior to going to the residence that day, I conducted some searches on who resides at the residence.  I determined that Patrick Killen, Senior, Patrick Killen, Junior, and Karen Killen all resided at the residence.  Most of the subjects in our child pornography investigations are male and

Kik is generally an application used by younger people.  So at that point I determined that Patrick Killen, Junior, was most likely the person that we needed to speak with.

Q.   But that didn't mean that you, in fact, knew he was RebeccaTill05 at that time?

A.   That's correct.  We didn't know.

Q.   Now, so you knock on the door.  And you ask to speak with the defendant.  Do they allow you in the house?

A.   Yes, they do.

Q.   And what would have happened at that point if they would have said, no, you can't come into our house and you can't talk to our son?  What would have happened?

A.   We would have had to leave.

Q.   All right.  But we know they didn't, they allowed you in house, correct?

A.   Correct.

Q.   What happens when you go inside the house?

A.   We enter the residence and either Patrick Killen, Senior or Karen Killen went to go get Patrick J. Killen, Junior.  He came out and we were directed to sit at the dining room table which was approximately 25 feet from the entrance to the residence.

Q.   All right.  Well, let me show you Government's 33E which has already been admitted.  We would just circle on the screen.  You talked about a dining room table?

A.   (Complies).

Q.   Is that where you sat down, right there?

A.   Yes, it is.

Q.   And why -- at this point did you want to speak with the defendant alone?

A.   We did.  However, I didn't specifically ask for that.  We were guess in the residence so I was satisfied with being able to sit with him at the dining room table to speak with him.

Q.   And at the time on February 11th, was the defendant an adult?

A.   Yes, he was.  He was approximately 20 years old.

Q.   And so it's you, Special Agent Ginther, and the defendant sitting at the dining room table?

A.   Yes, that's correct.

Q.   And do you see the person who you sat with, sat down with at the table, Patrick J. Killen, Junior?

A.   Yes, I do.

Q.   Would you please identify him for the record?

A.   The man briefly stood up in the red sweater and white collar.

        MR. EMERY:  May the record reflect that the special agent has identified the defendant?

        THE COURT:  The record will so reflect.

BY MR. EMERY:

Q.   Now, with respect to Government's 33E, when you were sitting down with the defendant, where was -- you said that there was -- his mother and his father also in the house, correct?

A.   **Correct.**

Q.   And where were they once you sat down at the dining room table?

A.   **The mother eventually sat down on the couch which you can also see from the picture here.  It was approximately 15 feet from the dining room table.**

Q.   Is that the couch right there?

A.   **That is the couch, yes.**

Q.   All right.

A.   **And the father appeared to be preoccupied with getting the younger sister ready for school.  I did see the younger sister later on after we had sat down at the dining room table.  Her name was Elisa Killen.  She came in to put her bookbag on the dining room table.**

Q.   So the mom's on the couch?

A.   **Correct.**

Q.   The dad is helping the younger daughter get ready for school; is that fair?

A.   **Yes, correct.**

Q.   And so people are -- while you're seated at the dining room table with the defendant and Special Agent Ginther, the

rest of the family members are going about their business and moving around the house?

A.   **Correct, yes.  Well, the father.  The mother was --**

Q.   The mother was right there?

A.   **Yes.**

Q.   But people in the house were free to move around; is that fair to say?

A.   **That's correct, yeah.**

Q.   All right.  So when you sat down with the defendant at the dining room table, what happened?

A.   **Well, we sat down.  He was in the chair closest to the sliding glass doors if you're looking at the table closest -- if you're looking at the table the way I am, so close on the left side closest to the sliding glass doors and I was seated right next to him on the left side.  Special Agent Ginther was seated across the table from him.  He was shaking noticeably and I asked him if he was cold.**

Q.   And was it cold in the house?

A.   **I didn't think it was.**

Q.   And after you asked if he was cold, what did he respond?

A.   **He said he was.  And he went up, went to get up to go get a large robe to put on.**

Q.   And where did he go get that robe, do you know?

A.   **He left our presence.  I believe he went to his room but I don't know specifically where he went.**

Q.   But you or Special Agent Ginther didn't go with him, correct?

A.   **No, no.  We stayed at the table.**

Q.   And he gets this robe and then does he come back and sit down with you all?

A.   **Yes, he does.**

Q.   What happens next?

A.   **Next we started asking him some general questions that we typically ask in these type of investigations.  We asked who else resides in the residence and he said that he resides there with his mother, Karen Killen; his father, Patrick Killen, Senior; his sister Elisa Killen.  He advised us that his sister was adopted and he also was adopted.**

**He said that individuals named Alex and Christian, he couldn't remember if the last name was Gonzalez or Rodriguez, previously resided in the residence.  They were younger adopted brothers of him.  But they hadn't resided at the residence since 2009.**

Q.   Did you ask him any questions with respect to the internet service?

A.   **Yes.  I asked him if -- who provided internet service for the residence and he said it was AT&T.  I asked him if it was secured.  And he said it was and provided me with the password.**

Q.   And did he say what the -- do you recall what the -- as

far as the name of the router service or that was -- of the internet service within the house?

A.  **To the best of my recollection, it was PJ Killen, I think.**

Q.  And why do you ask if it's secure or unsecured?

A.  **We ask that because if it's unsecured, there can be somebody close by stealing the internet, for instance, a resident next door, especially if you live in an apartment complex, but even in a single family house a next door neighbor could be stealing the network or somebody could be parked out front and be stealing the internet.**

**So we generally ask if it's secured and we also ask if anybody else has the password because they could give the password to somebody else and they could be using it.**

Q.  And did you ask him any questions about where he worked?

A.  **Yes.  He said he worked at Publix and he said he is a student at Miami-Dade College taking computer classes.**

Q.  Now, why --

THE COURT:  Let's go ahead and recess then.

MR. EMERY:  Very well.

THE COURT:  Folks, I mentioned a hearing at 2 o'clock.  It should take about 15 minutes.  So I'll give you a little extra longer today.  Instead of 2 o'clock, I'll have you come back at 2:15.  Okay.

(Thereupon, the jury was escorted out of the

courtroom.)

MR. SCHWARTZ:  May I raise a point with, Your Honor?

THE COURT:  Sure.  What do you have?

MR. SCHWARTZ:  One of the jurors apparently has been sleeping through about a good portion of this morning's session.

THE COURT:  Which juror are you referring to?

MR. SCHWARTZ:  There's a juror who is wearing a hood, I believe.

THE COURT:  Do you know which number seat?

MR. SCHWARTZ:  I believe it's Juror Number 10, Your Honor.

THE COURT:  Number 10 is an empty seat.

MR. WIDLANSKI:  It's the one after the two empty seats.  Maybe --

THE COURT:  The one after.

MR. WIDLANSKI:  Empty seat, empty seat and a juror with a blue hooded sweatshirt.

THE COURT:  Sometimes -- I noticed yesterday when that you made that comment immediately after I got the note that she was taking copious notes.

MR. SCHWARTZ:  I think she woke up.  I apologize. But I think both the Government and I have noticed this juror sleeping, not even just dozing off.  And I don't know if Your

Honor wants to watch this afternoon.

THE COURT:  I'll watch.  If I see something I'll say something, but sometimes, you know, if they're just closing their eyes they may not be actually asleep, they may be just listening to the testimony as opposed to watching the witness, but I'll keep an eye on it.

MR. SCHWARTZ:  And note for the record that I'm not accusing the prosecutors of being boring, Your Honor.

MR. EMERY:  I think that was during Fred's cross-examination, but just for the record the Government is not saying that juror is sleeping.

THE COURT:  I understand.  We don't know.  She certainly, whoever it was, certainly answered the bell when I said it was recess.

MR. SCHWARTZ:  Yes.

THE COURT:  Okay.  Well, and in connection with my 2:00 calendar call, it would be helpful to be able to represent to these lawyers when we might be able start the next case.  So I know at one time we had said six days or whatever, but what is it looking like for the remainder of the Government's case?

MR. WIDLANSKI:  Your Honor, I think Special Agent Schwartzenberger is our last witness.  The length of her testimony obviously depends on cross-examination.  It's possible that we finish today.  I think it's probable, at

least more likely than not, that we finish sometime early tomorrow morning.

THE COURT: So you expect you'll have this witness on the stand for the rest of the day?

MR. WIDLANSKI: I think it's a possibility, yes, Your Honor.

THE COURT: And for the defense's case?

MR. SCHWARTZ: Your Honor, we have three witnesses. The direct on two of them should be about an hour, each. And direct on the third should be two to three hours.

THE COURT: Okay. All right. All right, we'll see you back at 2:15.

(Thereupon, a luncheon recess was taken.)

*          *          *

A F T E R N O O N   S E S S I O N

2:12 p.m.

THE COURT:  Can we bring the jury out, please?

(Thereupon, the jury was brought into the courtroom.)

THE COURT:  Please be seated.  Good afternoon, ladies and gentlemen.

Ready?

MR. EMERY:  We're waiting on Mr. Schwartz.  He said he had to run to the restroom.  Thank you, Your Honor.

BY MR. EMERY:

Q.   All right.  Quickly before we broke for lunch, just to kind of recap, you had just asked the defendant some basic questions like where he worked, he said Publix, and he also said he was taking some computer classes; is that correct?

A.   **Yes, that's correct.**

Q.   Now, why as a special agent do you ask those types of questions?

A.   **We are trying to determine his ability to answer our questions, his educational background, that sort of thing. Whether he can understand my questions and understand them.**

Q.   And up to that point, had he expressed a problem understanding you?

A.   **No, he had not.**

Q.   And what about throughout the whole three hours you were there, at any time did the defendant express any inability to

understand you?

A.   **No, he did not.  He understood just fine and answered just fine.**

Q.   And how about yourself, the whole three hours did you have any problem understanding the defendant?

A.   **No, I did not.**

Q.   Did you ask him any questions about his computer usage?

A.   **Yes, we did.  I asked him if he owned any electronic devices and he said he did.  He said he had an Apple MacBook, an iPad 2 and an iPhone 5.  I asked him if he alone used those items and then he said yes.  I asked if other members of the family had their own electronic devices such as their own laptops and he said yes, everybody in his family had their own laptop and they used their own.**

**I asked him if he used any social networking sites. He said he has a Facebook account, but he really doesn't have time for it.  I asked him about Instagram, he said he has an Instagram account, P Killen 05 is the user name, but he never used it.**

**I asked him about Kik, and he said he installed Kik a few years ago, but he believed the app was deleted from his phone.  And I also asked him if he used any file sharing programs and he said no.**

Q.   Did you ask him how long he had his iPhone 5 for?

A.   **Yes.  Yes, I did.  And his MacBook Pro.  He said he had**

his iPhone 5 and his MacBook Pro for approximately five months.

Q. And, I'm sorry, you already mentioned this. Did you ask him if he had been using any file sharing programs?

A. Yes, and he said no.

Q. Now, when he said that his Instagram account was P Killen 05, did that user account name itself have any meaning to you?

A. Yes, it did. It had a 5 at the end, an 05. I knew that his birthday was in May. We find it very common for individuals to use user names with their birthdays, date of birth, something to do with their date of birth at the end. Also, that 05 was also in RebeccaTill05. I asked him what the 05 meant and he just shrugged and he did not answer me.

