IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
**MIAMI**
CASE NO. **15-CR-20106-KMM**

_____

**UNITED STATES OF AMERICA**,
                    Plaintiff
        vs.                              **July 10, 2015**

**PATRICK KILLEN, JR**,
                    Defendant.

_____

**TRIAL DAY 5**

BEFORE THE HONORABLE **K. MICHAEL MOORE**,

UNITED STATES DISTRICT COURT JUDGE

_____

**A P P E A R A N C E S**

FOR THE PLAINTIFF:      **ROBERT J. EMERY**, AUSA
UNITED STATES OF        **BENJAMIN J. WIDLANSKI**, AUSA
AMERICA                 U.S. Attorney's Office
                        99 NE 4th Street
                        Miami, FL 33132
                        (305) 961-9421
                        Robert.emery@usdoj.gov


FOR THE DEFENDANT:      **FRED A. SCHWARTZ**, ESQ
PATRICK KILLEN, JR      Kopelowitz Ostrow Ferguson Weiselberg
                        Keechl
                        200 E. Palmetto Park Road, Suite 103
                        Boca Raton, FL 33432
                        (561) 910-3070
                        Schwartz@kolawyers.com


REPORTED BY:            **GIZELLA BAAN-PROULX**, RPR, FCRR
                        United States Court Reporter
                        400 North Miami Avenue, Suite 8S32
                        Miami  FL  33128
                        (305) 523-5294
                        gizella_baan-proulx@flsd.uscourts.gov

Also present:  Special Agent Laura Schwartzenberger

## I N D E X

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| SPECIAL AGENT LAURA SCHWARTZENBERGER | | 3 | | |
| PATRICK KILLEN, SENIOR | 47 | 68 | 69 | |
| KAREN KILLEN | 71 | 98 | | |
| PATRICK KILLEN, JUNIOR | 110 | 142 | 181 | |

## G O V E R N M E N T   E X H I B I T S

| Exhibit | Received | Admitted |
|---|---|---|
| 1 | | 44 |

## D E F E N S E   E X H I B I T S

(None)

P R O C E E D I N G S

*(The following proceedings were held in open court.)*

(Thereupon, the jury was brought into the courtroom.)

THE COURT:  Good morning, ladies and gentlemen. Please be seated.  And we are at the cross-examination. Thereupon,

SPECIAL AGENT LAURA SCHWARTZENBERGER,

having been previously sworn by the courtroom deputy, testified further as follows:

*CROSS EXAMINATION*

BY MR. SCHWARTZ:

Q.   Good morning, Special Agent.

A.   **Good morning, sir.**

Q.   I used to ask FBI agents why they were special, but I got a five minute speech so I don't do that anymore.

You were assigned to this case sometime in February of 2014; is that correct?

A.   **I opened the case in February of 2014 for our division.**

Q.   Right.  And before that, you had reacted to a lead from the North Carolina office; is that correct?

A.   **Yes, that is correct.**

Q.   I should say field office then.  Just so we have the timeline right, sometime toward the end of 2012, Mr. Eckert came to the North Carolina FBI office in Charlotte, I believe

it was, and reported that his son had sent a nude photograph over the internet and some details and how he did his own investigation, et cetera; is that right?

A. **I believe it actually may have been around March 2013, but I would have to check the documents to make sure.**

Q. Well --

MR. SCHWARTZ: May I use, I guess it's called an ELMO, Your Honor?

THE COURT: (Complies).

BY MR. SCHWARTZ:

Q. All right.

MR. EMERY: Your Honor, this document is not in evidence.

MR. SCHWARTZ: Then I'll just read. I'll ask you from it.

BY MR. SCHWARTZ:

Q. Special Agent, did you prepare a report on or around February 20th, 2014, regarding a request to open an investigation?

A. **I don't know the date, but yes, we typically prepare what we called an EC to open an investigation, correct.**

Q. Would you like me to show you the report? Would that help be helpful to you?

A. **Yes.**

MR. SCHWARTZ: May I approach the witness, Your Honor?

THE COURT: All right.

BY MR. SCHWARTZ:

Q. (Complies).

A. **Correct.**

Q. Now, the incident where Mr. Eckert's son sent the picture over the internet was somewhere in November of 2013 and then he came to the FBI -- in November of 2012, and then he first came to the FBI office, as you said correctly, in or around February, I believe of 2013; is that correct?

A. **Well, I think my report says that he started following her on Instagram in November of 2012, not that he sent photographs then. I can reread it to make sure.**

Q. Okay. We have our time frame approximately, right?

A. **Yes. If you began from November 2012 and extend to February or March of 2013.**

Q. And the FBI office took the action we heard the supervisory special agent from North Carolina tell us about, I think the first day of the trial; is that right?

A. **Yes, that's correct.**

Q. And just so we're clear, you've been in the courtroom listening to all of the witnesses in the case; is that right?

A. **I was able to listen to most of what was said, yes. Correct.**

Q. Once or twice you had to go out for something but as the case agent, you're entitled to be excluded -- to not have the

rule that says witnesses can't stay in the courtroom apply to you, right?

A. **It's my understanding they do**, yes.

Q. You can stay in, other witnesses have to be out?

A. **Yes.**

Q. And my client, of course, can stay in because he's a defendant in the case and he's entitled to be here for his entire trial?

A. **Correct.**

Q. And then the FBI office in Charlotte, as we heard, made a request through the FBI's legal office to the courts in Canada to utilize a treaty to get documents from a Canadian corporation Kik; is that right?

A. **Correct. Yes.**

Q. And are you aware that those documents were received in or around November of 2013?

A. **I would have to check again. It sounds about right. Somewhere between September to November of 2013. I know it was several months after.**

Q. Your recollection is correct.

A. **Okay.**

Q. My reading is terrible. Would the date, September 25th, 2013, be a date that refreshes your recollection as to when the FBI office in Charlotte received that?

A. **I think that's correct. Again, I would have to see the**

documents to make sure.

Q. And sometime between September, October, November, December, January, and into February of 2014, the FBI office in Charlotte made a request for your office to follow up?

A. Correct.

Q. So you were following up and first assigned to this case roughly 17, 18 months, 16 months, something like that, after the incident over the internet occurred; is that fair?

A. Yes. The incident involving the victim in Charlotte, yes.

Q. Correct. And that was the only incident about which you were originally aware when you got the lead to follow up on the Killen house in Hialeah, correct?

A. That is correct, yes.

Q. And before you did that, before you went out to the house, you had a conference with an Assistant U.S. Attorney; is that correct?

A. We spoke over the phone. I don't know if he called or not. We didn't meet in person but we spoke over the phone.

Q. Let me rephrase. You had a telephone conversation with an Assistant U.S. Attorney; is that correct?

A. Correct.

Q. Do you remember who?

A. Barbara Martinez.

Q. Barbara Martinez?

A. Correct.

Q.   And you discussed whether you could get a search warrant or not; is that correct?

A.   **I brought the information to her that we had provided by the Charlotte division.  And yes, asked her for her opinion on how we could proceed.**

Q.   As a result of that conversation, was there a determination that the information was just too old for you to be able to say with any degree of certainty that there would be evidence in the Killen house regarding child pornography and, therefore, the information was what the law would call stale; is that fair?

A.   **She told me we could possibly have an issue with staleness. She didn't go into length.  I know what that means.**

Q.   You understood what staleness meant, correct?

A.   **Correct.**

Q.   You've had training in the law; is that correct?

A.   **Some training, yes.**

Q.   You attended the FBI academy in Quantico for how long?

A.   **At the time I went it was 18 weeks.**

Q.   And part of that involves some basic understanding of criminal law, correct?

A.   **Correct.**

Q.   You talk about the proper procedures for arrest, for search, things of that sort?

A.   **Yes.  That is correct, yes.**

Q.   Now, I haven't done any training in Quantico.  I was at Glynco for treasury agents, but do they also at Quantico teach you -- talk to you about testifying in court?

A.   **I -- I can't specifically remember right now if we had specific training in that or not.  I have since then had training in it, yes.**

Q.   Where did you have training about how to testify in court?

A.   **Working with the Evidence Response Team.  I know that it was a couple of our training sessions with testifying in court with information that we develop in our processing of crime scenes.**

Q.   And do -- are your classes on how to be a witness in court taught by other agents or are they taught by Assistant U.S. Attorneys?

A.   **They're typically taught by lawyers.  They're not specifically Assistant United States Attorneys.  Other lawyers.**

Q.   And they tell you the best way to respond to questions, et cetera?

A.   **Yes.  They give us an idea, yes, basically how the manner we should be responding and that sort of thing, yes.**

Q.   And you've testified -- this isn't the first time you've testified, is it?

A.   **No, it's not.**

Q.   About how many times have you testified before a jury?

A.   **I don't know.  I don't keep track of it.  Maybe six to**

eight times.

Q.   And other than before juries, you've testified at hearings before judges, haven't you?

A.   Yes, I have.

Q.   About how many hearings have you testified before judges?

A.   Again, I don't keep track of that but maybe about the same number, six.

Q.   Now, with your training and your times testifying, and your preparation for testimony each time, would you say that you're more experienced in this sort of thing than the average witness who takes the stand?

A.   I would say I am, yes.

Q.   And you're more able to portray what you want to portray to the jury in a manner that they might find acceptable; is that fair?

A.   I don't know if I would go that far.  I mean, it depends on the type of witness that would be here testifying.  Some of the witnesses were here earlier, I mean, what they're portraying is entirely different material than what I am.

So -- or what they're talking about is entirely different material than what I'm talking about so I don't know that I could say that.

Q.   So now, you've had your conversation with Assistant United States Attorney Martinez and a determination is made not to go to a U.S. Magistrate with an affidavit about why you should be

allowed to search the house and obtain the kind of search warrant spoken of in the Fourth Amendment to the United States Constitution; is that right?

A.   **It was discussed that we should start with a knock and talk and then I would contact her following that to determine where to go from there.**

Q.   Okay.  So it was important to moving your -- it wasn't your case now.  It was still North Carolina's case.  North Carolina's case forward, that you obtain evidence from Patrick Killen which would enable you to then continue the investigation with material that could lead to a search warrant or an arrest; is that fair?

A.   **When we receive a lead from another division we try to help the lead out, help the other division out as much as we can. We do the best we can to help them out.  We have done knock and talks before that have resulted in an arrest right away afterward, that have resulted in an arrest later, that have resulted in search warrants later.**

**I mean, it all depends on what's done during that time and what direction the case has taken.  So I wouldn't say that we do a knock and talk solely to obtain evidence to obtain a search warrant later.**

Q.   You do it to obtain evidence which could lead to an arrest either immediately or later or a search either then or later with a warrant; is that correct?

A.   The purpose of a knock and talk is to obtain evidence, if there is evidence, but to determine what's going on as well.

Q.   Now, you focused on the Killen house because of the addresses and the information that we heard extensively about. And you went to the right place, correct?

A.   That's correct, yes.

Q.   And you talked to the right person, correct?

A.   Correct.

Q.   Now, when you talked to Patrick, what was he doing immediately before you got to the house, to your knowledge?

A.   I don't know.  I don't have knowledge of that.

Q.   But when you knocked on the door, did his father tell you, "I think he's still sleeping, I'll go get him," or words to that effect?

A.   I don't recall that being said or hearing that.  He did look like he may have been sleeping, but I didn't ask him and I don't know specifically if he was or not.

Q.   Well, when he came out of his bedroom after his father went to get him, what was he wearing?

A.   What looked to me to be pajama pants and a T-shirt, to the best of my recollection.

Q.   And you described how you came into the house and you politely requested to be able to speak to Patrick and you -- everybody agreed to let you talk to him at the table; is that correct?

A.   We were directed to the table, yes.

Q.   And you said he was shivering or shaking and you thought he might be nervous or cold and you asked him and he went and got a robe, right?

A.   Yes, that is correct.

Q.   Were you aware from your research before you came there that he also had Tourette's Syndrome and that causes tics and shakes?

A.   No, I don't know that I would have even had any way of knowing that.

Q.   But, in any event, he got the robe and put it on and you chatted with him; is that correct?

A.   That is correct, yes.

Q.   Now, it's your testimony that you asked him after he made some denials about being Rebecca Till and didn't tell you the truth, you asked him to consent to his electronics; is that right, to let you seize or search his electronics?

A.   To let us search his electronics, correct.

Q.   And now you've testified a few times previously regarding this matter, correct?

A.   One time previously, correct.

Q.   Well, would I be correct in saying three times previously?

A.   I guess we'd have to clarify the time, because I have -- I don't know if I can say the time, the previous times.

Q.   Well, let's talk about it.

A.  Okay.

Q.  Before Patrick was arrested, you testified in a federal grand jury with Mr. Emory questioning you about what had happened in this case; is that right?

A.  Correct.

Q.  And then after Patrick was arrested, you testified in a hearing where we suggested that the search of Patrick's electronics wasn't constitutional; is that correct?

A.  Correct.

Q.  And after that, you testified again in the grand jury when they added counts to the indictment at Mr. Emory's request; is that correct?

A.  Well, we didn't discuss what we had already discussed previously in the grand jury.  I don't recall.

Q.  But you did testify about this matter?

A.  I testified about this matter.

Q.  Twice to the grand jury?

A.  Yes, I thought you were referring to the initial part of us entering the house.

Q.  So you've testified about this case three times before today; is that fair?

A.  Yes.  That is correct, yes.

Q.  And the first time when you testified in the grand jury, did anybody cross-examine you?

A.  No.  That's not part of the grand jury procedure.

Q.   It was Mr. Emory, 23, or approximately 23 grand jurors, you and a court reporter there?

A.   **Correct.**

Q.   And you told them about the case without any cross-examination or defense attorney or anybody else there or Patrick there and they returned an indictment that charged Patrick in this case; is that right?

A.   **Correct, yes.**

Q.   And then you went back to the grand jury a second time after he was arrested again with Mr. Emory, with a court reporter, somebody taking down what was said, the 23 or so grand jurors, and you added some additional facts?

A.   **Correct.**

Q.   But you didn't tell them everything about the case, did you?

A.   **No, I did not.**

Q.   As a matter of fact, the second time you testified in the grand jury, Mr. Emory specifically asked you, "Now, with respect to your testimony today, Special Agent Schwartzenberger, have you told the grand jury each and every fact you know about this case," and you said, "No, I haven't"?

A.   **Correct.**

Q.   And some of the facts you left out because it was just too voluminous, it wasn't a trial, and you just wanted to give them enough information upon which they would have probable cause to

perhaps return an indictment; is that correct?

A.   **That is correct.**

Q.   Did you leave out anything that could be beneficial to the defendant?

A.   **I don't believe I did.**

Q.   Did you tell the grand jury when you went there, either time, about your contacts with the Italian police, about the arrest with Mr. Karucem and his cooperation with them?

A.   **I didn't -- I for sure didn't know about the contacts -- first of all, I personally did not contact the Italian police. I sent a lead to our Rome Legat Division and they coordinate any questions and answers from the Italian police.**

**Prior to my previous testimony before the grand jury that had not yet been done.  I did not know that the Italian Police had taken over the account of Karucem.**

**I would have to check on the date of the lead I sent to the Legat Rome, the FBI Legat Rome to see if that was before or after the second time I testified before the grand jury. However, the second time I testified before the grand jury concerned information that we found during the search warrant which was on the Dell and the -- or on the Dell and the thumb drive that was taken during the search warrant from the defendant's bedroom.**

Q.   Just so we're clear, the information -- some of the information that you found on the Dell, for instance, was

information that was downloaded from the GigaTribe download folder that the defendant had received from Mr. Karucem; is that correct, from Mr. Karucem's computer?

A.   **Okay, I did not have the information from the GigaTribe download folder prior to my second testimony before the grand jury.**

Q.   Did you talk about the videotapes that were found on the Dell computer showing sexual intercourse with children at the grand jury, the second time?

A.   **I'd have to look at what videotapes, video files were shown to the grand jury from the Dell again.  I believe yes, it was video files -- there was a lot of child pornography so I'm trying to keep everything straight.**

Q.   Let me make it easier for you.

A.   **Okay.**

Q.   Were you asked the following questions in the grand jury on April 24th, 2015, and did you give the following answer?

"Question:  With respect to the images you just talked about, were you able to determine if the defendant had received any images via GigaTribe?

"Answer:  Yes.  We found many images and videos with a GigaTribe download folder pathway, meaning that these images and videos were in GigaTribe downloads folder, typically a file sharing program.  When you install certain programs in your computer it will set up peer folders and download folders

automatically by default, and that's where anything you download utilizing the file sharing program will put files, the files will be placed. We found many. Specifically, we found one titled, excuse me, 10 YO boy girl playing fuck dot 3G2."

Do you remember being asked that question and giving that answer?

A. **I remember being asked that question and giving that answer. I thought it was April 26th, no?**

Q. Ma'am, you want me to show you the date, Friday, April 24th?

A. **Okay, I believe you. I know it was a Friday. My answer to that question was based on the pathways of the video files that we found in the Dell, when we bookmark files in a computer, the pathways that come with them on -- and that's where -- that is the pathway that they are located in the computer.**

**So my testimony on that date was based on the pathway, not on extracted GigaTribe or parsed out GigaTribe chats.**

Q. I didn't ask you about chats. You told the grand jury a few minutes ago that -- I'm sorry, you told the jury a few minutes ago that when you testified in the grand jury a second time, you didn't have the information from the GigaTribe folder. You just -- I just read you your testimony describing the GigaTribe folder and how it worked and reading the name of a video that came from that folder.

Which testimony now in the last five minutes is true?

A.   **I'm sorry, I don't --**

MR. EMERY:  I believe that misstates what she said.

THE COURT:  Sustained.

BY MR. SCHWARTZ:

Q.   Let's be clear.  Did you tell the grand jury on the 24th about information from the GigaTribe folders on Patrick's Dell computer?

A.   **I told the grand jury on that date that that file was found in the GigaTribe downloads folder.**

Q.   Did you tell them that this information came from a gentleman -- from the computer of a gentleman named Karucem?

A.   **No, I did not because I don't know where that file came from.**

Q.   Hold it now.  We're talking about a few months ago.  April, of 2015.  That's less than three months ago, two and a half months ago, April 24th.  You weren't aware of the chats with Karucem on April 24th, just two months before this trial?

A.   **What chats with Karucem are you referring to?**

Q.   Chats.  My client, your co-agents have testified, had with Karucem over GigaTribe.

A.   **Are you referring to the chats from the Dell or the chats from the MacBook?**

Q.   Either chats.

A.   **I was aware of the chats from the MacBook but not from the Dell, yeah.**

Q.   You weren't aware of them?

A.   **No, I was not.**

Q.   Were you aware that Karucem sent -- that my client downloaded from Karucem's computer these blind folders that had the child porn in them, the child porn you described to the grand jury?

A.   **We -- it doesn't show in the chats that we have with Karucem actually downloading the folders.  I know they're talking about downloading.  It shows -- on one chat on the MacBook it does attach a picture that is child pornography, a graphic file, but as far as the video files there's discussions of them, but it doesn't -- those aren't shown to attach in the chats because they -- the chat parser parses out the actual chats that are done in GigaTribe so it will show if someone moves and they can click and drag, for instance, a traffic file or photograph into the chat.  But if they download something, the chats, the chat parser doesn't capture that.**

Q.   Now, when you were trained to be a witness in Quantico and you had your training sessions with lawyers before today, did they tell you if you're caught in a misstatement confuse the situation?

A.   **No, that's absolutely not --**

          MR. EMERY:  Objection, Your Honor.

BY MR. SCHWARTZ:

Q.   That speech you just gave -- let me just ask you the

question again.  Did you tell the grand jury about Karucem and his arrest and cooperation with the Italian --

MR. EMERY:  Objection.  Asked and answered, Your Honor.

THE COURT:  Overruled.

A.  **I did not.  I did not know about Karucem's arrest -- I don't know that he was cooperating at all or not.  We don't have that information from the Italian Police.  All we know is that the Italian Police took over his account and they had gone to his house on another matter and found GigaTribe chats involving BeverlyHills05.  I did not know about that prior to the first time I testified before the grand jury.**

**I would have to check my documents to see when I sent a lead to our FBI Legat Rome versus the time I testified the second time to see if I knew about that during that the second time.  I cannot remember if I knew about that or not.**

**But -- and have the answer returned to me by the Italian Police because it did take some time from the time I sent the lead to our FBI Legat Rome to the time the Italian Police responded to us.**

BY MR. SCHWARTZ:

Q.  Thank you for the answer but let me ask you two questions. Let me do the easy part first.  Let me just show you your report as to when you received the information from the Italian Police.

MR. SCHWARTZ:  May I approach the witness?

THE COURT:  All right.

BY MR. SCHWARTZ:

Q.   (Complies).

A.   **Yes.**

Q.   Has this report now refreshed your recollection as to whether you had received the report from the Italian Police when you had testified in the grand jury on the 24th of April, 2015?

A.   **I'm sorry, I may have to look at it another time because I know on the upper right-hand there was a date of the report. That's just the date of the report but not the date I received information.  I don't know if in the body it says the date that I read the information.**

Q.   Let me read it to you so you're clear and tell me if it refreshes your memory.

A.   **Yes.**

MR. EMERY:  Your Honor, I'm going to object to that.

THE COURT:  Sustained.

MR. SCHWARTZ:  Let me show it to her then to refresh her memory.

May I approach again?

THE COURT:  All right.

BY MR. SCHWARTZ:

Q.   (Complies).

A.   Yes.

Q.   Now that you've seen the report twice and your memory is refreshed, can you tell us the date you received an e-mail from the FBI Rome Legat in response to your lead or request referencing the GigaTribe user name Karucem?

A.   Yes.  I received it on April 7th, 2015.

Q.   And you testified in the grand jury the second time on April 24th, 2015, correct?

A.   Right.

Q.   That's 17 days later?

A.   Correct.  Approximately.

Q.   Now, you say you don't know whether Karucem was or was not cooperating with the Roman Police; is that correct?

A.   They didn't tell us information -- any information that he was cooperating.

Q.   Well, did you hear an FBI analyst testify earlier in this trial, I think the second day, and hear her say that he gave the FBI -- the Roman Police permission to use his computer?

A.   I believe they took over his account.  I don't know what their procedure on that is.

Q.   But if he gave them permission to take over his e-mail account, isn't that cooperation?

A.   Again, this is the Italian Police doing things.  I don't know how they do things versus how we do things, so I don't know about how to go about taking over accounts, whether it's

with permission, I really don't know.  And I can't answer the question.

Q.   But you didn't tell the grand jury any of that, did you?

A.   My testimony before the grand jury was solely to establish probable cause.

Q.   And just as a quick follow-up, on the reports that I've shown you, your reports in this case have a heading, don't they?

A.   Typically, yes.

Q.   And your reports, for instance, say Patrick --

MR. EMERY:  Your Honor, I'm going to object.  These reports are not into evidence.

He's reading the reports.

THE COURT:  Sustained.

MR. SCHWARTZ:  I won't read it, Judge.

BY MR. SCHWARTZ:

Q.   On your reports, do you say the subject is Patrick Killen?

MR. EMERY:  I'm going to object again.

THE COURT:  Sustained.

BY MR. SCHWARTZ:

Q.   Who was the victim in the case pursuant to your reports?

A.   On -- when we set up a case, and in this case when I open up a case after the lead from the Charlotte division and then after the knock and talk, I opened up a case for us.  I listed the victim as Kyler Eckert which was the victim in the

Charlotte division.  That's just the case title.  We have to put something down as a case title.  That title shows up in a lot of subsequent reports that we write.  It's not necessarily encompassing of all the subjects or all of the victims.

Q.   I realize that there are three victims named in the indictment of Mr. Frost, a Mr. Freeman and a Mr. Cook; is that correct?

A.   Correct.

Q.   So your caption wouldn't encompass all of those three; you'd just use the first victim; is that correct?

A.   Yes.  I use the victim that we know about, that I knew about, that the FBI knew about when I opened the investigation for the Miami division.

Q.   Was Mr. Eckert charged specifically in this indictment as a victim?

A.   Kyler Eckert?

Q.   Yes.

A.   No, he was not.

Q.   Was that because his father didn't want you to use him as a victim?

        MR. EMERY:  Objection, Your Honor.  That gets into the areas of prosecutorial discretion.

        THE COURT:  What was the question again?

        MR. SCHWARTZ:  I'm asking why Kyler wasn't charged as a victim, is that because his father didn't want you to use him

as a victim.

THE COURT:  If she knows.

BY MR. SCHWARTZ:

Q.   If you know.

A.   **I didn't ask his father either way.**

Q.   Do you know why Kyler wasn't charged -- wasn't listed in the indictment as a named victim?

A.   **When we testified before the grand jury, we used three victims where we actually had chats for and we did not actually have chats for Kyler victim on the subject's MacBook.**

Q.   But you had Kyler who could be a witness, you had his father whose testimony has been, set up his own account that had interaction with Patrick.

You had evidence from live people who could have come before this jury and told them what happened.  Why didn't you charge Kyler as a victim?

A.   **At the time it was because we did not have actual chats from Kyler victim on the defendant's MacBook computer.**

Q.   Are you sure that's the reason?

A.   **As far as I knew that was the reason.**

Q.   I'm sorry.  I've let myself go a little afield and I apologize.  Let's go back to the Killen house on the morning of February 11th, 2014.

A.   **Yes.**

Q.   It's your testimony under oath to this jury that Mr. Killen

gave you oral consent to look at what was on his computer and iPhone and iPad and then signed a written consent before you or Agent Ginther looked at it; is that correct?

A.   **That is correct**, yes.

Q.   Have you heard testimony from anybody else regarding this subject?

A.   **I've heard testimony from Agent Ginther.**

Q.   Have you also heard statements made by Mr. and Mrs. Killen and Patrick?

A.   **Yes, I have.**

Q.   Without going into what they said, do they agree with you on when the consent was written?

        **MR. EMERY:**  Objection, Your Honor.

        **THE COURT:**  Sustained.

BY MR. SCHWARTZ:

Q.   Is it possible that you and Agent Ginther looked at the iPad, searched the computer, and the iPhone before there was any consent?

A.   **No, absolutely not.**

Q.   And the reason you say you didn't -- withdrawn.

        If you had done that, would that have been a violation of the law?

A.   **If we had done it without which, the oral consent or the written consent?**

Q.   Either consent.

A.   I'm not a lawyer, but I believe that it would have been had we searched his items without consent or without a search warrant.

Q.   And it's clear you didn't have a search warrant; is that right?

A.   That is correct, yes.

Q.   So the only basis for having the authority other than being an FBI agent, to search through his laptop, his cell phone, and his iPad, was the fact that you say he gave oral and written consent first; is that right?

A.   Well, first of all, being an FBI agent doesn't give us the right to go searching through people's items.  And yes, we would have had to have consent in this case prior to doing any searches.  If he did not want to provide consent, then we would not have conducted any searches.

Q.   Now you heard Agent Ginther testify earlier in this case?

A.   Yes.

Q.   And he didn't find anything of value in the computer or the iPhone and no arrests were made, correct?

A.   To the best of my recollection, he didn't find any child pornography.  He did alert me at the residence during one of the times that Patrick Killen, Junior, left our presence that he had found something referencing a 14-year-old on the MacBook.

Q.   Well, you heard Agent Ginther testify in court just two

days ago, correct?

A.   **Yes, that is right.**

Q.   Did he say anything about finding something regarding a 14-year-old on the computer and alerting you to it?

A.   **I don't recall -- I don't think he said that, no.  I just think he didn't find any child pornography.**

Q.   But he was asked what happened, what he searched for, what he found.  You say he found that.  He didn't; is that correct.  He didn't say that?

A.   **To the best of my recollection of his testimony he said he didn't find any child pornography.**

Q.   Now, both you and Ginther consistently testified in this instance that Ginther only went to Patrick's room once; is that correct?

A.   **Yes, that is correct.**

Q.   And yet, both of you used the following -- used the language saying Ginther went back into his room; is that correct?

A.   **The room was located really in the back of the house.  It was the last room down the hallway to your left.  It was towards the back of the house.  So that, to me, is direction of travel.**

Q.   Well, isn't that really the side of the house?

        MR. EMERY:  Objection, Your Honor.

        THE COURT:  Overruled.

A.    I think it would depend on which way you were looking at the house.

BY MR. SCHWARTZ:

Q.    Well, we have a picture of the house and I can show them to you but let me try to bring it out without the pictures first. You come into the front door of the house, you're looking directly at the back of the house, that's the sliding glass doors that take you to the backyard.  To your right is a hallway where the bedrooms are located; is that correct?

A.    It depends which way you are facing because if you enter the house through the front door, the hallway I believe would be to the left with the bedrooms.

      So yes, if you were standing in front of the house Patrick's bedroom would be on the front side of the house, correct.

Q.    So your explanation that you said he went back into the -- he went back to the room because it's in the back of the house is kind of wrong, isn't it?

A.    To me it's deeper within the house.  The house -- if you walk in the house through the front door, it's a very -- it's not very long until you reach the sliding glass doors.  It's not very wide that way.  It's -- but walking down the hallway, in my opinion, is deeper into the house.

Q.    Agent, I know you're a trained witness, but if you walk into the house and you go to the side to the bedrooms, that's

going to the side of the house, not to the back of the house; is that correct?

MR. EMERY:  Objection, Your Honor.  Argumentative.

THE COURT:  Sustained.

BY MR. SCHWARTZ:

Q.   Isn't it a fact, Agent, that when you and Ginther testified that he went back into the -- back to the bedroom, it was because he had been to the bedroom either once or twice before?

MR. EMERY:  Objection.  Asked and answered, Your Honor.

THE COURT:  Overruled.

A.   **That is not at all correct.  Agent Ginther went to the bedroom one time.**

BY MR. SCHWARTZ:

Q.   And you said he went back to the bedroom because it's in the back of the house; is that correct?

A.   **In my opinion, it's deeper within the house.**

MR. SCHWARTZ:  May I have a moment, Judge?

THE COURT:  All right.

BY MR. SCHWARTZ:

Q.   Just a few more questions, Agent.  You had Patrick sign a consent form at some time when he was in the house, correct, and you were in the house?

A.   **We asked Patrick to sign a consent form, yes.**

Q.   Did you read it to him?

A.  **I did not read it to him, no.**

Q.  Did you require him to read it in your presence?

A.  **No, I did not.**

Q.  You gave it to him and he signed it?

A.  **That's correct, yes.**

Q.  Do you have any knowledge that he knew the words that were on the form?

A.  **No, I didn't -- I don't know if he, in fact, did read it. He had time to read it.**

Q.  Did you tell him that he had an absolute right not to turn over anything to you and not to have you search his electronics?