Q. When he didn't answer you, did you force him to give you a response?

A. No, I moved on.

Q. After that, did you ask him any additional questions? Did you ask him about Rebecca Till?

A. Yes. I asked him if he knew a Rebecca Till, if he had ever heard the name Rebecca Till or the user name RebeccaTill05 and he said no.

Q. Now, with respect to the electronic items that -- let me ask you this. So was the mother sitting on the couch when you were talking to the defendant?

A.   Yes, she was.  She was on the couch pretty much the entire time during the interview of Patrick Killen inside the residence.  She appeared to be thumbing through a tablet or a notebook.

Q.   And around this point did the mother say anything to you?

A.   Yes.  Several times during the course of our interview inside with Patrick Killen, Junior, she interrupted with some questions such as what the investigation was about, that sort of thing.  I told her on one occasion that we were investigating a crime on the internet and we were following up on a lead outside of North Carolina.

Special Agent Ginther told her the same thing on another occasion.  On another occasion that she interrupted I advised her the same thing, that we were trying to investigate a crime on the internet and I told her that we were trying to be low key in our investigation, and sometimes in these types of investigations we use the SWAT team and the whole neighborhood knows about it, but we weren't trying to do that here.  I said that for comparison purposes.  We were trying to be low key so that nobody knew that we were at the residence.

Q.   And how was your tone of voice when you were talking to the mother at this point?

A.   The same as I am now.  Conversational tone.

Q.   And did you ever threaten to come back with the SWAT team

and break down the front door?

A.  **No, I did not.  I never said anything about coming back with a SWAT team.**

Q.  Now, after that, did you ask the defendant for permission, consent to search the electronic items that he told you he had?

A.  **Yes.  Shortly after I said -- what I just told you to the mother, she told us, "Oh, just give them whatever they want." Shortly after that, I asked Patrick J. Killen, Junior for a consent to search his Apple MacBook, his iPhone 5, and his iPad 2 and he gave us verbal consent to search those items.**

Q.  After he gave you verbal consent to search those items, what happened next?

A.  **He then left our presence to go retrieve the Apple MacBook and the iPad 2.  He brought those items to us and he advised us that his iPhone 5 needed to be charged and it was charging in his room.**

Q.  And did you ask him -- did you provide him any sort of form?

A.  **Yes, I did.  I provided him with one of our FBI consent to search computer forms.  I completed the form with the information requested on the form which is the item and the description of the item.**

Q.  I'm showing you what's been admitted as Government's 10. Do you recognize this?

A.   Yes.

Q.   And is that the form you were just referencing?

A.   Yes, it is.

Q.   Well, he just gave you verbal consent.  Why did you go to the extra step for someone to give you written consent?

A.   This is the FBI's way of documenting that the person did provide us consent.

Q.   And did he give you written consent?

A.   Yes, he did.  I filled out the form.  I wrote Apple MacBook Pro, I crossed that out because I think he said something like he wasn't sure, it might have been just Apple MacBook.  I put silver in color.  I described the items on the form in color because I find that a lot of times on the Apple products sometimes if there is a serial number, it's very, very small or sometimes it's not on the back of the item.  You have to open up the back or maybe even remove the battery to get the serial number or other information regarding the product.  So I described it in color.

I put Apple MacBook silver in color with the iPhone.  Did not have the iPhone at the time so I asked him what color that was and he told me it was white.  So I wrote iPhone 5, white in color and then I wrote iPad 2, white in color.

Q.   And we'll talk about the other items later on.  And I see also there's a section right here (indicating).  What is that

section?

A.   Yes.   Earlier he had provided me with a password for the iPhone.   When he advised me that he had an iPhone I asked him what the password was and he told me it was 5319.   Then when we were executing the form I asked him again what the iPhone password was and what the password was for the MacBook and he told me they were both the same, they were both 5319.

Q.   Now if would you right below that, let's see, there's paragraph right below password?

A.   Yes.

Q.   If you would, what does that say?

A.   "I have been advised of my right to refuse to consent to this search and I give permission for this search freely and voluntarily and not as a result of threats or promises of any kind."

Q.   And did you give this form to the defendant to review?

A.   Yes, I did.

Q.   And did he take a look at it?

A.   Yes.   He had it for a little bit, long enough to read the form.

Q.   Did he ask you any questions about it?

A.   No, he didn't have any questions.

Q.   And then after he looked at it, what did he do next?

A.   He then signed the form.   I asked him to print his name beside his signature.

Q. Is that it right there?

A. **Yes, it is.**

Q. And then whose signature is that right below it?

A. **That's mine.**

Q. And then I see a date.

A. **Yes, and he wrote the date on the top and I wrote the date on the bottom.**

Q. Now, after he had just given you the verbal and written consent, did you all -- did you and Special Agent Ginther start searching the items?

A. **Special Agent Ginther started manually searching the MacBook. The reason he was doing that is because we brought a forensic tool that searches computers and notebook computers. But it's not good on Apple products, it doesn't work on Apple products. It's called OS Triage. It's just a program on a thumb drive. So because we were dealing with an Apple product, he just manually searched through the MacBook.**

Q. All right. So I'm showing you what's been marked as Government's 7 and has already been admitted. Do you recognize this?

A. **Yes, I do.**

Q. And what is that?

A. **This is the Apple MacBook that we obtained from Patrick Killen on 2-11-2014.**

Q. So after he gave you consent then, Special Agent Ginther

started looking through this; is that correct?

A.  **Yes, that's correct.**

Q.  Now, what about the -- what about the iPhone that he said that he had back in his room charging?

A.  **During the time that Special Agent Ginther was looking through the Apple MacBook, Patrick J. Killen, Junior got up at least two times to go back to his room to, what he said was checking on his iPhone to see if it was charging or if it had charged enough to bring it out to us.**

Q.  And so during those two times that he was coming back, did Special Agent Ginther say anything to him?

A.  **Yes.  The second time that he came back -- because he had been gone for a little bit longer than what we thought would be necessary to check on the charge of a phone.  So the second time that he came back Agent Ginther asked him if he had been deleting items on the phone.**

Q.  And what did he respond?

A.  **He said, no, he had not.**

Q.  Why, if, you know, he was going back to -- going back to the room and you also had some concerns about what he might be doing back there, well, then how come either you or Special Agent Ginther didn't go back with him?

A.  **We were guests in the residence.  At the time we were there on consent.  We were doing a consensual interview and a consensual search.  So we have to weigh the options of**

possibly losing evidence or him possibly deleting evidence with the other option that we're there on consent and we're doing the best we can in that scenario.

Q.   Did he eventually bring out his iPhone?

A.   Yes, he did.  The third time of going back to check on the phone he brought the iPhone out.  When he brought it out, he had showed it to Special Agent Ginther and Special Agent Ginther told me that it was unlocked and the icons were shaking, so he asked Patrick Killen, Junior, if he had been deleting items from the phone and he said he had not.

Q.   But the icons were shaking?

A.   Yes.  Special Agent Ginther told me that the icons were shaking but that the cell phone did have a low charge.

Q.   I'm sorry, showing you Government's 8.  Let me hand it to you.  Take a look at it and let me know if you recognize that.

A.   Yes.  This is the iPhone 5 that we obtained from Patrick J. Killen, Junior on 2-11-2014.

Q.   And do you recognize that handwriting on the outside?

A.   Yes.  That's my handwriting.

Q.   Now, after he had been had brought out his iPhone with the icons shaking, what -- did you ask him again about Rebecca Till?

A.   Yes.  I advised him a little bit more about the investigation and I asked him again if he was Rebecca Till or

RebeccaTill05 and he said he was not.

So then I advised him a little bit more about the investigation. With this I mean that I told him that the IP address that we had for RebeccaTill05 came back to his residence and at this time I told him that I knew that he was RebeccaTill05, I confronted him with that. He told me he's not gay, he's bi and I said, "So you are RebeccaTill05," and he said yes. And we were speaking in a whisper at this point.

Q. And when he made that comment to you, did -- had you told him anything in specific detail about your investigation as far as what kind of age group it involved or the type of crime?

A. No, I had not. I simply said that we were investigating a crime on the internet. I never said anything about it involving the sexual exploitation of child pornography or any type of sex crime at all. So I thought it was interesting that he answered the question or when I confronted him with being RebeccaTill05, I found it interesting that he answered that way.

Q. And then after you confronted him about being RebeccaTill05 again, what did he say?

A. He said he was, yes. And so then I said, "Okay. Can we talk about that?" And he said, "Can we go outside so my parents don't hear?"

Q.   And did you?

A.   Yes.  We left out the sliding glass doors to the back patio and he directed me to a round or a circular small patio table with two chairs on the side of the pool.

Q.   All right.  I'm showing you Government's 33-O.  If you could then just touch the screen then as far as -- is this the back patio area?

A.   Yes, it is.

Q.   And where did you go?

A.   This table right here (indicating).  We left out these doors.

Q.   All right.  And while you were doing this, where was Special Agent Ginther?

A.   He stayed in the residence.  He went to go obtain a Cellebrite machine which is a machine that we use for cell phones and other mobile devices to extract data, and he had to get that from the car.

Q.   Then while you were out on the back patio, did you and the defendant then take a seat at the table?

A.   Yes, I did.

Q.   And what happened?

A.   I said, "Okay, let's talk about Rebecca Till."  And he said, yes, that he did pose as Rebecca Till, that he said was a 15-year-old girl.  He used that identity to obtain pictures and nude pictures from boys.  He tried to get boys between

the ages of 14 and 15.  He said he would typically start out searching boys' names on Instagram, he would put any name in and various boys would come up.

After finding boys that he liked he would ask them on Instagram if he could Kik them.  Sometimes they would have a Kik account listed on their Instagram web page so he would start Kiking them from there.

Once they were chatting via Kik, the conversation would escalate to sexual in nature.  Sometimes he would ask the boys to send naked photos and sometimes the boys would initiate that.  He said he occasionally specified to the boys that he wanted full body nude images or mirror images, nude images from the boys.

He said the boys would comply with his request.  He said -- well, I asked him where he got the name Rebecca Till.  He said the first name came from an old girlfriend of his named Rebecca Nunez, he made up the last name Till.  He used pictures from a friend of his that he went to high school with named Alexandra Reyes.

Q.  Did he say -- so he just told you that he had been using Kik to obtain these nude photographs of boys, correct?

A.  Correct.

Q.  And did he say what type of electronic device that he used in order to get those pictures?

A.  Yes.  He said he always used a cell phone.  When we were

still in the residence I asked him what phone he had prior to the iPhone 5 and he told me he had a Blackberry Torch but the screen was cracked, the phone was broke, he didn't know where it was.  When we were out on the patio I asked him what phone he had prior to the iPhone 5 and he told me that he had a Samsung Galaxy, the screen was cracked and the phone was broke and he didn't know where it was, but he always used a cell phone.

Q.   And at that time, what cell phone was he using?

A.   He was using his iPhone.

Q.   What -- what, if anything, did he say about what he would do with those photographs?

A.   He said he would save the photographs onto his phone and that he would delete them approximately one month later.  He told me that he did not post any of the photographs and did not share any of the photographs.  I asked him if he masturbated to the photographs and he declined to answer.  He told me he didn't want to answer that.

Q.   Did you force him to answer that question?

A.   No, I moved on.

Q.   And as a trained special agent, why do you ask that question?

A.   Because it shows their intent for obtaining the photographs.  People that are involved in the receipt, distribution, possession and production of child

pornography --

MR. SCHWARTZ:  Objection, Your Honor.  Speculation.