A.  **I did not say that to him, no.**

Q.  By the way, you testified about a statement that he made; is that right?

A.  **That is correct, yes.**

Q.  You didn't advise him of his rights under Miranda before he made that statement, did you?

MR. EMERY:  Objection.  This issue was dealt with before.

THE COURT:  Overruled.

A.  **No, I did not advise him of his rights pursuant to Miranda.**

BY MR. SCHWARTZ:

Q.  And is that because Miranda technically requires that before you read somebody their rights, that they be in actual

custody; is that right?

A.   **It is -- from my training, it has to be a custodial interrogation.**

Q.   Now this was an interrogation, correct?  You were asking him questions and he was giving you answers.  That's an interrogation, right?

A.   **I guess if that's how you define all questions and answers as interrogations.**

Q.   Well, isn't that how the supreme court defines it?

          **MR. EMERY:**  Objection, Your Honor.

          **THE COURT:**  Sustained.

**BY MR. SCHWARTZ:**

Q.   If you have somebody in custody and you ask them questions and seek answers, do you have to advise them of their rights?

          **MR. EMERY:**  Objection, Your Honor.  Calls for a legal conclusion.

          **THE COURT:**  Sustained.

**BY MR. SCHWARTZ:**

Q.   Based on your training at Quantico and your subsequent job training as an FBI agent, are you instructed that if you have somebody in custody, and you ask them questions, you have to advise them that they have a right to remain silent, anything they say can will be used against them in a court of law, they have the right to have an attorney present, and if they can't afford an attorney one will be provided them free of charge?

Did I get it right?

A.   **I think so.  If someone is in custody, any questions that we ask them beyond just regular booking type questions such as name, date of birth, that sort of thing, yes, then we need to read them their Miranda right prior to asking the questions.**

Q.   And you told Patrick, "We're not going to arrest you today," when you took him out to the backyard to ask him questions; is that right?

A.   **I told Patrick that several times during the time we were at his house during the knock and talk while we were sitting at the dining room table and when we were out in the backyard.  I didn't tell him right before the back patio, but I did tell him when we were sitting at the dining room table and after he provided statements to us out in the back patio.**

Q.   So, technically, it's your position he wasn't in custody and doesn't have to be advised of his rights; is that fair?

A.   **Yes, it is my position that he was not in custody.**

Q.   So you didn't advise him of his rights and you also didn't tell him he had a right not to have his items searched if he didn't consent; is that a fair statement?

A.   **Right.  I did not verbally tell him, the form says it.**

Q.   But we don't know if he read the form, do we?

A.   **He didn't tell me specifically if he read it.  He had time to read it.**

Q.   Let me ask you about one other thing.  Government's Exhibit

10 is the consent form to search computers that was placed in evidence; is that correct?

A. **It's not coming up on my monitor.**

Q. I'm sorry. (Complies). See it now?

A. **Yes, Government Exhibit 10.**

Q. And is this the consent form that Patrick had time to read?

A. **Yes, it is.**

Q. Did he write his name on the top?

A. **No, I did.**

Q. Did he write MacBook Apple Pro and then initial it, initial and crossing out the word Pro?

A. **No, I wrote that. Those are my initials.**

Q. Did he write silver in color?

A. **No, I wrote that.**

Q. Did he write iPhone 5, white in color?

A. **No, I wrote that.**

Q. Did he write iPad 2, white in color?

A. **No, I wrote that.**

Q. Now, it's your testimony that later -- that he signed that and later on just before you left, you added the words on the line under iPad 2. What are those words?

A. **Can you move it over?**

Q. Maybe I can make it bigger.

A. **No, it's cutting off the words. I think it's Kingston. Yes, Kingston Data Traveler, two gigabyte thumb drive, black in**

color, Cruze SanDisk, 256 megabyte thumb drive, black in color.

Yes, I wrote those.

Q.   Now, it's your testimony under oath that Patrick signed this before you went outside with him and before you searched the computer; is that right, or before Agent Ginther searched the computer and the iPhone?

A.   Correct.  That is correct.

Q.   Then why didn't you write -- I'm sorry.  You didn't know --

A.   We wrote the top part, we didn't write the two thumb drives.  That was not written prior to going out to the back patio.

Q.   Right, you didn't know that they existed at that time, did you?

A.   That's correct, I didn't know.

Q.   When Agent Ginther went back to Patrick's room on the side of the house he found those thumb drives; is that correct?

A.   No, that is not correct.

Q.   Patrick brought them out at some point after he came back from outside, is that --

A.   Yes, after we came inside the house from the back patio I asked Patrick Killen, Junior, if he had any other storage devices and that's when he left our presence and came back with two thumb drives.  He left our presence alone.

Q.   If you wrote it in the sequence you claim, why did you have to write the color of the iPad in the middle of the line?  Why

not just put it on the line there?  Isn't it a fact that you wrote all of this at the same time and that's why you squeezed it in?

A.   **I'm not sure what you're saying.  I continued on the second -- the way I did, the way I wrote iPad 2, white in color, because the line above that asks for a CPU make,  model and serial number, and then the line below it where it asks for -- where I wrote the thumb drives asked for storage or retrieval media computer peripherals.**

Q.   But you didn't know they existed at the time you claim you wrote this before you went outside with Patrick, right?

A.   **Yes.  So there was nothing on that line when we first presented this form to Patrick Killen, Junior.  There was nothing on the storage or retrieval media line, meaning the Data Traveler, the two gigabyte thumb drive, and the other thumb drive were not on the form because I did not know they existed.  There was nothing on that line.**

Q.   And you chose to write the description of the iPad in the middle of the air, so to speak, rather than just put it on an empty line?

A.   **Yes, because it is not a storage or retrieval media computer peripherals.**

Q.   Now you wrote the description of the iPhone, the iPad, and the laptop after Patrick brought the iPad and the laptop out to you and before he brought the phone, right?

A.   **I'm sorry.  Can you repeat the question?**

Q.   Your testimony before this jury is that Patrick brought out the -- at your request with his consent brought out from his bedroom the MacBook Pro and the iPad, but he didn't bring out the phone because it was still charging, because he said it was still charging in the bedroom, correct?

A.   **Correct.**

Q.   And at that point he allegedly gave you verbal consent and then written consent to search all three items.  You wrote it down on the form and he signed it, correct?

A.   **I believe he gave us verbal consent before obtaining his MacBook and iPad and then when he went -- when he left our presence to get his MacBook and iPad and brought them back, we executed the written consent form.**

Q.   And at a previous hearing did I ask you, "How did you know if you hadn't seen it that the iPhone was white in order to write it on the form," and after a moment you said, "Oh, he told me"; is that correct?

A.   **That is correct.  Yes.**

Q.   Isn't it a fact that you filled out this form just before you were leaving the house after the electronics and the search of the electronics had already started?

A.   **No, that is not at all correct.**

          MR. SCHWARTZ:  I would tender this witness.

          THE COURT:  Cross?

MR. EMERY:  Yes, Judge.

*REDIRECT EXAMINATION*

BY MR. EMERY:

Q.   All right, Special Agent Schwartzenberger, let's go ahead and address this right away.  Remember when counsel was talking to you about a prior hearing that we had before a magistrate judge?

A.   **Correct, yes.**

Q.   And that was before a fair, neutral and detached magistrate judge?

A.   **That is correct, yes.**

Q.   And that was the hearing that started at approximately, let's just say, 9:30 in the morning and I believe lasted until about 7 o'clock at night; is that correct?

A.   **Yes.  Six or 7:00, correct, yes.**

Q.   And you testified at that hearing, correct?

A.   **Correct, I did.**

Q.   As well as Special Agent Ginther?

A.   **That's correct, yes.**

Q.   And there was also other witnesses that were called by the defense; is that correct?

A.   **That is correct.**

Q.   And that was a hearing because the defense was claiming that when you got his iPad and this thumb drive, that you had

violated, again, allegedly, his Constitutional rights; is that correct?

A.   **Yes.   I had the thumb drive, the iPhone as well, I believe.**

Q.   Yes.   But the hearing, the defendant was challenging and alleging that you had violated his Constitutional rights when you obtained these two, correct?

A.   **Yes, he was challenging our search prior to executing the form.**

Q.   And isn't it true that that neutral and detached magistrate found that you had not violated his Constitutional rights on February 11th, 2014?

A.   **That is correct, yes.**

Q.   And isn't it also true you that that decision finding that you had not violated the Defendant's Constitutional rights was affirmed by Judge Moore?

A.   **To the best of my knowledge it was, yes.**

Q.   And again, just to recap, yesterday you had testified that on Government's 7 on his MacBook Pro, that you found a lot of images of children engaged in sexually explicit conduct?

A.   **That is correct, yes.**

Q.   Also, a lot of images of children engaged --

         MR. SCHWARTZ:   I would object to her stating something is sexually explicit.   That's a legal conclusion for this jury to decide and not for her to decide.

         THE COURT:   Well, she testified based on her training

and experience it is a legal decision and that's the question the jury will have to answer.

MR. SCHWARTZ:  Thank you, Your Honor.

BY MR. EMERY:

Q.   And isn't it -- yesterday you also testified that on this MacBook Pro there were also, I apologize, images and videos found on the defendant's computer of adults engaged in sexual activity with children?

A.   **That is correct, yes.**

Q.   Do you remember the line of questioning when the defense counsel was asking why we only charged Jackson, Garrett, and Mason as victims in this case?  Do you remember that line of questioning?

A.   **Yes, I do.**

Q.   You also had testified yesterday, and we also heard throughout this trial, that they weren't the only victims of the defendant that were found on his MacBook computer; isn't that true?

A.   **That's true.  Many more victims.**

Q.   And, in fact, I believe you had testified that there was approximately, at least what you had found to date, 30 or so victims who had sent images of themselves engaged in sexually explicit conduct to the defendant?

MR. SCHWARTZ:  Again, I object to the prosecutor making the legal conclusion that it's sexually explicit.

THE COURT:  All right.  Overruled.

A.   Yes.  During the time period of the Kik chats that we obtained from the MacBook, which was August 26th, 2013 through September 12th, 2013, I identified over 30 boys who appeared to be under the age of 18 who sent sexually explicit photographs to Patrick Killen, Junior.

BY MR. EMERY:

Q.   So while we only charged those three victims in this case, we could have charged 30 victims in this case; is that correct?

MR. SCHWARTZ:  Objection.

MR. EMERY:  He opened the door, Your Honor.

THE COURT:  Overruled.

BY MR. EMERY:

Q.   We could have named 30 victims in the indictment against the defendant?

MR. SCHWARTZ:  Your Honor, I object since the prosecutor doesn't charge.  A grand jury charges by returning an indictment.  He's misstating the law.

THE COURT:  All right.

BY MR. EMERY:

Q.   Would it have been possible for me to, the prosecutor, right, in the case that you and I were working for us to proposed to the grand jury an indictment for the grand jury's consideration naming approximately 30 children who had been victimized by the defendant?

A.   **Oh, yes, and even more than that because there was a lot more children and sexually explicit photographs outside of the MobileSync backup folder on the MacBook as well.**

MR. EMERY:  Can I have one minute, Your Honor?

THE COURT:  All right.

BY MR. EMERY:

Q.   And just one last question, Special Agent Schwartzenberger. You heard defense counsel talking about Karucem.  The Italian Police took over his account in approximately September of 2014; is that correct?

A.   **Correct.**

Q.   And let's just talk about the MacBook.  The MacBook that you lawfully seized from the defendant was done on February 11th, 2014; is that correct?

A.   **That's correct, yes.**

Q.   And that was well before Karucem gave access to his account to the Italian Police?

A.   **That is correct, yes.**

MR. EMERY:  No further questions, Your Honor.

THE COURT:  Thank you.  You may step down.

MR. SCHWARTZ:  May I recross, Your Honor?

THE COURT:  No recross.

All right.  Call your next witness.

MR. WIDLANSKI:  Your Honor, by stipulation of the parties comes now the United States of America, by and through

the undersigned Assistant United States Attorney, Robert Emory, the defendant, Patrick Killen, Junior, personally and through his attorney, Mr. Fred Schwartz, stipulate as set forth below regarding the Government's exhibits admitted during the trial: The visual depictions at issue in this case were produced using materials that have been mailed, shipped or transported in interstate or foreign commerce.

        The visual depictions at issue in this case were shipped or transported by computer over the internet in or affecting interstate commerce.  It is signed by Robert J. Emory, Assistant United States Attorney, Fred Schwartz and Patrick Killen, Junior, defendant.

        This is Government's Exhibit 1, Your Honor, we move for admission.

        MR. SCHWARTZ:  And I would note Patrick Killen, Junior, read that and signed it.

        THE COURT:  All right.

        (Thereupon, the exhibit was admitted into evidence.)

        MR. EMERY:  Your Honor, the Government rests.

        THE COURT:  Okay.  Are you ready to proceed?

        MR. SCHWARTZ:  There are some motions I want to make. If you want me to reserve them we can do it later and assume that I made them now.

        THE COURT:  Okay.

        MR. SCHWARTZ:  We would call Patrick Killen, Senior.

**MR. EMERY:**  Your Honor, could the Government ask for a side-bar?

(Thereupon, there was a side-bar conference outside the presence and hearing of the jury.)

**MR. EMERY:**  Your Honor, we just want to just remind everybody about the order and that was granted by this Court granting the Government's Motion in Limine not to bring up on direct or cross-examination of any witnesses at this point, now direct, regarding any allegations with respect to the defendant and possible sexual abuse that he may have suffered.  That's the first one.

And then the second one, Your Honor, the Government also believes, based on prior testimony at the suppression hearing that the father and mother are going to seek to use the fact that the mother was undergoing cancer treatment at the time to excuse the defendant's conduct and the Government believes that's not relevant to the issues at hand and also it would be unfairly prejudicial to the Government.

**MR. SCHWARTZ:**  Your Honor, as to the first part I don't know that he was ever sexually abused and no one is going to suggest that, to my knowledge.  I can walk up to him and tell him that but in my conversations no one has told me that he was abused.

The second part of what the prosecutor said, the mother not only had breast cancer but was having a breast

cancer operation the afternoon of the knock and talk and this is some of the reasons why she reacted why she did when the agents were at the house was because she had breast cancer. I believe it's integral to the fact of the incident on the day of the knock and talk and that she should be allowed to testify to that.

MR. EMERY: And that issue was dealt with at the suppression hearing, Your Honor.

THE COURT: I know, but, I mean, I just don't understand what the problem is. Breast cancer and everything like that and that is part of what's going on that day, what's the problem?

MR. EMERY: Understood, Your Honor. Then just with respect to the Government's first motion, we also believe, though, that there is going to be testimony about how he was adopted from Romania and that when he was brought here that they noticed he had some sort of strap marks on his arms intimating that he was then abused in some sort of fashion.

MR. SCHWARTZ: I don't intend to ask him anything about strap marks on his arms or anything like that. I will bring out that he was adopted, I will bring out where he was from.

MR. EMERY: Thank you, Your Honor.

(Thereupon, the side-bar conference was concluded.)

Thereupon,

**PATRICK KILLEN, SENIOR,**

having been duly sworn by the courtroom deputy, testified as follows:

THE WITNESS:  I do.

COURTROOM DEPUTY:  Thank you, please be seated and state your full name for the record and also spell it.

THE WITNESS:  Patrick John Killen, Senior, P-A-T-R-I-C-K, J-O-H-N, K-I-L-L-E-N, Senior.

*DIRECT EXAMINATION*

BY MR. SCHWARTZ:

Q.   May I call you Pat?

A.   **That's fine.**

Q.   How old are you?

A.   **Seventy-two.**

Q.   Is Patrick your natural son?

A.   **No, he's adopted.**

Q.   And is your daughter your natural daughter?

A.   **No.  She's also adopted.**

Q.   Can you tell us a little bit about your background?  What was and is your occupation?

A.   **Well, after high school, I went to Edison High School, I became a surveyor.  I did that for two years.  I put in all the lines and measurements and everything for I-95 from 95th Street to Northwest 151st Street.**

Q. Slow down. I know you're nervous. Speak slowly. The court reporter has to take down what you say and speak loud into the microphone. Okay?

A. **I laid out the entire road from 95th Street to 151st Street, including the bridge, and I had an opportunity to go into the elevator business through a friend of mine who was in college and during the summer he worked there and he got me that job.**

Q. Did you go -- did you do these jobs directly from school?

A. **Right after high school. When I was in high school I actually worked in a grocery store.**

Q. And then what did you do again after?

A. **When we got into the business I developed -- I had a lot of mechanical skills. I became a master mechanic. I went to electronic school, hydraulic systems. I was there for 17 years, I had 25 crews all over the State of Florida. Excuse me, I'm sorry.**

**While I was working in the elevator business I went into the Marine Corps, I chose the reserves for seven years because we were putting elevators at the time on minutemen silos that were still being tested in Patrick's Air Force Base. I put elevators --**

Q. Relax. Again, I know this is emotional, but if you need a minute to compose yourself, fine, and then let's just testify to the jury. You were telling us that --

A.    I put elevators on launch pads 13, 17 and 19.

Q.    You put elevators on -- installed the elevators on those?

A.    Yes, I had the absolute top security clearance at that time.  Pan American was handling the security and during that time when I went into the Marine Corps I qualified destroyers for Vietnam and I was a spotter.

Q.    A spotter?

A.    Yes.  We called them gunfire.

Q.    Now, after you worked in the Marine Corps installing elevators for the minuteman silos, what was your next position?

A.    When my brother got killed in a boating accident he had a couple of properties and I decided to go into the elevator -- I mean, the real estate business which I've been doing for 36 years.

Q.    In what capacity have you been in the real estate business for the last 26 years?

A.    I carried a lot of responsibilities.  When I built my company over the years, 23 years I became the number one Century 21 office in Dade County.  While I was doing that, I was also chairman of the board of directors, board of governors of the Miami Lakes Methodist Church, and we built a new sanctuary.  I represented Century 21 on a national level in Congress on a National Brokers Communications Commerce.

Sorry.  I was on the president's task force and I know I was working in Washington, and then I also became chairman of

the professional standards at the association.  For the last 20 years I've been a member or a chairman of the board or chairman of the committee.  I have hearings every month.  I have a hearing this month.

Q.  And in your capacity --

A.  And ethics, pardon me, it's ethics, and it's morality that runs the day in what we try to do to govern ourselves.  I'm sorry.

Q.  As real estate brokers?

A.  As real estate brokers.

Q.  And are you still in the real estate business?

A.  Yes, I am.  Very active.

Q.  Do you have your same company that you founded?

A.  No.  I started the company when my brother got killed.  I built it for 23 years.  And then I went to work for Keller Williams as a commercial director.

Q.  Did you sell your company to anybody?

A.  No, we actually had to close it because of 911.  We were put out of business.

Q.  And did you ever work for Keyes?

A.  I worked for Keyes for five years and I was a manager and moved their office in Hollywood from Hollywood Boulevard to Sheridan Street, and then they started cutting back because of the recession and I went to work for Keller Williams.  Became their director of commercial and I'm still there today.

Q.   Are you married?

A.   Yes.  My first wife passed after 25 years.  She was diabetic and she had a kidney transplant in Boston.  She had a hepatectomy in Duke University.  Excuse me.

Q.   And to whom are you presently married?

A.   My wife Karen for 22 years.  Since she couldn't have any children, we adopted four.

Q.   And where do you live?

A.   We live in the Country Club of Miami just on the northwest corner of Dade County, just north of Miami Lakes.

Q.   Does that have a Hialeah post office?

A.   Yes, it does.  It's actually known as the Country Club of Miami, but the post office when I moved there in '75 there was only one post office, it was Hialeah but it was on 59th Avenue.

Q.   And let me direct your attention to February 11th, 2014.  Were you home that day?

A.   Yes.  I was getting my daughter ready for school.

Q.   Why were you getting your daughter ready for school?

A.   Well, normally Karen takes her but my wife Karen, she was going to have surgery.  She had cancer and she was having surgery that day.

Q.   What kind of cancer?

A.   Breast cancer.  She had both of them removed.

Q.   And her surgery was that day?

A.   No.  Actually, she's been about six or eight surgeries

because she had infections.  She still has two to go.

Q.   So what time day that day was she scheduled for surgery?

A.   I think it was an afternoon surgery, but I'm not sure of the exact time.  You would have to ask her.

Q.   And --

A.   But I was to take care of the kids and get my daughter off to school.

Q.   What time was your daughter supposed to arrive at school?

A.   She has to be there before 8 o'clock.

Q.   And what school did she go to?

A.   She's going to -- at the time she was going to Horab which is a school in Hialeah.  It's a Christian school.

Q.   And who was in the house that morning?

A.   Karen, Patrick, Elisa and myself.

Q.   And Elisa is your younger daughter?

A.   Yeah, she's 14.

Q.   Now she's 14?

A.   Yeah.

Q.   This was approximately a year and a half ago, correct?

A.   Yes.

Q.   So how old was she then, do you remember?

A.   I guess, I'm sorry, it wasn't my area of concentration so 12, 13.

Q.   And how old was Patrick at the time?

A.   Patrick was 20, I believe.

Q.   Can you describe what happened somewhere around 6:30 or 7:00 that morning?

A.   **Well, Elisa has to get into the shower usually between 6:30 and 6:45 so she had just been finishing the shower when we had the knock at the door.  It was 7:00 or a little bit before 7:00.**

Q.   And who answered the door?

A.   **I did.  My wife came behind me.**

Q.   And what, if anything, happened then?

A.   **They asked to speak to Patrick.**

Q.   Who asked to speak to Patrick?

A.   **Agent Schwartzenberger -- did I say that correctly? Schwartzenberger.  She asked to talk to Patrick because --**

Q.   Was she alone or was she with anybody?

A.   **She had another agent with her.**

Q.   And what did she say to you and what did you say to her?

A.   **She said that there was something that she wanted to talk to Patrick about in North Carolina, so I had no idea how he was connected but they looked to me like they were looking for information to help out a case.  I had no idea my son was involved.**

Q.   When you were brought up, what were you told by your folks about cooperating with law enforcement?

A.   **I've always cooperated with law enforcement.  I was in the Marine Corps.  I respect the law.**

Q.   And so when two FBI agents knocked on your door sometime around 7:00 in the morning or thereabouts, and asked to speak to your son, what did you do?

A.   **I allowed them to come in and I went and brought Patrick out.  He was still sleeping.  He usually sleeps until around 7:00 or 7:05, 7:10, because he has to be in school at 8:00.**

Q.   And where was he going to school?

A.   **He drives to school so he was going to the university where my wife is teaching.**

Q.   What university did your wife teach at?

A.   **At Keiser.**

Q.   Wasn't he at Miami-Dade?

A.   **Are we talking about the first time or the second time? I'm sorry.**

Q.   The first time the agents came to your house.

A.   **Yeah, I believe he was still in Miami-Dade at the time.**

Q.   And then subsequently did he transfer to Keiser?

A.   **He went to Keiser where he started doing much better.**

Q.   So you let them in and you went to get Patrick; is that right?

A.   **That's correct.  I went down the hall and woke him up.**

Q.   Just so we're clear, is Patrick's bedroom at the side of the house?

A.   **The house is about 70 feet long and from the middle of the house it's -- the hallway goes straight to the back, to the**

side, right down the side.  So he's in the bedroom on the front of the house and on the left side of the hallway.

Q.   Okay.  So when you walk in the door to get to Patrick's bedroom, what do you do?

A.   I said, "Patrick, you need to get up, there's some people that want to talk to you."

Q.   Now, you said -- does he have a window that opens to the front of the house or the side of the house?

A.   Both.  He's in the corner.

Q.   So one window opens to the front and one window opens to the side?

A.   Two in the front and two to the side.

Q.   And by the way, when you come in the door, what part of the house are you facing if you face directly from the door?

A.   Straight out to the pool area through the dining room.

Q.   And is that the backyard?

A.   That's the backyard.

Q.   You went and you got Patrick.  What happened next?

A.   He came out, and with a little bit of shuffling around we all sat down or they sat down at the dining room table.

Q.   Who sat down?

A.   The two FBI agents and Patrick.  I stood behind and my wife Karen was behind me.

Q.   Did there come a time when Karen sat on a couch in the living room?

A.   **Yes, she did.  It was as the conversation began.**

Q.   And were you able to hear the conversation?

A.   **I heard it with the distraction of my daughter shuffling around getting ready for school, making sure she wasn't late. Because of the surgery, I wanted to make sure everything was on time and I wanted my wife not to worry about her being on time for school.**

Q.   And did there come a time when you took your daughter to school?

A.   **Yes, I did.  I took her to school.  At a point in time when the -- when Patrick had brought out some equipment of his, that Agent Ginther started looking into it and Agent Schwartzenberger was trying to convince my son to go to the backyard, and right after that I left.**

Q.   Well, you say he brought out some equipment from his room. What equipment are you talking about?

A.   **Could be a phone.  Honestly, I wasn't watching the equipment.  It wasn't my focus at that time, at the point.**

Q.   Did you see if Patrick signed anything before Agent Ginther?

A.   **After I came back and when I was -- sometime, maybe 20 minutes after I came back, but I'll go over that if you want to now or we can talk about it as you go forward.**

Q.   Let's talk about it in time sequence.  But my question is did Patrick -- did you see Patrick sign any consent form before

Agent Ginther started looking at the equipment?

A.   **Absolutely not.**

Q.   What happened next?

A.   **Well, at that point I took my daughter to school.  It takes 45 minutes to an hour round trip.  It goes on 57th Avenue and over south to Hialeah on 16th Street.  I dropped her off, come back through traffic, and I'm usually -- it's usually 45 minutes to an hour.**

Q.   Maybe you're leaning a little close to the microphone because your words are a little muffled.  Do you remember what time you left the house?

A.   **It had to be very close to 7:30 because of the expectation of being there on time.  I'm always on time.  Almost always.**

Q.   By the way, have you been at the courthouse throughout the trial?

A.   **I've been here every day before and until the end of the trial.**

Q.   Were you in the courtroom for anyone else's testimony?

A.   **No.  I was not allowed.**

Q.   Is that because of the sequestration rule saying a witness other than the case agent or defendant --

A.   **Whatever the rule was.  I don't know.**

Q.   But you haven't been in the courtroom?

A.   **I have not.**

Q.   How long had the agents been there when you left to take

your daughter to school?

A.   **They got there around very close to or before 7 o'clock, so at about 30 minutes later I left.**

Q.   Was Patrick still at the table when you left?

A.   **They were getting up to go outside.**

Q.   And what was Agent Ginther doing?

A.   **He was researching or looking into my son's equipment.**

Q.   And about what time did you get back to the house?

A.   **Again, if it was 7:30 that I left, it was before 8:30, maybe 8:15.**

Q.   What happened when you came back to the house?

A.   **When I came back to the house, Agent Ginther had a black box that I had not seen before I left and he was using it on the equipment.  My son was still outside.  And I wasn't allowed to go out there.  I was told I couldn't go out there.**

Q.   What do you mean?  Who told you couldn't go out to your own backyard?

A.   **Agent Ginther said I couldn't.  I'm sorry.**

Q.   Who told you you couldn't go to your own backyard?

A.   **Agent Ginther said I can't go out there.**

Q.   How did that happen?  Can you tell us the conversation?

A.   **Well, I said, "I'd like to go and see my son."  And he said, "No, you can't."**

Q.   But it was your house.  Why didn't you go outside?

A.   **They represented authority.  Authority that I always**

respected until that incident.

Q. What did you do when you got home after you had your conversation with Agent Ginther?

A. It was probably a few minutes, maybe 15, 20 minutes they came inside. But before that, Agent Ginther went out there and I believe he picked up two pieces of paper and took them out there. And I believe that they came back in and coached Patrick to sign the papers.

Q. Did you hear any conversation?

A. The conversation was about the papers being signed and, honestly, I wanted to see them. I was told, by the way, by Agent Ginther when I was at the door when I asked to go outside that Patrick's of age and he's an adult and you can't go out there. That was the reason he told me I couldn't go out there. And the reality of the signing of the papers, I have no idea what the papers were. Didn't know what the papers were. Even after they left because they threw them on the table and ran right after that.

Q. Well, let me ask you this: Patrick was of age. He was 20 years old, right?

A. Yes.

Q. Why were you so protective of him at this point?

A. We've been protecting Patrick all his life because he's immature. He has issues of naivety. We know that he has times when he just is naive. He doesn't know. We have instructed

him a lot.  He doesn't know about the laws.  He doesn't know about the rule of law.  He doesn't know about any of those things.  He doesn't know that when he signed a piece of paper, that is a form that not only requires him to give away his life, give away his rights, give away -- he was not advised to see an attorney.  He was not advised what is on the document. He did not read the document and he was not told about the consequences of 30 years in prison.

MR. EMERY:  Objection, Your Honor.

MR. WIDLANSKI:  Objection, Your Honor.

A.   Boy, that was uniform.

THE COURT:  Yeah.

MR. SCHWARTZ:  I agree, that should be stricken, Judge.

THE COURT:  Well, let me just remind the jury that you are to determine from the evidence in the case what the facts are and they should not concern themselves with any kind of punishment in the event of conviction.

So it really has no bearing on their consideration what that sentence should be if it gets to that point.

MR. SCHWARTZ:  And I apologize to the Court.

BY MR. SCHWARTZ:

Q.   Let's not talk about any consequences.  Let's just talk about what happened that day.

A.   Where do you want to pick up?

Q.   Why were you so protective of your son?

A.   **My son has had a lot of things to deal with in his life.**
**And --**

Q.   You said your son is immature; is that right?

A.   **That's correct.**

Q.   Has he been diagnosed with any illness regarding his
maturity or anything like that?

A.   **There have been some diagnoses.  The most pertinent one**
**that when he was in school was that he needed more time to take**
**tests because he couldn't take the tests at the same pace as**
**the other kids.**

Q.   Does he have something like ADHD?

A.   **He has ADD, I believe, or it might be ADHD.  I don't know.**

Q.   And after Patrick signed these papers and the agents
immediately left, what happened next?

A.   **Well, before they left they actually -- I mean, there was**
**an incident where my wife asked, "Why are you asking him to**
**sign papers," and they basically threatened us.**

        MR. EMERY:  Objection, Your Honor.  Hearsay.

A.   **I'm sorry, I was there when I heard it.**

        MR. SCHWARTZ:  I'm sorry, no.  You don't rule on the
objections.  The Judge does.

        THE COURT:  Sustained.

BY MR. SCHWARTZ:

Q.   Did you have any -- were there any conversations in your

presence between your wife and any FBI agents before they left?

A.   My wife --

Q.   Don't tell me what was said, I'm just asking were there conversations?

A.   Yes.

Q.   With whom was your wife speaking?

A.   To agent -- I'm sorry.

Q.   The male agent or the female agent?

A.   Female agent.

Q.   What did she say to your wife and what did your wife say to her?

         MR. EMERY:   Objection, Your Honor.  Hearsay.