THE COURT:  What he said?

MR. SCHWARTZ:  About her reasons for asking a particular question.

THE COURT:  Overruled.

BY MR. EMERY:

Q.   Please continue.

A.   In my training and experience, people that are involved in the production, distribution, receipt, and possession of child pornography typically masturbate to the videos or photographs that they obtain.  They do it for sexual gratification.

Q.   And then after he refused to answer that question, you said you moved on.  What did you -- what did you ask him next and what was said next?

A.   I asked him if he also video chats or cams with boys.  He said, no, he just gets pictures of boys.  I asked him if he uses Skype and he said he has Skype, but he doesn't use it. I asked him if he searches for boys on the internet.  He said he has occasionally on IMGSRC, I-M-G-S-R-C.  It's a website. It's a Russian-owned website.

Q.   And what did you ask him anything about Ask.fm?

A.   Yes, I asked him if he used Ask.fm and he said he has gone to the site before, but he didn't believe he had an

account set up.

Q.   And did he give you any indication as far as how many boys that he had been communicating with?

A.   Yes.  He said he had been doing this for approximately two years starting at approximately the age of 16.  He said at that time he had communicated with 100 or 200 boys and received photographs from approximately 50.

Q.   And what about any e-mails at that time, did he tell you any e-mails he had been using?

A.   Yes, I asked him if he used ZacGonzalez05@yahoo.com, an e-mail address, and he said that is his e-mail address, but he believes it's empty.  He just used it to log into an account.

Q.   And why was ZacGonzalez05@yahoo.com important to you?

A.   It came up in the Kik MLAT.  The Charlotte division of the FBI advised me of that.

Q.   And one thing with respect to that.  Did the IP location go to any specific location for that e-mail address as far as the Kik records?

A.   I'm not sure they received the results from that.  I know they had subpoenaed Yahoo, but I can't remember if they received the results from Yahoo regarding that or not.

Q.   And after he had told you that, what happened next?

A.   He did express some concern about his parents being angry with him regarding this and kicking him out of the house.

Suicide is a very real concern for us and for these type of cases. It is a big concern that people involved in the production and distribution or possession of child pornography commit suicide. It sometimes happens when law enforcement confront them with what they've been doing.

So I tried to be on guard for that so I did try to tell him I'm sure his parents love him, I don't think they would kick him out. We do need to explain what's going on because they're curious, but I think they love him and they wouldn't kick him out of the house.

Q. And after he said that, did anyone come outside?

A. Yes. Special Agent Ginther came outside. He was unsuccessful in conducting a physical extraction of the iPhone. When he came outside, I reviewed the interview that I just had with Patrick Killen, Junior, by reading from my notes. Went over everything that Patrick J. Killen, Junior had told me and then I asked Patrick J. Killen, Junior if everything there was correct and this was all in the presence of Special Agent Ginther.

Q. After he just agreed with everything you had just read, based on your notes, did the three of you go back inside?

A. Yes, we went back inside the house.

Q. And what happened once you got back inside?

A. Once we got back inside the house, I advised Patrick J. Killen, Junior that we were going to need to take his

electronic items to the FBI to conduct a search on them because we were unable to search them at the residence.  I also asked him if he had any other storage media that --

Q.   And at that point why were you concerned if he had anymore storage media?

A.   Because child pornography is illegal to possess as well so we want to try and get everything concerning that that we can, so I asked him if he had any other storage media with that and he left our presence and returned with two thumb drives.

Q.   I'm showing you what's been admitted as Government's 19 -- I'm sorry, Government's 9.  Take a look at it and let me know if you recognize that.

A.   Yes.  This is the SanDisk Cruzer, one of the thumb drives that he brought back to me.

Q.   And did he leave your presence to go get this thumb drive?

A.   Yes, he did.

Q.   Did anyone go with him?

A.   Neither Ginther or I went with him.

Q.   And in addition to this thumb drive, did he give you anything else at that point?

A.   Another thumb drive.

Q.   And after he then gave you those two thumb drives, what did you do next?

A.   I added those two thumb drives to the consent to search form that we had previously executed --

Q.   And is this --

A.   -- on the next line.

Q.   Is this Government's 10?

A.   Yes, this is.

Q.   And if could you just then indicate on the form.

A.   Yeah.  So starting here you see the Data Traveler -- it's kind of -- it's a one gigabyte thumb drive or two gigabyte thumb drive, black in color and 256 megabytes on the drive, black in color, Cruze SanDisk, yes.

Q.   So both of those were then added to the consent form?

A.   Yes.  After writing them to the consent form, I again presented the consent form to Patrick J. Killen, Junior for his review, again, and approval again.

Q.   After he gave you then the thumb drives, and signed or at least they were added to the consent form and agreed, what happened after that?

A.   I asked him if we can try to find the Samsung Galaxy phone and he said he would try to search for it.  Special Agent Ginther offered to go back to his room to help search for the Samsung Galaxy phone.

Q.   And did they find it?

A.   No, they did not.

Q.   And while -- and how long was Special Agent Ginther gone

for?

A.   **It was approximately ten minutes, five to ten minutes, something like that.**

Q.   And was that the only time that Special Agent Ginther went back to the defendant's room?

A.   **Yes, it was.**

Q.   And while Special Agent Ginther was back there with the defendant, where were you?

A.   **I was speaking with the parents at the dining room table.**

Q.   And did you recommend anything to them about their router?

A.   **Yes.  I recommended that they change the password on the Wi-Fi to prevent him from accessing the internet because we were not arresting Patrick J. Killen, Junior that day and I advised them several times while we were there that we were not arresting him that day.**

Q.   I'm showing you on the screen Government's 11.  Do you recognize that this?

A.   **Yes, I do.**

Q.   And what is this?

A.   **This is our property receipt that the FBI fills out when we take any property from an individual.  Special Agent Ginther let me know that he searched the Apple iPad 2 and that he didn't find child pornography on it, so I told Patrick J. Killen, Junior that -- well, first of all, I asked**

him if there was any images of or videos of child pornography on it.  He said no, he uses it for school, and so after Special Agent Ginther told me he didn't find anything, I gave that back to Patrick J. Killen, Junior to keep to use for his school work.  So the rest of the items, however, that we were going to have to take back to the FBI to conduct the consensual search on the items, I listed on the property receipt.

So that would include the Apple MacBook, the Apple iPhone 5, chargers for both, the Kingston Data Traveler two gigabyte thumb drive and the Cruze SanDisk, 256 megabyte thumb drive.

Q.   And I see at the bottom of the page a couple of signatures.  Whose signatures are those?

A.   Yes.  This --

Q.   Can't circle?  Let me move it up.  How about now?

A.   This signature is mine.  And this signature is Patrick J. Killen, Junior.

Q.   And what is the FBI -- why did you fill out this form?

A.   We do that to document items that we take from an individual.  That's a copy of it, it's in triplicate form, the original, and then we give then the middle copy so they have a copy as well of the items that we take from them.

Q.   And then after you signed this form, did you leave the house?

A.   Yes, we left the house.

Q.   And you said that was about 10:30 a.m.?

A.   Yes, approximately.

Q.   And did you -- but you didn't arrest him at that point, correct?

A.   No, we did not.

Q.   And -- go ahead.

A.   Why?

Q.   And why not?

A.   We still had to search his electronic devices before we could make a determination of everything that was going on in the matter.

Q.   All right.  All right.  So you leave the house, right, and you left the house with the electronic items that are referenced on the property receipt, Government's 11, correct?

A.   Correct.

Q.   All right.  So let's go ahead and then shift gears a little bit.  I want to ask you about Government's 4XX which has already been admitted into the record.  Let me just zoom out.  Do you know what that this document is?

A.   This is the metrics user inspector that was obtained from Kik.

Q.   And is this -- this is from the supplemental?

A.   Yes, this would be from the supplemental Kik MLAT.

Q.   And this is for RebeccaTill05?

A.   Correct, yes.

Q.   Now, I just want to cover some information here.  I know we did that with Senior Special Agent Ostrobinski so I'm not going to cover all of this.  So at the top we have the identifying information and then I just want to talk to you a little bit over to the left here which is the registration client info.

A.   Yes.

Q.   Do you know what that is as far as general terms?

A.   Yeah, information that is registered with Kik regarding the client using that particular Kik account.

Q.   And does this register devices of the client of the user when they first appear in the Kik system?

A.   Yes, and other times as well, yes.

Q.   And other times?

A.   Yes.

Q.   So, for example -- and I know this is kind of hard to read so let me just zoom in a little more.  I'm just going to ask you then about this one.  If you need me to hand it to you, let me know.

A.   I can't tell what the first part is but the second part says iPad.

Q.   And then to the right there's a time stamp, right?

A.   Correct.

          THE COURT:  Mr. Horton, are you doing all right?

Do you need a break?

JUROR:  I'm just cold.

THE COURT:  Okay.

JUROR:  Very cold.

THE COURT:  Okay.

BY MR. EMERY:

Q.   And then right there are you able to make out the time and the date and time?

A.   **Yes.  February 11th, 2014, at 10:51:40 and Kik has advised us at all times they use our eastern standard time.**

Q.   And that -- the device that was register with Kik on February 14th at 10:51 was an iPad, correct?

A.   **Correct.**

Q.   And you had just returned and left the defendant's iPad with him; is that correct?

A.   **That is correct, yes.**

Q.   And does that mean then that at that time then on the iPad that Kik is being used?

A.   **Yes, with the RebeccaTill05 account.**

Q.   So then let's go back to the items that you seized; the MacBook, the iPhone, and the two thumb drives.  Let's just first talk about that.  What did you do with the MacBook once you left the defendant's house?

A.   **I provided the MacBook to forensic examiner David Mingarelli of the FBI for him to examine.**

Q.   And then after Dave Mingarelli got it, was it then passed on to Examiner Soto?

A.   **Forensic David Mingarelli advised me that the Apple MacBook was boot-camped, which we did not know.  Patrick J. Killen, Junior did not disclose that to us, so that means there was a Windows side of the Apple MacBook.  He made -- I believe he made an image of it and then needed to pass it on to another forensic examiner, which was forensic examiner Ricardo Soto.**

Q.   And then after then Examiner Soto got it, was it then made available to you for review and for bookmarking?

A.   **Yes.  And forensic examiner David Mingarelli also advised me that GigaTribe was on the MacBook when he made an image of it.**

Q.   Now I know -- and then, so then you reviewed the MacBook, correct?

A.   **Correct.**

Q.   As well as Examiner Soto, correct?

A.   **Correct.**

Q.   And we know that the defendant confessed to being RebeccaTill05, correct?

A.   **Correct.**

Q.   And at that point and then after the forensic review, were you able to determine if he was using any other user names?

A.   Yes.

Q.   As far as other than the RebeccaTill05, were there additional user names that he used the majority of the time?

A.   Yes.  It became evident that he had established another female identity of Chanel Izzabel, sometimes calling her Carly Izzabel.

Q.   And what about any other user name that might be associated besides Chanel Izzabel, was there anything else?

A.   Yes.  And we found a records list to BeverlyHills05 as well.

Q.   And then while the computer, the MacBook was being reviewed -- and you said you went through the bookmarking process; is that right?

A.   Yes.

Q.   And did you identify certain images that were of investigative value to you?

A.   Yes.  Yes, I went through the bookmarking process and created several different bookmarks, I saw many images of boys, both clothed and unclothed, many images that appeared to be selfies, most of them appeared to be under the age of 18.