         THE COURT:   Sustained.

A.   I was there.

         MR. SCHWARTZ:   Again, you don't rule on the objections.  You're not chairing a hearing.

BY MR. SCHWARTZ:

Q.   As a result of this conversation with Special Agent Schwartzenberger, did you feel threatened?

A.   Absolutely.  They were going to come and --

Q.   The Judge ruled you can't say what they said.

A.   Sorry, Your Honor.

Q.   Did you feel threatened?

A.   Absolutely.

Q.   What occurred after that?

A.   There was some further shuffling around.  Somehow Patrick and the agents went to his room, came back, they dropped the papers on the table and left.

Q.   Did they drop the original papers on the table?

A.   Yes.

Q.   Did they take --

A.   Or copies, I don't know.  It was only one set for us and that was the set they left.

Q.   And after that, did you see the agent again?

A.   After they left?

Q.   Yes.

A.   Well, when they came back a year later they came with a SWAT team, or whatever you call it, and some banging on my door and getting ready to knock it down.  There was a line of them six or eight deep when we had already told them that if they decided to arrest Patrick we would bring him down and they showed up like they were ready to tear up the house.

Q.   Let me go back.  Did you tell -- after a conversation with Special Agent Schwartzenberger that you had, did you send her an e-mail sometime after?

        MR. EMERY:  Objection, Your Honor.

        THE COURT:  Let me hear the question again.

BY MR. SCHWARTZ:

Q.   After the conversation that you had with Special Agent Schwartzenberger, did you subsequently send her an e-mail?

A.   **Yes.  But she had told me --**

MR. EMERY:  Objection, Your Honor.

THE COURT:  Sustained.

A.   **I can't say that?**

BY MR. SCHWARTZ:

Q.   What did you say to her in e-mail?

A.   **In an e-mail --**

MR. EMERY:  Objection.

THE COURT:  Overruled.

BY MR. SCHWARTZ:

Q.   What did you say to her in an e-mail?

A.   **I told her that we had made an appointment for Patrick with a psychiatrist.**

MR. EMERY:  Objection, Your Honor.  Relevance.

THE COURT:  Overruled.

MR. EMERY:  Plus the Court's ruling.

THE COURT:  Let me hear the answer.

A.   **In an effort to help Patrick, which I knew that he had some immaturity, I thought it was a good idea for him to see a psychiatrist.**

MR. EMERY:  Objection, Your Honor.

THE COURT:  The question was what did he say in his e-mail.

MR. EMERY:  But, Your Honor, he's going beyond what was in the content of the e-mail.

THE COURT:  I understand.  So just answer the question that was asked.

A.    I told her that we made an appointment for my son with a psychiatrist or psychologist that day.  I didn't know it was that day in previous, but I know I did it.  I just didn't remember what day.  It turned out to be that day.

BY MR. SCHWARTZ:

Q.    And did there come a time when the agents came back to your house?

A.    You're talking about next year?

Q.    Yes.

A.    Yes, they came back.

Q.    Let me direct your attention to March 6th, 2015, two months ago.  What happened on that day?

A.    Around somewhere between 6:00 and 7 o'clock, they came slamming at my door, banging on my door and there was a line of them running out into the street.

Q.    And what happened?

A.    It made me real nervous.  I know that there were uniforms there so I didn't go get a gun, I opened the door but the problem was I was so nervous I couldn't get the numbers into the security and she was yelling, one of the agents, a different agent was yelling, "She's going to break down the door."

Q.    And what did you do?

A.   I finally got the security code down and I opened the door and they rushed in and came in and took Patrick and took him away.

Q.   Did they do anything else?

A.   They went to the house taking pictures and ransacking through things.  Fortunately, they didn't destroy anything, but they had threatened to do it previously.

Q.   Did you -- let me show you a picture of Patrick's room.

MR. SCHWARTZ:  Can I have the picture?

MR. EMERY:  (Complies).

BY MR. SCHWARTZ:

Q.   Let me show you what's been marked in evidence as Patrick's -- as Government's Exhibit 33G.

A.   That's it.

Q.   Whose room is this?

A.   Patrick's.

Q.   Is this how Patrick's room looked before the FBI agents came into the house?

A.   The answer is probably just different, but the same mess.

Q.   Was Patrick messy?

A.   Yes.

Q.   Were the blinds the way they were in this picture?

A.   I don't recall that.

Q.   Does he normally sleep on a bed that's unmade like it is in this picture?

A.   He has usually sleeps on a sheet or the comforter.

Q.   Do you see a comforter in this room?

A.   I can't see the whole picture so --

Q.   I'm sorry.

A.   Not to my -- from what I can see.

Q.   What is the white balled up object in the lower right- hand corner of the picture?

A.   That might be the comforter.

Q.   Is that normally on the bed or off the bed?

A.   It's supposed to be on the bed.

Q.   When Patrick has the room, is it on the bed or off the bed?

A.   When Patrick -- when Patrick is Patrick anything can be anywhere.

Q.   So would it be fair to say that the FBI didn't tear his room apart.  This is the way Patrick keeps his room?

A.   Yeah.  I can't tell the difference, however, you'll have to find out from Patrick what it looked like when he's -- before that happened.

Q.   In your presence, was Patrick advised of his rights not to sign or consent to the search of his equipment?

A.   No, he was not.

Q.   In your presence, was Patrick advised of his Miranda rights?  You know what those are?

A.   Yes, I know, and he was not.

Q.   Did you agree to the FBI agents taking anything from your

house on February 11th, 2014?

A.   **No.**

Q.   Did your wife agree?

A.   **No, not to my knowledge.**

Q.   To your knowledge, did Patrick agree?

A.   **Patrick apparently signed those documents.**

Q.   Do you know if Patrick read those documents before --

A.   **I know now that he did not.**

MR. SCHWARTZ:  May I have a moment, Your Honor?

THE COURT:  All right.

MR. SCHWARTZ:  I would tender the witness, Your Honor.

THE COURT:  Okay.  Let's go ahead and take our --

THE WITNESS:  Am I allowed to saying anything?

THE COURT:  No.

MR. EMERY:  Your Honor, I just have one question to ask.


*CROSS EXAMINATION*

BY MR. EMERY:

Q.   Good morning, Mr. Killen.

A.   **Good morning.**

Q.   You love your son a lot, correct?

A.   **Absolutely.**

MR. EMERY:  No further questions, Your Honor.

MR. SCHWARTZ:  One redirect question and I think we're

finished with the witness.

THE COURT:  All right.

### *REDIRECT EXAMINATION*

BY MR. SCHWARTZ:

Q.   You believe in God?

MR. WIDLANSKI:  Objection.

MR. EMERY:  Objection, Your Honor.

THE COURT:  Overruled.

A.   **I think there is some information missing that I would like to speak about.**

THE COURT:  It's not.

MR. EMERY:  I would object.

THE COURT:  Sustained.

BY MR. SCHWARTZ:

Q.   Would you lie under oath --

MR. WIDLANSKI:  Objection.

MR. EMERY:  Objection.

BY MR. SCHWARTZ:

Q.   -- to protect your son?

A.   **No.**

THE COURT:  Thank you.  We'll take our midmorning recess.

(Thereupon, the jury was escorted out of the courtroom.)

(Thereupon, a brief recess was taken.)

**MR. EMERY:** Your Honor, we just want to raise an issue before the jury comes out.

**THE COURT:** Okay.

All right. What do you have?

**MR. EMERY:** Your Honor, based on what happened with the last witness, the father who mentioned the possible penalty, we would ask that the mother who is going to be testifying next be instructed that she's not to mention anything about a possible term of incarceration for her son.

**MR. SCHWARTZ:** I've already done that, Judge, but it might help if you did it, too.

**THE COURT:** All right. So what's her name?

**MR. SCHWARTZ:** This is Ms. Karen Killen and she was told not to testify about any possible penalty.

**MR. EMERY:** Your Honor, I'd like her to be instructed by this Court.

**THE COURT:** Okay. So, Ms. Killen, you know you're not to testify regarding anything about any possible penalty in the event of a conviction?

**THE WITNESS:** Yes, Your Honor.

**THE COURT:** All right. Anything else? Come over here, please.

(Thereupon, the jury was brought into the courtroom.)

**THE COURT:** Okay, please be seated.

Call your next witness. Swear in the witness.

Thereupon,

                              **KAREN KILLEN,**

having been duly sworn by the courtroom deputy, testified as

follows:

          THE WITNESS:  Absolutely.

          THE COURTROOM DEPUTY:  Thank you.  Please state your

full name and spell it for the record.

          THE WITNESS:  Karen Killen, K-A-R-E-N, K-I-L-L-E-N.

          THE COURTROOM DEPUTY:  Thank you.


                         *DIRECT EXAMINATION*

BY MR. SCHWARTZ:

Q.   Good morning, Mrs. Killen.

A.   **Good morning.**

Q.   Are you related in any way to the defendant, Patrick

Killen, Junior?

A.   **Yes, I'm his adoptive mother.**

Q.   And how old was Patrick when he came to live with you?

A.   **Patrick arrived from Romania.**

Q.   You don't have to say where he was from.  Just how old he

was?

A.   **He was three and a half years old and weighed 24 pounds.**

Q.   And Patrick grew up in your household?

A.   **Yes.**

Q.   And where do you live?

A.    We live in a very small community in northwest Dade called the Country Club of Miami.  There are about 152 houses in there.

Q.    And do you work or are you a stay-at-home -- I shouldn't say that.  Do you work in or out of the house?

A.    I work out of the house.

Q.    What do you do for a living?

A.    I teach business accounting and economics at the university level.

Q.    And were you recently employed by Keiser University?

A.    Yes.  I'm still an adjunct with Keiser University with DeVry University and with UAC Miami.  I teach at both the undergraduate and graduate levels.

Q.    And when you say you teach business, what type of courses do you teach?

A.    Ethics, leadership, entrepreneurship, project management.

Q.    And do you have a college degree?

A.    Yes.  Yes, sir.  I hold a master's degree in business from the University of Miami.  This keeps going in and out.  I'm sorry.

Q.    Lean back a little bit.

      And so you have a master's from the University of Miami?

A.    Yes.  Yes, sir.  I told -- can you hear me?  Okay.  Sorry. Yes, I hold a master's degree from the University of Miami and

I'm currently finishing up my dissertation in business with a specialization in advanced accounting from North Central University.

Q. And is that for a doctorate degree?

A. Yes, sir. A Ph.D.

Q. And have you completed your doctoral courses?

A. Yes, sir. I'm just finishing up the dissertation work now.

Q. And where did you get your undergraduate degree?

A. A school in Chicago called Illinois Institute of Technology. I had two scholarships.

Q. And how old were you when you married Patrick Killen, Senior?

A. Thirty-eight.

Q. And I'm going to ask you an uncomfortable question, and I apologize, how old are you now?

A. I'm 59.

Q. To me that's young. And do you have any other children besides Patrick?

A. Right now we have one daughter who just turned 14.

Q. And where has Patrick gone to school?

A. For pre-K Patrick went to St. Lawrence Child Care Center. For kindergarten through second grade he went to our Lady of the Lakes Catholic School. When he was in second grade he developed an ailment called HSP which is Henoch-Schonlein Purpura. It traveled to his --

Q.   Would you spell that for the court reporter if you can? She doesn't need you to.

A.   **And I'll try.  H-E-N-L-O-C-H, I believe it's S-C-H-O-N-L-E-I-N, Purpura, P-U-R-P-U-R-A.  It caused Patrick to have rheumatoid arthritis.  We had to carry him around.  It ultimately traveled to his kidneys.  We had to hospitalize him.**

          MR. EMERY:  Objection, Your Honor.  Relevance.

          THE COURT:  Overruled.

A.   **It actually is relevant, Your Honor.**

          MR. SCHWARTZ:  You don't rule on the motion.

A.   **Oh, sorry.**

BY MR. SCHWARTZ:

Q.   So he was hospitalized.  Did he miss any school while he was in the hospital?

A.   **Yes.**

Q.   Did it cause him to have a problem with staying in his grade?

A.   **Yes.**

Q.   What happened?

A.   **He was held back.  After second grade we moved him to a different school where we thought he would have more one-on-one interaction with the teacher and they held him back so he repeated second grade.**

Q.   And that was because he missed classes due to his illness?

A.   **Yes.**

Q.   And after his hospitalization, he came out and he went back to school.  What school did he go to?

A.   **Dade Christian School, but he was on a number of drugs, including steroids.**

Q.   And that helped him with his health, physical health problems, right?

A.   **Yes.  But the steroids stunted his growth.**

Q.   His physical growth?

A.   **His physical growth.**

Q.   And what happened -- how long did he stay at Dade -- was it Dade Christian?

A.   **Yes.**

Q.   How long was he at Dade Christian?

A.   **Until fourth grade.  And when he was in fourth grade I had a problem with one of the teachers.  She had him sitting under an air vent and Patrick didn't know -- we think it was because he was strapped to a crib in Romania.**

        MR. EMERY:  Objection, Your Honor.

        MR. WIDLANSKI:  Objection, Your Honor.  Side-bar, Your Honor?

        THE COURT:  Sustained.

BY MR. SCHWARTZ:

Q.   Please don't talk about -- don't add to the answer.  Just answer the question.

A.   **I just wanted to explain that he didn't know, he was in**

seventh grade, to put on a jacket.  So he was always sick, he was cold, and so in fourth grade I moved him to a different school.

Q.   Okay, that's fine.  Now, in fourth grade what school did you transfer him to?

A.   Well, I had a problem in fourth grade.  So in fifth grade he went to a small school in Miami lakes.  Miami Lakes Baptist School.

Q.   You're covering all denominations.

A.   Well, we're very religious.

Q.   You can't volunteer stuff.  Okay?  At -- how long did he stay at Miami Lakes Baptist?

A.   One year.

Q.   Is that fifth grade?

A.   Fifth grade.

Q.   Now it's time for middle school.  Where did he go to middle?

A.   Dade Christian.

Q.   So went back to Dade Christian School?

A.   Correct.

Q.   And how long did he stay there?

A.   For 6th and 7th grade.

Q.   Does the middle school also include 8th grade?

A.   He wasn't doing well.  He was getting poor grades.  He didn't seem to be applying himself.

Q.   So did there come a time when he was tested for ADHD?

A.   **Yes.**

Q.   And when was that?

A.   **Right before high school.**

Q.   And where did he finish middle school, by the way?

A.   **Lawton Chiles.**

Q.   And where is that?

A.   **Northwest Dade.**

Q.   That's a public school?

A.   **Yes, sir.**

Q.   And when he started high school, where did he go to high school?

A.   **I want to explain why but you're not letting me so -- it's okay.**

Q.   Did you take him out of the public school system after Lawton Chiles?

A.   **Yes.**

Q.   Why did you do that?

A.   **He was being bullied.**

Q.   And how did he react to being bullied?

         MR. EMERY:  Objection, Your Honor.  Relevance.

         THE COURT:  Overruled.

A.   **He became very withdrawn.  Very quiet.**

BY MR. SCHWARTZ:

Q.   Did he socialize with the other kids?

A.  No.

Q.  Did he have a lot of friends?

A.  No.

Q.  Did he engage in sports?

A.  No.

Q.  What did he do?

A.  Well, we tried to spend time with our children playing games, watching movies, going on vacations, going out to dinner.  We tried to spend as much time as we can with them.

Q.  So because of the problems that he had at Lawton Chiles Middle School, where did you send him to high school?

A.  We applied to Chaminade-Madonna, which is in Hollywood.

Q.  And what happened?

A.  He wasn't accepted.

Q.  Where did he go to school?

A.  That's when we had him tested with Dr. Silverman.  He --

Q.  Was that where he was diagnosed with ADHD?

A.  Yes, sir, diagnosed with ADHD and test anxiety.

Q.  And because of his ADHD and test anxiety, did you reapply to Chaminade?

A.  Yes.  Chaminade has a program for special needs children.

Q.  And did he go to Chaminade?

A.  Yes, sir.

Q.  What grades did he go to Chaminade?

A.  Ninth and tenth grade.

Q.    And did his social skills improve at Chaminade?

A.    **They seemed to improve a little bit.  He had a girlfriend. He was the assistant coach for the girls' lacrosse team.**

Q.    And what happened after that?

A.    **Again, his grades just didn't warrant spending all that money for that school and after tenth grade I said to Patrick, "Maybe it might be better if I try to home school you because you're not learning."**

Q.    So did you home school him?

A.    **Yes, sir.  We used the Florida Virtual School curriculum.**

Q.    And how many years did you home school him?

A.    **Once I started, he picked up the ball and ran with it.  So he was there for two years, he completed 11th and 12th grade and then completed his GED.  We were very proud of him.**

Q.    But how did that affect his ability to socialize with other high school kids?

A.    **That was a problem.**

Q.    In what way?

A.    **He didn't.**

Q.    What do you mean?

A.    **He didn't socialize.  He had clubs that he belonged to with Florida Virtual School, but he continued with his Tae- Kwon-Do, he became a first degree black belt with Tae-Kwon-Do, he socialized there, but not too much interaction face-to-face. That was a problem.**

Q.   You say he graduated, he got his GED.  Did he go on past secondary school to college?

A.   **He started Miami-Dade College.  But he flunked out.**

Q.   When was that, what years?

A.   **He started 2012 and he was there for, I believe, two years.**

Q.   When the FBI came to your house on February 11th, 2014, was he attending Miami-Dade?

A.   **Yes.**

Q.   And when did he flunk out of Miami-Dade?

A.   **Later that year.**

Q.   And did he continue his college education after that?

A.   **Yes.  Because I was faculty at Keiser and Keiser was more of a private school with a more one-on-one approach with the students, I suggested that perhaps he try Keiser University and he was accepted into Keiser.  He was doing very well at Keiser. He was getting all As and Bs.**

Q.   You weren't helping him, were you?

A.   **No.  No.**

Q.   When he was going to Keiser, was he also working?

A.   **Yes.**

Q.   For whom was he working?

A.   **He was working at One Click in the Pembroke Pines location doing sales.**

Q.   Now, does Patrick have electronics in your house?

A.   **Yes.**

Q.   What electronics did he have?

A.   **He had a MacBook, a phone, Apple TV, television in his room, a Wii.**

Q.   Did he have an iPad?

A.   **He had an iPad.**

Q.   No wonder he never wanted to go out.  Did he spend a lot of time on his electronics?

A.   **Yes.**

Q.   Were you able to monitor what he was doing on his electronics?

A.   **No.**

Q.   Why not?

A.   **I didn't think I had to.  He was always a good boy.  He's always so sweet.**

Q.   Did there come a time when some FBI agents came to visit you?

A.   **Yes.**

Q.   Well, let me direct your attention specifically to February 11th, 2014.  Can you tell me what you were preparing for that day?

A.   **December 20th, 2013, I had been diagnosed with breast cancer and had both breasts removed.  I was constantly getting infections in my breasts so February 11th, 2014, I had a surgery scheduled for that morning to do reconstruction on my breasts.**

Q.    What time was the surgery scheduled for?

A.    **Around 11 o'clock.**

Q.    And who usually takes Elisa to school?

A.    **I do.**

Q.    On that day, who was going to take Elisa to school.

A.    **My husband.**

Q.    Why was that?

A.    **Because I had the surgery scheduled.**

Q.    Was there any prep work you had to do before the surgery?

A.    **Yes.**

Q.    What type of prep?

A.    **Shower with a certain gel, calm myself down.**

Q.    Did there come -- was there a knock on your door sometime that morning?

A.    **Yes.**

Q.    About what time?

A.    **6:15, 6:30.**

Q.    And who answered the door?

A.    **My husband and I.**

Q.    And who was this?

A.    **Two plainclothes people, one who was wearing -- a woman who was wearing a polo shirt and a man who was wearing a very wrinkled Hawaiian shirt.**

Q.    And what did they say to you and what did you say to them?

A.    **Well, we opened the door and they asked to talk to our son**

and I said, "Well, who are you?"  And they said, "FBI."

Q.   Did you ask for any identification?

A.   Yes.

Q.   Did they show you any identification?

A.   Yes.

Q.   And what happened next?

A.   They came in, my husband went to get my son.

Q.   Where was your son Patrick at the time?

A.   He was still in bed sleeping.

Q.   Where was your daughter?

A.   She was taking a shower.

Q.   And after your husband got Patrick, what happened next?

A.   The FBI sat down Patrick at the table.  I thought they were there to talk about one of his friends.  I thought one of his friends was in trouble.

Q.   Let me interrupt you for a second.  Instead of generally referring to them as the FBI, speak individually about the two individuals so we know who said what and who did what, okay?

A.   Yes, sir.

Q.   So who did Patrick then talk to at first?

A.   Agent Schwartzenberger.

Q.   And where did he talk to Agent Schwartzenberger?

A.   At the dining room table.

Q.   Were you present at that time?

A.   I was sitting in the living room.

Q.   How far were you from them?

A.   **From here to that little podium there.**

Q.   The podium with the electronic equipment on it?

A.   **Yes, sir.**

Q.   Let me show you a picture of your living room area and see if you can point it out to me.

Let me show you what's been received in evidence as Government's Exhibit 33E and ask you to look at the screen in front of you and ask you if you recognize it?

A.   **Yes.**

Q.   What do you recognize it as?

A.   **My living/dining room area.**

Q.   Now you can, with the magic of the Court system, would you circle with your finger the area where Patrick was with the agents?

A.   **(Complies).**

Q.   That's where Patrick was sitting?

A.   **Yes.**

Q.   Was anybody else at that table?

A.   **Mr. Ginther.**

Q.   Where was he sitting?  Circle that.

A.   **I think he was standing.**

Q.   How about Special Agent Schwartzenberger?

A.   **Those two chairs that I circled.**

Q.   Okay.  So who was in the chair closest to us?  There are

two chairs that you circled where Patrick and Special Agent Schwartzenberger are sitting next to each other?

A.   **I don't remember but -- I'm sorry, Patrick and Ms. Schwartzenberger were sitting next to each other, but I don't remember which way it was.**

Q.   Who was in which chair?

A.   **No, sir.**

Q.   And thank you, if you don't remember don't try to give an answer that you think it should be.  Exactly what you remember.  Okay?

Where were you sitting?

A.   **In the living room.**

Q.   Can you show us where on this picture?

A.   **It's behind, it's hidden behind that vase.  There are two chairs behind that vase and I was sitting in one of the chairs.**

Q.   The vase is the --

A.   **Right in the front on the right-hand side there is that tall vase.**

Q.   Is that this?  I'm sorry, this thing right there?

A.   **Yes.  Right.  So behind there further off there are two chairs.  I was sitting in one of those chairs.**

Q.   And did you ever move to the couch?

A.   **I may have.**

Q.   So you're in the living room in a chair.  Special Agent Schwartzenberger and Patrick are at the table.  Agent Ginther

is standing near the table; is that right?

A.   **Yes.**

Q.   Where is your husband?

A.   **I believe he was getting ready to take my daughter to school.  I apologize.  It was a year and a half ago and I had surgery later that day so I apologize if I don't remember all of the minute details.**

Q.   Could you hear what was being discussed between Patrick and the agents?

A.   **No.**

Q.   Did you hear anything or did you just --

A.   **No.**

Q.   Did you make any attempt to participate in the conversation?

A.   **I did ask Special Agent Schwartzenberger why they were there.**

Q.   What did she say to you?

A.   **"We're just here to ask your son some questions something about North Carolina."**

Q.   And what did you do then?

A.   **I became very uncomfortable because she didn't explain it to me.**

Q.   Lean back a little bit.

A.   **I became very uncomfortable because she didn't explain it to me.**

Q.   And did you say or do anything?

A.   **I said, "I have surgery scheduled later this morning.  I don't have time for this."**

Q.   What did Agent Schwartzenberger say to you?

A.   **She ignored me.**

Q.   What happened next?

A.   **I was very uncomfortable.  I had surgery.  I didn't have time for this.  They should have left and let us get on with our lives.**

Q.   What happened next?

A.   **At some point Patrick became cold, he asked to get a robe from his room.  He went to his room to get a robe.**

Q.   And did he come back?

A.   **Yes.**

Q.   What happened next?

A.   **I apologize, I don't remember all of the minute details.  I do remember at some point Mr. Ginther going back into the room with Patrick.  I don't know what happened.  I wasn't there in the room.**

Q.   Was that before or after Patrick went outside to the patio?

A.   **Before.**

Q.   How long did Patrick and Special Agent Ginther stay in the bedroom?

A.   **A fairly long time.**

Q.   Do you know what happened during that time?

A.   **No, sir, I wasn't there.**

Q.   Did Patrick and Ginther come back into the living room?

A.   **Into the dining.**

Q.   Into the dining room, forgive me.  And what happened then?

A.   **Mr. Ginther took something out of his pocket.  But I don't know what it was.**

Q.   What did it look like?

A.   **Like a little, I don't know, flash drive or something.  I don't know.**

Q.   And did he do anything with that?

A.   **At some point they had some equipment on the table but, again, I'm sorry, so sorry, I just don't remember the sequence of events.**

Q.   Did there come a time when Patrick and Special Agent Schwartzenberger went outside?

A.   **Yes.  And I told Patrick not to go outside.**

Q.   What do you mean?

A.   **I'm sorry?**

Q.   What do you mean you told him not to go outside?

A.   **I didn't want him out there and now I'm feeling really nervous because they didn't tell us why they were there.  And they're going into my son's room and collecting things and now they want to take him outside without me hearing what's going on and this is my son.**

Q.   But wasn't he an adult?

A.   Mr. Schwartzenberger, I teach at the college level.  And my students ask me all the time, "Oh, Professor Killen, do you have children," and I tell them, "Yes, I have children.  They're both adopted.  I have a girl who is 13" -- well, now she's 14 but back then she was 13, "going on 16.  And then I also have a son who is also adopted who is 21, also going on 16.  But they get along really well together."

And then my students say, "But Professor Killen, you know, girls, they mature a lot faster than boys."

Patrick --

MR. EMERY:  Objection.

A.   Excuse me.  Patrick --

MR. EMERY:  Objection, Your Honor.  Non-responsive.

THE COURT:  Sustained.

A.   I needed to be with my son.  They had no right to separate me from my son.

BY MR. SCHWARTZ:

Q.   Wait.  Wait.  You were concerned because of Patrick's maturity level of being away from him; is that correct?

A.   Correct.

MR. EMERY:  Objection.  Leading.

THE COURT:  Sustained.

BY MR. SCHWARTZ:

Q.   I won't lead.  Why were you concerned about being away from Patrick?

A.   Because of his maturity level.  He has the psychological and emotional acuity of a 16-year-old.

Q.   And did you express your concern to Special Agent Schwartzenberger or Ginther or Schwartzenberger?

A.   To Mr. Ginther.

Q.   What did he say?

A.   I started to walk out the sliding glass door and I said, "This is my house, I need to go out and be with my son," and then he stepped in front of me and wouldn't allow me to go out.

Q.   Well, could you show us on picture where the sliding glass door is you're talking about?

A.   (Complies).  (Indicating).

Q.   He didn't physically touch you in any way?

A.   He put his hand out and had I taken one more step he would have touched me.

Q.   But he didn't touch you?

A.   No, sir.

Q.   And did you try to go out again after that?

A.   I stood at the door, at the sliding glass door and I was motioning to Patrick, you know, to try to get his attention.  I didn't want him out there with her.  I wanted him to come back inside.

Q.   And did he see you?

A.   I don't think so.

Q.   Well, how was he sitting outside?

A.   They were parallel to the door.

Q.   How long was Agent Ginther -- I'm sorry, Special Agent Schwartzenberger and Patrick outside?

A.   I don't recall.

Q.   Were they still outside when your husband came home from taking to your daughter to school?

A.   I don't recall.

Q.   Did there come a time when they came inside?

A.   Yes, sir.

Q.   What happened then?

A.   Ms. Schwartzenberger said she had to take Patrick's electronics.

Q.   Well, where were Patrick's electronics during the time they were outside?

A.   On the table with Mr. Ginther.

Q.   Who gave them to him?

A.   Patrick went back to his room.  Ms. Schwartzenberger insisted he bring his electronics to her.

Q.   Did you ever hear her ask him for his consent to search the electronics?

A.   No.

Q.   Did you ever, before they went outside, see Patrick sign any consent form to search the electronics?

A.   No.

Q.   What was Agent Ginther doing other than blocking the door

when you wanted to go out?

A.   **Searching electronics.**

Q.   How was he doing that?

A.   **He had some electronic equipment and he was opening Patrick's laptop and I believe they demanded Patrick give them his passwords.**

Q.   And did he give him the passwords?

A.   **Yes.  He's a child.  He was intimidated by the FBI.**

Q.   Well, how were you brought up to react to law enforcement?

MR. EMERY:   Objection, Your Honor.  Relevance.

THE COURT:   Overruled.

MR. SCHWARTZ:   I'll withdraw the question, Judge.

BY MR. SCHWARTZ:

Q.   How did you bring up Patrick to react to law enforcement?

A.   **The same way I was brought up.  I'm a baby boomer and we were taught to respect authority.**

Q.   So when Patrick came inside, was Agent Ginther still working on the electronics?

A.   **Yes.**

Q.   Had he gone outside at all?

A.   **Not that I remember, but I don't recall.  Again, I don't recall every minute detail.**

Q.   When Patrick came inside, did you see him given any papers?

A.   **At some point he was handed papers and I wanted to read them and I was refused.**

Q.   Was that after Patrick was on the patio or before he went out?

A.   **No.  After.  When he came back in.**

Q.   What do you mean you were refused to read them?

A.   **I wanted to read them.**

Q.   Why did you want to read them?

A.   **Because he's my son.  He's a child.  I should have the right to read what he's signing.**

Q.   Did you read them?

A.   **Did I -- no, they wouldn't let me read them.**

Q.   Who wouldn't let you read them?

A.   **Ms. Schwartzenberger and Mr. Ginther.**

Q.   In your presence did Patrick read them?

A.   **No.**

Q.   Why did he sign them without reading them, if you know?

          MR. EMERY:  Objection, Your Honor.

A.   **I don't know.**

          MR. EMERY:  Objection, Your Honor.

          THE COURT:  If she knows.

BY MR. SCHWARTZ:

Q.   Did you have any other conversations with Agent Schwartzenberger about the electronics?

A.   **Yes, she said she needed to remove them from my home and I said, "Don't you need a search warrant for that?"**

Q.   And what did she say to you?

A.   "Oh, you need a search warrant?  Okay, I'll get a search warrant but when I come back with a search warrant I'll come back with a SWAT team, break your door down, tear your house apart, and surely you don't want that in such a nice neighborhood."