I also saw many images that were screen shots of other people's applications such as their Instagram accounts. I saw screen shots of Kik chats and screen shots of Ask.FM sessions.

Q.  And what about any -- did you see any or find any videos of adults with children?

A.  **Yes, I did.  I found also that type of pornography -- of child pornography which is hundreds of videos and images of adults in sexual relations, sexual intercourse with kids.  I also saw many videos of underage males masturbating.  Some of the kids were quite young.**

Q.  And when you say "quite young," what do you mean by that?

A.  **There were a few toddlers, and under the age of 12.**

Q.  Under the age of four you said?  I'm sorry.

A.  **There were a few toddlers, yeah.**

Q.  Now, were you able to complete your review and bookmarking process of the defendant's MacBook?

A.  **I was not.  There was too much.  It was taking a very, very long time to go through everything.  And also forensic examiner Ricardo Soto advised me that he found a MobileSync backup folder on the MacBook.  So he ran Lantern through that to parse out the data from that into readable items/ categories that we can see.**

**In that we found Kik chats for the time period of August 26th, 2013 through September 12th, 2013.  And so I was looking through that as well and I found a lot of the same type of images which was males appearing to be under the age of 18.  Some are clothed, many were not.  A lot of them were selfies.**

Also, screen shots of Kik chats and Instagram pages of the boys and of Carly Manning.  The MobileSync, the Kik chat was for the account of Chanel Izzabel but there were also references to Rebecca Till and another Kik user name which was -- I can't pronounce it, it's like YTeeny in there as well.

And so it just became too much to analyze and I wanted to focus on the Kik chats a little bit and trying to identify victims.

Q.   And when you said you wanted to identify victims, what is that process about?

A.   It can be kind of a time-consuming process.  We had to subpoena Kik first with the user name of -- the Kik user name that the kid was using.  So we would do that.  With that, Kik provides typically the e-mail address because some -- an individual to set up Kik would submit an e-mail address and then also IP addresses for log-in times.  And then we'll provide the most recent IP address.

So from there we can subpoena those IP addresses in hopes of determining who a kid is that way or actually who the parents are, who their internet service provider is, and who that comes back to.

Sometimes if we don't have any luck doing that, we subpoena the e-mail address which results in another IP address or series of IP addresses and then we have to

subpoena those to get the -- first determine the internet service provider and serve that internet service provider with a subpoena to determine the owner at the time of the IP address.

Q.   And then with respect to the -- and I just want to talk about then, you said you had found some Kik chats, correct?

A.   Correct.

Q.   And that was from the time period of approximately late August to mid-September 2013; is that right?

A.   That is correct.

Q.   And I know we have already heard from some of the parents, from three of the parents throughout this trial, correct, about their sons and how they were victims; is that right?

A.   Correct.

Q.   And that was Jackson Cook, Garrett Frost and Mason Freeman?

A.   Correct.

Q.   And in addition to those three, did you identify any other victims in the MobileSync backup folder, specifically the Kik chats?

A.   Yes.  Yes.  There were, approximately, so far I think we have identified, approximately, ten victims in all in the investigation.  We'll still working on identifying more in the Kik chats.  There are over 30 boys that sent naked

photographs.

Q.   And when you say "naked photographs," I need you to be more specific.  What do you mean by that?

A.   **Sexually explicit photographs**.

        MR. SCHWARTZ:  Objection.  She's making a legal conclusion.

        THE COURT:  Overruled.

BY MR. EMERY:

Q.   Continue.

A.   **They are photographs that we consider to be child pornography**.

Q.   And so, for example, the pictures that we saw the other day with Jackson Cook when he was nude and in a certain sexual position, are those -- was that picture consistent with the 30 or so other pictures of boys that you saw in the MobileSync backup folder that had sent similar photographs to the defendant?

A.   **Yes, there was.  Yes.  The positions were similar, everything was very similar**.

Q.   Now, we have heard a lot from defense counsel talking about these so-called legal adult pornography web sites that the defendant was visiting.  Did you find any web sites or information about web sites of interest to you that were found in the defendant's MacBook?

A.   **I don't recall off the top of my head web sites from the**

MacBook.  I would have to refresh my memory on that because more prominently I'm thinking of the Dell.

Q.   Okay.  All right.  When we get to the Dell we will then talk about that.

I'm going to show you then a series of photographs of some of the exhibits that have been admitted subject to further authentication.  So I'm going to show you now Government's 23A.  Do you recognize that?

A.   Yes, I do.

Q.   And where did -- and this is a picture of who again?

A.   Alexandra Reyes.  This I found on the MacBook outside of the MobileSync backup file.

Q.   All right.  I'm showing you also Government's 43A and 43G.  If you could just tell me what these are and where they came from.

A.   Yes.  These are screen shots of Instagram pages that I found in the MobileSync backup file on the MacBook.

Q.   And are these the pictures that were shown earlier today to Carly Manning?

A.   Yes, they were.

Q.   I'll show just one, for example, that picture right there, right?

A.   Yes.

Q.   And for the record, that was 43A that I just showed the witness.  I'm showing you here Government's 46K and 46L.

Again, what are those?

A.   **These are -- they're actual images of Carly Manning but they were used for the profile or for the person that Patrick Killen, Junior, created to be Chanel Izzabel and they were found in the MobileSync backup folder on the MacBook.**

Q.   So I'll just put one on the screen for the record. Showing briefly 46K.  And, again, this was shown prior to today?

A.   **Correct.**

Q.   All right.  45A through 45G, just take a look at these and let me know if you recognize those.

A.   **Yes, I do.**

Q.   And what are these?

A.   **Those are screen shots from a Facebook page of Car M Izza.  During one of our interviews of one of the victims, the victim advised us that he is still friends with Chanel Izzabel on Facebook and that she recently had updated her profile picture.  So while we were interviewing him, he pulled up her Facebook page and that picture and showed me that the date that that profile picture was updated was on June 23rd, 2014.**

Q.   And that's what was shown to you when you were talking to the victim?

A.   **Yes.**

Q.   And on the left, have we seen this picture before?

A.   **Yes, we have.**

Q.   And what about that picture?

A.   **Yes.  They're both of Carly Manning.**

Q.   And, again, you said then that this -- and the date -- let me blow that up.  The profile picture was changed when?

A.   **June 23rd, 2014.**

Q.   And this was after the defendant had confessed to you on February 11, 2014, correct?

A.   **Yes.**

Q.   I'm going to show you Government's 54A through 54E.  And again, let me know if you recognize these and where they came from.

A.   **Yes, I do.  The first one is a screen shot of an Instagram page of Sam Katzman and the others are images of Sam Katzman and I found them on the Apple MacBook Pro outside of the MobileSync backup file.**

Q.   And so on the screen we have 54A, correct?

A.   **Correct.**

Q.   And this is what we had -- I had shown to Sergeant Federici the other day, correct?

A.   **Correct.**

Q.   I'm showing you what's been marked for identification as Government's 54F, 54G and 54H.

     (Thereupon, the exhibit was marked for identification.)

BY MR. EMERY:

Q.   Please take a look at those and let me know if you recognize those.

A.   **Yes, I do.**

Q.   And what are those, for the record?

A.   **These are screen shots of Kik chats that I found on the Apple MacBook outside of the MobileSync backup file.  They were -- the time for them were -- it was the same time period as the photographs and images of Sam Katzman.**

MR. EMERY:  We're going to talk about that in more detail but move to admit.

THE COURT:  Be admitted.

(Thereupon, the exhibit was admitted into evidence.)

BY MR. EMERY:

Q.   So what's going on here?  I have Government 54F, so what is this?

A.   **This is a screen shot of a Kik chat.  The individual's name is Sydney.**

Q.   And what is Sydney saying?  Is this Sydney speaking?

A.   **Yes.  It says, "What the fuck is your problem?  Why the hell do you have fucking nudes of Sam?  Why the fuck would you post them because he wouldn't fucking send you more, you hoee," with two Es at the end.**

Q.   And you can see now in Government's 54G, we have actually already read -- the first two are right there.  So look what happens then in the next message?

A. After that it says, "I just want to know how you got it. It's a fucking Photoshop U dum ass gossipers," and that's from another individual with -- there's no avatar there, and the other individual without the avatar says also, "Fuck off, it's a joke," and there's a read checkmark next to that.

Q. And then Government's -- and that was 54G -- 54H. What does that then say right there? Right there?

A. Yes. Sydney says, "Have you ever let a guy suck you?" The other individual says, "Yup, my juicy pussy." Sydney says, "You wish you got a dick." The other person says, "Yup, you caught me, you're so" -- with two Os -- "cool."

Sydney says, "Thankss," with two Ss, "babe," and the other individual says, "Wanna see more Photoshopped pics of Sam's dick," question mark.

Q. This screen shot was found on the defendant's MacBook?

A. Yes.

Q. And then you started before talked about the timing. Were you able to make a connection between -- at all between these screen shots we just went over and the pictures of Sam Katzman that I just showed you?

A. Yes. Because they were during the same time period on the MobileSync or, I'm sorry, on the MacBook Pro outside the MobileSync backup file as the pictures of Sam Katzman at that time already knew about the Norwood Police Department investigation into Chanel Izzabel.

I was advised of that approximately one week after our knock and talk and the interview with Patrick Killen, Junior, I got a call from the Miami-Dade Police Department because they, along with HSI, showed up at Patrick J. Killen's residence as well approximately a week after attempting to speak with the occupants and they were told no and they left.

And they were -- first of all, that they had already been there and they said no, I assure you we haven't been there.  And then they finally realized that it was actually the FBI that was there before.

Q.   And eventually did Sergeant Federici contact you?

A.   Yes.  Yes.  I received the documents concerning the Norwood Police Department investigation from a Miami-Dade Police Department detective and then I contacted Sergeant Federici and told him that we were investigating the matter.

Q.   But you said as far as time, with respect to these, as far as Government's 54H, as far as the time that it was found on the MacBook; is that right?

A.   Yes.  The time period of when the documents, the creative time period for the documents on the MacBook Pro are in the same time period.  They're in the same time period.

Q.   As the --

A.   As the images of Sam Katzman, and I was able to pretty much find everything pretty close together and I knew from

the Norwood Police Department investigation that Sam Katzman's friend had contacted Chanel Izzabel and asked Chanel Izzabel why she had nude photographs of Sam and why she was threatening him.

Q.   I'm showing you Government's 59.

(Thereupon, the exhibit was marked for identification.)

BY MR. EMERY:

Q.   Do you recognize this?

A.   Yes, I do.

Q.   And what is that?

A.   This is a screen shot of an Instagram page for Kyler Eckert.

MR. EMERY:  Move to admit Government's 59.

THE COURT:  Be admitted.

(Thereupon, the exhibit was admitted into evidence.)

BY MR EMERY:

Q.   And Government's 56A and 56B, do you recognize those?

(Thereupon, the exhibit was marked for identification.)

A.   Yes.  This is a screen shot of a Kik conversation that I found in the MobileSync backup file on the MacBook.  The other I found on the MacBook outside of the MobileSync backup file.

MR. EMERY:  Move to admit?

THE COURT:  Admitted.

(Thereupon, the exhibit was admitted into evidence.)