Q.   What did you say?

A.   What could I say?  I was so taken aback.  I didn't know what to say to her.

Q.   What did you do?

A.   I didn't do anything.  I just stepped away.

Q.   Did you tell Patrick to give them what they wanted?

A.   No.

Q.   Could you have?

A.   Maybe.  I don't remember.  It was a terrible -- what a terrible thing for a government official to threaten a U.S. citizen.

Q.   What happened next?

A.   They took the electronics.

Q.   Did they stay or did they go?

A.   They left.  The took the electronics, then they left.

Q.   Did there come a time when you saw these agents again?

A.   Yes.

Q.   When?

A.   March 6th, three days before my daughter's 14th birthday.

Q.   What year?

A.   **This year, 2015.**

Q.   So it's approximately 13 month after they came to your house and took Patrick's electronics?

A.   **Yes.**

Q.   Can you tell us about that encounter?

A.   **It was about 6:15 in the morning, there was banging on our door. My husband and I jumped out of bed, we went to the front door, we turned on the light and Ms. Schwartzenberger and nine other fully armored guards were standing at our door screaming at the top of their lungs, "FBI, open the door," and my husband, we have -- the sliding glass door that you can see there on the screen is very similar to our front door, glass from floor to ceiling, and Ms. Schwartzenberger could see my husband fiddling with the alarm, and he's 72 years old, he's had open heart surgery, he's fiddling with the alarm trying to turn the alarm off, she's looking right at him and she's still screaming at the top of the lungs, "FBI, open the door." It was totally uncalled for.**

Q.   What happened next?

A.   **We opened the door. They rushed in. They ushered my husband and me into our family room which is in this picture off to the right. And then they went to the left where the bedrooms were. My son and daughter were still in bed asleep. The fully armed guards roused my 13-year-old daughter without me present out of bed. She came out shaking like a leaf.**

Q.   And what, if anything, did they do to Patrick?

A.   **They brought the four --**

Q.   You want to rest for a moment?

A.   **(Nodding).**

Q.   You want a sip of water?  There's some water right in front of you.

A.   **I didn't know until 20, 30 minutes later that they had taken my son.**

Q.   What do you mean they took your son?

A.   **They arrested him.  They took him.  I said -- we were sitting in the family room and I said to them, "I want to see my son, I want to talk to my son.**

**"Oh, he's already gone."**

Q.   What else did they do in your house?

A.   **They marked letters on all of the different rooms.  They had a Miami-Dade Police Officer standing over us in the family room.  Ms. Schwartzenberger interrogated my daughter.  They went through everything, all our personal belongings.  For two hours they were in our house.**

Q.   And what happened after that?

A.   **They took all of our electronics.  They tried to take my laptop and I begged them not to take it.  My dissertation is on that laptop.  And then they tried to take my phone.  I said, "Please don't take my phone.  My father is 85 years old.  He can only communicate with me with my cell phone, this is the**

only number he knows."  They tried to take my daughter's equipment.  My husband's equipment.

Q.   Did they take your husband's laptop?

A.   They took my husband's laptop.

Q.   Did they give you receipts for what they took?

A.   Yes.

Q.   Have you received any of it back?

A.   Just a few things.  Not everything.

Q.   Now, did you have any conversations with the agents that day other than what you described?

A.   Just Ms. Schwartzenberger, she took the search warrant and threw it down on the coffee table in the family room.  And by 8:15 there were two agents in my husband's work area going through his boxes of papers and the papers were just being flung through the air.  It was so disrespectful, and I told them, "You are being so disrespectful," and the one agent she came, like, in my face and screaming at me at the top of her lungs -- don't ask me what she said, I was so upset.  All I remember was her screaming at me.  They were so disrespectful.

MR. SCHWARTZ:  May I have a moment, Judge?

THE COURT:  All right.

BY MR. SCHWARTZ:

Q.   So how long did they keep your husband's computer?

A.   My husband is a commercial broker, he needs that computer to do work.  He was -- he could not earn a living for the four

or five weeks they had that computer.

MR. EMERY:  Objection.  Move to strike as non-responsive.

THE COURT:  Overruled.

MR. SCHWARTZ:  One moment.

BY MR. SCHWARTZ:

Q.   Prior to -- between the time that you were visited for the first time by these FBI agents, and the search and the arrest, did anybody make any offers to surrender Patrick?

MR. EMERY:  Objection, Your Honor.

THE COURT:  Overruled.

A.   Yes, our first attorney Mr. Salzman.

BY MR. SCHWARTZ:

Q.   What did he offer?

A.   I don't know.  I just know that he offered Patrick -- I can't testify to what.  I don't know.

MR. SCHWARTZ:  No further questions, Judge.

THE COURT:  Cross?

MR. EMERY:  Yes, Your Honor.

*CROSS EXAMINATION*

BY MR. EMERY:

Q.   Good morning, Mrs. Killen.

A.   Hello.

Q.   You love your son a lot, don't you?

A.   **I love my son like crazy, but I'm not going to commit perjury for him if that's what you're asking.**

MR. EMERY:  No further questions, Your Honor.

THE COURT:  Redirect?

MR. SCHWARTZ:  None, Your Honor.

THE COURT:  Thank you.  You may step down.  Call your next witness.

MR. EMERY:  Your Honor, if I could have a minute with Mr. Schwartz.

THE COURT:  Okay.

(Thereupon, there was a side-bar conference.)

MR. SCHWARTZ:  The marshals have to move my client to the witness stand and we don't want to do that.  May we take a lunch break now?

THE COURT:  Yes.  Okay.

(Thereupon, the side-bar conference was concluded.)

THE COURT:  All right, folks.  Why don't we go ahead and take our lunch recess and I'm asking that you be back at 1:00.

(Thereupon, the jury was escorted out of the courtroom.)

THE COURT:  What do you have?

MR. SCHWARTZ:  Your Honor, you allowed me to reserve --

THE COURT:  That's right.

MR. SCHWARTZ:  -- at the end of the Government's

case --

THE COURT: That's correct.

MR. SCHWARTZ: -- my Rule 29 motion. At this time I'd ask Your Honor for a judgment of acquittal as to all counts of the indictment for the failure of the Government to prove their case beyond a reasonable doubt.

Your Honor's heard all of the evidence, but particularly I'd ask Your Honor for a dismissal or an acquittal on 18 USC 1519. That's the count for -- and I know Your Honor is familiar with the section -- knowingly altering, destroying or concealing or covering up a tangible object, that is, an Apple iPhone and Kik messenger application with intent to impede, obstruct and influence the investigation and proper administration of any matter within the jurisdiction of the Federal Bureau of Investigation, FBI, an agency of the United States in relation to and contemplation of any such matter and case, and the case they're referring to are the allegations contained in the indictment or the investigation thereof.

There is some evidence that Agent Ginther saw or believes he saw the applications on the phone shaking and from that he thought Patrick might have erased his Kik messenger app on the phone. He asked Patrick. Patrick said no. And then when the phone was examined, the Kik application wasn't there.

There's also testimony in September that Patrick intended to move everything from Kik to his computer and he

does use Kik sometime later but there's no proof and certainly not proof beyond a reasonable doubt that Patrick on the day in question erased the Kik application from his phone.

Now, I understand that the issues of intent as to this section are somewhat murky. I think it needs to be done intentionally knowing there's an investigation. There is case law that says it doesn't have to be done intentionally knowing a specific investigation is occurring.

I believe the Government's case and the only evidence they've offered is the belief by Ginther that he might have done it on that day. I suggest to the Court that the evidence they have does not rise to proof beyond a reasonable doubt.

So I would specifically ask that that count be dismissed, but I also ask Your Honor to find that the picture of young boys in frontal nudity, although there is some arousal in those picture don't meet the standards set forth in the statute as to what's sexually explicit. They certainly don't meet the first few definitions of sexually explicit. The only one they could come under are the -- is the lascivious section, and although a few of the standards -- the items cited to consider under there are met, certainly not all of them, and I suggest to Your Honor that it is not a sexual pose, the same way Michelangelo's David, for instance, is not a sexual pose. A boy standing nude in front of a mirror in his bathroom or in his bedroom is not a sexually explicit pose.

Your Honor might find that's a factual question for the jury, but as a preliminary matter I would ask Your Honor to find that the Government hasn't met its burden of proof and dismiss or acquit the defendant on those counts.

THE COURT: Well, I'm going to give the jury an instruction on the definition of lascivious exhibition and that instruction, according to the 11th Circuit case law, is for the jury to consider the context and setting in which the genitalia or pubic area is to be displayed. Factors to consider is the overall content of the material, whether the focal point of the visual depiction is on the minor's genitalia or pubic area; whether the setting of the depiction appears to be sexually inviting or suggestive, for example, in a location or in a pose associated to sexual activity; whether the minor appears to be displayed in an unnatural pose or in inappropriate attire; whether the minor is partially clothed or nude; whether the depiction appears to convey sexual coyness or an apparent willingness to engage in sexual activity; and whether the depiction appears to have been designed to elicit a sexual response in the viewer.

A visual depiction need not have all of these factors to be a lascivious exhibition.

Now, you are -- am I to understand your argument that you are comparing this to art? You mentioned Michelangelo, is that your argument?

MR. SCHWARTZ: I'm not suggesting and I won't suggest to the jury that it's art. But I'm suggesting to the Court that a nude boy standing there even with an erection, although a couple of those criteria are met, and I know it doesn't have to meet all of them, is not sexually explicit. It's not there to arouse. It's not a coy pose. And this may be a factor for a jury to consider rather than the Court, but I would ask, at least initially, and I think I must, that Your Honor preliminarily say that the Government hasn't, as to those particular pictures which particularly affect the distribution counts, the Government hasn't met its burden of proof beyond a reasonable doubt on its case.

THE COURT: Okay. Well, the standard for review at this stage of the trial or the Government's case requires the Court to view the evidence in the light most favorable to the Government, including all reasonable inferences and credibility choices that can be drawn therefrom, and on that basis I would have to conclude that at this stage that is a question of fact for the jury.

With respect to the destruction of evidence, let me hear the Government's response.

MR. EMERY: Yes, Your Honor. First we have the testimony of Special Agent Ginther where he had said that when the phone came out that the icons were shaking. We heard testimony that that can be one of two things; one, either

moving the icons or when you want to destroy them.

We also have the evidence that was put on with respect to the iPhone, that the two notes sections of the iPhone when it was seized on February 11th had been updated fairly recently as far as information contained with respect to Kik.  Also, the fact that the most --

THE COURT:  So what is the significance of that?

MR. EMERY:  Well, that he's continuing to use Kik, Your Honor.  He had two separate notes updated different dates.

THE COURT:  But how does him continuing to use Kik make it more likely than not that he is attempting to destroy evidence?

MR. EMERY:  Well, it just goes to show that he had it on the phone, Your Honor.

THE COURT:  I know, but the count is destroying evidence.

MR. EMERY:  Correct, and I'm about to get to that, Your Honor.  Also in the MobileSync backup folder, the Kik icon app was there.  When the agents arrested him it was gone.  Again, this all relates to what he was doing back in his room, Your Honor.

Agent Ginther testified that he went back for a few times for what he found to be an unusually long period of time.  Also, when the phone was seized on February 11th, it also had the application Nixpa which as the examiner Diaz testified

about, that Nixpa is dependent upon Kik to operate at that time.  So that being said, Your Honor, he had that Kik application on that phone because Nixpa was on there also.

Also, Your Honor, right after the agents left, you can also look at the activity that he did, the testimony and the evidence is 20 minutes after Special Agent Schwartzenberger left the house he got back on Kik, right, with respect to the iPad.

So again, Your Honor, it's further circumstantial evidence and in the light most favorable to the Government that when the defendant was back there, plus the defendant confessed to Special Agent Schwartzenberger that he was using Kik to perpetuate his criminal activity.

And so based on all that, Your Honor, in the light most favorable to the Government, all credibility choices, again, we realize it's a circumstantial case, Your Honor, but it's one that at this point the Government has met its burden to be able to argue and present to the jury.

THE COURT:  Well, you say it's circumstantial.  I guess Mr. Schwartz is saying it's speculative.  I'm prepared to let it go forward at this point, but I have to say that I have my own reservations, if not doubts about the viability of this count being sustained.  And I'm aware, based on our side-bar conversation that the defendant may take the stand and will be subject to direct and cross-examination.  I suspect that this

Case 1:15-cr-20106-RNS   Document 144   Entered on FLSD Docket 01/26/2016   Page 106 of 249

may be an area of examination as well.

MR. EMERY:  Okay, Your Honor.  One other issue just, Your Honor, I had e-mailed a copy to chambers about a revised superseding indictment.  The Government had motioned to remove the letter N from one of the a/k/as.  We had -- and the reason why we did that --

THE COURT:  What page are you talking about in the instructions?

MR. EMERY:  The instructions are correct, Your Honor. It's actually in the superseding indictment.  So I just didn't know how Your Honor wanted to handle that.

THE COURT:  Which one was that?  I think I saw that.

MR. EMERY:  It's just to -- initially in the superseding indictment, we had two Ns in Chanel Izzabel and the reason why that was is because there was evidence where it was being used for both, but ultimately we determined that the majority of the evidence in the business records had Chanel Izzabel spelled with only one N.  So we moved --

THE COURT:  All right.  So this is a scrivener's error, Mr. Schwartz.  Do you have any problem with it?

MR. SCHWARTZ:  I had told the prosecutor and I think in the motion it says I consent to the --

MR. EMERY:  He did.

MR. SCHWARTZ:  -- amendment.

MR. EMERY:  So I didn't know how Your Honor wanted to

handle it as far as putting in a new copy that I sent or back to the jury.

THE COURT:  What do you want to me to do?

MR. SCHWARTZ:  I have no objection to the new copy being utilized to go back to the jury when they deliberate.

THE COURT:  All right.

MR. SCHWARTZ:  And it's probably no longer necessary, but are you reserving as to the 1519 through the end of the entire case?

THE COURT:  I will, and depending on what the verdict is I also want to consider in post trial motions.  I want to see exactly in detail what the Government's best evidence is or argument is as to what that evidence is and give you a chance to respond and I will make a ruling, but as I say, I have my -- I don't want to say doubts, but I have my reservations about the sufficiency of the evidence on that count.

MR. EMERY:  And if I could just add one more thing.  I meant to refer to the Skype chats that we put in yesterday where the defendant has a conversation saying where he deleted the Kik app when he's speaking with another boy.

THE COURT:  Well, my concern, quite frankly, is I don't question a healthy investigator's suspicions about what may have occurred, and the investigator may have an honest belief that that is, in fact, what occurred.  But belief doesn't get you home.  I mean, it has to be evidence and there

has to be evidence sufficient to withstand the scrutiny of whether there is sufficient evidence beyond a reasonable doubt and that's the point that we're at.  Not suspicion.  Not belief.  Not coming from someone who is trained to uncover illegal activity.

It may believe that there was illegal activity afoot, but sufficient to convict a defendant beyond a reasonable doubt is what we're looking at.

MR. EMERY:  Understood, Your Honor.

THE COURT:  Okay.  What else?  How long do you anticipate?  Do you know how long your examination is going to take?

MR. SCHWARTZ:  I believe my direct examination will take about an hour and a half, Judge.

MR. EMERY:  Your Honor, it looks like since the defendant is going to take the stand we would ask that he similarly be instructed not to mention any possible penalty during his direct testimony or cross-examination.

MR. SCHWARTZ:  And I have instructed him rather vigorously, but perhaps you should, too.

THE COURT:  Okay.  Well, any mention of a sentence to be imposed in the event of a conviction is not for the jury to consider, but it's for a judge alone to determine in the event of a conviction.  So there should be no testimony in that regard.

MR. SCHWARTZ:  Thank you, Your Honor.

MR. EMERY:  Thank you, Your Honor.

THE COURT:  We'll see you back at 1 o'clock.

On these instructions, you did note that a number of the counts have the same elements in terms of the description of some of these elements and it doesn't make sense for me just to repeat them for each count that they're applicable to, but just say it one time, they'll have reference to it and each of these counts.

MR. SCHWARTZ:  We spoke with your law clerk about that, Judge, and although from my point of view I would love for them to hear it ten times, we agree that if Your Honor very clearly instructs them that those definitions apply to each of the sexually related counts, that should be sufficient.

THE COURT:  And we will do that.  Okay.  All right. Otherwise, they're okay.

(Thereupon, a luncheon recess was taken.)

*          *          *


## A F T E R N O O N   S E S S I O N

(Thereupon, the jury was brought into the courtroom.)

THE COURT:  Good afternoon, ladies and gentlemen. Please be seated.  Call your next witness.

MR. SCHWARTZ:  Yes, Your Honor.  The defendant would call himself, Patrick Killen, Junior, to the stand.

THE COURT:  Please have the defendant sworn in.

Thereupon,

**PATRICK KILLEN, JUNIOR,**

having been duly sworn by the courtroom deputy, testified as follows:

THE DEFENDANT:  Yes.

THE COURTROOM DEPUTY:  Thank you.  Please be seated, and would you please state your full name for the record.

THE WITNESS:  Okay.  Patrick Killen, Junior.

THE COURTROOM DEPUTY:  Thank you.

THE WITNESS:  Thank you.

### *DIRECT EXAMINATION*

BY MR. SCHWARTZ:

Q.   And Patrick, you don't have to lean too close to the microphone.  It should pick you up.  If it's not, either myself or the court reporter will let you know.

A.   **Okay.**

Q.   Patrick, how old are you?

A.   **I am currently 22 years old.**

Q.   When did you turn 22?

A.   **May 31st.**

Q.   Of this year?

A.   **This year.**

Q.   Where do you live?

A.   I'm currently living in the prison, but I live at 6880 Pinehurst Drive, Hialeah, Florida.

MR. WIDLANSKI:  Objection, Your Honor.

THE COURT:  Overruled.

BY MR. SCHWARTZ:

Q.   And your home in Hialeah, Florida, who do you live with?

A.   I live with my two parents, Patrick Killen, Senior and Karen Killen, and also my sister, Elise (ph.) Killen.

Q.   And Patrick, you heard your mother testify about where you went to school.  Was she -- was she correct about where you went to school?

A.   She was correct.

Q.   And did you have a lot of friends in school?

A.   I did not.

Q.   Why is that?

A.   I can't tell you why not.  I'm not those people.

Q.   Okay.  Did you engage in a lot of extra curricular activities?

A.   I did.  I tried.  And even when I did try, I attempted to. But, you know, some of those extra curriculars were taken back because of my grades.

Q.   What do you mean by that?

A.   Meaning I didn't do that well in school, so some of the extra curricular was like for -- one example was soccer.  I played soccer, but I -- I tried to play soccer in high school

and I was recommended by my parents not to continue because they noticed that my grades were lowering tremendously.

Q.   Did you date a lot?

A.   I'm sorry.  Excuse me?

Q.   Have you dated a lot?

A.   Have I dated?  I have not dated a lot.  I haven't -- a lot. I mean, in reference to what?

Q.   How many girls have you dated --

A.   Comparing to maybe other guys my age, I have not dated a lot.

Q.   About how many girls have you dated in your life?

A.   Maybe four.

Q.   Using Bill Clinton's definition, have you engaged ins sex?

        MR. WIDLANSKI:  Objection, Your Honor.  Relevance.

        THE COURT:  Overruled.

A.   Excuse me?

BY MR. SCHWARTZ:

Q.   Have you had sex with a girl?

A.   I have not had sex with a girl or a woman.

Q.   Have you ever had sex with anybody?

A.   I have not had sex with anyone.

Q.   Do you -- or did you use your cell phone to induce teenage boys to send you picture of themselves nude?

A.   Yes.

Q.   How old were you when you started doing that?

A.   **I was 19.**

Q.   Did you ever do it before you were 19?

A.   **No.  I did not use Kik to induce anyone when I was not 19.**

Q.   Did you use any other social media to do that before you were 19?

A.   **Facebook.**

Q.   Did you do it on Facebook before that?

A.   **Yes.**

Q.   Okay.  So you've been doing it for a while; is that right?

A.   **Yes.**

Q.   And let me ask you something that probably all of us are wondering.  Why did you do it?

A.   **I was insecure with myself.  I was insure with my physical and my social abilities and also my -- my size down there.**

Q.   Okay.  And why did you then want to see pictures of other boys?

A.   **When I was younger, around maybe 15, I mean I didn't have very much social abilities with other people, so I started getting insecure on maybe why they didn't want to be my friend or even want to be my girlfriend.  Because I've attempted on several occasions to ask girls out and they said, No, ooh.  But it was never defined on what was disgusting and so I was insecure.  And when I asked, you know, with a girl, I asked, you know, Am I ugly?  She goes, You're not ugly.  And I go, Well, what is it?  She goes, I don't know.  I just don't like**

you. So that doesn't define what makes me not to attract women. So I felt insecure about my body, about my face, about my hair -- which is not that good right now, great. I don't know. Just -- just everything about me. I was just consciously just questioning everything. I was curious.

Q. And when you were able to induce or persuade or even extort or force other boys to send you pictures, did it give you a particular feeling of power or anything like that?

A. I would say when I first started out, I did not intend to threaten or extort anyone sending pictures to me. It was more of just comparing. But then as -- as it continued, I felt when they didn't send me it, that yes, it would give me some sort of power that I've never had before in my life or that I couldn't -- I felt that I couldn't control really anything in my life; my grades; my friendships with other people; my family life; and just about everything. I always questioned, but I could never, you know, go through with anything.

Q. So did you want naked pictures of boys for sexual gratification?

A. I would say that's not true.

Q. Were the pictures you asked for pictures in sexual poses?

A. They were not.

Q. What were they?

A. They were just mirror images of themselves.

Q. Did you do this frequently?

A.    **Do what?**

Q.    Ask boys on the internet for pictures.

A.    **Yes.**

Q.    Now, a few times we heard you threatening boys that if you didn't -- if they didn't send you pictures, you would post their picture on the internet --

A.    **I never said anything --**

Q.    Say what?

A.    **-- on the internet for their friends to see.**

Q.    You anticipated my question.  My question was --

A.    **It's been questioned by the prosecutor many times.  And I did not do that.**

Q.    You didn't --

A.    **I did not.**

Q.    You never posted these boys' pictures on the internet even though you said you would?

A.    **I did not Post-It for their friends to see.  No, I did not.**

Q.    But you did send a couple of those pictures to a trader, didn't you?

A.    **I don't know if he is a trader or not.  He was a person that was sort of telling me what to do and I was just following along with him.**

Q.    And who was that?

A.    **His name was Karucem.  I don't know the real person. That's all I know, Karucem.**

Q.    Does he use another name?

A.    **Vanyher.**

Q.    Vanyher?

A.    **Vanyher.**

Q.    And how did you meet this person on the internet?

A.    **This person contacted me from GigaTribe -- actually -- I'm sorry.  They contacted me -- he contacted me or she or whatever it is, contacted me through Kik which then told me to download GigaTribe.  And the way that person found me was from a request from a boy's Instagram profile that I had asked the boy to Kik me and they had seen that and Kik'd me.  And then -- and then after they Kik'd me, they asked, Do you know what GigaTribe is? I said, No, and he asked that I download it.  And I did.  I did not know what GigaTribe was before that.**

Q.    And before this fellow Karucem or Vanyher contacted you and directed you to GigaTribe --

A.    **Yes.**

Q.    -- had you had videotapes of young children engaged in sex?

A.    **No.**

Q.    Was that something you were interested in?

A.    **No.**

Q.    Now, the government put in a lot of exhibits and a lot of evidence showing that on your computers, you had these videotapes of children engaged in sex.  Do you remember that?

A.    **I do.  I remembered them showing it to me.  I don't**

remember the video clips because I never watched them.

Q.  Well, tell me how that happened.  You're chatting with this fellow --

A.  Karucem.

Q.  -- Karucem.  What happens?

A.  Karucem would upload folders and they would be, for example, not generated by me but I said, like the government, they lied.  They were generated by Karucem and they were titled Self-made and Good Action Bibs.  And the government states by their expert witness -- which I don't think is an expert at all because he made a mistake on one thing.  But that's beside the point.  That it was usually generated by me, that I made up the name Good Action Bibs or Self-made.  And that's not true.  I actually downloaded that.  And not knowing what Self-made or Good Action Bibs is, I did download it, but I did not know what was inside of it.  It was downloaded onto my computer.

Q.  From who?

A.  By me.  I did download the folder.

Q.  Where did you get it?

A.  I got it from Karucem on GigaTribe.

Q.  How does that work?

A.  Well, you download GigaTribe.  You install it.  And then you're able to add the person, which I did.  He gave me his GigaTribe account and I added him.  And then he posted a folder and I did a download on the folder.

Q.   And then when you downloaded it, did you open -- did you download all of the little video -- or the videos within the folder or did that happen automatically?

A.   **No, that happened automatically.  Once you download a folder, it downloads all the contents inside the folder without you knowing what's inside the folder.**

Q.   And did you look at some of the videos that were in the folder?

A.   **I did.**

Q.   And how long did you look at them for?

A.   **If they were disturbing, I looked at them for maybe a second.  And if I didn't find them disturbing, I would view them.  But I didn't keep viewing them.  I viewed them once and either I deleted it or I just forgot to delete it and it was just left on the computer.**

Q.   And how would you define what you found disturbing?

A.   **I would definitely find disturbing that a man was having sexual intercourse with a six-year-old.  But we also don't know what happens in that set of video, nor do I.  So it's all speculation.**

Q.   But these videos that had child pornography on it, kids engaged in sex, you found disturbing; is that correct?

A.   **I believe so.**

Q.   And did you try to delete any of them?

A.   **I did delete a lot of them.**

Q.    The government said there were thousands of files deleted in your permanently deleted area that they recovered.

A.    **Actually, they never recovered any permanently deleted because they didn't want to make me seem any sort of person that would delete any of those files.  So what they did is actually they looked in my recycle bin and they found four files, none of which we know the title of because it's all random numbers.  All we know is what I did have on the computer at the time.  They contained it.**

Q.    But did you hear the witness for the government saying that they carved out --

A.    **Even then --**

Q.    -- thousands of images?  They didn't say what they were --

A.    **They didn't say what the contents contained.  They just said that they carved out.  And it doesn't work anything in my favor because they don't tell the jury or this Court what those graphic files contained.**

        MR. WIDLANSKI:  Objection, Your Honor.  I'm going to object to the defendant speculating about the prosecution's motives.

        THE COURT:  Sustained.

BY MR. SCHWARTZ:

Q.    About how many files from the -- how many videos from the files that you downloaded from Karucem were you able to delete?

A.    **Many.**

Q.   Thousands?

A.   **Thousands.**

Q.   But --

A.   **Not because -- not because I pick and choose what I wanted to delete, but because I deleted by folders and the contents were deleted with it.**

Q.   Now, what we saw on a screen shot that the government's witness gave us, these videos, they said that they were still downloading when the agents copied your computer.  While you were deleting these folders -- these videos from your computer, were any of them continuing to download?

A.   **They were in a downloading state.  So when you're logged into the account, it would continue to download.  When you're not logged into the account, it would -- it would be abrupt.**

Q.   Even if you did nothing to make them continue to download?

A.   **I don't get the question.**

Q.   Would they continue to -- did you have to do anything to get them to continue to download or just by clicking on GigaTribe would they automatically start downloading again?

A.   **When you re-open the ap, it just continues downloading.**

Q.   And did you continue deleting?

A.   **I did continue deleting.**

Q.   These videos, when we saw a chart of them that the government produced, were -- and you'll have to correct me because my name is not good for these things -- but they were

little pictures instead of names of files or symbols?

A.   **They're called thumbnails.**

Q.   They're called what?

A.   **Thumbnails.**

Q.   Thumbnails?

A.   **Yes.**

Q.   That's the way they appear in the backup that the government recovered.  Is that how they appear on GigaTribe?

A.   **That is not how they appear on GigaTribe.  On GigaTribe they appear not in thumbnails but just a folder with the name. So, for example, if I were to go on to GigaTribe or anyone else, you would sign the viewer's name and then it would have uploaded files by the name of Karucem and there would be whatever folders he wanted to share.  And it would have the folder -- just a picture of a folder with not the contents inside of it and the name of the folder.**

Q.   And then when you clicked on the folder, and the contents downloaded into your computer, what did you see on your computer?  Did you see the pictures or the images that we saw in the courtroom or did you see something else?

A.   **No.  What you see when it's downloading on GigaTribe is just the folder name.  And it says downloading, and it has a green percentage loading bar which tells you how many percent it is to completing.**

Q.   Now, when you say the folder name, do you mean something

like --

A.   Untitled, Good Action Bibs, for example, as the ones that they showed in evidence.

Q.   Okay.  But how about, what does it say for when those videos now are automatically downloaded into your computer, does -- do you see a picture on that particular video that was downloaded before you click on it or is there a name or is there a symbol?  What do you see?

A.   Where?  On GigaTribe or Windows?

Q.   On GigaTribe.

A.   You just see the folder.  You don't see pictures.  It doesn't work like that.

Q.   Have you ever met with any of the boys that you solicited pictures from on the internet?

A.   Never.  And never did I even ask.

Q.   Did you ever cam any boys on the internet?

A.   In reference to what?

Q.   In other words -- not like a video chat where you're talking to each other or things like that, but did you ever have any of the boys you were communicating with, for instance, masturbate and videotape it and send it to you or something like that?

A.   Where?

Q.   On your computer.

A.   Yes.

Q.   Were these people who were over 18?

A.   **No.**

Q.   What did you do with that image?

A.   **Image or video?**

Q.   Video.

A.   **What did I do with the video?**

Q.   Uh-huh.  (Nodding.)

A.   **I kept it.  I never shared any of the videos.**

Q.   Let me talk to you about what happened on the day that you were first approached by the FBI.

A.   **Okay.**

Q.   What did you -- what happened that morning?

A.   **They came to the house.  They woke me up from sleeping. They asked to talk with me, I sat down.  They asked me basic questions.  She seemed to appear somewhat nice.**

Q.   Who is she?

A.   **Laura Schwartzenberger.  And she asked me questions about the investigation in which I replied no to every single question.**

Q.   Were you being honest when you replied no to every question?

A.   **I was not being honest to her.  Go on?**

Q.   Yes.  What happened next?

A.   **After I refused to answer her questions, she became irritated.  And that's when she changed her personality from**

being good cop to bad cop.  And she then interrogated me. Asked me questions about the case and also, as she does not state, she states that she did not go into a sexually explicit manner.  But she did.  She asked me if I had asked underage boys or a underage male of North Carolina to send nude photos of them self.  And I then refused and said no.

Q.   What happened then?

A.   After I refused to -- after I refused -- not refused, but I had not answered honestly to her questions, she then requested that I get my electronics so that they could see them.  And I had actually first said no.  And she said -- she started making promises and trying to coerce me, but it was a very -- it was a light coerce, but she still tried to coerce me.  And then she made promises like, Gust give us the electronics.  And if you just do that, I'll go away.