BY MR. EMERY:

Q.   Showing you Government's 59, and this is, again, who is this?

A.   **This is Kyler Eckert.  It's his Instagram web page.**

Q.   And this was found on the defendant's MacBook?

A.   **Yes, it was.**

Q.   And is this the same avatar that we saw in the first Kik MLAT?

A.   **I believe it is.**

Q.   Government's 56A, what is going on here?

A.   **This is a screen shot of a Kik chat that was found on the MacBook computer.  It says, "Chanel Izzabel says no," with several Os.  "Send face, send dick, send mirror.  Collin replace mirror," with three question marks.**

**Chanel Izzabel says, "Yes."**

**Collin says, "What OS a mirror is," corrects himself.  And Chanel Izzabel responds with a --**

Q.   Government's 56B?

A.   **A picture of a mirror?**

Q.   So that's 56A, a picture of a mirror, correct?

A.   **Yes.**

Q.   And then 56B, does the conversation continue?

A.   **Yes, with the rest of the picture of the mirror.  Chanel Izzabel says, "Mirror."**

**Colin says, "Uh-huh.  Okay."**

Chanel Izzabel says, "Send face and dick in mirror. Send," with an exclamation point.  Colin responds, "Send your pussy, boobs and face."

Q.   Have we seen this image of the mirror before?

A.   Yes.  We saw that he Googled an image of a mirror.  From my investigation, I know Colin to be outside of the country.

Q.   So then the last one -- so showing you 55A and 55B.

      (Thereupon, the exhibit was marked for identification.)

BY MR. EMERY:

Q.   Do you recognize these?

A.   Yes, I do.  These are screen shots of a Kik chat with an individual named Zane, between Zane and Chanel Izzabel.  They were found on the mobile -- I'm sorry, on the MacBook Pro outside of the MobileSync backup file.

      MR. EMERY:  Move to admit, Your Honor.

      THE COURT:  Be admitted.

      (Thereupon, the exhibit was admitted into evidence.)

BY MR. EMERY:

Q.   Showing 55A.  There's an image at the top.  Have we seen that image before?

A.   Yes, that's the bottom half of Carly Manning working out that I saw on several places on the defendant's MacBook Pro.

Q.   And then what happens with the chats, the messages right after that?

A.   Carly Manning says, "Working out.  Tell Logan to Kik me

or I'm posting his nudes."

Q.   You mean Chanel Izzabel?

A.   I'm sorry.  Yes.  Chanel Izzabel says, "Tell Logan to Kik me or I'm posting his nudes," and I believe it's Zane, correct, is the other name of the person, Zane with some emoticons.

Q.   Okay.

A.   Says, "Okay."  Chanel Izzabel then says, "He has five secomds" and then one minute later, "Wanna see Logan nude."

Q.   Government's 55B, what happens there?

A.   Zane says, "Okay.  Chanel Izzabel says he has five secomds."  Twenty-four minutes later she says, "Wanna see Logan nude."  One minute later there's an image of a nude male --

Q.   And that's --

A.   -- who appears to be under the age of 18.

Q.   And is that sent by --

A.   Chanel Izzabel.

Q.   And that's to this person by the name of --

A.   Zane.

Q.   And just briefly then, how is the boy then posed in this picture for the record?

A.   He is in an aroused state.  His penis is erect and that is an image of child pornography.

Q.   And is this a mirror shot?

A.   Yes, it is.

MR. EMERY:  Your Honor, this may be a good time for a break.

THE COURT:  Okay.  Short ten-minute break.

(Thereupon, the jury was escorted out of the courtroom.)

(Thereupon, a recess was taken from 3:25 p.m. to 3:43 p.m.)

THE COURT:  Please be seated, everyone.  Please continue.

MR. EMERY:  Thank you, Your Honor.

BY MR. EMERY:

Q.   Now, I want to move in a different direction.  Previously you testified that you had -- you were unable to complete your bookmarking of the images of children engaged in sexually explicit conduct on this computer because of the amount; is that correct?

A.   That's correct, yes.

Q.   All right.  Now you did say that there were amongst the many -- so amongst what you did review there were a lot of videos, too, correct?

A.   Correct, yes.

Q.   And is that adults engaged in sexual intercourse with children under the age of 18?

A.   Yes, it is.

Q.   And are also some of those of adults engaged in sex with

children under the age of 12?

A.   **Yes.**

Q.   So at this time I'm going to be showing you Government's 48B, as in boy, through 48I, and for identification just generally take a look at them and let me know where they came from and what generally what they are.

(Thereupon, the exhibit was marked for identification.)

A.   **48B, C, D, E, F, G, and H were screen shots that I took from a video file that was found on the Apple MacBook of a person, an adult engaged in sexual intercourse with anal penetration with a boy appearing to be under 12.**

MR. EMERY:  Move to admit.

MR. SCHWARTZ:  Harking back to my objections regarding the R and R.

THE COURT:  Be admitted.

BY MR. EMERY:

Q.   And then what about Government's 48I?

A.   **48I is a collection, it's several images that appear to be a collection probably from a video of a boy masturbating his penis and then touching his lips on an adult male penis. The boy appears to be under the age of eight.**

Q.   And where was this image found.

A.   **On the Apple MacBook.**

Q.   And, again, this is a series of images?

A.   **Yes, it's a series of images which we found a lot of**

those on the Apple MacBook and then for a lot of them we also found a full video.

MR. EMERY: Your Honor, move to admit Government's 48B, as in boy, through 48I.

THE COURT: Be admitted.

(Thereupon, the exhibit was admitted into evidence.)

BY MR. EMERY:

Q. And ladies and gentlemen of the jury, I, unfortunately, am going to have to show you some of these images. As the Judge told you at the beginning of the trial, the Government has the burden in this case and we have to show some these images in order to meet that burden. So I will move as quickly as I can through them.

48B, 48C, 48D, as in David, 48E, 48F, and 48G. And Special Agent Schwartzenberger, you said that these are screen shots that you took of a video?

A. Correct.

Q. And actually let me show you one more, unfortunately, of that 48H.

And then going back to 48I that you had described.

I want to talk to you about Government's 9, which was the thumb drive that was given to you by the defendant on February 11th, 2014, correct?

A. Correct.

Q. And did you conduct a review of this thumb drive?

A.  **Yes, I did.**

Q.  And this is the thumb drive that's labeled just SanDisk, correct?

A.  **Correct.**

Q.  Did you find any photographs or videos of investigative value to you on that thumb drive?

A.  **Yes, I did.**

Q.  I'm showing you Government's 48A, as in apple -- I'm sorry 49A, as in apple, through 49I?

(Thereupon, the exhibit was marked for identification.)

BY MR. EMERY:

Q.  Can you please take a look at those marked for identification and let me know if you recognize them?

A.  **Yes, I do.  49A and 49B were images that were found on the thumb drive.  49C, 49D, were screen shots that I took of a video that was found on the thumb drive.  49E, 49F, 49G, 49H, and 49I were screen shots of a second video that I took that was found on the thumb drive as well.**

Q.  This is all Government's 9, correct, the thumb drive?

A.  **Yes.**

Q.  I'm showing you Government's 49A.  What's going on here?

MR. EMERY:  And I'm sorry, Your Honor, I would move to admit Government's 49A through I.

THE COURT:  Admitted.

MR. SCHWARTZ:  Same objection.

(Thereupon, the exhibit was admitted into evidence.)

BY MR. EMERY:

Q.   Special Agent Schwartzenberger, for the record, what's going on in this picture?

A.   This was an image that was found on the SanDisk thumb drive.  It is an image of a male who appears to be under the age of 18 exposing his genitals in a mirror image photograph.

Q.   Government's 49B?

A.   This is an image that was found on the SanDisk thumb drive.  It is an image of a male appearing to be under the age of 18 exposing his genitals which includes an aroused penis in a mirror-imaged photograph.

Q.   Government's 49C, what's going on here?

A.   This is a screen shot taken from one of the videos from the SanDisk thumb drive.  Right now it depicts a male who appears to be under the age of 18.

Q.   And Government's 49D, as in David?

A.   Yes, this is another screen shot that I took of that same video with the same male who appears to be under the age of 18 exposing his genitalia with an erect penis.

Q.   Government's 49 --

A.   This is a --

Q.   -- E?

A.   Yes.  This is a screen shot that I took of another video, a different video that was found on the thumb drive.  It

depicts a male.  Right now it's just the head of a male who appears to be under the age of 18.

Q.   And is this a video?

A.   Yes, it is a video.  It's a screen shot from a video.

Q.   And then tell me about Government's 49F.

A.   During the video, this screen briefly appeared and I took a screen shot of it.

Q.   And is there anything of interest to you on the screen?

A.   Yes.

Q.   And would you please circle it?

A.   Yes.  There is Izzabel.  During that video, there was some adjustments made to the video recording program, whichever one was used, and this was one of the adjustments that were made.  They were kind of made throughout the video so I took a screen shot of this one as well.  It's the same video.

Q.   Same video.  So before I showed you 49F and that's when Izzabel appears and then 49G, you said it -- does it appear that there's -- somebody is doing something on the screen?

A.   Yes, somebody is making adjustments to the camming program and I think the recording program as well.  That's what it appears to me to be.

Q.   And this is a video?

A.   Yeah, this is all in a video and I just took screen shots of that video.

Q.   And then I'm going to show you then Government's 49H and 49I since we had to screen shot them, and if you could just describe them and let me know what's -- do they relate to the same video that we have been talking about?

A.   **Yes.  They are two screen shots from the same video. They're dark, the entire video was dark but you can make out it is the same boy who appears to be under the age of 18 and you can tell that his genitalia is exposed and his penis is erect.**

Q.   Now, you said that that day on February 11, 2014, you got two thumb drives and we just viewed the images on this one. What about on the other thumb drive?

A.   **I did not find anything of investigative value on the thumb drive and I returned it to him.**

Q.   And in addition, though, to on Government's -- I'm sorry, you returned that thumb drive to the defendant?

A.   **Yes.  To the defendant's, I believe, defense team.**

Q.   And on Government's 9, other than the videos you talked about, are there any other types of images that were of investigative value to you?

A.   **Yes, there are a couple of other images of child pornography so it's depicting males who appear to be under the age of 18 and depicts their genitalia.  Also there are many images of males and females under the age of 18 that are clothed.**

Q.   All right.  So let's switch gears from that and talk about March 6th, 2015.  Did you and other FBI agents execute a search warrant on the defendant's residence?

A.   **Yes, we did.**

Q.   And, approximately, what time did you arrive at the defendant's residence on March 15th, 2015?

A.   **It was approximately 6:00 in the morning.**

Q.   And before you got there at 6 o'clock in the morning, can you tell the ladies and gentlemen of the jury approximately how many agents were going to be participated in that search?

A.   **There was approximately ten agents and task force officers.**

Q.   And before arriving at the house, was there a meeting to discuss division of responsibilities?

A.   **Yes, there was.**

Q.   And for that search, what was your role?

A.   **My role was to be on the entry team at first during the entry of the residence and then later to transport Patrick Killen, Junior, because we also had an arrest warrant for Patrick Killen, Junior, with Special Agent Ellie Gray to the custody of the marshals.**

Q.   Now, is it normal for the lead investigator in the case to be part of the entry team?

A.   **Yes, it is.**

Q.   And so you said there was approximately ten agents and

task force officers with you.  And when you arrived at the house at 6 o'clock that morning?