And, you know, finally I obliged her and I went to my room to go get my MacBook and my iPad.  My phone had been charging.  It was on very low.  It was actually dead when I got into the room and I put it in the charger and it was charging. And then I quickly came back out with my MacBook and my iPad, which then I gave -- I handed over the iPad to Laura after she asked me for it and she asked me for the password.  I said I didn't want to give it to her.  She demanded that I give it to her, and so I gave it to her.  And then --

Q.   Why did you give her your MacBook and why did you give her

your password, or your iPad and password?

A.   **I felt I had to.**

Q.   Why did you feel you had to?

A.   **She was authority.  She was an FBI agent.  I didn't feel like I could say no to her.  And when I did say no to her, she still kept asking me to give it to her.  So I didn't feel like she was going to go away with that sort of response.  Just no, you can't have it.  And she wasn't -- I said no.  She still asked me for it.  So at that point, my thought process was that she wasn't going to go away unless I gave her, you know, what she demanded.**

Q.   At that time did she ask you whether or not she or her partner could look at what was contained on your electronics?

A.   **I know that they wanted to look inside of it.  And when I refused, she -- it became more demanding.  Also, before I brought out the MacBook and the iPad, they had asked me about an old phone that I had been using in regards to the North Carolina incident that I had been Kik'ing a boy and requesting nudes from him, that I go find that phone.  In which I stepped aside after requesting permission and went back to my room, which again Ginther followed in after me.  After Ginther had followed in after me, he had asked, you know, that he just -- you know, he help find the iPhone -- not the iPhone but the Samsung Galaxy.  That's two for me.**

          **And he started looking through my drawers, through my**

room, pretty much through everything.  And I had not given consent to go through my room and not even to even open up drawers or anything like that.  And I was not going to fight him.  I mean, I didn't think I could.  In which he found two thumb drives on my desk and said, I'm taking this.  And then again, not going against an FBI, don't think I would win.  And I wouldn't win.

Q.   Did there come a time after Mr. -- Special Agent Ginther searched your room and took those two thumb drives --

A.   Yes.

Q.   -- that you went back out to the table?

A.   Yeah.  Yes.  In which they requested more electronics, which then I -- I had my -- it was previously stated that why would Ginther go into my room and not take other electronics but only the thumb drives --

MR. WIDLANSKI:  Objection Your Honor non response stiff.

THE COURT:  Sustained.

A.   The MacBook Pro was not on the desk --

BY MR. SCHWARTZ:

Q.   Wait, wait, wait, wait, Patrick.  When Special Agent Ginther was in your room the first time --

A.   Yes.

Q.   -- before you went down to the backyard or anything like that, where was your MacBook Pro?

A.   It was in my drawer, which he had not searched that desk drawer.  He had searched drawers within the closet, within my nightstand.

Q.   Okay.  And where was your iPad?

A.   My iPad was in the drawer with it as well, and that's why I was able to bring it out to Ginther.

Q.   And where was your cell -- your iPhone?

A.   My iPhone was under my covers of the bed.

Q.   Were your covers on the bed?

A.   My covers were on the bed all covering my electronic (inaud.).

Q.   And did there come a point after you went back out to the table that you were asked to bring out any other electronics?

A.   Yes.  My phone, my computer, in which again I stated that -- in which I again state that I brought out my MacBook and my iPad but did not bring iPhone due to the fact that it was charging.

Q.   Okay.  At that point, what did Agent Ginther or Agent Schwartzenberger do regarding your iPad or your MacBook?

A.   They searched it.  I gave Laura Schwartzenberger the opportunity to (inaud.) it.  And I gave the (inaud.) after it.  And after I gave it to her, she noticed that there was nothing in it.  And then she said, You can keep that.  And then Jason Ginther took my MacBook Pro and started -- he didn't search it heavily.  He opened it up in which he asked me for the password

and I gave the password to the Mac OSX partition of the computer and he started just thumbing through, you know, the applications.  But then he was doing that in front of me, but then he turned the computer over to his side so that he could look at it.  And I did not know what he was doing or what he was looking at.  I didn't know.

Q.   Prior to that happening, had you been asked by Agent Schwartzenberger for consent for them to go through your electronics?

A.   No, I did not.  I didn't -- I did not consent.  It was more of when getting into that matter, neither was I shown any papers of consent.

Q.   At that point?

A.   At that point, no.

Q.   What happened next?

A.   After that?

Q.   Let me ask you specifically.

A.   Okay.

Q.   Did you ask Agent Schwartzenberger to go outside so your parents wouldn't hear what you were saying?

A.   No, I did not.

Q.   How did you end up outside?

A.   Laura on the record states that I admitted that I was not gay, I was bi inside.  And that I admitted to -- to Rebecca Till105.  The funny fact is that my parents were also inside.

And why would I -- if I wanted to go outside for my parents not to hear, why would I admit everything inside for my parents to hear?  So those factual findings are not factual at all. They're lies.

Q.   What did you say to Agent Schwartzenberger about Rebecca Till eventually and about going outside?

A.   So after she had asked me again if I was RebeccaTill05, I had been refusing and saying no.  And she finally said, Okay, we need to go outside and talk.  And also including my mom, who was interrupting many times, which then Laura was just getting so irritated that she thought it was better to talk with me outside.  And when my parents had objected to that, Laura and Ginther said no, because he's over age.  And after I was demanded to go outside, I went outside with Laura to talk with her privately.  My parents could not be there.

Q.   Did you request that or did they request it?

A.   Laura requested it.

Q.   And did you do it?

A.   I did agree.

Q.   And when you were outside, did you basically tell Special Agent Schwartzenberger the things she said you told her?

A.   She had asked me questions in which -- in which I -- I did answer some of the questions were not -- some of the answers or questions were not completely honestly, but it was not me making a statement or me wanting to make a statement.  It was

her basically having to force it out of me.  I had said I won't answer that, in which she continued to ask it a different way in which I did answer the question eventually.

Q.   But you did basically say what she says you said; is that right?

A.   Essentially, yes.

Q.   When you were outside, did she give you a consent form to sign?

A.   No, she did not.

Q.   Without telling me what she said, did she threaten you in any way outside to get you to make these statements?

A.   She made promises.  She coerced me and she threatened me.

Q.   Did there come a time when you went back inside?

A.   Pretty much after the interrogation was done outside, she asked that I go back inside.

Q.   And what did you do?

A.   I went back inside.

Q.   Why didn't you just walk out of your backyard and leave?

A.   I felt if I did that, I would get shot.

Q.   Did you go back in the house?

A.   I did.

Q.   What happened when you went back in the house?

A.   After I came back inside, I noticed Ginther had papers and handed it over to Laura, in which Laura placed it on top of the table and said, We need to take your stuff.  And she -- and

what I saw was a consent to search computers form.  Not having the knowledge of what that form even meant, I thought the form meant that they needed to search it outside of -- outside of my home at their headquarters, not inside my home.

Q.   Did you read the form?

A.   I did not read the form.  I actually didn't have time to read it.

Q.   Did Laura write anything on the form?

A.   My name.  And she told me to sign here -- date here and sign there.

Q.   Did she write what it was she was going to search or take?

A.   There was listed devices that she -- what she was going to search and take.

Q.   When she was -- said she had to take the devices, was there any conversation with either you or your mom or your dad about her taking the devices?

A.   Sorry.  (Coughing.)  Sorry for not covering my mouth.

When Laura had placed the papers on the table, my mom had interjected and asked Patrick --

MR. WIDLANSKI:  Objection, Your Honor.  Calls for hearsay.

THE COURT:  Sustained.

A.   My mom asked me what the papers were, in which then I answered back to her, They're consent to search forms.

BY MR. SCHWARTZ:

Q.   Okay.  Did you say anything else to your mom?

A.   **Did I say anything else to my mom?**

Q.   Right.

A.   **No, I did not.  I stated that they were consent to search forms in which then my mom responded --**

          MR. WIDLANSKI:  Objection, Your Honor.  Calls for hearsay.

          THE COURT:  Sustained.

BY MR. SCHWARTZ:

Q.   You don't have to say what your mom said.

          Then what happened next?

A.   **After -- after I was questioned that they needed a search warrant of the devices, Laura turned over to my mom in a very loud voice --**

          MR. WIDLANSKI:  Objection, Your Honor.  Calls for hearsay.

A.   **It's not hearsay --**

BY MR. SCHWARTZ:

Q.   Uh-huh.  (Nodding.)  You're not making the ruling.

          THE COURT:  Sustained.

BY MR. SCHWARTZ:

Q.   Relax.

          After a conversation between Laura and your mother, did the agents take anything from your home?

A.   **After threatening the SWAT --**

MR. WIDLANSKI:  Objection, Your Honor.  Calls for hearsay.

A.    **It's not hearsay.**

THE COURT:  Sustained.

BY MR. SCHWARTZ:

Q.   Did the agents take anything from your home?

A.   **After threatening me, they took stuff from my home.**

Q.   What did they take?

A.   **I thought I had to protect my family against the SWAT and K9s --**

MR. WIDLANSKI:  Your Honor.  Objection.  The defendant seems to be smuggling in the hearsay testimony.

THE COURT:  Overruled.

BY MR. SCHWARTZ:

Q.   Did you consent to them taking these things?

A.   **I did not consent.  I gave in.**

Q.   And did they, in fact, take items?

A.   **They did.**

Q.   What did they take?

A.   **They took my MacBook, my iPhone, two thumb drives and charger.**

Q.   Did they take your iPad?

A.   **They did not take my iPad.**

Q.   Did they give you and have you sign a receipt for what they were taking?

A.    I signed also at the same time a property form.

Q.    Now, did there come a time when you saw the agents again?

A.    A year later.

Q.    On or about September?

A.    A year and a month later.

Q.    On or around March 6th, 2015, did you see the agents again?

A.    I saw Laura, not Ginther.  Laura came into my room and stated very rudely, You remember me?  And I said, Yes.

Q.    And what happened next?

A.    They arrested me right there and then on my bed.

Q.    And was your room messy?

A.    It was actually not that messy as portrayed in that picture.  They destroyed my room.  I do have a habit of making a mess and having a mess in my room, but never was it that messy.  My sheets are were not on the floor.  I saw a clothes hamper in the middle of the room, the telescope in the middle of the room, which I don't keep it there.  I keep it near the door.  I saw the blinds up and everything was discombobulated, and I had not kept it like that.

Q.    And did you leave your house with the agents?

A.    I left the house with Laura and another lady, which I believe is in the courtroom, but I don't see her.  I didn't see.

Q.    Now, did there come a time when you learned what, if anything, the agents took from your house pursuant to the

Q. search warrant?

A. **I don't understand the question.**

Q. Do you know if the agents took any of your property based on a search warrant on the 6th of March 2015?

A. **Yes, they took a lot of devices.**

Q. Did they take a Dell computer that you owned?

A. **Yes.**

Q. Did they take any thumb drives?

A. **Yes.**

Q. To your knowledge -- to the best of your knowledge, was the search warrant that they served on you and showed you when they came in for the arrest based at least significantly or in part on the information they obtained from the electronics they took on February 11th?

MR. WIDLANSKI: Objection, Your Honor. Outside the scope.

THE COURT: Overruled.

A. **I don't understand the question.**

BY MR. SCHWARTZ:

Q. Then let me repeat it. The agents took a lot of electronics or items from your house on February 11th, right?

A. **They what?**

Q. On February 11th, the agents took, supposedly with your consent, your --

A. **Not with my consent.**

Q.   -- your MacBook Pro, your iPhone, and some thumb drives, right?

A.   **And a MacBook.**

Q.   Right.  Your MacBook, the iPhone and some thumb drives, right?

A.   **Yes.**

Q.   The information in the search warrant that -- the information they used in part as probable cause for the search warrant --

A.   **I didn't read the search warrant, so I don't know.  I know that Laura flashed a piece of paper when I was arrested in the car, but I didn't read the search warrant.**

Q.   You've been in court for the entire trial, right?

A.   **Yes.**

Q.   And by the way, you heard the prosecutor mention a hearing that was had on a motion regarding the evidence that they took from your house the day that they did what they call a knock and talk, right?

A.   **Yes.  We had a Motion to Suppress hearing.**

Q.   And at that hearing, a magistrate listened to about eight hours of evidence -- of testimony?

A.   **I believe so.  If that's was eight hours.**

Q.   Approximately.  And you've been in Judge Moore's courtroom now for five days, right?

A.   **Yes.**

Q.   And Judge Moore works a very hefty schedule in his court, doesn't he, in the sense of how many hours he puts in a day; is that right?

A.   **He works very hard.**

Q.   Would you estimate that each day that we've been in court there's been about six hours of testimony?

A.   **It guess.**

Q.   Maybe a little more sometimes?

A.   **Yeah, some testimony has gone over the next day.**

Q.   And five times six is about 30 hours; is that right?

A.   **Yes.**

Q.   So -- have you in this courtroom over the last five days heard a lot more evidence and a lot more testimony about what's happened in this case than the magistrate heard in that eight -- seven and a half, eight hours of that hearing?

A.   **Yes.**

Q.   Now, let me ask you about certain of the evidence that the government has introduced in front of the jury.

A.   **Okay.**

          **MR. SCHWARTZ:**   And I thank you in advance, the assistant U.S. attorney for helping us with this.

**BY MR. SCHWARTZ:**

Q.   Government's Exhibit 7 was an Apple MacBook Pro laptop computer.  Did you consent to that Apple MacBook computer being seized from your house?

A.   **Did not consent.**

Q.   Exhibit Number 8 was an Apple iPhone.  Did you consent to that Apple iPhone?

A.   **I did not consent.**

Q.   Being seized from your house?

A.   **I did not consent.**

Q.   Exhibit Number 9 is a SanDisk USB thumb drive.  Did you consent to that being seized from your house?

A.   **I did not consent.**

Q.   And I believe that's already there on the table.

Exhibit Number 10 is a consent to search form.  Did you sign that consent to search form before the agents searched your computer and iPhone?

A.   **I did not sign that before they searched it.**

Q.   Exhibit Number 12-A and 12-B, 12-C, are hash value reports from the image -- from the laptop computer image hard drive hash value verification screen shot.  Did you give anybody permission to go through your computer and access these exhibits?

A.   **I did not consent.**

Q.   13A, B, C, D, E, F, G, H, I, J, K, L, M, N, O, P, Q, R, S, T, U, V are examination reports from your MacBook, the examination reports of a MobileSync backup, summary chart of Kik chats, Apple MobileSync backup folder, Apple MobileSync folder Kik, P list, virtual screen shot, MacBook laptop -- I'm

sorry -- virtual machine screen shot, et cetera, et cetera, Lantern report, Lantern report, Lantern report, Lantern report screen shot, Lantern report screen shot, et cetera, up through a file tree for recycle bin of MacBook Pro laptop computer.

Did you give the government the right to go through your computer and extract those items?

A.   **I did not get give consent**.

Q.   And 14-A through C are disks with Google searches from your computer and other Google search items.

A.   **Which computer?**

Q.   The MacBook Pro, the laptop.  Did you give the government consent to take that from your computer?

A.   **I did not give consent**.

Q.   15-A through -- and D are reports from the MacBook regarding the Window system or the NT user data files or date files.  Did you give consent to that?

A.   **I did not give consent**.

Q.   How about 16-A through O screen shots from GigaTribe from the MacBook, did you give permission to that?

A.   **I did not give consent**.

Q.   How about 17-A and B, disks from the GigaTribe chat from MacBook Pro laptop or summary charts of the GigaTribe chats?

A.   **I did not give consent**.

Q.   And 19 and 20 all contain -- I'm sorry.  19 contains GigaTribe (sic) chats with Mason Frost and Cook and Vanyher.

Did you give consent to them to access that?

A.   **Could you repeat that?  I didn't have any GigaTribe chats with Frosty or Mason.**

Q.   I'm sorry.  With Kik chats.

A.   **I did not give consent.**

Q.   If the search warrant was based on all of this evidence, did you give anybody consent to access your Dell computer?

MR. WIDLANSKI:  Objection, Your Honor.  It's a misstatement of the law, assumes facts not in evidence.

THE COURT:  Overruled.

A.   **I don't understand the question.**

BY MR. SCHWARTZ:

Q.   It was probably a bad question.  Did you give anybody consent to search your Dell computer or to retrieve anything from it?

A.   **On February 11th, 2014, I was coerced into giving this up, which then gave probable cause for a search warrant on March 6th.**

MR. WIDLANSKI:  Your Honor, that was non-responsive.

THE COURT:  Overruled.

BY MR. SCHWARTZ:

Q.   Did you -- the Dell computer contained videos of child pornography from GigaTribe; is that correct?

A.   **Yes.**

Q.   Did you download that file that contained that pornography

knowing what was in it?

A.  **No, I did not.**

Q.  Did you attempt to delete it from your computer?

A.  **I may have.**

Q.  Did you ever finish deleting it?

A.  **I don't remember that specific one.  I don't remember that video.**

Q.  The folder you're talking about?

A.  **Please repeat the question.**

Q.  You've testified that this Italian Police informant Karucem posted on his GigaTribe -- on his computer through GigaTribe folders whose contents were not evident; is that correct?

A.  **That is true.**

Q.  And you clicked on them and brought those folders to your computer; is that correct?

A.  **They were downloaded on the computer, yes.**

Q.  Okay.  Through GigaTribe?

A.  **Through GigaTribe.**

Q.  Did you know the contents when you downloaded them?

A.  **I did not know the contents of the folder when I downloaded the folder.**

Q.  Were you able to delete all of those -- all the videos contained in the folder?

A.  **Most of them, yes.  Some of them, no.**

Q.  And did they continue to download every time you turned on

GigaTribe, you clicked on it or opened GigaTribe?

A. **Yes.**

Q. By the way, do you know the ages of the children in those videos?

A. **No, I don't.**

Q. Do you know -- withdrawn.

Did you ever get pictures of the nude bodies of boys for sexual purposes?

A. **Never.**

MR. SCHWARTZ: No further questions at this time.

THE COURT: Cross?

*CROSS-EXAMINATION*

BY MR. WIDLANSKI:

Q. Good afternoon, Mr. Killen.

A. **Good afternoon, Ben.**

Q. I'm sorry. What did you call me?

A. **Ben. I believe that's your name, but I may be incorrect. Widlanski.**

Q. We've talked a lot about form. About how you didn't give consent even though we heard earlier that a magistrate judge, a neutral and detached magistrate found you did. We heard a lot about form when Mr. Schwartz was examining you, didn't we?

A. **Forms or form?**

Q. Form. We heard a lot about form?

A. **Forms. Two pieces of paper.**

Q. Mr. Killen, we heard a lot about form, F-O-R-M, as in form over substance?

A. **Yes.**

Q. I'd like to talk about substance.

A. **Okay.**

Q. So let's talk about things that I think we all agree on. You're RebeccaTill05?

A. **Yes.**

Q. You're Chanel Izzabel?

A. **Yes.**

Q. You are BeverlyHills05?

A. **Allegedly.**

Q. No, it's not allegedly, sir. You are BeverlyHills05?

A. **Allegedly.**

Q. Mr. Killen, this is going to go a lot smoother if you just answer yes or no questions with a yes or a no.

You are --

A. **Allegedly.**

Q. Mr. Killen, do you understand where you are right now, sir?

A. **I am in a courtroom.**

Q. Okay. I'm going to ask you a yes or no question. You are BeverlyHills05, correct?

A. **Allegedly.**

MR. WIDLANSKI: Your Honor, I would ask that you

instruct the witness to answer the question.

THE COURT: Well, he is answering the question and the jury is going to make of it what they will.

BY MR. WIDLANSKI:

Q. You stole pictures from Carly Manning, correct?

MR. SCHWARTZ: Objection to the word stole, Your Honor.

THE COURT: Overruled.

A. **I used pictures of Carly Manning, yes.**

BY MR. WIDLANSKI:

Q. Well, you heard her yesterday. That was the 17-year-old blonde that came in and testified. You heard her yesterday, right?

A. **Yes.**

Q. And you heard her say that she did not give you permission to use them, right?

A. **As to her she -- did she -- not give me permission, so.**

Q. You heard her say when asked the question, did you give the defendant, Patrick Killen, permission to use your pictures, the answer that she gave was no, right? You heard her say that?

A. **When you post a picture online, I wouldn't call it stolen.**

Q. Mr. Killen, you heard her say no when asked whether or not she had given you permission; is that correct?

A. **That is correct.**

Q. And you stole pictures from Alexandra Reyes, correct?

MR. SCHWARTZ: Object to the word stole, Your Honor.

THE COURT: Overruled. Cross-examination.

A. Used, yes.

BY MR. WIDLANSKI:

Q. Well, let's talk about Alexandra Reyes because I'm sure the jury remembers her. She was the taller woman that came in here that you went to high school with. Do you remember her?

A. Yes.

Q. She testified on Tuesday. That was not that along ago.

A. Not that long ago.

Q. And you remember I, Ben, as you said, I asked her, Did you give the defendant, Patrick Killen, permission to use your photographs? Do you remember I asked her that?

A. Yes, you did.

Q. And do you remember what her answer was?

A. No.

Q. Are you saying you don't remember or are you saying what her --

A. No, I'm saying her response.

Q. I'd like you to answer only the questions that I ask, please, sir.

A. I did.

Q. Do you remember what her answer was?

A. Yes.

Q. And was her answer no?

A.   **Yes.**

Q.   So using the pictures that you stole from Carly Manning --

A.   **Used.**

Q.   Sir, I'm going to ask you to please let me finish my questions.

        MR. SCHWARTZ:  I again object to the word stole, Your Honor.

        THE COURT:  All right.  I note your objection to the use of the word stole.  It's been overruled.

BY MR. WIDLANSKI:

Q.   Mr. Killen.

A.   **Yes, sir.**

Q.   Using the pictures that you stole from Alexandra Reyes and Carly Manning you created fake Facebook and Instagram accounts in the names of numerous people, Chanel Izzabel, Rebecca Till; is that correct?

        MR. SCHWARTZ:  Your Honor, I object to the question because it contains a premise that is baseless.

        THE COURT:  Then he can answer the way he thinks it should be answered.

        MR. SCHWARTZ:  But either way he answers it is wrong because it contains the word stole.

        THE COURT:  And that's what cross-examination is all about.

BY MR. WIDLANSKI:

Q.   You can go ahead and answer the question, sir.

A.   **Can you please repeat the question?**

Q.   Happy.  Using the picture that you stole from Alexandra Reyes --

A.   **Used.**

Q.   Sir, I'm not a 13-year-old boy.  You can't make me do whatever you want.

A.   **I never said you were a 13-year-old boy.**

Q.   Okay.  Please remember that as we continue.

Using the pictures that you stole --

A.   **I object to what he just said.  He just said he's not a 13-year-old boy and I -- that's completely disrespectful and rude.  He's using sarcasm in the courtroom.**

Q.   Mr. Killen, do you know -- once again.  Do you know where you are right now?

A.   **I'm in a courtroom and you're using sarcastic remarks.**

Q.   I'm not being sarcastic at all, sir.

A.   **You're being very disrespectful.**

Q.   Well, sir, them is the breaks.

A.   **Never heard that before.**

Q.   Do you or do you not agree with me, when I say the following statement?  Using pictures you stole from Alexandra Reyes and Carly Manning --

A.   **I don't agree.**

Q.   Sir, please let me finish my questions.  We're going to be

here all day.  I got all the time in the world.

A.  **Same.**

Q.  Okay.  Using pictures that you stole from Alexandra Reyes and Carly Manning, you created fake social media accounts in the names -- multiple names including Chanel Izzabel, Rebecca Till, and Car Amuzo; is that correct?

A.  **No, it's not because I did not steal.**

Q.  So you are denying that.  You're denying what I just said?

A.  **If you use the correct word used, then yeah, I will confirm.**

Q.  We're going to move on, I think.

A.  **Okay.**

Q.  You chatted with Karucem; is that correct?

A.  **I did.**

Q.  When you were BeverlyHills05, you chatted with Karucem?

A.  **I used the username BeverlyHills05 to chat with Karucem on GigaTribe.**

Q.  So earlier when you said allegedly, that was just you being obstinate, correct?

A.  **No, because you used the word Kik chat on BeverlyHills05.**

Q.  Were you BeverlyHills05, sir?

A.  **In what terms?**

Q.  Sir, were you BeverlyHills05?

A.  **In GigaTribe chats, yes.**

Q.  Okay.  And you chatted with Karucem?

A.    **Yes.**

Q.    And you, personally you, not the name, whatever name it was, but you chatted with Vanyher, correct?

A.    **Yes.**

Q.    And that's the same as Vanessa Hermadova?

A.    **Yes.**

Q.    And you, personally you, chatted with Natty0524?

A.    **Don't recall that.**

Q.    Well, we can show you the Kik chats again.

A.    **I remember the Kik chats.  But you can't confirm any of those boys were underage.**

Q.    Sir, I'm not asking you about the age of boys right now. I'm asking whether you had conversations with people.

A.    **I don't recall.**

Q.    And I said I would happily show you the chats again if you'd like.  Will it refresh your recollection?

A.    **Sure.**

Q.    Okay.  Let's do that.

        **MR. WIDLANSKI:**  Can I have the ELMO, Your Honor?

        **THE COURT:**  (Complies.)

A.    **I don't recall those chats.**

BY MR. WIDLANSKI:

Q.    They're nothing -- I haven't asked you a question yet. Just give us a second.  We'll get there.

        This is 19-F, Government's Exhibit 19-F.  And these

are chats on Kik between user name Chanel Izzabel and Natty0524.  Do you remember seeing these earlier in the trial?

A.  **I do.**

Q.  And you just admitted earlier that you are Chanel Izzabel?

A.  **Yes.**

Q.  Okay.  So these are the chats between you and user name Natty0524, correct?

A.  **Yes.**

Q.  Okay.  That wasn't that hard, right?

A.  **You were asking it very differently.**

Q.  From August -- end of August through September 12th or thereabouts, those dates, you had many, many, many Kik chats with underage boys wherein you had them send you naked pictures of themselves; is that correct?

A.  **Yes.**

Q.  And as we heard from Mr. Schwartz on multiple occasions, you agree, you admit that you, in fact, extorted them?  You threatened them in order to get them to send you the pictures that you wanted, correct?

A.  **Yes.**

Q.  Okay.  So you have -- you are agreeing and you're telling the jury right now at 2:10 on Friday, you're telling them that you sent threats to children to get them to send you naked picture of themselves?

A.  **Yes.**

Q.   You also agree, do you not, sir, that you had extensive conversations over GigaTribe chat with user name Karucem?

A.   **Yes**.

Q.   You agree that you had extensive conversations over Skype with many people including young boys, do you not?

A.   **Yes**.

Q.   I'm sorry?

A.   **Yes**.

Q.   And you agree -- because you saw the evidence, it was in right there.  You agree that these chats weren't limited to the time period of August and September of 2013, but, in fact, continued November, December 2013, January 2014.  Do you agree with that?

A.   **Yes**.

Q.   Then on February 11th, 2014, there was an event, correct?

A.   **Yes**.

Q.   Now, that event we've heard a lot about.  That event involved Special Agent Schwartzenberger and Special Agent Ginther coming to your house in the morning of February 11th; is that correct?

A.   **Yes**.

Q.   And you say you didn't consent.  A federal magistrate judge disagrees with you.  But whatever happened during that day, they left with pieces of your digital media; is that correct?

A.   **Yes**.

Q.    They left with your MacBook Pro?

A.    **Yes.**

Q.    They left with your iPhone?

A.    **Yes.**

Q.    They left with two thumb drives?

A.    **Yes.**

Q.    And the MacBook Pro, the iPhone, and one of the thumb drives are on that table right now, aren't they?

A.    **Yes, the ones that were thoroughly coerced are on that table.**

Q.    And after that, after February 11th, 2014, after the FBI came to your house, frightened you half to death, as you say, and coerced -- your words -- you would have given these -- these devices up.  You immediately went on to all of your other devices and deleted everything that could possibly be considered child pornography, didn't you?

A.    **I don't understand the question.**

Q.    Well, this young lady right here, Special Agent Schwartzenberger, spent two hours talking to you on February 11.  You remember that, right?

A.    **Yes.**

Q.    And she told you that there was a boy in North Carolina who had pictures demanded from him by RebeccaTill05, right?  That's what that conversation was about?

A.    **That's actually not true.  The boy didn't say he demanded.**

**The father acted as the boy and -- which then he says I demanded the father.  You changed the story here.**

Q.   Special Agent Schwartzenberger had a conversation with you on February 11th that involved RebeccaTill05 threatening a young boy for pictures; is that correct?

A.   **Actually, the father.  It was the father that was, not the boy.**

Q.   Special Agent Schwartzenberger had a conversation with you on February 11th, 2014, that involved threats to a boy in North Carolina for naked pictures?

A.   **Actually, the threats were not made to the boy.  It was made to the father.  The father instigated the situation and tried to get me to send him photos.  So you're incorrect.**

Q.   I'm not saying that the boy was threatened.  I'm saying --

A.   **Yes, you just said the boy was threatened.**

Q.   Please, let me finish, sir.

      Special Agent Schwartzenberger had a conversation with you on February 11th of 2014 in your house and in the back pool area in which she informed you that a complaint had been made to the FBI involving someone threatening a boy for pictures; is that correct?

A.   **That is correct, but the boy was not threatened.**

Q.   And after that, after you admitted that you were RebeccaTill05, and after you admitted that you had these pictures in your devices, you then immediately went back to

your room and deleted everything that could possibly be considered child pornography from all of your other devices, didn't you?

A. **What do you mean all --**

Q. Well, you had other devices, didn't you?

A. **No, I did not.**

Q. You didn't have any other devices?

A. **I had an iBook. I had an iPhone and I had two thumb drives that were taken that day. That's March -- that's March, not February.**

Q. It was taken in March, correct?

A. **Yes.**

Q. This is Government's Exhibit 34. It was taken in March?

A. **I did not have that computer in -- after February, though.**

Q. And 35?

A. **What is that?**

Q. This is a thumb drive that was taken in March? You had that (inaud.)?

A. **I didn't have any knowledge of where it was located.**

Q. So now -- so what you're telling us is that you went out and got new devices and then put child pornography on those, too?

A. **Actually, the stuff on the flash drive is stuff from 2008 when I was 15.**

Q. So you did have that device?

A.   **I did have it, but I didn't know what was on it.**

Q.   Okay.  But you didn't look for it?

A.   **It was deleted.**

Q.   It was deleted?

A.   **I believe so.**

Q.   Did you hear Special Agent Schwartzenberger testify that she just stuck it into a computer and found -- found those videos?