A.  **Yes.  That's correct.**

Q.  And how were you dressed that morning?

A.  **I was dressed in raid gear.  I had a bullet resistant vest on, two firearms, I carry one on my hip during whenever we're conducting entry on a search warrant or arrest, and one on my ankle, three magazines, a radio, handcuffs, and everyone else on the team is dressed in similar fashion.**

Q.  And again, why are you dressed with bulletproof vests?

A.  **To ensure officer safety and we also have FBI insignia and any task force officers that are with us they say police or something of that nature on vests or whatever they're wearing as well.**

Q.  And you said you had ten, approximately ten agents and task force officers total?

A.  **Correct.**

Q.  Why ten?  Why did you need to go with -- why did you go with approximately ten?  Is that normal?

A.  **Yes, it is.  You don't want too many to the point where we're stumbling over each other but it is safer for everyone involved if we far outnumber who we believe to be residing in the residence.  These situations are highly fluid, they're highly tense, and when we approach a residence and make entry, sometimes residents choose to obey our orders and**

sometimes they don't, and if there's more of us coming in then they're more likely to obey what we have to do. They are more likely to come out with their hands up and not go running back inside the residence or something along those lines and create a very dangerous situation.

Q. And when you got there at the house, you had a search warrant that was signed by a federal magistrate; is that correct?

A. That is correct.

Q. And then you also had an arrest warrant that was for the defendant that was signed by the federal magistrate?

A. That is correct.

Q. So what happened then when you arrived at the defendant's residence at approximately 6:00 a.m.?

A. There were several of us stacked on the front door. The residence that Patrick J. Killen, Junior resided in had a glass front door. We knocked on -- I knocked on the front door, pounded on the front door, and I think there was a doorbell on the side and I rang that, if I remember right, to try and get the attention of the residents. I saw that Patrick Killen, Senior and Karen Killen came to the door. Patrick Killen, Senior was attempting to deactivate the alarm, I believe, because he kept pushing in numbers on a box that was located near the front door. I was yelling at him to open the door. I saw Patrick J. Killen, Junior, come

behind his two parents and then leave again.  It would be -- he left at his right.  He was facing me, he left at his right so it would be down the hallway where I knew that his room was located.

Because I saw Patrick Killen come behind his parents and then leave, I yelled more at the father and mother to open the door.  I didn't care if the alarm went off, I needed that door to be opened.

Q.   But why did you feel you had to yell?

A.   Because they weren't opening the door.  Patrick Killen, Senior was worried about the alarm going off or I'm guessing that's what would have happened, which it's understandable but we were worried because I saw Patrick J. Killen, Junior, come behind them and then leave again.

In that type of situation a lot runs through somebody's mind, for instance, through my mind at the time I was thinking he could be leaving to go get a gun.  Like I said, in these type of situations suicide is a very real risk for us.  So I'm worried about him using the gun on himself, him using the gun on other occupants or residents or us.

So that's my first concern and then my second concern is destruction of evidence.  We do have evidence that he destroyed evidence before and I believe that he would do it again.  Of course, that's secondary to everybody's safety.

Q.   Now, and have you participated in other search warrants

before?

A.   **Yes.  Many other search warrants, yes.**

Q.   And is it normal at times for agents having to depend on a situation raise their voices and yell during a search warrant?

A.   **Yes.  If we feel that somebody is not complying or not doing what we ask immediately, yes.**

Q.   Did you eventually get access to the house?

A.   **Yes, we did.  Patrick Killen, Senior opened the door.  As soon as he got the door opened, Special Agents Matt Fowler and Ellie Gray rushed in and went straight to Patrick Killen, Junior's room.  I told them prior to entering where his room was located in the residence.**

Q.   And what did you do next?

A.   **I went in behind them.  I passed Elisa Killen's room, she was in her room, I told her to stay in there and then I proceeded to Patrick Killen, Junior's room.  By the time I got there, he was handcuffed and seated on his bed.**

Q.   And why did you tell the defendant's younger sister to stay in the room?

A.   **Because I didn't know at that time what Patrick Killen, Junior was doing and I was concerned for her safety.**

Q.   I'm showing you Government's 33C.  Do you recognize this?

A.   **Yes.  This is the hallway that leads to Patrick Killen, Junior's room.  The last room to the left is his room.  The**

room to the left right before his is Elisa Killen's room.

Q. So would that be somewhere around here?

A. Yes, that's Patrick Killen, Junior's room.

Q. And you said once you got there, Government's 33F, he was seated in here?

A. Yes, he was seated on his bed.

Q. And is this how the room looked when you walked into the room?

A. Yes.

Q. For example, I see the blinds right here that are halfway up.

    THE DEFENDANT: No.

BY MR. EMERY:

Q. Were they like that?

A. Yes. His room was a mess, yes.

Q. Now after you then saw the defendant in his room, what happened next?

A. I proceeded to the living room area of the house where other agents had gathered. Karen Killen, Patrick Killen, Senior, and Elisa, the three of them were seated off to the right of the front door.

Q. And so you were there with an authorized search warrant. Did anyone start searching the room where you found the defendant?

A. After entry photos were taken.

Q.   And was anything found in the defendant's room?

A.   **Yes.  Several electronic items.**

Q.   Was a laptop found?

A.   **Yes.  Several laptops actually.**

Q.   And let me show you Government's 34.  Do you recognize this?

A.   **Yes, I do.**

Q.   And what is this?

A.   **That was the Dell laptop that was found in Patrick Killen, Junior's room.**

Q.   And that was found by Special Agent Carpinteri?

A.   **Correct.**

Q.   Government's 35, what is that?

A.   **This is a thumb drive that was found also in Patrick Killen, Junior's rooms by Special Agent Alexis Carpinteri.**

Q.   And in addition to these items that we have for the jury, these two items, were there other electronic items that were found in his room?

A.   **Yes.  Many other electronic items, yes.**

Q.   And were they seized?

A.   **Yes.**

Q.   For example, without going into each and every one of them, what were some of those items that were seized?

A.   **There were several other thumb drives.  There was an Apple TV, there was an iPod.  There were several other**

laptops, phones, cellular phones.  There were some CDs and DVDs, miscellaneous, unmarked.

Q.   And talking about those items, did the FBI -- did you search those items?

A.   I searched some of the items that I have the ability to search such as the CD, DVD, the thumb drives.  There was a camera found which I searched that.  I did a physical extraction of the iPod and I submitted into evidence all of the items, but the other items that were submitted into evidence, including the laptops, the cell phones, the Apple TV, I submitted a request to have the forensic examiners search those items.

Q.   And was there anything of investigative value found on those items other than the laptop and the thumb drive that we have in front of us?

A.   No.  We did have a problem with all of the phones, actually.  All of the phones we weren't able to get charged up enough to even do a physical extraction or any type of analysis on the phones and there was one thumb drive, or, I'm sorry, one hard drive that we couldn't extract any information from that was corrupt.  And there were, I think, two or three old laptops that we couldn't get information from either.

Q.   And after --

A.   The forensic examiner's couldn't.  I don't understand

why, but they weren't able to.

Q.   And were some of those items that were not of investigative value, were those returned to the defense team?

A.   Yeah, some of them.  We still have in our custody some of the laptops, the hard drive, and the cellular phones that we couldn't extract information from but a lot of the other electronic items that we were able to successfully search and we did determine there was nothing of investigative value on they were returned to the defense team.

Q.   And I just want to go back.  So then while you're at the house, before you had testified that you had recommended that the parents change the password on the router?

A.   Correct.

Q.   Did you have a conversation with the parents on March 6th, 2015 about that, following up on this?

A.   Yes, I asked Patrick Killen, Senior if he changed the password and he said he did not.

Q.   And what about, was there also a laptop that was seized by the FBI that -- during March 6th that belonged to the defendant's father?

A.   Yes, there was.  During the search warrant a couple forensic examiners came in their mobile unit as Special Agent Alexis Carpinteri described to you.  And they conduct previews of items during search warrants, SWAT search warrants that we do.

And in this case I asked them to preview all the items not belonging to Patrick Killen, Junior, so that there was nothing of investigative value on those items we could return them, and that's what they did. However, they were unsuccessful and I'm not sure why, but they were unsuccessful in previewing one laptop that belonged to Patrick Killen, Senior.

Q.   And was that laptop eventually forensically reviewed by the FBI?

A.   Yes, it was. And it was returned to Patrick Killen, Senior.

Q.   Now, so then on March 6th, you said the defendant was arrested and then was he -- so then I take it at some point that morning, did you leave the house?

A.   Yes. I left the house before they started the search with Patrick Killen, Junior. It was Special Agent Ellie Gray and I drove Patrick Killen, Junior, to Miami marshals.

Q.   Okay. So we'll just leave it at that. I want to talk to you now about the Dell laptop, Government's 34. Did you submit this electronic item, the defendant's laptop for forensic review?

A.   Yes, I did.

Q.   And who conducted the forensic review of this?

A.   The complete review was conducted by forensic examiner Yoel Diaz.

Q.   And did you find any images or videos of investigative value?

A.   **Yes, I did.  I found many.**

Q.   And what type of images and/or videos were those?

A.   **I found more images of males apparently around the age, under the age of 18, taking selfies in mirrors, both nude and clothed.  I found several screen shots of pornography web sites.  I also found more videos depicting child pornography and more images depicted child pornography.**

Q.   With respect to the Dell laptop, though, were you able to complete the bookmarking process?

A.   **Yes, I was.**

Q.   So I'm going it show you for identification 51A through 51E.

     (Thereupon, the exhibit was marked for identification.)

**BY MR. EMERY:**

Q.   Please take a look at these and let me know if you recognize them.

A.   **51A is one page that consists of three screen shots that I made from a video that we found on the Dell laptop.  51B and 51C consists of a total of seven screen shots that I made from a video that I found on the Dell laptop depicting child pornography.  51D and 51E depicts five screen shots that I made from a video that I found on the Dell laptop, again depicting child pornography.**

MR. EMERY:  Move to admit, Your Honor.

THE COURT:  Be admitted.

(Thereupon, the exhibit was admitted into evidence.)

BY MR. EMERY:

Q.  So again, I'm going to quickly show some of these images. 51A, and we'll see if we can see at the top.  Is that the -- what is that there at the top?

A.  **This is the -- what the video was titled on the Dell laptop, which is 06-web cam video from May 22nd, 2014, 11 underscore 55 PM dot FLV.  The last part is the player that I used to play the video.**

Q.  And just what's going on here?

A.  **These are screen shots that I took from a video depicting a male who appears to me to be under the age of 12.  He is masturbating and exposing his genitalia.**

Q.  Showing you 51B, as in boy.  What's going on here?

A.  **These are the first four screen shots that I took from a video that I found on the Dell laptop.  The video was quite long in length.  The name --**

Q.  We'll see if we can pull up a video name.

A.  **Eleven-year-old kids fooling around.**

Q.  What's going on here?

A.  **This video depicted one female and several males all appearing to be under the age of 12.  The female and one of the males are performing oral sex.  They're performing**

vaginal sex and other males in the video can be seen watching.

Q.   And then Government's 51C, is this part of the same video?

A.   Yes.  Part of the same video and you can see in the bottom screen shots to the left several other males watching.

Q.   Showing you Government's 51D.

A.   This is another video that I took screen shots from that was found on the Dell.  The name is Hub dash 11 YO duo shows.

Q.   Okay.

A.   And I think in this video there are actually three boys who appear to be under the age of -- yes, three boys who appear to be under the age of 12.  At least two of the boys masturbate in front of the camera showing the genitalia.  At the end you can see the faces of the three boys.