A.   **She can testify to anything she wants.**

Q.   Well, I'm asking you whether you heard that she did testify to that exactly?

A.   **I don't remember.**

Q.   You don't remember that?

A.   **No.**

Q.   It was a couple of hours ago?

A.   **In the morning.  Maybe yesterday.**

Q.   You don't remember Special Agent Schwartzenberger testifying that she found videos of child pornography on the thumb drives?

A.   **I remember that.**

Q.   On June 23rd of 2014 you went on Facebook on one of the fake accounts you created and you changed a profile picture, didn't you?

A.   **As shown in the evidence, yes.**

Q.   I'm sorry?

A.   **As shown in the evidence, yes.  I don't recall -- I don't recall specifically going in.**

Q.   Well, let's look at it.

A.   **I never -- I never objected to it being done.  I objected to -- to the memory of it being done.  So yes, it had been done, but I just don't remember it.**

Q.   So on June 23rd of 2014 you agree that you changed the profile picture on one of your fake Instagram accounts?

A.   **As shown in the evidence, yes.**

Q.   You keep saying as shown in the evidence.  I'm not asking you --

A.   **As shown in the evidence.  I don't recall.**

Q.   Sir, please let me finish.

A.   **You did finish.**

Q.   As shown in the evidence is irrelevant.  I'm asking you whether or not on June 23rd, 2014, you changed the profile picture on one of the fake accounts that you created?

         **MR. SCHWARTZ:**  I'm sorry to interrupt my colleague, but I would object.  It's been asked and answered three times.  He said he doesn't remember, but he accepts the fact that it's shown in the evidence.  I don't know what better answer could be given.

         **THE COURT:**  Overruled.

BY MR. WIDLANSKI:

Q.   You can go ahead and answer, sir.

A.   **As shown in the evidence, it was done.**

Q.   It was done.  By you?

A.   **As shown in the evidence.**

Q.   You did it?

A.   **As shown in the evidence, it was done.**

Q.   You keep using a passive voice?

A.   **So are you.**

Q.   You did it, did you not?

A.   **As shown in the evidence, it was done.**

Q.   Did someone else have access to your fake profile name?

A.   **I don't remember.**

Q.   So on June 24th -- June 23rd, 2014, which is about four and a half months after Special Agent Schwartzenberger and Special Agent Ginther came to your house, you went on the fake Facebook account that you had made and changed the profile picture?

A.   **As shown in the evidence, yes.**

Q.   And you did this despite the conversation you had with Special Agent Schwartzenberger about exactly this conduct, right?

A.   **Repeat the question.**

Q.   Are you okay.  You need a drink of water?

A.   **I'm fine.**

Q.   Are you sure?

A.   **Yes.**

Q.   Special Agent Schwartzenberger came to your house and took

your stuff because you were extorting boys and sending --
demanding pictures of them, right?  That's why she came?

A.  **Because I extorted an adult male that pretended to be the boy for pictures, yes.**

Q.  Earlier you just said to me, sir, that you admitted that you extorted from young boys.  You admitted that?

A.  **Yes.**

Q.  Okay.  So Special Agent Schwartzenberger came to your house, took your stuff because you were committing these acts of extorsion?

A.  **To an adult male who pretended to be a boy.  The father, not the boy.  She only gained the (inaud.) after she apparently coerced for the devices.  Then she got the evidence.**

Q.  Well, I'm not asking about the evidence.  I'm asking about what you did.

A.  **Please ask that.**

Q.  I thought I did.  Let me be very, very clear.

        **MR. SCHWARTZ:**  Your Honor, I object.  The question was why Special Agent Schwartzenberger took the computer, not whether he had extorted other boys.  He's answered it.  And I'd ask that the prosecutor have to go on to other questions.

        **THE COURT:**  All right.  Next question.

BY MR. WIDLANSKI:

Q.  You heard from Heather Freeman, Tara Jo Frost and Terry Cook during this trial, did you not?

A.   Yes.

Q.   And you heard that all three of their sons were under the age of 15 and living in states not in Florida, right?  You heard that?

A.   Yes.

Q.   And you heard that they were living there when you extorted pictures from them?

A.   Living where?

Q.   Outside the state of Florida?

A.   Yes.

Q.   So you said on your direct that you were ashamed of your body?

A.   Yes, sir.

Q.   And you didn't want -- I'll withdraw.

You were ashamed of your body.  You were ashamed of -- you know, sounds like -- and correct me if I'm wrong -- but it sounded like you said you were ashamed physically of your penis size?

A.   Yes, sir.

Q.   Is that what you said?

A.   Yes, sir.

Q.   So you never sent pictures of your penis over the internet; is that correct?

A.   I wouldn't say that's not -- I wouldn't say that's not true.

Q.   I think I had a double negative in there.

A.   **I'm sorry.**

Q.   That's okay.  Let's try it again.

A.   **Yes.**

Q.   Have you ever sent naked pictures of yourself over the internet?

A.   **I have.**

Q.   Naked pictures of your penis?

A.   **Yes, sir.**

Q.   That you're ashamed of?

A.   **Yes, sir.**

Q.   So you're so ashamed of your penis that you take pictures of it and send it over the internet?

A.   **I guess you could say that.**

Q.   I did say that.

A.   **Yes.**

     MR. WIDLANSKI:  Now, I apologize to the jury for this next line of questioning.  I'm going to ask to have the computer connected, Your Honor.

**BY MR. WIDLANSKI:**

Q.   On direct examination you stated that one of the videos we didn't establish what was on it.  You said --

A.   **I didn't watch the whole thing.**

Q.   No.  I, again, am going to ask you to let me finish the questions.  Cool?

A.    **Very.**

Q.    Thank you.

A.    **You're welcome.**

Q.    You stated that you weren't sure what was on that video and that you weren't sure it was child pornography --

A.    **(Inaud.)**

Q.    Will you please let me finish, sir.  It's not that hard.

A.    **I didn't watch the whole thing.**

Q.    Sir, please let me finish.  You stated that you weren't sure that this was child pornography, that Special Agent Schwartzenberger's summary of it wasn't conclusive.  We attempted to spare the jury this, but based on what you said, I'm going to actually have to play this.  And I'd like you to tell the jury whether or not you believe the images you're about to see constitute child pornography.  Okay?

        **MR. SCHWARTZ:**  Your Honor, I would object.  Unless the prosecutor establishes whether the defendant has seen the entire film before; otherwise, the question is groundless because he said he's not sure.

A.    **No, I'm not -- not sure.  I have never watched the whole video.  It's not a matter of being unsure or not.**

        **THE COURT:**  Well, I thought that was the purpose of the exercise.  Play it.

        **MR. SCHWARTZ:**  The exercise only has a probative value if he establishes that the defendant has seen the parts he's

going to show him now.  Then whether he was sure or not can be compared to the film.  If he hasn't seen the parts he's going to show, that his being unsure is irrelevant.

THE COURT:  Well, that's what we're going to find out.

MR. WIDLANSKI:  Your Honor, for the record, this is Government's Exhibit 48-A.  And please press play.

BY MR. WIDLANSKI:

Q.   Mr. Killen, I'm going to ask -- ask you to look at the monitor?

A.   **No, thank you.**

Q.   Sir --

A.   **You can't force me to look at the monitor unless you take my head and you force it to look at the monitor.**

MR. WIDLANSKI:  Your Honor, I would ask that you instruct the defendant to look at the monitor.

THE COURT:  You know, if he doesn't want to, you live with it.

MR. WIDLANSKI:  Sounds good.  Your Honor.

THE COURT:  I mean, you know, there -- if you want to move to strike his entire testimony, cross and direct, you can do that, too, if you don't think he's being responsive.

MR. WIDLANSKI:  Fair enough.  And well let this one go.

THE COURT:  I'm offering it to you as another solution.  If you don't think he's being responsive to your

questions, we'll just strike his testimony on direct and cross.

MR. WIDLANSKI: Can I have one moment to confer with my colleagues?

THE COURT: All right.

MR. WIDLANSKI: Your Honor, we're going to publish this exhibit and we're going to keep it quick. We're not going to play the entire thing. And we will allow the jury to make their own determination as to whether or not this constitutes child pornography. And again I apologize, ladies and gentlemen of the jury.

(Video playing)

MR. WIDLANSKI: We have completed showing a very small part of that video.

BY MR. WIDLANSKI:

Q. Mr. Killen, I'd like to talk a little bit more about the conversation you had with Special Agent Schwartzenberger on February 11th.

A. **Okay.**

Q. Now, initially you told her that you were not Rebecca Till?

A. **Initially, yes.**

Q. And then initially you told her you never used Zac(inaud.)05 as the e-mail address?

A. **That may be true. I may have said I don't remember or that I didn't use it.**

Q. You told her that you didn't use it, correct?

A.   **I may have actually said that, yes.**

Q.   Those were both lies, correct?

A.   **They were both lies.**

Q.   And then when you went outside, and you continued the conversation, you told her, in fact, that you were Rebecca Till, right?

A.   **After I refused to answer the question again, yes, she eventually coerced me in into answering her questions.**

Q.   You told her that you were Rebecca Till, correct?

A.   **I did.**

Q.   You didn't tell her at that time that you were Chanel Izzabel?

A.   **I did not.**

Q.   You didn't tell her at that time that you were BeverlyHills05?

A.   **I did not.**

Q.   You didn't tell her at that time that you were on GigaTribe?

A.   **I did not.**

Q.   Let's talk about GigaTribe a little bit.

A.   **Okay.**

Q.   You mentioned early that you agreed that you as BeverlyHills05 engaged in GigaTribe chats with a fellow named Karucem; is that right?

A.   **Yes.**

Q.   And you mentioned earlier that you basically just did what he told you to do and that you downloaded these blind folders from him and then none of the videos that you looked at gave you sexual gratification.  That's what you testified about, right?

A.   **That's what I testified, yes.**

Q.   I'm just going -- we're going to go through Government's Exhibit 17-B a little bit, and I'd like you -- this is page 7 of 17-B.

        **MR. WIDLANSKI:**  Your Honor, if I could have the ELMO, please.

        **THE COURT:**  (Complies.)

**BY MR. WIDLANSKI:**

Q.   So I'd like you to look at this line right here on page 7 (indicating).  Now, you're BeverlyHills05, correct?

A.   **Okay.**

Q.   And you're talking to Karucem, correct?

A.   **Yes, sir.**

Q.   And you said, Yup, the bait is getting him to go on Skype, correct?

A.   **I did say that.**

Q.   You did?

A.   **I did.**

Q.   And then the next line says, The catch is telling him to show and promising you will show.  And then the next line says,

Q. That's good strategy. And then the line after that -- what does the line after that say?

A. **Do that with the other boys you talk to?**

Q. Now, I'd like you to look at the top of page 8 right here (indicating). And you see the very top line that's on the screen?

A. **The very first question where it says, A question?**

Q. Yes. From Karucem to you.

A. **Written by a German, right? He was German. He knows English pretty well here.**

Q. I'm sorry. What does that have to do with what that box says?

A. **When you put that type of mark, it looks to show that he knows English pretty well but he's a German. So I don't know who wrote that or not. This is maybe entrapment.**

Q. So I'd like to look at the date here for that chat. What's that date?

A. **12-15-2013.**

Q. Okay. Now, you heard Special Agent Schwartzenberger testify earlier that Karucem was -- his account was taken over in November of 2014.

A. **2014?**

Q. Do you remember --

A. **I don't --**

Q. September of 2014.

A.   **September?**

Q.   Yes.  Karucem's account was taken over on September 24th, 25th of 2014.  Do you remember Special Agent --

A.   **When it was taken over doesn't mean anything.  He could have been working with them before.**

         **MR. SCHWARTZ:**  Your Honor, may I object and ask to approach.

         **THE COURT:**  All right.

         (Thereupon, there was a side-bar conference outside the presence and hearing of the jury.)

         **MR. SCHWARTZ:**  Your Honor, at this time I would move for a prejudicial mistrial based on Brady versus Maryland.  I have made specific Brady requests for all the information regarding Karucem and his cooperation with the Germans.  All I got was one e-mail -- one report saying that the Special Agent received an e-mail from the Italian Police regarding Karucem. Now there's apparently details regarding when he was arrested, when he started to cooperate, what he did, that I have not seen.  And I believe that if this gentleman was cooperating with authorities at any time and he was Skyping or GigaTribing or whatever you call it with my client, that information could be exculpatory.  I specifically requested it and I got -- and I'll turn over as part of the record -- one text saying that she got an e-mail.  Nothing else.

         **THE COURT:**  Response?

**MR. WIDLANSKI:** Yes, Your Honor. Initially the Italian authorities are not part of the prosecution team. Everything we have we have turned over. Special Agent Schwartzenberger testified earlier exactly what I just said. Defense didn't raise this objection at that point because Defense already had that information. That's the extent of the information that we have. The United States of America has no idea whether or not Karucem was at any point cooperating other than that the account was taken over at the end of September. That's all we've got and that's all we know and that's what we turned over.

**MR. SCHWARTZ:** Where is the e-mail that she allegedly got? I've never seen that.

**THE COURT:** What is the e-mail?

**MR. WIDLANSKI:** The e-mail is -- I don't know what the e-mail -- where the e-mail is, Your Honor, but I don't believe we're required to turn over a specific document as opposed to just the substance of the document.

**THE COURT:** I understand. But do you have the substance of it?

**MR. SCHWARTZ:** I don't know if I got the substance of it. I don't know what the e-mail says.

**MR. EMERY:** The substance is that everything that Special Agent Schwartzenberger has testified as well as I did with this Court has been turned over to the defense.

THE COURT:  Does the e-mail exist?

MR. EMERY:  The e-mail does exist.

THE COURT:  So is there any reason why we can't turn it over as long as it says the same thing that's already been provided?

MR. EMERY:  Sure.  Yeah, I mean...

THE COURT:  Okay.  So you'll get it?  I mean, we're not going to suspend proceedings, but, you know, he thinks there was something in there.  He doesn't know, I guess.  But provide it to them.

MR. EMERY:  Okay.

MR. SCHWARTZ:  Thank you, sir.

(Thereupon, the side-bar conference was concluded.)

BY MR. WIDLANSKI:

Q.   Returning to Government's Exhibit 17-B.

A.   **Yes.**

Q.   Karucem on December 15th of 2013 sends to you a question. When you blackmailed a boy, did he tell you if you post his pics he kills himself?

A.   **Do you have any proof of me saying that to a boy?  I don't see any (inaud.) that will turn into evidence of a boy telling me that he's going to kill himself and me just saying ha, ha, ha.  But they don't.  It depends on I have never said that to a boy unless you can show proof.  I'd like some.**

Q.   Mr. Killen, do you read English?

A.   **I don't know.  Do I?**

Q.   You write English, correct?

A.   **I do write English.**

Q.   And you know what letters are?

A.   **Yes.**

Q.   And you know that they go together --

A.   **To create words.**

Q.   -- and create words?

A.   **Yes, I do.**

Q.   And that the words sometimes are formed together in long chains --

A.   **Make sentences.**

Q.   I'm going to ask you again to let me finish the questions, please.

     Right?  They make sentences?

A.   **Yes.**

Q.   And those sentences can come together in groups as well which are called paragraphs?

A.   **Yes.**

Q.   Right?  And you understand that those words and sentences in paragraphs have meaning in the English language, correct?

A.   **Yes.**

Q.   And you recognize that?

A.   **Yes.**

Q.   So you read, correct?

A.   **Yes, sir.**

Q.   In English?

A.   **Yes, sir.**

Q.   Okay.  I'm glad we established that.

A.   **Thank you.**

Q.   I'm asking you whether or not this line that I'm pointing to on Government's Exhibit 170B says a question:  When you blackmailed a boy, did he tell you if you post his pics he kills himself?  Does it or does it not say that?

A.   **It does say that.**

Q.   The next line down is your response to Karucem.  Ha, ha, ha, ha, ha, correct?

A.   **Okay.**

Q.   Am I right?  Is what I just said, correct?

A.   **I think you're missing a ha.**

Q.   Thank you for correcting me there.

        And then you just said, Yes?

A.   **Yes.**

Q.   And then the next line is, But they don't, correct?

A.   **You are correct.**

Q.   And then Karucem sends -- asks you to explain by saying, When they reply it, parens, I will kill myself, close parentheses, comma, what do you answer them, question mark?

A.   **It's called a parentheses.**

Q.   So that's -- you're correcting me and saying that's a

parentheses?

A.   **Yes.**

Q.   Okay.  But the substance of what I just said was accurate?

A.   **Yes, you are.**

Q.   I'm sorry?

A.   **Yes, you are.  You're correct.**

Q.   And then you said, It depends on the situation.

A.   **Yes.**

Q.   That's what you said?

A.   **That's what it said there.**

Q.   And then you told Karucem, I say more like IDC just send, right?

A.   **That's what it says.**

Q.   And you admitted earlier that you're BeverlyHills05?

A.   **Yes.**

Q.   And then the next line says, Or just ignore them if they say it, right?

A.   **In quotation marks.**

Q.   Again, thank you.  But that's what it says, right?

A.   **Yes, sir.**

Q.   And then the next line -- let's test this.

A.   **Okay.**

Q.   I'd like you to read that next line, please.

A.   **Sure.  It says from Beverly Hills to Karucem, Hey, you cam any of my boys, question mark.**

Q.   Your boys.  Do you make any other reference to your boys in the chats that we went through earlier?

A.   **I don't remember.**

Q.   Let's show you.  Sorry about that.  There are a lot of chats to go through.

This is page 36.  So Karucem is asking you -- and this is a couple days after New Years on 2014.

Were you away on holiday?

And then after a line you say, Yeah, at Disney.

And Karucem asks you, Nice boys there?

And you reply, OMG, yes, in all caps with multiple S's.  Do you see that?

A.   **I do see that.**

Q.   And then you just say, I even got the Kik of one boy and I got nudes.  Do you see that?

A.   **I do see that.**

Q.   And then you say down here, He is 14.  You see that?

A.   **Okay.**

Q.   Do you see that?

A.   **I do see that.**

Q.   And then you say, I'll send you on Kik.  You see that?

A.   **Yes.**

Q.   And scrolling down, Karucem asks you, If it's a hard boy or easy.  And you say, Easy, in all caps with multiple exclamation points.  You see that?

A.   **Yes.**

Q.   And then you say --

A.   **But he's Christian.**

Q.   Please let me finish.

A.   **You did finish.**

Q.   I was in the middle of my question, which is:  You say, But he's Christian which makes it hotter.  I saw him in person.  He is the hottest boy ever.  He's hotter in person than in his pics.  Do you see that?

A.   **I do see that.**

Q.   Now, you stated earlier, sir, that none of these pictures were taken for the purpose of sexual gratification.  Do you remember saying that?

A.   **That's true.  This doesn't prove sexual gratification.**

Q.   Showing you page 30 of this same exhibit.  And this is where you're talking about Cameron Hales.  We heard his name a bunch.  You ask Karucem, Can you make Cameron Hales say when he's going to cum next time you cam him, right?  You say that?

A.   **Okay.**

Q.   Do you say that?

A.   **It says it right there.**

Q.   Do you say, Can you make Cameron Hales say when he's going to cum next time you cam him?

A.   **It says it there.**

Q.   Did you type that?

A.   I don't know.  I don't remember.

Q.   But you're BeverlyHills05, right?

A.   Yes.

Q.   And you talked to Karucem?

A.   I don't remember specifically what I typed or if you guys didn't put anything in there.

Q.   You heard from Forensic Examiner Soto talk about the hash values, right?

A.   You could actually still alter the hash values if you're saying they've done that in other cases before.

Q.   You heard Forensic Examiner Soto talk about the hash values, right?

A.   Yes, I did.

Q.   And you heard him talk about how there was a hash value in the beginning and then at the end --

A.   They're both the same.

Q.   Sir, I know this is hard for you.  I know it is.  But I really need you to stop talking over me for the benefit of our court reporter.  Okay?

A.   Uh-huh.  (Nodding.)

Q.   Can you try and do that for us?

A.   I can try and do that.

Q.   Thank you.  So again, you heard Forensic Examiner Soto talk about how they did a hash value at the beginning, they did a hash value at the end, they compared the hash values and that

was the same, right?

A.   **Allegedly.**

Q.   No, I'm asking you if you heard him say that?  I mean it's not allegedly --

A.   **He can allegedly say that's correct and still be invested interest.**

Q.   When you were sitting at this table right here and this chair right here, between your attorney and I believe on that day it was his paralegal --

A.   **Yes.**

Q.   -- Forensic Examiner Soto was in the chair that you're sitting in right now.

A.   **He was sitting here.**

Q.   And these jurors were sitting right where they're sitting right now?

A.   **Yes.**

Q.   And the court reporter was here and the judge was here and everybody was here --

A.   **Thank you --**

Q.   Do you remember that?

A.   **Yes, I do.**

Q.   And do you remember when Special -- I'm sorry -- Forensic Examiner Soto sitting in that chair said they took a hash value at the beginning, they took a hash value at the end, they compared the hash values and they were the same.  Do you

remember him saying those words?

A.   **He can say anything he wants.  Doesn't make it true.**

Q.   Do you remember him saying those words?

A.   **I don't.**

Q.   You do not remember?

A.   **I don't remember them.**

Q.   Okay.  This trial wasn't that important to you for you to pay attention?

          MR. SCHWARTZ:  Objection, Your Honor.

          THE COURT:  Overruled.

          MR. SCHWARTZ:  Argumentative.

A.   **I'm not answering that question.**

          MR. WIDLANSKI:  Your Honor, at this time I think -- hold on a second.

A.   **He got his feelings hurt.  Now he's going to his prosecutor attorney Robert Emory.**

BY MR. WIDLANSKI:

Q.   I'm showing you Government's (inaud.).  19-B.  These are Kik chats between you and Frosty2499?

A.   **Yes.  They were coerced from my MacBook.  I agree with that.**

Q.   I didn't ask you a question.  You're Chanel Izzabel, right?

A.   **Yes.**

Q.   And we heard from Ms. Tara Jo Frost during this trial, right?

A.   Yes.

Q.   And we saw his birth certificate?

A.   Yes.

Q.   And we saw that he was a young boy in September of 2013, right?

A.   Yes.

Q.   Turning to page 29 of Government's Exhibit 19-B.  See this?

A.   Yes, I see the page.

Q.   And these dark blue bubbles on the side a number of times are your dark blue bubbles, and the light blue bubbles are the boy that you're extorting?

A.   Yes.

Q.   And you say, I'm posting?

A.   Yes.

Q.   What were you referring to when you say, I'm posting?

A.   I did trend that I would post them, yes.

Q.   Post what?

A.   Pictures.

Q.   What kind of pictures?

A.   His nude picture.

Q.   His nude pictures?

A.   Yes, sir.

Q.   Pictures of him exposing his erect penis?

A.   Yes, sir.

Q.   You threatened a -- I believe he was 13?

A.   **Yes, sir.**

Q.   -- a 13-year-old boy that you would post picture of him with his erect penis so that you could get the exact shot you wanted, correct?

A.   **Yes.**

Q.   And he says?

A.   **No.**

Q.   No with lots of Os and then an I.  And you said, Be an asshole, yes, send correctly, right?

A.   **Yes.**

Q.   Then he says, I'm not an ass -- I'm guessing that's supposed AS as in butt, but it says AS an in as.  I'm not just hard.  Literally can't get hard once you jizz, you can't -- it won't get hard.

And then you said, You jizzed and you didn't show me -- I'm sorry.  You jizzed and it didn't show me.

And then he said, It went too fast.

And you said, No, you're just an asshole.

Then on the top of page 31.  What does Mason -- I'm sorry -- Garrett --

A.   **Frost.**

Q.   What does Garrett Frost, a 13-year-old boy, type to you on September 10th of 2013?

A.   **You want me to read it?**

Q.   I would like you to do that.

A. You just threatened my life, I'm crying right now.

Q. And then what do you say?

A. L-M-F-A-O-S-T-F-U. You caused that yourself.

Q. And what does L-M-F-A-O mean?

A. I don't remember.

Q. You don't remember what L-M-F-A-O means?

A. No.

Q. What about S-T-F-U?

A. I don't remember what that means either.

Q. You're Chanel Izzabel?

A. Yes.

Q. You're BeverlyHills05?

MR. SCHWARTZ: Objection. Asked and answered three times.

THE COURT: Overruled.

A. Allegedly.

BY MR. WIDLANSKI:

Q. You're RebeccaTill05?

A. Yes, sir.

Q. And you extorted young boys in order to get them to send naked pictures of themselves to you?

MR. SCHWARTZ: Objection. Asked and answered twice.

THE COURT: Overruled.

A. Yes, sir.

MR. WIDLANSKI: No further questions, Your Honor.

THE COURT: Redirect?

### REDIRECT EXAMINATION

BY MR. SCHWARTZ:

Q. Did your attorney tell you not to fight with the prosecutor?

A. **Yes, he did.**

Q. You were asked by the prosecutor about deleting things from your computer or electronics on February 11, 2014. Do you remember being asked that early on in the examination?

A. **He did ask -- I don't remember, actually.**

Q. Okay. Did you -- let's take the electronics one at a time. Did you delete anything from your telephone on that day?

A. **I did not.**

Q. Did you delete Kik from your phone on that day?

A. **I did not.**

Q. When you came out of your bedroom with your telephone after it was charged, was it fully charged?

A. **It was not. It was like 1 to 2 percent.**

Q. It took -- did it take a long time to charge for some reason?

A. **When an iPhone is completely dead and it needs to recharge to 1 percent, if it's been dead for I would say more than an hour or a few hours, it takes about 5 minutes to charge to even 1 percent.**

Q.   Okay.  And when you brought it out, was it open or locked?

A.   **It was locked.  The screen was black.**

Q.   And on your -- was your telephone password protected?

A.   **It was password protected.  It was PIN protected.**

Q.   What does that mean?

A.   **There's a difference between a password and PIN.  A PIN is a four-digit number that the iPhone uses to unlock itself for the user, and a password is a password that you use more characters and digits to type in.  So you can use letters and numbers to type the password but only numbers to type in a PIN.**

Q.   So the password -- the phone was PIN protected?

A.   **It was PIN protected.**

Q.   Did -- were you asked by any of the special agents for the PIN number of your phone?

A.   **I was.  When I -- when Laura demanded that I get the iPhone and I told her it would charge.  Eventually when I got the iPhone, she asked -- she requested that I give her the password.**

Q.   Did you?

A.   **I did.**

Q.   What did she do with it?

A.   **She typed it into the phone and she found nothing on the phone.**

Q.   When you say found nothing on the phone --

A.   **She found no videos, no app.**

Q.   Were the apps shaking?

A.   **The apps were not shaking.  They tend to shake when you first open the phone from being unlocked.**

Q.   Had you at some point erased Kik from your phone?

A.   **I had.  Not that day, though.**

Q.   When?

A.   **About maybe a week or so.  A week or two even.  I don't remember specifically.**

Q.   Why did you erase it a week or two before?

A.   **Sometimes I let my friends, you know, look at my phone or use it, or I leave it in an area where it's exposed.  And even though I wouldn't say the content would be sexually explicit or even child pornography, it would be embarrassing to have it exposed.  So I delete the app and the pictures every few weeks.**

Q.   Was this a regular thing you did?

A.   **Yes, sir.**

Q.   Did you delete it on September -- I'm sorry -- on February 11th, 2014?

A.   **Delete what?**

Q.   The Kik app.

A.   **No, I did not.**

Q.   Now, you were asked about deleting other electronics after the agents left your house.  Do you remember that?

A.   **Yes, but I didn't understand the question.**

Q.   Okay.  Let me try to make it clearer even though it wasn't

my question originally.

Did you have any electronics left after the agents left your house on February 11th, 2014?

A.   **I didn't really have any electronics.  I had some thumb drives that were on the desk, but I never really knew what was on them.  I had -- I had maybe even about eight to ten different thumb drives, and I didn't really use those thumb drives.**

Q.   Did you have an iPhone anymore?

A.   **I did not have an iPhone.  I had an iPad, though.**

Q.   You still had your iPad?

A.   **I still had my iPad, yes.**

Q.   Did you erase anything from your iPad?

A.   **That day, no, I did not.**

Q.   And by the way, had Special Agent Schlesinger -- Schwartzenberger checked your iPad and found nothing offensive on it --

A.   **Yes.**

Q.   -- and given it back to you?

A.   **Yes, sir.**

Q.   Did -- there was a Dell laptop in your drawer on March 6th, 2015.  Did you have that on February 11th, 2014?

A.   **No, I did not.**

Q.   When did you get that Dell laptop?

A.   **Maybe two, three months after.**

Q.   And who did you get it from?

A.   **I didn't really get it from anyone.  It was more just in the house and I used it.  It may have even actually been in my room, but I didn't know the password.  I asked my dad for the password.  He didn't know it.  And I got the password.**

Q.   But you hadn't used it or have access to it on February 11th, 2014; is that right?

A.   **I'm sorry.  Repeat the question.**

Q.   You didn't have access to it on February 11th --

A.   **No, I did not.**

Q.   -- 2014?

A.   **No, I did not.**

Q.   I don't mind if you speak over his question, but you can't speak over mine.

A.   **Okay.**

Q.   I'm only joking about speaking over his.

So did you erase anything from that Dell on 2000 -- in 2014, February 11th?

A.   **It really wasn't being used by me after February 11th until maybe two or three months after.  So no, I didn't delete anything or was there anything -- it wasn't even touched or used.**

Q.   Is there any other electronics that you had that you deleted something from on 2011 (sic) -- February --

A.   **I didn't delete anything after --**

Q.   I'm sorry.  On February 11th, 2014?

A.   **I didn't -- no.  There was -- they took most -- they took all of the personal electronics that I had used that day, February 11th, 2014.**

Q.   Except your iPad?

A.   **Except my iPad which I used for school.**

Q.   Now, when you were about 15 years old, did you once get a video cam of a boy masturbating?

          MR. WIDLANSKI:  Objection, Your Honor.  Beyond the scope of cross.

          THE COURT:  Overruled.

A.   **Yes.**

BY MR. SCHWARTZ:

Q.   The prosecutor asked you a number of questions regarding the comment you made to Karucem about, They always say they're going to kill themselves, they never do, et cetera, et cetera. Do you remember that?

A.   **Yes, I do.**

Q.   Why did you say that?

A.   **I don't remember saying it.  I can't say why I said it because I don't even remember saying it at all.**

Q.   But it's clear you typed it, right?

A.   **I may have.**

Q.   Did you ever have a boy who you forced, cajoled, extorted into giving you pictures say they were going to kill

themselves?

A.   **No, sir.**

Q.   Did you ever laugh at somebody who said that?

A.   **Never.**

Q.   Because no one ever said it, right?

A.   **No one ever said it.**

Q.   Any -- on any of the chats that the government found and produced here in court, are you saying that -- are you being told that by any boy?