Q.   And is 51E part of that?

A.   Yes, part of the same video, a screen shot from the same video.

Q.   Okay.  Now I want to talk to you then about the Government's 35, the thumb drive?

A.   Yes.

Q.   And is this the thumb drive that was recovered on March 6th, 2015?

A.   Yes, it is.

Q.   And I see this has the word Cruzer on it, correct?

A.   Yes, it does.

Q.   And this was found in the Defendant's bedroom, correct?

A.   Correct.

Q.   Did you find anything of investigative value on that?

A.   Yes, I did.

Q.   What did you find?  Well, let me go ahead and show you Government's 52A through 52C for identification.

(Thereupon, the exhibit was marked for identification.)

BY MR. EMERY:

Q.   And let me know if you recognize those.

A.   Yes.  52A and 52B were screen shots that I took from a video that I found on the thumb drive depicting child pornography, and 52C and 52D were screen shots that I took from a different video that I found on the thumb drive also depicting child pornography.

(Thereupon, the exhibit was marked for identification.)

        MR. EMERY:  Move to admit, Your Honor.

        THE COURT:  Admitted.

(Thereupon, the exhibit was admitted into evidence.)

BY MR. EMERY:

Q.   Showing you Government's 52A, and what's the file name?

A.   2 underscore 1 dash 84345506 dash 2, preteen boys playing nude near river.

Q.   Okay.  And what's going on in this?  Is this a video?

A.   It is.  These are the first four screen shots that I took

from the video.

Q.   And I can see they don't have any clothes on, correct?

A.   **Right.  They start out clothed and then during the video they later both take off their clothes.  Both boys appear to be under the age of 18, one actually even younger.  I mean, one appears to be under the age of 14, and the other I would say under the age of 13.**

Q.   And then showing you Government's 52C and 52D.  Let me see if I can -- are you able to make out that file name?

A.   **One underscore young boys cumming underscore gay preteen underscore no bull, in capital letters, underscore parade of young jerkers and cummers, parentheses PTHC, pedo masturbation, end parentheses.**

Q.   And then, briefly, what is this a video and what's going on?

A.   **Yes.  And in child pornography, PTHC is a common term used to search for child pornography.  It stands for preteen hard core and it's a video.  It's a compilation of -- it appears to be several different boys masturbating that are put into one video and I took screen shots of that.**

Q.   And then showing you Government's 52D, as in David.  Is that from the same video?

A.   **Yes, it is.**

Q.   So I want to change gears a little bit and show you what's been admitted as Government's 38A.  I'll put it up on

the screen.  This is the lab report for the AD Lab report?

A.  **Yes.**

Q.  And is this for the Dell?

A.  **Yes, it is.**

Q.  And did you encounter a video of investigative interest? I know there's several videos, but one in particular with respect to making any sort of a video?

A.  **Yes.**

MR. EMERY:  Your Honor, permission to publish this video.

THE COURT:  All right.

MR. EMERY:  Again, there's no explicit photographs.

BY MR. EMERY:

Q.  So what we're going to see here, and I ask you to describe it, but there is no explicit images here.  It's just a video and, again, I apologize for having to show the pictures that I show, but the Government has the burden here.

MR. EMERY:  Your Honor, do you mind switching to the --

THE COURT:  (Complies).

BY MR. EMERY:

Q.  Go ahead and tell us what's going on here.

A.  **This is a Skype conversation and the defendant made a video of the Skype conversation.  You can see Carly Izzabel. The Skype --**

Q.   Will you stop it for a second?  So what's going on here, and you can use the touch screen, it will probably be helpful to explain your testimony.

A.   **So we have the title of the video here is -- it's not working but upper left-hand corner, untitled 1.  We have here (indicating) an image that was found many times on the MacBook.  It is an image of Carly Manning working out that we found many times, like I said, on the MacBook Pro.  We have here Vanessa Hermannova who we believe to be the same person as Vanyher.  She also went by the display name Vanessa H in the Kik chats that were found on the MacBook in the MobileSync backup file, and we found many Skype chats with Vanessa Hermannova on the Dell.**

Q.   And what about, for example, what about that name, is that --

A.   **Yes.  Tristen Hando is a boy who we have identified to be under the age of 18 and residing in United States.  We have not interviewed him yet but we did find photos of Tristen, images of child pornography, nude photos of Tristen Hando on the Kik chats on September 8th, 2013, in the MobileSync backup file of the MacBook computer.**

Q.   And does this appear -- I see down here there's a word that's kind of covered by --

A.   **Skype.  Via Skype.  Yes.  This is Skype.  He's making a video with John Footen.**

Q.   So it's the defendant then calling Johnny, John Footen

and at the beginning the avatar of Carly Manning shows up,

correct?

A.   **Carly Manning, John Footen's avatar.  In the upper left**

**you can see the account is Chanel Izzabel, then display name**

**is Chanel Izzabel.**

Q.   Please continue.

        And I see that there's a cursor moving around.  Is

that -- that's actually on the video itself, correct?

A.   **Correct.  And you can see Skype chats there between Carly**

**Izzabel --**

Q.   And that's right there --

A.   **-- and John Footen.**

Q.   -- Skype chats right there?

A.   **Correct, yes.**

Q.   So while they're talking on the video or seeing each

other on video or, I guess, defendant seeing John Footen, at

the same time you can chat?

A.   **Correct.  At the end --**

Q.   Fast forward towards the end of the --

A.   **At the end you see debut video captures software**

**professional, unlicensed, noncommercial, home use only.  This**

**was discussed, if you remember, in the GigaTribe chats**

**between BeverlyHills05 and Karucem.**

Q.   Now you said that it's possible that Karucem and Vanessa

Hermannova and Karucem are the same person?

A.   **It's possible.  During my investigation I determined that Vanyher was using an IP address that resided in Rome, Italy.  Karucem was taken over by the Italian police.  It has not been confirmed with the Italian police.  I don't know that they are, but it is possible.**

Q.   And did there come a point in time when the Italian police indicated to the FBI that they had taken over the Karucem account?

A.   **Yes.  They took over the Karucem account.  I believe it was September 25th, 2014.**

Q.   And did they indicate whether or not they had ever used the Karucem account in an undercover capacity?

A.   **They said they had not.**

Q.   And we have heard some comments from defense counsel about whether or not Karucem was cooperating with the Italian authorities.  Now, based on your training and experience, is it normal for a law enforcement agency to allow someone who had just been arrested with having child pornography to then continue to work in that same capacity?

        **MR. SCHWARTZ:**  Now I object.  This is all speculation.  They could have gotten the facts and they haven't.

        **THE COURT:**  Sustained.

**BY MR. EMERY:**

Q.   So let's go ahead then and talk about Government's 37A. We heard forensic examiner Yoel talk about that he had pulled some -- 50-some-thousand Skype chat transactions from the defense Dell laptop; is that right?

A.   **That is correct, yes.**

Q.   And that report, that was the IEF report that is on Government's 37A?

A.   **That is correct.**

Q.   And did you review those 52-some-thousand chats that were contained on 37A?

A.   **Yes.**

Q.   And based on those reports, did you then prepare -- did you take that chart and prepare another chart for your -- to present your testimony today?

A.   **I did because the IEF, the Excel spreadsheet for the Skype chats that was in the IEF report was difficult to read if you printed it out because each row would extend -- have extended several pages and then, of course, several pages after that.**

**So I deleted some columns that for demonstrative purposes I didn't think were necessary so that the necessary columns all fit on one page and I adjusted some of the columns so that the words wrapped to the next line rather than extend past into the next cell.  Basically so each page fit on one actual page and then I printed everything out and.**

Q.   So I'm showing you Government's 37F which are in two Redwelds.

     (Thereupon, the exhibit was marked for identification.)

BY MR. EMERY:

Q.   Do you recognize 37F?

A.   **Yes, I do.**

Q.   And is this the summary chart that you prepared from 37A?

A.   **Yes, it is.**

Q.   And is this a fair and accurate depiction of the overall report that's existed on Government's 37A?

A.   **Yes, it is.**

          MR. EMERY:  Move to admit, Your Honor.

          THE COURT:  Admitted.

     (Thereupon, the exhibit was admitted into evidence.)

BY MR. EMERY:

Q.   We're just going to talk very briefly about this, about some of the chats.  Now, when -- let me first give it to you then.

          What is the time period, and I may probably need to give you the second one.  The time period that these chats cover and these are the -- as far as the entire chats?

A.   **The first chat -- well, first of all, it starts with a lot of chats saying that the user was blocked with the BeverlyHills05 profile name.  Now these include all the Skype profiles, not just BeverlyHills05 or Chanel Izzabel.  So many**

with the BeverlyHills05 were blocked.  It starts on March 30th, 2014, but there are some chats that start also on March 30th, 2014.

Q.   And when did these chats then -- I'm giving you the second part then.  More or less, when did these charts, at least according to what was extracted from the Defendant's computer, when did these Skype chats end approximately?

A.   There's a couple anomalies at the end.  They end on April 2nd, 2014.  There are a couple of dates at the end.  One December 31st, 2011 and another December 31st, 2011.  I don't know why those, why Evidence Finder -- or, I'm sorry, the program pulled those at the end.  But everything else is in order except for those two at the end.

Q.   Okay.  And so these chats start you say May -- I'm sorry, March 30, 2014?

A.   Yes.

Q.   Now, that was after you had gone to the defendant's house to do a knock and talk and he confessed what he was doing on Kik?

A.   Yes, correct.

Q.   And I just want to confirm something with you.  Now, you had said that they ended in April.  I'm showing you the third to the last page --

        MR. EMERY:  Permission to publish, Your Honor.

        THE COURT:  All right.

MR. EMERY:  If I could have the ELMO, please.

THE COURT:  (Complies).

BY MR. EMERY:

Q.  And here I see --

A.  Oh, that one goes -- yes.  That one goes through -- so I guess that whole last page there were some anomalies at the end, so that one goes through August 1st, 2014.

Q.  And so let's just talk briefly about some of that.  So at the top here, is this the legend at the top?

A.  Yes.

Q.  So at the top the first column to the left it says record?

A.  Correct.

Q.  And then profile name and the next column, author, recipient, from, display name, message, time, and then it says -- and then message, correct?

A.  Correct.

Q.  So here I just want to focus on this message right here. Who is sending that message and to who?

MR. SCHWARTZ:  Perhaps he can make it a little larger.  My eyes may not be --

MR. EMERY:  Sure, Counsel.  (Complies).

BY MR. EMERY:

Q.  Okay.  So then who is speaking here?

A.  It's BeverlyHills05 is the account name.

Q.   And right there?

A.   **The BeverlyHills05, the display name is Rebecca Till and he's speaking with Jeriko dot Salazar.**

Q.   And the date of that chat message?

A.   **March 30th, 2014.**

Q.   And what was the message that the defendant sent BeverlyHills05 account?

A.   **It says, "Why did you block my friend Carly?"**

Q.   And does that have investigative value to you?  What is that about?

A.   **Yes, we noticed on the -- both on the Dell and the MacBook that the defendant would use two profiles if need be if, for instance, the person he was communicating with would block one profile he would use another profile to contact that person and try to get them to unblock the first or speak with the first.**

Q.   Just like here it's the defendant using BeverlyHills05. What's the display name?

A.   **With the display name of Rebecca Till.**

Q.   Saying, "Why did you block my friend Carly?"

A.   **Correct, yes.**

Q.   Which is also --

A.   **Chanel Izzabel.**

Q.   Then what's going on in this page?  All right, so who is speaking there?  And let me just go ahead and move it over.