A.   **No, sir.**

Q.   Were you just being a big shot when you said that to Karucem?

A.   **I was.**

Q.   Was it true?

A.   **It was not true.**

Q.   Let me clear some things up.  The prosecutor asked you some questions early on in your testimony that you seemed to have trouble with.  Do you remember?

A.   **Trouble remembering --**

Q.   For instance, he said, When you stole the picture of Carly Manning, did you use it to send to young boys to induce them to send you nude pictures, or something similar to that.  I'm paraphrasing.  Do you remember that question?

A.   **I do.**

Q.   And you answered it no, didn't you?

A.   I answered it no because I didn't think I was stealing.  I was using, and maybe not for the right purposes.  But I never stole because once you put something on the internet, it does become public.  Now, am I saying that, you know, everyone should go and do this?  No.  But it's not stealing.

Q.   And the prosecutor continued to hammer away at you, you stole it, didn't you?

A.   Yes, sir.

Q.   And you kept saying what?

A.   Used.  I used the picture.

Q.   Okay.  And are there a lot of pictures on the internet?

A.   Yes, sir.

Q.   Do people take and resend those pictures to other people?

A.   Yes, sir.

Q.   As a matter of fact, some singer that my daughter likes, Justin somebody, became famous because he had an iTune video on the internet that people took and kept sending and sending and sending; is that correct?

         MR. WIDLANSKI:  Objection, Your Honor.  Leading.

         THE COURT:  Sustained.

         MR. SCHWARTZ:  Withdrawn.

BY MR. SCHWARTZ:

Q.   Do you know a singer by the name of Justin --

A.   Bieber.

Q.   -- Bieber?

MR. WIDLANSKI:  Your Honor, irrelevant.  Beyond the scope.

THE COURT:  Counsel, if you want to get into this, fine, but it wasn't brought up in cross-examination and it's going to be a new area.  Then we're going to open up --

MR. SCHWARTZ:  Okay.  I don't want to open up a new area, Judge.  And just he was told that he stole a picture that he got from the internet.  I'm trying to show that it's a regular practice of everyone to use public domain items on the internet.  If Your Honor feels I shouldn't go further, I'll certainly stop.

THE COURT:  I just want to alert you that if it's going to be a new area, that we're going to give it the same latitude.

MR. SCHWARTZ:  Then I'll stop asking the question.

BY MR. SCHWARTZ:

Q.   You were asked about statements that, That boy's hot, I saw him in person and he's hotter than his pictures.  Do you remember that?

A.   **I do remember that.**

Q.   Were you talking about that in a sexual sense?

A.   **Not in a sexual sense, no.  I was just saying that because I was going along with what Karucem was saying about boys being hot.**

Q.   Have you ever seen a picture of an actress or a singer or

somebody who you thought was hot?

A.   **Yes.**

Q.   And is that a sexual reaction or is that just admiring the attributes of a person?

A.   **They may have some good characteristics about them.**

Q.   In following up on the prosecutor's line of questioning, when you got these pictures of these boys standing naked in front of a mirror, was it for sexual purposes?

A.   **It was not intended for sexual purposes at all, actually.**

MR. SCHWARTZ:  I have no further questions, Judge.

THE COURT:  All right.  Thank you.  You may step down.

MR. WIDLANSKI:  Perhaps we should take a recess.

THE COURT:  We'll go ahead and take a -- before we do that, Mr. Schwartz, are you going to have any other witnesses?

MR. SCHWARTZ:  I'm not, Your Honor.  No, I'm not, sir.

THE COURT:  Is there going to be any rebuttal testimony?

MR. WIDLANSKI:  No, Your Honor.

THE COURT:  Folks, so you've heard all of the evidence that you're going to hear in the case.  The next step in the proceedings are the closing arguments by the lawyers and then I'll read the instructions to you and then we'll turn it over to you for your deliberations.

So before we do that why don't we go ahead and take our afternoon break now and come back and hear closing

arguments.

THE COURT SECURITY OFFICER: Please rise for the jury.

(Thereupon, the jury was escorted out of the courtroom.)

THE COURT: Okay. Have a seat. You want to renew your motions, right?

MR. SCHWARTZ: Correct, Your Honor. And in particular in light of the all of the testimony that's been interjected before the jury, I particularly, although I renew all the motions, I would particularly renew my motion to dismiss the charges under 18 USC 1519.

With all of the evidence in now, there's no definitive evidence other than -- I'll use a word I've heard in court recently -- speculation about the erasing of the Kik app on February 11th, 2014, and there's definite direct evidence that it wasn't done.

I would say taking all of the evidence now at the end of the entire case, there is not proof beyond a reasonable doubt that the defendant violated Section 1519 in Title 18.

THE COURT: Well, you know, I don't -- I don't think the testimony changes anything at this point. I mean, I do think there has been some additional evidence, it kind of cut both ways from the way I heard it, but if you believe them, then yes. There is more in evidence to suggest that he did not destroy any records.

On the other hand, if you don't believe him then

that's evidence in the record as to why not to believe him now, then you can infer that he's lying about the destruction as well.

So I think the more prudent course at this point would be to allow that to go forward and, as I said, I will revisit it again depending on the outcome of the case.

MR. SCHWARTZ: Thank you, Your Honor.

THE COURT: Okay.

MR. EMERY: One last thing, in side-bar the Court had instructed the Government to turn over the e-mail --

THE COURT: Right.

MR. EMERY: -- from the Italian Police. That has been done now.

MR. SCHWARTZ: I have, in fact, received it.

THE COURT: Was it a smoking gun?

MR. SCHWARTZ: It was not only a smoking gun but -- no. It was as the prosecutor represented it would be.

THE COURT: Okay. All right. So it doesn't really add or take away from what you already had?

MR. SCHWARTZ: May I ask Your Honor one procedural question?

THE COURT: Yes.

MR. SCHWARTZ: I wanted to display a particular section of the Court's instructions to the jury during my closing argument.

THE COURT:  Sure.

MR. SCHWARTZ:  Is there any problem with that?

THE COURT:  Not at all.

MR. WIDLANSKI:  And, Your Honor, with respect to the jury instructions given the testimony the United States would ask that the inconsistent statement instruction when a defendant testifies be added to the jury instructions.

THE LAW CLERK:  It's in.  It's 5.

THE COURT:  I believe that is in and it also includes the -- you're referring to the defendant has a right not to testify, but if he does then --

MR. WIDLANSKI:  I think it's 6A.

THE COURT:  Do you have it in your set?

THE LAW CLERK:  It's flagged in yours.  In the set I just gave you, it's flagged.

THE COURT:  The pages aren't numbered so you just have to page through to five.

MR. SCHWARTZ:  And, Your Honor, I would also ask that an instruction as to other witnesses, I assume it's included in there, be given as to Special Agent Schwartzenberger.

THE COURT:  It just refers to all witnesses and then there's -- the instruction has a separate paragraph.  If you go to it, it has a separate paragraph with respect to a defendant who testifies.

MR. SCHWARTZ:  Thank you.

THE COURT:  Okay.  Are we ready?  So we will come back to close?

MR. EMERY:  Yes, Your Honor.

MR. WIDLANSKI:  Yes, Your Honor.

THE COURT:  So let's take a short recess.

MR. WIDLANSKI:  And, Your Honor, still 20 minutes, is that what we're going with?  The Government's fine with that, Your Honor.  That's what I practiced on.

THE COURT:  If the Government's fine with it, you're fine with it, and we'll stick with it.  Okay.  Good.

MR. SCHWARTZ:  Thank you for telling me that, Judge.

(Thereupon, a brief recess was taken.)

(Thereupon, the jury was brought into the courtroom.)

THE COURT:  All right, ladies and gentlemen, please be seated.  So we'll now hear from each side with their closing arguments.  Both sides have the same amount of time, 20 minutes apiece.  The Government will go first and then you'll hear from the defense counsel, and then the Government, if they haven't used up all of their 20 minutes, they can reserve whatever time they have remaining to respond to the defense closing arguments, but it's 20 minutes for both sides in total, and when their 20 minutes is up, it's my job to tell them that it's time for them to sit down.

MR. SCHWARTZ:  I don't know that I formally rested. If I haven't, I do, and any motions I would renew now.

THE COURT:  All right.  The record so reflects and no rebuttal for the Government.

MR. EMERY:  Thank you, Your Honor.

### *CLOSING ARGUMENT*

MR. WIDLANSKI:  Ladies and gentlemen, I'm going to quote the defendant.  Once it's on the internet, it's out there.  That's what he said about 15, 20 minutes ago.  And it's true.  Thousands of pictures of young boys that the defendant extorted and produced are now out there.  They're out there on the internet.

And why?  Why are they out there?  For his and for the sexual gratification of others.  And that's what this case boils down to.

Mr. Schwartz conceded at the very beginning that he did, in fact, the defendant did, in fact, threaten boys across state lines, that he extorted these picture from them.  The point that Mr. Schwartz was attempting to make was that these pictures, which you saw, were somehow not graphic, not lascivious, that they were not child pornography.  That was his thrust.

You saw the pictures for yourselves.  You can make that determination yourself.  And you will with the assistance of the Judge's instructions.  He's going to tell you what the law says child pornography is.  I urge you when you're back

there during your deliberations, don't lose sight of your common sense.  You're allowed to keep your common sense. You're allowed to maintain basic reason, basic understanding of the way the world works.  You're allowed to act like normal people, to think like normal people.  And to know that when one person says to another, "Can you make Cameron Hales say when he's cumming next time," that is because it's for sexual gratification.

Let's take a step back.  Let's take a step back and look at the timeline that this case presents.

The first evidence really that the United States has presented to you comes from the end of August of 2013.  And that sort of goes until the middle of September 2013.  And why is that?  Because the MobileSync backup that was contained on Government's Exhibit 7 that refers to Government's Exhibit 8 and you saw the IMEI number, the unique number that links (phone falls out of the bag) -- pardon me -- that links the phone with the computer is the same.  So you saw the MobileSync backup of this phone from the end of August, middle of September.

In that limited amount of time, just a few weeks, you saw thousands of chats, Kik messages.  You saw September 8th alone, on September 8th alone that many Kik chats on the MobileSync backup, because he basically didn't stop it.  He couldn't do it.  And he did constantly all hours of the day,

all hours of the night, and he did it for the purposes of getting naked picture from boys.  He basically admitted on the stand.  We know that that's what he did.

Then we have a break because there's no MobileSync backup.  But you heard from the examiners about the GigaTribe chats that started October, November, December of 2013, continuing to January of 2014.  And you saw in some of those GigaTribe chats, that's 17B, if you forget when you get back there, all of this evidence is there for you to look at if you'd like to.  But you saw the defendant telling Karucem about his trip to Disney.  About how he saw the hot boy and how he was even hotter in person than he was in the picture in Disney in 2014.  That was in January.

What happened in February, on February 11th to be specific?  What happened?  Laura Schwartzenberger and Agent Jason Ginther show up at his house.  You heard a substantial amount from the defendant and his parents about how Laura Schwartzenberger coerced, threatened him.  I urge you don't pay any attention to that because it has already been ruled upon. The legality of the consensual search of the devices is a nonissue for you to consider.

**MR. SCHWARTZ:**  Objection.

**THE COURT:**  Overruled.

**MR. WIDLANSKI:**  It's not an issue for you to consider because it has been dealt with.  They have the computer

legally. They searched it legally, and what you saw before you was completely legal. There is no legal question of the consent search for you to consider.

So they search it and did this warning, this FBI show-up that apparently was so stressful to the family, did this show-up stop Patrick Killen, Junior, from continuing to do what he did? Not even remotely. Not even a little bit. Because a year and a half later, a year and a month later they come by and he's got another computer and he's got Skype chats which you saw. And he's got GigaTribe on that, too. He didn't stop. He knew the FBI was on to him and he didn't stop because he was getting sexual gratification.

Now, you also heard a little bit in the opening and then a little bit during Mr. Killen's testimony that he was embarrassed by the size of his penis and this embarrassment forced him to go on social media and extort young boys, threaten them, and make them send picture of their penises. That's what he said.

He also said, if you recall when cross-examined, that he sent pictures of his own penis across the internet so clearly his embarrassment didn't extend to his shipment of his own penis. I'll leave that for you to consider when thinking about the defendant's shyness and embarrassment.

Did the defendant produce these videos? That's another question that was raised by the defense. Did the

defendant himself produce them? Well, look at the chats, the Kik chats. First he would get them to send them. Right? They adjust a shot only of the penis which, by the way, one of the examples of a lascivious exhibition of the genitals is that the shot is focused on the penis so consider that as well.

But after he got that first picture, he would then bribe them with picture of girls. Now, we do not allege that the pictures he sent were of the two young ladies that you heard from in this trial. But he did send pictures of women across in the hopes that that would encourage the boys to reciprocate and they did, because they're 13-year-old kids and he's an adult, and he's smarter than they are because they're kids. So he would get them to turn a little bit. No. Add the face. Turn the flash off. In the mirror. Can you get the balls in, too? That man is sitting in the director's chair.

Anything other than production does not give it scope. Does not give it the definition of what it is. He produced those pictures, there is no question. That man, that adult man would communicate with 11, 12, 13, 14, 15- year-old children and produce child pornography. They would share it with Karucem and once it's out on the internet, it's out there forever. It's out there forever.

And you heard from Colonel Cook and Tara Joe and Heather Freeman. They told you about their sons, the victims in this case. And you also heard there was only three. Three

of dozens, maybe hundreds.  Who knows how many?  Because the defendant had a plate.  He had a procedure.  He went over it in his chats.  You saw that.  How he would convince these boys to do what he wanted them to do.  How he would blackmail these boys, his word, not mine, blackmail these boys.  And what if they said, "I'm going to kill myself?"  What if these 13-year-old boys who that man was preying on said, "I'm going to kill myself"?  What then?  Haha haha haha.  I'd tell them, "IDC, I don't care."

You saw what Mason and Garrett texted.  And you saw LMFAO in response, which apparently the defendant now forgets what that means.  But I think you all will know what it means when you get back there.

You heard from the defendant.  You heard from his own mouth, and you are allowed to make credibility determinations.  In fact, you are encouraged to do so.  I encourage you to make a credibility determination.

Did you find the defendant's testimony credible?  Did you?  Or when presented with this, the evidence in this case, the thumb drives, the computers, the hard drive, the screen shots, the Skype chats, the GigaTribe chats, the Kik chats, the recent files viewed, when presented with that evidence, there can be no other possible conclusion that the defendant, that man, Patrick Killen, produced, possessed, distributed, received sexually explicit photographs and videos of children under the

age of 18.  And as you saw, some much younger than 18.

The defendant did not have one computer.  He didn't have one device.  He couldn't stop.  He had his chance to stop after the FBI came to his door and he didn't.  He knew they were looking at him and he didn't stop because it was power.  You heard him say that.  It was about power.  He felt good.  He felt good taking these boys' innocence and putting it on the internet where anyone could see it for the rest of time.

Ladies and gentlemen of the jury, when you get back there and you see the evidence, there is only one outcome, there is only one possible way that you can find and that is that the defendant is guilty of every single count charged in the indictment.

Thank you very much.


### *CLOSING ARGUMENT*

**MR. SCHWARTZ:**  Ladies and gentlemen of the jury, let me start by apologizing for not saying hello to you when I walked by always or saw you in the cafeteria, we're not allowed to interact with the jury.  So I intentionally didn't.

Now, let me start with the last witness.  You saw Patrick on the witness stand.  Was his behavior that of an adult or was it the inappropriate behavior of a 13 or 14-year-old immature kid?  Those of you who are parents, those of you who have sisters or brothers, know what kids act like.

What did he act like?  An immature kid.  And that's basically what his parent said was a problem.  And I suggest to you it is.  And his very behavior here verifies that although he has an adult body, he doesn't have an adult mind.

Now, there are a couple of issues here that I'd like to raise and I have a very brief time to do it in, so let me start.  You should convict Patrick of what?  Of extortion?  He should be convicted of threatening these boys, there is no question he did that.  And he did that for his own purposes.  He did that to get pictures of the boys.

I suggest the Government said Patrick lied when he wasn't credible.  I tell you he's probably too credible.  He kept telling the truth.  He said, even though it's hard for somebody to do that, he was embarrassed about his body, he was curious about other boys' bodies.  And that's why he asked for the pictures.  He didn't ask them for sexual gratification.  He didn't ask for sexually explicit pictures.  In this day and age when I was a kid we didn't see sexually explicit pictures.  This day and age they're all over and you all know what a sexually explicit picture is.

Is it a picture of a young boy standing in front of a mirror, even if he has an erect penis?  Is it there to arouse?  Is this arousing?  Does anybody find that arousing, or is it a picture just for the reasons that Patrick said, that he was looking at it for his own curiosity and it gave him a feeling

of power, not sex, to get these boys to send it to him.

Was it the right thing to do?  Absolutely not.  It was wrong, and he should be convicted for it, for the extortion.

Now, the evidence that the Government seized I suggest was seized illegally.  A magistrate did have a hearing.  A magistrate did make a pretrial preliminary determination that it was properly seized.  She heard about eight hours of testimony, give or take.  I think it was give.  You heard about 30 hours or more of testimony.  You understand what happened here I suggest a lot better than the magistrate did.  And the question I have for you is from all of the evidence you heard, did Patrick knowingly, intelligently consent to the FBI taking his electronics?  If he didn't, then none of this evidence should be here.

We all have Constitutional rights --

MR. EMERY:  Objection, Your Honor.

THE COURT:  Overruled.

MR. SCHWARTZ:  We all have Constitutional rights under the Fourth Amendment of the Constitution not to be subject to illegal searches and seizures.  If you find as a jury that Patrick didn't consent, then I tell you not to consider this evidence.

MR. EMERY:  Objection, Your Honor.  He's stating the law incorrectly.

THE COURT:  I think it goes to the issue of

credibility.  For that purpose I will allow it but the legal determination has been made.

MR. EMERY:  Can we at least include a statement as far as that not only did the magistrate judge make that finding, but that finding was affirmed by this Court?

THE COURT:  I'm sure you're going to tell them that on your rebuttal.

MR. EMERY:  Thank you, Your Honor.

MR. SCHWARTZ:  And can I have some time added now?

THE COURT:  Yes.

MR. SCHWARTZ:  Thank you.  But let's assume that we do consider this evidence.  What does this evidence show?  One question:  Are the pictures of the boys what the law says are sexually explicit?  Because the Judge is going to instruct you on the law -- can this be on, Judge?

THE COURT:  (Complies).

MR. SCHWARTZ:  And the Judge is going to instruct you that on any of the sexually related crimes, that's approximately 13 of the counts, in the indictment, in order for him to be guilty of that, there has to be sexually explicit conduct, pictures of sexually explicit conduct and that means actual or simulated sexual intercourse.  I'm talking now about the pictures of the boys which involve the counts involving the named victims, Frost, Freeman, and Cook.

There were no sexual intercourse in those pictures,

oral or genital or anal or genital in those pictures of the boys.  There was no bestiality, having sex with animals.  There was no masturbation in those pictures although there was a couple of pictures of the boys holding their penis.  No sadistic or masochistic abuse.

So the question comes down to was there a lascivious exhibition of the genitals or pubic area of a person?  And the Judge will tell you that to decide if something is lascivious, you have to look at a number of factors, consider a number of items.

No one of the items, in and of itself, is decisive.  You have to consider that number of items and decide, is this going to arouse someone?  Is it lascivious?  And the number of items are the overall content of the material.  Are people displayed in a sexual manner, whether the focal point is the genitalia?  Yeah, it is.  That's one factor.

Whether the setting or depiction is sexually inviting or suggestive, for instance, a location or a pose of a guy standing in the mirror in his bathroom?  Is that sexually inviting or suggestive?

There's some other factors.  Whether the minor is in an unnatural pose.  Standing naked in front of a mirror, is that natural?  Probably the most natural state of a man without clothes.  But inappropriate attire, yeah, I guess that's inappropriate attire, partially clothed, really.

Whether the depiction appears to convey sexual coyness or apparent willingness to engage in sexual activity.  I think not, but you're the triers of facts.

Is this arousing?  Is this something that gets you sexually stimulated?  Whether the depiction has been designed to elicit a sexual response to the viewer?  Patrick said it didn't elicit a sexual response in him.  But you're the triers of the fact to decide whether this elicits a sexual response. It's your call.

Now there are things in this case that are clearly and disgustingly child pornography.  I understand why Patrick didn't want to look at it.  I didn't want to look at it.  You didn't want to look at it.  But the law says in order for someone to possess child pornography, they have to knowingly possess it.  And the Judge will tell you what possession means. You can read all that, the instructions I displayed and the Judge reads to you, you'll take back with you into the jury room and you'll be able to discuss the law.

But Patrick said, and there's no evidence to the contrary, that he clicked on this not knowing what it would contain.  He clicked on this material.  It downloaded, he started looking at some of them.  He didn't have the picture on GigaTribe.  He just had the folders.  He clicked on them.  You saw all of the folders involving the videos that the Government showed you on that sheet of how many times they clicked it, he

clicked on it once for seconds and not again. Never looked at it again and again. And he said he tried to delete it, he deleted, I think they said a thousand or something like that, or more.

And you heard yourself from the expert and from Patrick and from Special Agent Schwartzenberger that they keep downloading. It's like a virus. Once it's there, it continues to download.

She said in the grand jury, and I read it to her in the trial, typically a file sharing program when you install a certain program on your computer, it will set up peer folders and download folders automatically by default. And where there's anything that you download utilizing a file sharing program will put the files, the files will be placed. And when you look at the chart it says downloading every time you click on it.

So once he made the mistake of clicking on the folder that Karucem sent him, Karucem who, by the way, the Government finally acknowledged was at least at some point in time cooperating with the Italian authorities. He kept on downloading and like a virus kept infecting his computer.

But did he knowingly possess at that point child pornography? If you think he did, then you have to convict him. If you think he didn't click on that, or he didn't try to delete it or he didn't -- it didn't keep automatically coming

down, then you should find him not guilty of the charges of possession of child pornography.

As to the distribution, those charges, the charges involving the boys, I suggest to you that it's not child pornography and I ask you -- I ask you to read the definitions.

The question really is, is Patrick guilty of those crimes or is he an immature boy who started to get out of this when he finally went to college where his mother was working and started getting his grades up and started socializing?

Does he need help?  Does he need to be punished by charging him with extortion and finding him guilty of extortion or does he need to be punished a lot?  Your decision shouldn't be based on punishment, it should be based on whether you think he is or is not guilty of these crimes, as the Judge defines the crimes to you.

But look at the pictures of those boys standing there naked in front of a mirror and ask yourself, are those sexually explicit?  Are those designed to arouse?  If they're not, then I suggest you should find him not guilty of those sexual charges.  And if you decide that you can't consider any of the evidence, then you should find him guilty of extortion only.  Those are two counts.  And that's what he should be held accountable for because it was a terrible thing to extort those young boys.

And just so maybe you'll feel better, I think the

prosecutor is confusing private chat rooms with pictures that are all over the open internet.  There's no showing that more than a couple of people, Patrick and maybe this guy Karucem who was arrested and his computer was seized, who has also used the name Vanyher, was seized by the Italian Police, had these pictures.  So they're not all over the internet.  But that's not an excuse.  He shouldn't have extorted the boys.

Ladies and gentlemen, the Judge is going to send you, after my colleagues have the last word, I don't have the last word, so I'd ask you to listen to them and say, "What would that short, fat, balding lawyer answer them?"

After they have their last word, the Judge is going to instruct you on the law.  I'd ask you to go back into the jury room, find Patrick either not guilty of all the charges because you don't think that you can consider the evidence or if you find that legally and properly you should consider the evidence, then I'd ask you to only convict him of the extortion counts.

And I thank you.

### *CLOSING ARGUMENT*

**MR. EMERY:**  Good afternoon.  Defense counsel seems to say that these pictures were not meant for the defendant's personal sexual gratification.  You saw the evidence.  Without a doubt, the defendant wanted those pictures because he got off

on it. In his own words the defendant said this to Frosty: "I want a mirror, geez, with balls or just like you said with balls, too." Those words, without a doubt, shows the defendant's intent. Those pictures he produced from those boys were meant to incite lust. They were for the defendant's personal own sexual gratification and he didn't stop there. He shared with others so they could be sexually gratified too.

Now, you know, this case could have been really short, and I'll admit that. I probably could have stood up here and just showed you these chats from Jackson Cook with the defendant, Garrett and Mason, and sat down. But I didn't. The Government didn't. Why didn't we?

We presented all this evidence to you so that you could see the entire picture of what the defendant did. The defendant and his defense counsel portrays this as child's play. Think about that.

You sat throughout this whole trial this whole week. Was it child's play? Clearly it was not. Look at the extremes the defendant went to. His Google searches. Carly Manning, Ask.FM. He was doing recon on these boys. He was tricking them. He was reaching out to them pretending to be a 14-year-old cheerleader in Florida. Why? Because he wanted those photographs. He wanted those photographs of those boys's penises because that's what he wanted for his own personal sexual gratification.

Definitely not child's play.  Think about why we're here.  When you go back in the jury room -- if I could have the ELMO, Your Honor.

THE COURT:  (Complies).

MR. EMERY:  Think about why we're here.  Jackson Cook, 13 years old.  Garrett Frost.

Your Honor, it's not on the jury screen.  Is it on now?

JUROR:  Now it is.

MR. EMERY:  Now it is.  Okay.  Jackson Cook.  That's why we're here, 13 years old.  Garrett Frost, 13 years old.  Mason Freeman, 13 years old.  We're not here because of child's play.  We are here because of what the defendant did, because with every click of the camera, with every Kik message he sent, he robbed those boys of their innocence.

And why did he want their innocence?  He wanted their innocence for his own personal sexual gratification.  Because it just didn't stop there.  It wasn't just enough for the boys to send the picture of their genitals.  He wanted face.  Remember that?

Why did he want face?  Because he wanted to put those boys in his trophy cases.  He wanted to put those boys in this trophy case, this trophy case, and so on and so on.  Why?  So that any time he wanted, 24/7, he could go back to those pictures.

Just like how we had his Dell organized.  The screen shots, take a look at these screen shots.  Right next to his resume, when he's doing his resume for college, for his job, he has separate thumb nails so he could quickly toggle over while he's doing his resume so he can look at his boys.  You heard his words.  "These are my boys."

He used the words after he got picture of boys, "young, hot, my boys."  And the defendant, he had a second chance when Special Agent Schwartzenberger came to change his life.  Did he?  No.

And you know who didn't have a second chance?  Mason, Garrett.  They'll never have a second chance.  What they sent the defendant will be out there forever following them wherever they go.  The defendant simply didn't learn his lesson the first time.

And just remember the chat from Garrett.  "I know, I'm sorry, please don't put them on Insta.  I'm begging, I'll send one more, but please delete them."  One word the defendant said, capital letters, "SEND."  He wanted those pictures for his sexual gratification.

And based on all this overwhelming evidence, you can see the length that the defendant went to for his own personal sexual gratification and sexual gratification of others, and based on that we ask that you find the defendant guilty on all counts.

Thank you.

## *INSTRUCTIONS*

**THE COURT**: Members of the jury, it is my duty to instruct you on the rules of law that you must use in deciding this case. After I have completed these instructions, you will go to the jury room to begin your discussions, what we call your deliberations.

You must decide whether the Government has proved the specific facts necessary to find the Defendant guilty beyond a reasonable doubt.

Your decision must be based only on the evidence presented here. You must not be influenced in any way by either sympathy for or prejudice against the Defendant or the Government.

You must follow the law as I explain it, even if you do not agree with the law, and you must follow all of my instructions as a whole. You must not single out or disregard any of the Court's instructions on the law.

The indictment or formal charge against the defendant is not evidence of guilt. The law presumes every defendant is innocent. The defendant does not have to prove his innocence or produce any evidence at all. The Government must prove guilt beyond a reasonable doubt. If it fails to do so, you must find the defendant not guilty.

The Government's burden is heavy, but it does not have to prove a defendant's guilt beyond all possible doubt. The Government's proof only has to exclude any "reasonable doubt" concerning the defendant's guilt.

A "reasonable doubt" is a real doubt, based on your reason and common sense after you have carefully and impartially considered all the evidence in the case.

"Proof beyond a reasonable doubt" is proof so convincing that you would be willing to rely and act on it without hesitation and in the most important of your own affairs. If you are convinced that the defendant has been proved guilty beyond a reasonable doubt, say so. If you are not convinced, say so.

As I said before, you must consider only the evidence that I have admitted in the case. Evidence includes the testimony of witnesses and the exhibits admitted. But anything the lawyers say is not evidence and is not binding on you.

You should not assume from anything I have said that I have any opinion about any factual issue in the case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision about the facts.

Your own recollection and interpretation of the evidence is what matters.

In considering the evidence, you may use reasoning and

common sense to make deductions and reach conclusions.  You should not be concerned about whether the evidence is direct or circumstantial.

"Direct evidence" is the testimony of a person who asserts that he or she has actual knowledge of a fact, such as an eyewitness.

"Circumstantial evidence" is proof of a chain of facts and circumstances that tend to prove or disprove a fact.  There is no legal difference in the weight you may give to either direct or circumstantial evidence.

When I say you must consider all the evidence, I do not mean that you must accept all the evidence as true or accurate.  You should decide whether you believe what each witness had to say, and how important that testimony was.  In making that decision you may believe or disbelieve any witness, in whole or in part.  The number of witnesses testifying concerning a particular point does not necessarily matter.

To decide whether you believe any witness, I suggest that you ask yourself a few questions:

Did the witness impress you as one who was telling the truth?

Did the witness have any particular reason not to tell the truth?

Did the witness have a personal interest in the outcome of the case?

Did the witness seem to have a good memory?

Did the witness have the opportunity and ability to accurately observe the things he or she testified about?

Did the witness appear to understand the questions clearly and answer them directly?

Did the witness's testimony differ from other testimony or other evidence?

You should also ask yourself whether there was evidence that a witness testified falsely about an important fact. And ask whether there was evidence that at some other time a witness did something, or didn't say or do something, that was different from the testimony the witness gave during the trial.

But keep in mind that a simple mistake doesn't mean a witness wasn't telling the truth as he or she remembers it. People naturally tend to forget some things or remember them inaccurately. So, if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception. The significance of your decision may depend on whether the misstatement is about an important fact or about an unimportant detail.

A defendant has a right not to testify. But since the defendant did testify, you should decide whether you believe the defendant's testimony in the same way as that of any other witness.

When scientific, technical, or other specialized knowledge might be helpful, a person who has special training or experience in that field is allowed to state an opinion about the matter. But that does not mean you must accept the witness's opinion. As with any other witness's testimony, you must decide for yourself whether to rely upon the opinion.

If the Government offers evidence that a defendant made a statement or admission to someone after being arrested or detained, you must consider that evidence with caution and great care.