A.   This is account Chanel Izzabel with display name Carly Izzabel sending a message to Franco underscore Ferreiros, spelled F-E-R-R-E-I-R-O-S, 14, sent on March 15th, 2014.   The message is, "My computer doesn't have a camera."

Q.   Okay.   And then does Chanel Izzabel continue to speak?

A.   Chanel Izzabel also says to the same person, "My phone has a camera.   Read."

Q.   And then?

A.   That person Franco Ferreiros 14 responds to Chanel Izzabel, "Kik," question mark.

Q.   And then does Chanel Izzabel respond?

A.   Yes.

Q.   And what does Chanel Izzabel say?

A.   "Deleted."   Same date.

Q.   And then what does Chanel Izzabel say next?

A.   "Just show me on cam and I'll send a pic."

Q.   Then I just want to show you a couple more quickly.   So I'm just going to show you one more here.   First I want to focus in on the conversation parts that he has and I notice here on the left there is some Facebook pops-up.   Do you know what that's about?

A.   Yes.   Forensic examiner Yoel Diaz told me that it looked like the defendant was having the two platforms interact, cross platforms, Facebook and Skype.

Q.   So here it looks like there's a -- I'll go ahead and zoom

in on that a little bit.  As far as that's a message from Paulo Morejon to Chanel Izzabel.  I see that there's actually no -- oh, to the left there is Chanel Izzabel, correct?

A.  **I can't see.**

Q.  (Complies).  There you go.

A.  **Yeah.  Chanel Izzabel is the account name**, to Paulo, **P-A-U-L-O, last name Morejon, M-O-R-E-J-O-N.  Date is March 15th, 2014.**

Q.  And what does Paulo say?

A.  **"Only when I jizz."**

Q.  And then so what does Paulo say on the next line, on the next page?

A.  **"It gets sensituve."**

Q.  Is this a conversation that the defendant is having with Paulo Morejon?

A.  **Yes.**

Q.  So then, "It gets sensituve."  And then the defendant responds?

A.  **"Oh, okay.  And then so I get on my knees and I slowly rub my hands over the area of your pants where your dick is."**

Q.  Uh-huh.  (Nodding.)

A.  **Paulo Morejon says, "Go on."**

**Chanel Izzabel or displayed as Carly Isabel, "Can you whisper dirty stuff so I can get wet?  I would squirt all over your cock as you fuck me.  You know my pussy is tight,**

right," with an arrow?

Q.   And then lastly, Carly Izzabel says?

A.   **"Spit on your cock."**

Q.   So the context of this, what do you believe is happening here?

A.   **They are camming each other making --**

Q.   And is that then a reflection of the chat that's going on?

        MR. SCHWARTZ:   Your Honor, I would object.  Again, that's speculating that they're camming each other.  They're talking.  They're sexting.

        MR. EMERY:   Based on the context, that's a reasonable interpretation of how --

        MR. SCHWARTZ:   But that's not evidence to be reasonably interpreted.

        THE COURT:   Well, cross-examine her on it.

BY MR. EMERY:

Q.   Okay.  So let me then show you -- I'm talking about a video that was found in the MobileSync backup folder so we're going to go ahead and -- which is I'm going to show a quick video from Government's 13B which has been admitted.

        MR. EMERY:   If we could have the video, Your Honor.

        THE COURT:   (Complies).

BY MR. EMERY:

Q.   That's the second video?

A.   Yes.

Q.   And before we play, is this the video and this video was found in the MobileSync backup folder?

A.   Yes.

Q.   And meaning that it was on the defendant's iPhone; is that correct?

A.   It was on the MacBook Pro.  At one time it would have been on the iPhone, correct, yes.

Q.   Go ahead and play it, please.

A.   I think if you don't allow -- just exit out of that you'll allow it.

                    (VIDEO PLAYING)

BY MR. EMERY:

Q.   What's going on here?

A.   Somebody is taking a video of a boy who appears to be approximately the age of five or six using the restroom.

Q.   Is this a type of spy cam?

A.   Yes, it is.

Q.   And then, lastly, I just want to show you one more which is a video from Government's 48A.  I'm just going to show you the beginning so we can see what the child on the video looks like and then I will have you then describe for the ladies and gentlemen of the jury what happens later in the view, but I'm not going to show that graphic content.  All right?

A.   Okay.

Q.   So Government's 48A, and this is from -- this video was from where?

A.   **This was from the MacBook Pro outside of the MobileSync backup file.**

Q.   And before we begin, is this the -- I want to talk about this file name right here.

A.   **Yes.**

Q.   What is that file name?

A.   **Files backslash exclamation point 2010 bracket MB end brackets Juanito 8 YO Lizet bro fuck parentheses comp 15. I'm blanking -- apostrophe, I'm sorry, 37 end parentheses dot AVI.**

Q.   I know you've been on the stand for a while.  So let's just go ahead and play the first thirty seconds, so you can see what's going on in the video and then we'll stop it there and then we'll have you describe without showing what actually happens later on, okay?

A.   **Yes.**

Q.   Okay.  So right there what do we have on that beginning of the video?

A.   **We have a male who appears to be approximately the age of eight looking at a screen, what appears to be a computer screen with an adult male standing behind him.**

Q.   And later on in the video, what happens?

A.   **The adult male shifts the boy onto his knees.  He pulls**

down his pants. He masturbates his penis and then he annually penetrates him.

Q. We have shown you a lot of videos and images. Was this all of what was on the defendant's digital devices?

A. It's not all of it. We weren't able to look at it all. It was too much.

Q. But as far as what we could show the jury, was there more?

A. There was a lot more.

Q. Consistent with everything that we have seen as far as the images of children engaged in sexually explicit conduct?

A. Correct. Yes.

Q. And we have shown images from the Apple, the Dell, the SanDisk, and the SanDisk micro Cruzer flash drive.

Now -- and have I shown you images or videos from each of those devices?

A. Correct, yes.

MR. EMERY: The Government tenders the witness, Your Honor.

THE COURT: Okay. Ladies and gentlemen. We'll go ahead and recess and we'll start with the cross-examination tomorrow morning at 9 o'clock. Have a pleasant evening.

(Thereupon, the jury was escorted out of the courtroom.)

THE COURT: Go ahead. You want to say something?

**MR. SCHWARTZ:**  Yes.  I assume this is the Government's last witness and then I will be cross-examining in the morning and they would have redirect in the morning. Then I have probably four and a half to five hours of direct testimony and maybe less, and then some cross.

Assuming that I'm done with my case at 3:00 or so, or 4:00 tomorrow, are you going want us to sum up tomorrow or wait until Monday?

**THE COURT:**  Well, it depends.  I think if you say 3:00, I don't want to encourage you or discourage you in the length of your examination.

**MR. SCHWARTZ:**  I understand.

**THE COURT:**  But I think if we were to finish at 3:00, assuming there's no rebuttal, there would be no reason why we wouldn't want to go with the close at that time.

If we get to 4:00 or thereafter, I think it's getting a little tight.  It would depend on how much time you're going to want for closing.  I can tell you normally something like this would be about 20 minutes a side.  And then my instructions are going to take about 15 minutes.  So that's another hour's worth of work.

You know, if we finish before -- if we get all that done and allow them to deliberate, if they wanted to, tomorrow night, we'll just come back, and if it goes past 4:00 I think then I would want to break up the argument and

and the instructions.

MR. SCHWARTZ: Well, Your Honor anticipated my next question. I was going to ask for about an hour and 20 minutes and see if I can cajole your Your Honor into giving me an hour, but I think the Government wanted about the same.

THE COURT: I'll give you the 20.

MR. SCHWARTZ: What if I ask for two hours and 20 minutes, could I get an hour?

THE COURT: No. So, I mean, I think it's -- whatever this case is, it's pretty straightforward. I think that ought to be a sufficient amount of time.

MR. SCHWARTZ: So 20 for each side, Judge?

THE COURT: Yes. And the Government can split up their time however they see fit.

MR. WIDLANSKI: Your Honor, if I might implore you for perhaps 30 per side, just based on the number of counts and the voluminous nature of the exhibits, I would need at least a minute each count to go through the elements in closing if Your Honor would so oblige us.

THE COURT: Well, let's plan on 20 and see how we do tomorrow and that would give you an opportunity in the evening to kind of tighten up your argument.

MR. WIDLANSKI: Yes, Your Honor.

THE COURT: As I understand it, there are two questions that are on the table for the jury instructions.

One was the issue of the willfulness and one was the verdict form, guilty or not guilty.  Are there any other issues?

MR. SCHWARTZ:  No, Your Honor.

MR. WIDLANSKI:  Yes, one other -- there is an outstanding instruction on inconsistent statements by witnesses that we weren't sure because when we spoke with your clerk yesterday there had not been.  And as testimony is not completed, I don't think we have yet been able to make that determination.

THE COURT:  So you would want inconsistent statements in there, for example, if the defendant testifies?

MR. WIDLANSKI:  Yes, Your Honor.

MR. SCHWARTZ:  Or if Ms. Schwartzenberger is inconsistent.

THE COURT:  Well, you haven't started your cross; fair enough.

MR. SCHWARTZ:  Yes.

THE COURT:  So remind me of that.  The verdict form there was no reason to -- if you want to argue.

MR. SCHWARTZ:  Judge, out of every judge I asked to say not guilty before guilty because of the presumption of innocence, consistently everyone has denied it.

THE COURT:  Well, I'll be consistent, for whatever that's worth.

And then willfulness, you know, I don't see

anything in the statute that suggests that that should be included, but I'll note your request for that and then that way you can preserve it for the record and deny it.

MR. SCHWARTZ:  Thank you, Your Honor.  Because I knew how you ruled pretrial, but I think if I didn't request the charge, I would have been abandoning that issue.

THE COURT:  Okay.  All right.  So -- yes.

MR. EMERY:  I'm sorry, one last thing.  Just for the record, a couple of days defendant had made a request, Brady Giglio request with respect to the information about Karucem and what we had on him, and I just want to, since he put that on the record, respond on the record that we have given him everything that we have within the hands of the prosecution team and that's literally what Special Agent Schwartzenberger testified about today, and that's the extent of what we have with respect to Karucem.

MR. SCHWARTZ:  And I've also made a specific request regarding the investigation of the forensic examiner that first handled the Dell.

THE COURT:  Anymore on that?

MR. EMERY:  Just, Your Honor, we provided a response to Mr. Schwartz that we don't believe that it's -- since that has been testified it's not Giglio, it's not Jencks, and with respect to Brady, that the defendant also had access to the same laptop as forensics examiners came to

the FBI numerous times to view it, and also my understanding is that that's not the theory of the defendant's case that there was any sort of evidence tampering here, plus we also have the, solely and apart, the MacBook Pro which has as Special Agent has testified about, a lot of images consistent with children engaged in conduct of sexually explicit conduct.

THE COURT: And you're saying that that's separate and apart from --

MR. EMERY: From the Dell. That one examiner just dealt with the Dell.

THE COURT: Okay. See you tomorrow morning at 9 o'clock. Have a pleasant evening.

(Thereupon, the above portion of the trial was concluded.)

*          *          *

**C E R T I F I C A T E**

    I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

01/26/2016

_____    _____

DATE COMPLETED    GIZELLA BAAN-PROULX, RPR, FCRR