You must decide for yourself, first, whether the defendant made the statement, and, second, if so, how much weight to give to it. To make these decisions, you must consider all the evidence about the statement, including the circumstances under which it was made.

During the trial, you heard evidence of acts done by the defendant on other occasions that may be similar to acts the defendant is currently charged with. You must not consider any of this evidence to decide whether the defendant committed the acts charged now. But you may consider this evidence for other very limited purposes.

If other evidence leads you to decide beyond a reasonable degree that the defendant committed the acts, the charged acts, you may consider evidence of similar acts done on other occasions to decide whether the defendant had the state

of mind or intent necessary to commit the crime charged in the superseding indictment, the defendant had a motive or the opportunity to commit the acts charged in the superseding indictment, the defendant acted according to a plan or to prepare to commit a crime, or the defendant was identified as the person who committed the crime charged in the superseding indictment.

In addition, some of the people who may have been involved in these events are not on trial. This does not matter. There is no requirement that all members of the conspiracy or all co-codefendants be charged and prosecuted in one proceeding.

You may not draw any inference, favorable or unfavorable, toward the United States or the defendant on trial from the fact that certain persons named in the superseding indictment were not on trial in this proceeding. The fact that these persons were not on trial here must play no part in your deliberations. It should be of no concern to you and you should not speculate as to the reason for their absence. Their absence should not influence your verdict with respect to the defendant on trial at this time. You must base your verdict as to this particular defendant solely on the evidence against him.

You have been permitted to take notes during the trial. Most of you, perhaps all of you, have taken advantage

of that opportunity.

You must use your notes only as a memory aid during deliberations.  You must not give your notes priority over your independent recollection of the evidence.  And you must not allow yourself to be unduly influenced by the notes of other jurors.

I emphasize that notes are not entitled to any greater weight than your memories or impressions about the testimony.

The superseding indictment charges sixteen separate crimes, called "counts," against the defendant.  Each count has a number.  You will be given a copy of the superseding indictment to refer to during your deliberations.

I will explain the law governing those substantive offenses now.

It is a Federal crime for any person to employ, use, persuade, induce, entice, or coerce a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of the conduct, if the visual depiction was produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means, or the visual depiction has been transported or transmitted using any means or facility of interstate or foreign commerce.

The defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

1) an actual minor, that is, a real person who was less than 18 years old, was depicted;

2) the defendant employed, used, persuaded, induced, enticed, or coerced the minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of the conduct; and.

3) either (a) the defendant knew the visual depiction was produced using materials that had been mailed, shipped, or transported in interstate or foreign commerce; or (b) the visual depiction was actually transported or transmitted using any means or facility or foreign commerce.

The term "interstate or foreign commence" means the movement of a person or property from one state to another or from one state to another country.

The term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.  It is not necessary for the Government to prove that the defendant knew that the visual depiction or materials used to produce the visual depiction had moved in interstate or foreign commerce. The internet is an instrumentality of interstate commerce.

The term "minor" means any person who is less than 18 years old.

The term "producing" means producing, directing, manufacturing, issuing, publishing, or advertising.

The term "computer" means an electronic, magnetic, optical, electrochemical, or other high-speed data-processing device performing logical, arithmetic, or storage functions, and includes any data-storage facility or communications facility directly related to or operating in conjunction with that device, but the term does not include an automated typewriter or typesetter, a portable hand-held calculator, or similar devices that are limited in function to only word-processing or mathematical calculations.

The term "visual depiction" includes undeveloped film and videotape, and data stored on a computer disk or by any other electronic means that can be converted into a visual image.

The term "sexually explicit conduct" means actual or simulated:

Sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;

Bestiality;

Masturbation;

Sadistic or masochistic abuse; or

Lascivious exhibition of the genitals or pubic area of any person.

"Lascivious exhibition" means indecent exposure of the genitals or pubic area, usually to incite lust.  Not every

exposure is a lascivious exhibition.

To decide whether a visual depiction is a lascivious exhibition, you must consider the context and setting in which the genitalia or pubic area is being displayed.  Factors you may consider include:

The overall content of the material;

Whether the focal point of the visual depiction is on the minor's genitalia or pubic area;

Whether the setting of the depiction appears to be sexually inviting or suggestive, for example, in a location or in a pose associated with sexual activity;

Whether the minor appears to be displayed in an unnatural possess or in inappropriate attire;

Whether the minor is partially clothed or nude;

Whether the depiction appears to convey sexual coyness or an apparent willingness to engage in sexual activity; and

Whether the depiction appears to have been designed to elicit a sexual response in the viewer.

A visual depiction need not have all these factor to be a lascivious exhibition.

Note that these instructions I just gave you on the terms "interstate" or "foreign commerce," "State," "minor," "computer," "visual depiction," "sexually explicit conduct," and "lascivious exhibition" apply only to Counts 1, 2, 3, 4, 7, 8, 9, 10, 11, 12, 13, 15 and 16 of the superseding indictment.

They do not apply to Counts 4, 6 and 14 of the superseding indictment.

It is a federal crime to knowingly receive or distribute any visual depiction using any means or facility of interstate and foreign commerce or that has been shipped or transported in or affecting interstate or foreign commerce, by any means including by computer, when the visual depiction was produced by using a minor engaging in sexually explicit conduct and depicts the conduct.

The defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

The defendant knowingly received or distributed a visual depiction:

The depiction was received or distributed using any means or facility of interstate or foreign commerce, or (b), was shipped or transported in or affecting interstate or foreign commerce, by any means, including by computer;

Producing the visual depiction involved using a minor engaged in sexually explicit conduct;

The depiction is a minor engaged in sexually explicit conduct; and

The defendant knew that at least one performer in the visual depiction was a minor and knew that the depiction showed the minor engaged in sexually explicit conduct.

To "distribute" something simply means to deliver or transfer possession of it to someone else, with or without any financial interest in the transaction.

To "receive" something simply means knowingly to accept or take possession of something. Receipt does not require proof of ownership.

It is a Federal crime to knowingly send in interstate or foreign commerce a threat to damage another person's property or reputation.

The defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

First, the defendant knowingly sent a message in interstate or foreign commerce containing a true threat to damage the reputation of another; and.

Two, the defendant did so with the intent to extort something of value to the defendant.

To transmit something in "interstate commerce" means to send it from a place in one state to a place in another state.

To transmit something in "foreign commerce" means to send it from a place in the United States or anyplace outside the United States.

A "true threat" is a serious threat, not idle talk, a careless remark, or something said jokingly, that is made under

the circumstances that would lead a reasonable person to believe that the defendant intended to injure another person.

To act with "intent to extort" means to act with the purpose of obtaining money or something of value from someone who consents because of fear or because of the wrongful use of actual or threatened force or violence.

A "thing of value" is anything that has value to the defendant, whether it was tangible or not.

The heart of the crime is intentionally sending a message in interstate or foreign commerce to extort something of value.  The Government does not have to prove that the defendant intended to carry out the threat or succeeded in obtaining the money or any other thing of value.

It is a Federal crime to knowingly possess a matter containing any visual depiction using any means or facility of interstate and foreign commerce or that was produced using materials that had been so shipped or transported, by any means, including by computer, when the visual depiction was produced by using a minor engaging in sexually explicit conduct and depicts the conduct.

The defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

The defendant knowingly possessed a matter containing a visual depiction;

Two, the depiction had been shipped or transported using any means or facility of interstate or foreign commerce, or (b) was produced using materials which had been so shipped or transported, by any means, including by computer;

Three, producing the visual depiction involved using a minor engaged in sexually explicit conduct;

Four, the depiction is of a minor engaged in sexually explicit conduct; and.

Five, the defendant knew that at least one performer in the visual depiction was a minor and knew that the depiction showed the minor engaged in sexually explicit conduct.

The defendant is charged in two counts with possessing a matter which contained a visual depiction that involved a prepubescent minor or a minor who had not attained twelve years of age.  But you may find the defendant guilty of the crime even if the depiction did not involve such a minor.  So if you find the defendant guilty, you must also unanimously agree on whether the depiction involved a prepubescent minor or a minor who had not attained twelve years of age and specify the same on the verdict form.

It is a Federal crime to knowingly alter, destroy, conceal, or cover up a tangible object with intent to impede, obstruct, or influence a Federal investigation.

The defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable

doubt:

One, the defendant knowingly;

Two, altered, destroyed, or covered up a tangible object; and.

Three, the defendant did so with intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States, or in contemplation of or relation to any such matter.

A "tangible object" is an object one can use to record or preserve information.

The law does not require that an investigation be pending or that the defendant be aware of one when he falsifies the record. Instead, the statute only requires that the falsification be done with intent to impede an investigation or in contemplation of that investigation.

The law recognizes several kinds of possession. A person may have actual possession, constructive possession, sole possession, or joint possession.

"Actual possession" of a thing occurs if a person knowingly has direct physical control of it.

"Constructive possession" of a thing occurs if a person does not have actual possession of it, but has both the power and the intention to take control over it.

"Sole possession" of a thing occurs if a person is the

only one to possess it.

"Joint possession" of a thing occurs if two or more people share possession of it.

The term "possession" includes actual, constructive, sole, and joint possession.

You will see that the superseding indictment charges that a crime was committed "on or about" a certain date.  The Government does not have to prove that the crime occurred on an exact date.  The Government only has to prove beyond a reasonable doubt that the crime was committed on a date reasonably close to the date alleged.

The word "knowingly" means that an act was done voluntarily and intentionally and not because of a mistake or by accident.

Each count of the superseding indictment charges a separate crime.  You must consider each crime and the evidence related to it separately.  If you find the defendant guilty or not guilty of one crime, that must not affect your verdict for any other crime.

I caution you that the defendant is on trial only for the specific crimes charged in the superseding indictment.  You are here to determine from the evidence in this case whether the defendant is guilty or not guilty of those specific crimes.

You must never consider punishment in any way to decide whether the defendant is guilty.  If you find the

defendant guilty, the punishment is for the Judge alone to decide later.

Your verdict, whether guilty or not guilty, must be unanimous, in other words, you must all agree. Your deliberations are secret, and you will never have to explain your verdict to anyone.

Each of you must decide the case for yourself, but only after fully considering the evidence with the other jurors. So you must discuss the case with one another and try to reach an agreement. While you are discussing the case, do not hesitate to reexamine your own opinion and change your mind if you become convinced that you were wrong. But do not give up your honest beliefs just because others think differently or because you simply want to get the case over with.

Remember that, in a very real way, you are judges, judges of the facts. Your only interest is to seek the truth from the evidence in the case.

When you go to the jury room, you should choose one of your members to act as your foreperson. The foreperson will direct your deliberations and will speak for you here in court.

A verdict form has been prepared for your convenience.

Take the verdict form with you to the jury room. When you have all agreed on the verdict, your foreperson must fill in the form, sign it, date it, and carry it. Then you will return it to the courtroom.

If you wish to communicate with me at any time, please write down your message or question and give it to the marshal. The marshal will bring it to me and I will respond as promptly as possible, either in writing or by talking to you in the courtroom.  But I caution you not to tell me how many jurors have voted one way or the other at that time.

So here is the verdict form.  It has the style of the case, United States of America versus Patrick Killen, Junior. Verdict form.  We, the jury, find as to Count 1, there is the word guilty, a line next to it and next to that there is another column, not guilty, and a line next to those words.

And when you reach a unanimous agreement as to each count, you just have the foreperson put a check or an X next to the line that corresponds to your unanimous verdict, and you go each through each count like that, and then, you remember, I gave you the instruction regarding Count 12 on the prepubescent charge, so there is a question there as to whether the individual was a prepubescent minor who had not attained 12 years of age or no prepubescent minors who had not attained 12 years of age.

And then at the end you have your foreperson sign it and date it and let the marshal know and we'll bring you back into court to read your verdict.  Okay.  And I will send that copy of the instructions that I've just read to you as well.

Anything from the lawyers before we have the jury

retire?

MR. EMERY:  Nothing from the Government, Your Honor.

MR. SCHWARTZ:  Nothing from the defendant.

THE COURT:  Thank you.  Isabel Monsibaez and Israel Fernandez-Garcia, if the two of you will stay behind, the other jurors can retire to begin their deliberations.

THE COURT SECURITY OFFICER:  All rise for the jury.

(Thereupon, the jury was escorted out of the courtroom.)

THE COURT:  Folks, have a seat.  You were selected as alternates.  We do lose jurors during the course of the trial, as you know we lost two jurors early on in the case.  By law we are only allowed to have 12 jurors deliberate.  So we can't have you participate at this point in the deliberations and that may come as a relief to you or that may be a disappointment after having to sit through this and having to render a verdict, but, in any case, those are the rules.  It doesn't change the fact that we very much appreciate your willingness to serve.

I know jury service can be difficult and impose an imposition on you and your family and your work lives.  It doesn't take away from the fact that I was very grateful for the attention that you gave to the case as the evidence was presented and I would ask you not to talk about the case with anyone until the verdict is reached because if it does happen

that during the course of the deliberations you could lose a juror or two, in which case we'll be in touch with you and ask you to return and start deliberations with the jury again.

So if you're interested in the outcome of the case, feel free to call our office chambers and we'll let you know what the status of the deliberations are and what the verdict was, when the case finally concludes.

But with that and our thanks, it's 20 minutes to 5 o'clock on Friday afternoon, you are welcome to go.  And this concludes your service.  This is your second week, right?

JUROR:  Yes.

THE COURTROOM DEPUTY:  Do you have anything in the jury room that you need to get?

JUROR:  No, just some water.

THE COURTROOM DEPUTY:  And I have your attendance sheets.

THE COURT:  Okay, if you can get with the courtroom deputy.

THE COURTROOM DEPUTY:  I'll be right back for the evidence.

THE COURT:  Gather up the exhibits before we send them on back.  And we'll have you stick around in the courtroom and until we hear something from the jury, see what they want to do, see if they want to deliberate after 5:00 or not, if they want to go home and come back Monday, we'll just see what they

say.

MR. SCHWARTZ:  For the record, we checked the exhibits and those are that on the table are those that are admitted into evidence.

THE COURT:  Good.  Good.  All right.  Thank you.

(Thereupon, a brief recess was taken.)

THE COURT:  So we have got a note from the jury  that says, "Count 12, everything for February 11th.  Tye Goodine, 7-10-2015, 5:46."

MR. SCHWARTZ:  And thanks to the help of my colleagues, since I have packed up my indictment, that seems like a possession count of child pornography on that day.

THE COURT:  Count 12 is on February 11th, possessed an Apple MacBook Pro computer that had visual depictions, transport, interstate commerce.

MR. SCHWARTZ:  So I don't know if they're asking for the evidence -- I would suggest, although officially my colleagues might disagree, that we have to bring them in and ask or send them a note back saying, "What do you mean or what are you looking for?"

MR. EMERY:  I would agree with just sending a note back and asking for a clarification.

MR. SCHWARTZ:  But if Your Honor wouldn't mind, I'd like my client to be here before we send it back to them.

THE COURT:  Okay.  All right.  I mean, this is like a

jeopardy question.

MR. SCHWARTZ:  It's the answer.

THE COURT:  The answer and --

MR. SCHWARTZ:  We need the question.  (Laughter).

THE COURT:  What I propose is sending back the response from the Court, "Dear Jurors, I am in receipt of the note.  Can you please clarify what your question is regarding Count 12?"

MR. EMERY:  Agreed, Your Honor.

MR. SCHWARTZ:  I just want my client --

THE COURT:  Right, right.  We won't do it.  I just want to see if that sounds reasonable.

MR. SCHWARTZ:  Your Honor, may we note for the record that the defendant is present in the courtroom.

THE COURT:  Okay.  And have you had an opportunity to discuss the question and the answer?

MR. SCHWARTZ:  I've told him that -- I've read him the note and I've told him that you're going to send a note back basically asking what do they mean by that.

THE COURT:  All right.  So we'll go ahead and do that and we'll make this Court's Exhibit Number 2.

(Thereupon, there was a brief pause.)

THE COURT:  Okay.  So this is the note.  "Where," I think it means were but I'll read it as, "Where there any visual image of any prepubescent boys on the MacBook Pro and

which exhibits can we find those visual images on?"

MR. SCHWARTZ: Your Honor --- -

THE COURT: Yes.

MR. SCHWARTZ: I think that -- I think the Government may agree that we should tell them this, they have to rely on their memory and on the exhibits they have. If they want a laptop computer, they can have it but other than that, they should rely on what they heard in court.

THE COURT: Well, when you say if they want a laptop computer, they have laptop computers there but they're the laptops that are in evidence. Are you saying in addition to that?

MR. SCHWARTZ: The Government put in some disks in evidence, some CDs.

THE COURT: Okay. And so they relate to --

MR. SCHWARTZ: Count 12.

THE COURT: Well, this one doesn't say Count 12 on it, so we have to make some inferences on it. But is there an answer to this question? I mean before we --

MR. WIDLANSKI: The answer is yes, we put that evidence in.

THE COURT: On the MacBook Pro?

MR. WIDLANSKI: Yes, we put that in yesterday and today, I believe.

THE COURT: And are there exhibits that relate to

that?

MR. WIDLANSKI: There's actually both the CDs that relate to that as well as --

MR. EMERY: Your Honor, Government's 48A which we played today when the defendant was on the stand, as well as --

THE COURT: This count is the count that has the additional question?

MR. WIDLANSKI: Yes, Your Honor. Twelve and 15 both have the additional question.

MR. SCHWARTZ: Your Honor, I could be wrong and I often am, but I thought what they played came from the GigaTribe downloads; is that correct?

MR. WIDLANSKI: From the MacBook Pro. We played it from the GigaTribe, from the MacBook and GigaTribe.

MR. SCHWARTZ: From the shared folder, yes.

MR. WIDLANSKI: From both. I think that -- I don't think it's the Court's job to identify what evidence says what. It's up to the jury to decide that and that would be the position that we take, Judge.

THE COURT: Okay. And what's the Government's position?

MR. EMERY: Your Honor, we would agree initially with what Mr. Schwartz says as far as responding that they should rely on their memories and the exhibits that were admitted and that we do have a laptop available to play any disks that they

so wish.

THE COURT: Okay. Well, let's bring the jury out and tell them that.

(Thereupon, the jury was escorted out of the courtroom.).

THE COURT: Have a seat, everyone. Ladies and gentlemen, I thought I'd have you come out here so I can respond to your question by speaking to you rather than writing a note. I thought it might be more helpful.

Your question is were there any visual images of any prepubescent boys on the MacBook Pro and what exhibits can we find those visual images on, so I really cannot answer that question directly, I'm somewhat constrained in how I am permitted to respond to your question because I really can't comment on the evidence. You have to rely on your collective recollection of what the testimony was, including the exhibits that have been admitted into evidence.

If you need a computer to view any of those exhibits, we can make a computer available to you, if you find that necessary. Anything -- is that satisfactory?

MR. EMERY: That's fine with the Government, Your Honor.

MR. SCHWARTZ: Yes, Your Honor.

THE COURT: Okay. All right. So with that, you can rely on the collective recollection and the evidence that has

been admitted.  Thank you.

(Thereupon, the jury was escorted out of the courtroom.)

THE COURT:  And we'll be in recess.

(Thereupon, a brief recess was taken.)

THE COURT:  So we got a note from the jury that says, "What happens if we're not unanimous on one count?"

MR. EMERY:  I would write back, "You need to continue deliberating."

MR. SCHWARTZ:  I would have a different view.  I would say if they're unanimous on 15 out of 16 counts I would suggest they might want to return a verdict on those counts and forget about it.  I don't know.

THE COURT:  I don't know why you're laughing, it sounds pretty reasonable from my standpoint.  But let's play this out.  If we took the verdicts on the counts that they had reached a unanimous verdict on, would you want to know those verdicts and my thought process is that, you know, let's consider the possibility if there were some guilty counts, some not guilty counts, that's one possibility.  The other possibilities would be all not guilty counts.

MR. SCHWARTZ:  I'll vote for that.

THE COURT:  And the third possibility would be all guilty counts, right?  Those are the three pockets.

MR. SCHWARTZ:  Correct.

**THE COURT:** Now if we were all not guilty, but with the exception of one, my guess is the Government would say we want a verdict, we want them to continue deliberating on that one verdict, on that one count, you would move for a mistrial. And I would probably say keep deliberating until we got to a point where we didn't think we could get to a verdict, give them an Allen charge or whatever we needed to do.

The other extreme is they come back and they have guilty verdicts on 15 of the counts, then we would turn to the Government and say, what do you want to do?

Now, maybe it would depend on what count we're talking about, but if they got 14 out of 15 counts, then I might still say, continue to deliberate, in which case you would move for a mistrial, in which case I would probably be more inclined to grant it, and we can retry that if the Government really wants to go after them, they go back and they talk to their supervisors and whoever they are and they say, "We're going to have a whole new trial on this particular count," who knows what it is, destruction of evidence or prepubescent, they couldn't agree on prepubescent, or I'm just thinking of possibilities.

And then there's a mixed bag of guilty and not guilty. And, you know, for sentencing purposes I'm not quite sure what difference it's going to make, depends on which counts, but I just want to kind of -- those are the things that I see out

there, share that with you if it helps in whatever position you want to take.

MR. SCHWARTZ:  Judge, my view would be if you're going to have them to continue to deliberate, then I wouldn't want the verdict to be returned on any counts.  I'd just say go back and deliberate and continue.  Because in the course of the deliberations people could point out to other people and verdicts could change.

If you were going to take the verdict on 15 counts and just say, to quote some of my old New York clients, forget about it, one of the counts, then I would say take the verdict.  But if the Government wants them to continue to deliberate on the one count that they're still hung on, then I'd say don't take any verdicts.

THE COURT:  Well, when you say forget about it though, I mean, it would just be declaring a mistrial.

MR. SCHWARTZ:  Correct.

THE COURT:  It would mean that we would be, at least potentially, in a position of having to retry that one count.

MR. SCHWARTZ:  I can't -- you know, I've never been able to predict what the Government will do or what a jury will do, but I should think if there was a conviction on 15 of the 16 counts, I don't know that these nice folks would want to try it again.  If there was an acquittal on 15 of the 16 counts, then they may want to try it again, but that's their decision.

**THE COURT:**  When you said forget about it, I didn't want to misinterpret that, that that count would go away, it doesn't go away.

**MR. SCHWARTZ:**  I knew that, Judge.

**THE COURT:**  Well, what does the Government want to do here?

**MR. EMERY:**  I mean, I think at this point we would defer to the defense as far as what they want to do.  If the defense is inclined to bring them out and hear -- yeah, and hear what they have to say about 15 of the 16, and then decide where we go --

**THE COURT:**  But you want to know what those verdicts are, is that what you're saying?

**MR. SCHWARTZ:**  Well, no.  If there's a possibility of continuing, I don't think we should know what those verdicts are.  I think they should go back and continue to deliberate because, again, those verdicts may change on the counts that they now have reached a decision on.

If, on the other hand, we're going to accept the verdicts, then I don't think they should continue to deliberate.

**THE COURT:**  So -- are you asking to take the verdicts and declare a mistrial on the count that they have not had a verdict or unanimous verdict?

**MR. SCHWARTZ:**  I want to confer with my client, but

that would be my predisposition.

THE COURT:  Okay, go ahead.

MR. SCHWARTZ:  Your Honor, at this point if they have a verdict on 15 counts, I would say take that verdict and mis-try the 16th count.

THE COURT:  What does the Government say?

MR. EMERY:  Judge, I mean, I think at first we would suggest giving the jury an Allen charge first.

THE COURT:  Giving the jury an Allen charge.  What's the defense response to the Allen charge request?

MR. SCHWARTZ:  Well, if you're going to tell them to continue to deliberate I think it's too early for an Allen charge, I think I would tell them to go back and continue to deliberate on that count.

THE COURT:  Okay.  Back to the Government.

MR. EMERY:  Yeah, Judge.  If it's too early for an Allen charge, then it's probably -- I mean, it's too early to declare a mistrial then.

THE COURT:  So you just want me to give them an instruction to continue to deliberate?

MR. SCHWARTZ:  That's fine, Judge.

MR. EMERY:  Government agrees.

THE COURT:  Okay.  So what do you want me to tell them what happens if we're not unanimous on one count?

MR. SCHWARTZ:  I think you should say something --

Judge.  You know better than I, but I would suggest saying something like continue to deliberate to see if you can reach a unanimous decision on that count.

MR. WIDLANSKI:  Agreed.

THE COURT:  You know what happens if they are not unanimous on one count?  We're not giving them the answer to the question, we're dodging it is what you want me to tell them?

MR. EMERY:  At this point, yes, Your Honor.

MR. SCHWARTZ:  Of course, Your Honor could order pizza.

THE COURT:  We could.  "Dear jurors, I would encourage you to continue your deliberations in order to reach a unanimous verdict on all counts."

MR. EMERY:  That's fine with the Government, Your Honor.

THE COURT:  Okay with the --

MR. SCHWARTZ:  I think in light of the Government's position, that's a reasonable stand.

THE COURT:  Okay.  You've had an opportunity to discuss this with your client?

MR. SCHWARTZ:  Yes, Judge.

THE COURT:  Okay.  We'll make this Court's Exhibit Number 6, question number 5.  Okay.  We will be in recess.

(Thereupon, a brief recess was taken.)

**THE COURT:** Okay, so we got a note that from the jury that we have made a decision.  So we're just waiting on the defendant.

**MR. SCHWARTZ:** We couldn't have predicted that this would have happened that way, could we?

**THE COURT:** Right.  Right.  Ready?

(Thereupon, the jury was brought into the courtroom.)

**THE COURT:** All right.  Good evening, ladies and gentlemen.  I understand you have reached a verdict now on all counts, so at this time I'll ask you to hand your verdict form up the courtroom deputy and I'll ask the courtroom deputy to publish the verdict.

**FOREPERSON:** (Complies).

**THE COURTROOM DEPUTY:** Members of the jury, please rise and harken to your verdict.

### *VERDICT*

**THE COURTROOM DEPUTY:** In the case of the United States of America versus Patrick Killen, Junior, Verdict Form.

We, the jury, find as to Count 1, guilty.  As to Count 2, guilty.  As to Count 3, guilty.  As to Count 4, guilty.  As to Count 5, guilty.  As to Count 6, guilty.  As to Count 7, guilty.  As to Count 8, guilty.  As to Count 9, guilty.  As to Count 10, guilty.  As to Count 11, guilty.  As to Count 12, guilty.

We, the jury, having found the defendant guilty of the offense charged in Count 12, further find with respect to that count that he possessed a visual depiction that involved the following:  Letter A, a prepubescent minor who had not attained the age of 12 is checked.

We, the jury, as to Count 13, guilty.  We, the jury, find as to Count 14, not guilty.  We, the jury, as to Count 15, guilty.

We, the jury, having found the defendant guilty of the offense charged in Count 15, further find with respect to that count that he possessed a visual depiction that involved the following:  And next to letter A, a prepubescent minor who had not attained the age of 12 years old is checked.

We, the jury, find as to Count 16, guilty.

So say we all, Tye Goodine, foreperson of the jury, dated July 10th, 2015.

THE COURT:  Okay.  Please have a seat, ladies and gentlemen, and please poll the jury.

THE COURTROOM DEPUTY:  Members of the jury, as I ask you the following question, please answer yes or no.

Is the verdict as read your true verdict:

Juror Number 1?

JUROR 1:  Yes.

THE COURTROOM DEPUTY:  Juror Number 2?

JUROR 2:  Yes.

THE COURTROOM DEPUTY:  Number 3?

JUROR 3:  Yes.

THE COURTROOM DEPUTY:  Number 4?

JUROR 4:  Yes.

THE COURTROOM DEPUTY:  Number 5?

JUROR 5:  Yes.

THE COURTROOM DEPUTY:  Number 6?

JUROR 6:  Yes.

THE COURT:  Number 7?

JUROR 7:  Yes.

THE COURTROOM DEPUTY:  Number 8?

JUROR 8:  Yes.

THE COURTROOM DEPUTY:  Number 9?

JUROR 9:  Yes.

THE COURTROOM DEPUTY:  Number 10?

JUROR 10:  I'm Juror Number 12.

THE COURTROOM DEPUTY:  Okay.

THE COURT:  Is your verdict yes or no?

JUROR 12:  Yes.

THE COURTROOM DEPUTY:  Number 13 and Number 14?

JUROR 13:  Yes.

JUROR 14:  Yes.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  Okay.  Folks, this concludes your jury service and I know it's 7:20 on Friday, the 10th, and I don't

want to hold you up any longer, I know you want to get home.

Let me leave you with these parting comments.  First of all, again, thank you for your jury service, you're willingness to serve as jurors.  I hope you found it to be an interesting and educational case.  These are difficult cases to try.  But it was obvious to me that you gave your -- the case its careful consideration as the evidence was presented.  I think you gave it your serious consideration as well during the course of your deliberations.

When you leave here tonight, I heard the same evidence that you heard.  There's substantial evidence to support your verdict, so you should have every confidence in the correctness of your verdict and not have any doubts or hesitation about its correctness, but with that and our thanks you're free to go and the courtroom deputy will escort you out.

(Thereupon, the jury was escorted out of the courtroom.)

**THE COURT:**  Mr. Killen, the jury has returned verdicts of guilty as to all counts with the exception of Count 14. According to the Court, I hereby adjudicate you guilty of all of those counts and adjudicate you not guilty as to Count 14.

The next step in these proceedings is the preparation of a presentence investigation report.  You and your attorney on your behalf will be asking you for information for the probation officer to prepare the presentence investigation

report.  You'll also have an opportunity to read and file any objections to the report before the sentencing hearing, and at the time of the sentencing hearing, you and your attorney on your behalf will be given an opportunity to address the Court with respect to the sentence to be imposed.

We'll set sentencing for September 24th, at 2:00 p.m.

Is there anything further that we need to take up?

**MR. SCHWARTZ:**  Your Honor, within the appropriate time frame, I'll be making a motion for a judgment of acquittal. Notwithstanding the verdict, I'll make one orally now, but I will be filing a formal.

**THE COURT:**  Okay.  I expect to receive that.  And the exhibits are -- did you have any exhibits yourself?

**MR. SCHWARTZ:**  No, we didn't introduce any exhibits.

**THE COURT:**  So the Government will retain custody of the exhibits for the record?

**MR. EMERY:**  Yes, sir.

**THE COURT:**  Anything else?

**MR. EMERY:**  No.  Thank you, Your Honor.

**THE COURT:**  Thank you, and gentlemen, well tried on both sides.  I appreciate it.

**MR. EMERY:**  Thank you, Your Honor.

(Thereupon, the above portion of the trial was concluded.)

*          *          *

**C E R T I F I C A T E**

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

01/26/2016

DATE COMPLETED          GIZELLA BAAN-PROULX, RPR, FCRR